IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION

| | | |
|---|---|---|
| **PATRICK HENRY MURPHY, JR.,** | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | |
| **BRYAN COLLIER,** Executive Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Huntsville, Texas | § | |
| | § | Civil No. 4:19-cv-01106 |
| **LORIE DAVIS,** Director, Texas Department | § | ***CAPITAL CASE*** |
| of Criminal Justice, Correctional Institutions | § | |
| Division, Huntsville, Texas | § | |
| | § | |
| **BILLY LEWIS,** Warden, Texas Department | § | |
| of Criminal Justice, Huntsville Unit, | § | |
| Huntsville, Texas | § | |
| | § | |
| | § | |
| *Defendants*. | § | |

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
## AND MEMORANDUM IN SUPPORT

David R. Dow
Texas Bar No. 06064900
University of Houston Law Center
4604 Calhoun Rd.
Houston, TX  77204-6060
Tel. (713) 743-2171
Fax (713) 743-2131
Email ddow@central.uh.edu

Jeffrey R. Newberry
Texas Bar No. 24060966
University of Houston Law Center
4604 Calhoun Rd.
Houston, TX  77204-6060
Tel. (713) 743-6843
Fax (713) 743-2131
Email jrnewber@central.uh.edu

*Counsel for Patrick Henry Murphy, Plaintiff*

i

# Table of Contents

Table of Authorities................................................................................iv

Table of Exhibits……. ..........................................................................vi

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND
MEMORANDUM IN SUPPORT ...................................................................1

I.  Nature and state of the proceeding......................................................1

II.  Jurisdiction…....................................................................................3

III.  Venue………… .............................................................................4

IV.  Parties……….. ............................................................................4

V.  Statement of the issues ...................................................................5

VI.  Summary of the argument ...............................................................7

VII.  Argument………. .........................................................................8

A.  The Court should grant Plaintiff's Motion for Summary
Judgment because uncontested facts make clear TDCJ's
execution policy violates the First Amendment's Establishment
Clause because it is not neutral toward religion and, in its
amended form, it evinces a hostility toward religion generally.............9

1.  Defendants' amended policy is not neutral between
religions and cannot survive strict scrutiny. .............................10

2.  Even if the Court believes Murphy's Establishment
Clause claim must be reviewed under the *Turner* factors,
it should nonetheless find Murphy is entitled to relief. .............14

3.  Defendants' amended policy evinces a hostility toward
religion generally.........................................................................15

B.  The Court should grant Plaintiff's Motion for Summary
Judgment because uncontested facts make clear TDCJ's policy
unjustifiably interferes with Murphy's ability to practice his

religion and therefore violates his First Amendment right to the Free Exercise of religion. ........................................................................18

C. If the Court believes TDCJ's policy does not interfere with Murphy's rights pursuant to the Free Exercise Clause, it should nonetheless find the policy violates the RLUIPA. ................................21

VIII. Prayer for Relief ...............................................................................22

Certificate of Service ...................................................................................23

## Table of Authorities

**Cases**

*Adickes v. S.H. Kress & Co.,*
    398 U.S. 144 (1970)...................................................................................9

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)...................................................................................9

*Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp.,*
    289 F.3d 373 (5th Cir. 2002)....................................................................5

*Burwell v. Hobby Lobby Stores,*
    573 U.S. 682 (2014)..............................................................................6, 21

*Cantwell v. Connecticut,*
    310 U.S. 296 (1940)..............................................................................9, 18

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986)...................................................................................5

*Church of the Lukumi Babalu Aye, Inc. v. Hialeah,*
    508 U.S. 520 (1993)..............................................................................6, 19

*Holt v. Hobbs,*
    135 S. Ct. 853 (2015)............................................................................7, 21

*Jones v. Bock,*
    549 U.S. 199 (2007)...................................................................................8

*Larson v. Valente,*
    456 U.S. 228 (1982).........................................................................5, 9, 13

*Lemon v. Kurtzman,*
    403 U.S. 602 (1970)..................................................................................10

*Lynch v. Donnelly,*
    465 U.S. 668 (1984)..................................................................................10

*Masterpiece Cakeshop v. Colo. Civil Rights Comm'n,*
    138 S. Ct. 1719 (2018).............................................................................19

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)..................................................................5

*Murphy v. Collier*,
    139 S. Ct. 1475 (2019)..............................................................9

*O'Lone V. Estate of Shabazz*,
    482 U.S. 342 (1987)..............................................................6, 14

*Overton v. Bazzetta*,
    539 U.S. 126 (2003)..............................................................6, 14

*Turner v. Safley*,
    482 U.S. 78 (1987)...............................................................6, 14

*Zorach v. Clauson*,
    343 U.S. 306 (1952)..................................................................9

## Other Authorities

Fed. R. Civ. P. 56(a)......................................................................5

U.S. Const., amend. I ...........................................................5, 9, 18

# Table of Exhibits

Exhibit 1    TDCJ, Correctional Institutions Division, Execution Procedure, April 2019 ............................................................. Tab 1

Exhibit 2    Defendant Bryan Collier's Responses to Plaintiff's Interrogatories ............................................................. Tab 2

Exhibit 3    Defendant Davis's Responses to Plaintiff's Interrogatories ............................................................. Tab 3

Exhibit 4    Transcript of Deposition of Timothy Jones ........................... Tab 4

Exhibit 5    Defendants' initial disclosures ............................................... Tab 5

Exhibit 6    Transcript of Deposition of Thomas Brouwer ...................... Tab 6

Exhibit 7    Transcript of Deposition of Defendant Davis ....................... Tab 7

Exhibit 8    Transcript of Deposition of Wayne Moss ............................. Tab 8

Exhibit 9    Chaplain I job description ..................................................... Tab 9

Exhibit 10   Retired Chaplain David Collier's Responses to Plaintiff's Interrogatories ............................................................. Tab 10

Exhibit 11   TDCJ Chaplain III – Religious Support Services job description ............................................................. Tab 11

Exhibit 12   Plaintiff's Unit Chaplaincy File ............................................ Tab 12

Exhibit 13   Transcript of Deposition of Plaintiff .................................... Tab 13

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION

| | | |
|---|---|---|
| **PATRICK HENRY MURPHY, JR.,** | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | |
| **BRYAN COLLIER,** Executive Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Huntsville, Texas | § | |
| | § | Civil No.4:19-cv-01106 |
| **LORIE DAVIS,** Director, Texas Department | § | **\*\*\*CAPITAL CASE\*\*\*** |
| of Criminal Justice, Correctional Institutions | § | |
| Division, Huntsville, Texas | § | |
| | § | |
| **BILLY LEWIS,** Warden, Texas Department | § | |
| of Criminal Justice, Huntsville Unit, | § | |
| Huntsville, Texas | § | |
| | § | |
| *Defendants*. | § | |

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
AND MEMORANDUM IN SUPPORT**

## I.      Nature and stage of the proceeding

On April 2, 2019, five days after the Supreme Court stayed Plaintiff Patrick

Henry Murphy's execution, Defendant Davis amended Texas's execution protocol,

purportedly in an effort to address the concern expressed by Justice Kavanaugh in

his March 28, 2019 opinion concurring in the decision to stay Murphy's March 28

execution. Justice Kavanaugh explained that TDCJ could not treat Buddhist

inmates, like Murphy, differently than Christian inmates. Under TDCJ's new

protocol, no religious cleric is allowed in the execution chamber during an execution.

1

In point of fact, however, this new protocol probably does not satisfy Justice Kavanaugh's concern, and it certainly does not comply with the constitutional requirements of the First Amendment or applicable statutory law. In particular, Murphy's execution pursuant to the amended protocol would still violate his rights protected by the Establishment Clause. As has been revealed during discovery, Christian inmates continue to receive preferential treatment under the new policy during the hours immediately preceding an execution before the inmate enters the execution chamber. Furthermore, with respect to its provision concerning who is now allowed in the execution chamber, the new policy evinces a hostility toward religion generally, which the Establishment Clause will not permit.

In addition, Murphy's claims pursuant to the Free Exercise Clause and the RLUIPA were unaffected by Defendant's change in policy. Under the previous version of the execution protocol, there was a process in place Defendants believed satisfied their compelling interest in executions being secure. However, as has been revealed in discovery, the process by which it was determined who could be present in the execution chamber under the previous policy was not nearly as rigorous as Defendants previously claimed. Murphy has not contested, and does not contest, that Defendants have a compelling interest in maintaining security during and throughout the execution procedure. Nevertheless, the means chosen to achieve that compelling interest must be narrowly tailored, and the revelations uncovered during discovery make clear that TDCJ's policy, in both its current and previous

2

versions, is not narrowly tailored to advance Defendants' security interest.

On April 18, 2019, Plaintiff filed his First Amended Complaint pursuant to section 1983, ECF No. 22, addressing the April 2. Discovery having concluded on June 28,[1] Plaintiff now files this Motion for Summary Judgment pursuant to the Court's April 18, 2018 Docket Control Order, ECF No. 24.

## II.   Jurisdiction

This court has jurisdiction under 28 U.S.C. §§ 1331, 1343, 1651, 2201, and 2202, and under 42 U.S.C. § 1983. Defendants admit this Court has jurisdiction over the lawsuit. ECF No. 26 at 7.[2] Defendants argue that the Court does not have jurisdiction over Defendant Lewis because Lewis lacks the authority to grant the relief Murphy requests. ECF No. 26 at 7, 14. As has been revealed in discovery, however, Defendants assertion is factually incorrect, because, as the Warden of the Huntsville Unit, Defendant Lewis is the person who possesses the power to extend the time an inmate is allowed to visit his spiritual advisor on the afternoon of his execution. Exhibit 1 at 9 (Paragraph V.C).[3] As explained in greater detail below,

---

[1] June 28 is the date by which discovery was to have been completed. ECF No. 24 at 2. As the Court is aware, Plaintiff has filed a motion that asks the Court to compel Defendants to supplement their responses to his interrogatories. ECF No. 35 at 8-9. That motion remains pending.

[2] As is also the case for exhibits cited in this Motion, *see infra* note 3, prior pleadings in this case are cited according to the page number stamped by the Clerk at the top of the page and not according to any other page numbers appearing anywhere else on the page.

[3] All exhibits in this Motion are cited according to the page number stamped by the Clerk at the top of the page and not according to any other page numbers appearing anywhere else on the page.

Defendant Lewis's refusal to exercise this power to permit non-Christian condemned men to have the same access to their spiritual advisors (including Murphy's spiritual advisor, Rev. Hui-Yong Shih, or any other Buddhist reverend) while allowing condemned men to have access to the Christian TDCJ chaplains violates Murphy's rights under the First Amendment and the RLUIPA.

## III.   Venue

Venue is proper under 28 U.S.C. § 1391 because defendants Collier, Davis, and Jones maintain offices in Huntsville, Texas. Defendants are being sued in their official capacities. Venue is also proper because Plaintiff's execution will occur in this district. Defendants agree venue is proper. ECF No. 26 at 7.

## IV.   Parties

Murphy is currently incarcerated under a sentence of death at the Polunsky Unit of the Texas Department of Criminal Justice in Livingston, Texas.

Bryan Collier is the executive director of the Texas Department of Criminal Justice. He is being sued in his official capacity.

Lorie Davis is the director of the Correctional Institutions Division of the Texas Department of Criminal Justice. She is being sued in her official capacity. Ms. Davis is the person charged by the trial court's order to execute the judgment of death against Murphy.

Billy Lewis is the senior warden of the Huntsville Unit, the unit at which TDCJ executes inmates. He is being sued in his official capacity. As the warden of

the Huntsville Unit, Mr. Lewis has authority to make some decisions relevant to this proceeding, including deciding when an inmate may visit with his spiritual advisor on the afternoon of his execution. Exhibit 1 at 9 (Paragraph V.C).

## V.   Statement of the Issues

The issue before the Court is whether there is a need for a trial on Murphy's claims that his rights under the First Amendment's Establishment and Free Exercise Clauses and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is appropriate if the Court finds Plaintiff has shown in this Motion that there are no genuine disputes and that he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

The First Amendment of the United States Constitution commands that "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof." U.S. Const., amend. I. The Establishment Clause of the First Amendment prohibits governmental entities from passing laws that demonstrate a hostility toward religion generally, or that prefer one or more religions over others. *Larson v. Valente*, 456 U.S. 228, 246 (1982). Laws and policies that demonstrate a denominational preference or favoritism are suspect and strict scrutiny should be applied when determining whether they are constitutional. *Id.* In

addition, any policy that hinders an individual's ability freely to exercise his religion and that is not neutral and generally applicable "must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest." *Church of the Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 531 (1993).

The Supreme Court often considers additional factors when the person who is alleging a violation of his rights under the First Amendment is a prisoner. *Turner v. Safley*, 482 U.S. 78, 90 (1987); *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348-50 (1987). These include:

(1)  whether the challenged restrictions bear a "valid, rational connection" to a legitimate governmental interest";

(2)  whether alternative means are open to inmates to exercise the asserted right;

(3)  what impact an accommodation of the right would have on guards and inmates and prison resources; and

(4)  whether there are "ready alternatives" to the regulation.

*Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) (citing *Turner*, 482 U.S. at 89-91) (internal quotations omitted).

Like the Free Exercise Clause, the RLUIPA protects an individual's right to exercise his religion, but it protects any exercise of religion regardless of whether it is compelled by a system of belief. *Burwell v. Hobby Lobby Stores*, 573 U.S. 682, 696 (2014). Under the RLUIPA, the Court should find TDCJ's policy impermissible if its enforcement substantially burdens Plaintiff's religious exercise, if that exercise is

6

ground in a sincerely held religious belief. *See, e.g.*, *Holt v. Hobbs*, 135 S. Ct. 853, 862 (2015).

## VI.   Summary of the Argument

It is uncontested that under the TDCJ's amended policy, TDCJ-employed chaplains have greater access to an inmate in the hours immediately before he enters the execution chamber than do spiritual advisors who are not employed by TDCJ. It is uncontested that TDCJ employs no Buddhist chaplains. It is uncontested that all three of the chaplains who currently work during executions are Christian. It is uncontested that these chaplains would pray with a Christian inmate if asked to do so in the time immediately before his execution but would not chant with Murphy because doing so would not be in accord with their Christian faith. Under this set of facts, no material dispute exists that should prevent this Court from finding TDCJ's amended policy violates Murphy's rights under the First Amendment's Establishment Clause.

It is uncontested that, despite Defendant Davis' claim to the contrary, people who worked in the execution chamber had not always been employed by TDCJ for many years. It is uncontested that a person was allowed to work in the execution chamber after being employed by TDCJ for less than four months. This Court should find that the process by which Defendants previously cleared individuals to work in the execution chamber was implemented with relative ease, such that employing this same process to clear non-Christian spiritual advisors (whether

7

TDCJ employees or not) to minister to non-Christian inmates during their executions would not impose an overly onerous burden on Defendants and would not interfere in any meaningful sense with Defendants interest in maintaining security during executions.

Murphy sincerely believes he must focus on the Buddha at the moment he dies to enter the Pure Land. Murphy sincerely believes chanting with his spiritual advisor when he is executed will help him maintain this focus. This Court should find that Defendants' policy denying Murphy the right to exercise his religion in this way evinces a hostility toward religion generally or toward non-Christianity, and also violates Murphy's rights under the Free Exercise Clause and the RLUIPA.

## VII.   Argument[4]

---

[4] Plaintiff anticipates Defendants will argue in their Motion to be filed contemporaneously with Plaintiff's that Plaintiff's claims should be dismissed because they are unexhausted. *See* ECF No. 26 at 14. Because the Court has indicated it is not going to entertain a threshold exhaustion argument, ECF No. 33 at 11, Plaintiff does not believe it to be necessary or even appropriate for him to respond to this anticipated argument above the line. It is worth noting, however, that it has been revealed during discovery why the typical procedure of exhaustion through the grievance process would be insufficient to protect the rights of an inmate whose execution is imminent. During her deposition, Defendant Davis testified that there is no rule that would prevent her from amending TDCJ's execution protocol as soon as two days before a scheduled execution. Exhibit 7 at 66. Completing both steps of TDCJ's two-step grievance process could take eighty days or longer. ECF No. 8-2 at 87. Strict adherence to the two-step grievance process in cases where an execution is imminent would leave an inmate without the ability to have his constitutional claims heard by a federal court when those claims arise from an amendment to the State's execution procedure made within eighty days of his scheduled execution. Moreover, the exhaustion requirement exists to ensure the Defendants receive notice of the Plaintiff's claim before the Plaintiff files his complaint so that prison officials have "an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court." *Jones v. Bock*, 549 U.S. 199, 204 (2007). Plaintiff gave Defendants this opportunity by making them aware of his claims in an email to TDCJ's General Counsel sent on February 28, 2019 and then giving them ample opportunity to respond before

Rule 56 of the Federal Rules of Civil Procedure authorizes this Court to grant judgment as a matter of law where there is no genuine issue as to any material fact. An issue is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Accordingly, the moving party must establish that no issues remain for trial, even if the evidence is viewed in the light most favorable to the non-moving party. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

A.  **The Court should grant Plaintiff's Motion for Summary Judgment because uncontested facts make clear TDCJ's execution policy violates the First Amendment's Establishment Clause because it is not neutral toward religion and, in its amended form, it evinces a hostility toward religion generally.**

The First Amendment of the United States Constitution commands that "Congress shall make no law respecting an establishment of religion." U.S. Const., amend. I. This command is similarly binding on the states. *See Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940). The Establishment Clause of the First Amendment prohibits governmental entities from passing laws that demonstrate a hostility toward religion or that prefer one or more religions over others. *Larson v. Valente*, 456 U.S. 228, 246 (1982); *Zorach v. Clauson*, 343 U.S. 306, 313-15 (1952).

Defendants' amended policy might appear, at first blush, to be neutral, but it is not. In the first place, the Establishment Clause requires not only that the State

---

filing his Complaint almost a month later. In his concurring opinion in this matter, Justice Kavanaugh expressly noted Murphy gave Defendants adequate and timely notice of his claims. *Murphy v. Collier*, 139 S. Ct. 1475, 1476 n.* (2019).

be neutral among religions, it also requires the State be neutral between religion and non-religion. *See, e.g.*, *Lemon v. Kurtzman*, 403 U.S. 602, 612 (1970); *Lynch v. Donnelly*, 465 U.S. 668, 698 (1984). Second, despite its facial neutrality as among religions, the amended policy continues to prefer certain religions over others by giving Christian inmates greater access to religious clerics of their faith during the time immediately preceding their executions.

### 1.    Defendants' amended policy is not neutral between religions and cannot survive strict scrutiny.

Under the new policy, after being transported to the Huntsville Unit, a condemned prisoner can have visits with a TDCJ Chaplain, a minister or spiritual advisor who has the appropriate credentials, and his attorney. Exhibit 1 at 8 (Paragraph III.B.12). Attorney visits and visits with approved ministers and spiritual advisors can take place only between 3:00 and 4:00 pm. Exhibit 1 at 9 (Paragraph V.C). There is no such restriction on visits with a TDCJ chaplain, who has access to an inmate until the very moment he enters the execution chamber.

At the pretrial conference convened on April 18, Counsel for Defendants stated it was her belief that visits with TDCJ chaplains also occurred during this one-hour window, from 3:00 to 4:00 pm. ECF No. 33 at 4. As has been revealed during discovery and as Defendants now admit, Counsel for Defendants was mistaken. Exhibit 2 at 18 (Response to Interrogatory 21); Exhibit 3 at 20 (Response to Interrogatory 21).

Under the current system, three TDCJ chaplains are ordinarily present in the area where a condemned inmate is housed during the afternoon of his execution. These chaplains are Wayne Moss (the chaplain of the Huntsville Unit), Thomas Brouwer (the assistant director of TDCJ's chaplaincy department), and Timothy Jones (TDCJ's deputy director of religious services, who oversees all chaplaincy operations). Exhibit 4 at 27. In their initial disclosures, Defendants identified these three men as being individuals who have knowledge of the chaplain's role throughout the day of an execution. Exhibit 5 at 4-5. These three men are all Christians. Exhibit 6 at 33. The chaplains refer to the area where the inmate is housed before he enters the execution chamber as the "death house." Exhibit 4 at 21. In addition to the chaplains, three security officers are stationed in the death house the entire time the inmate is there. Exhibit 7 at 52-53; Exhibit 6 at 27. Because the TDCJ chaplains are not in the death house from 3:00 to 4:00 pm (i.e., the hour during which a non-employee spiritual advisor is allowed to visit the inmate), only these security officers, the inmate, and his spiritual advisor are in the death house during this time. Exhibit 6 at 26-27.

Throughout the day, the chaplains who are assigned to work in the death house on the day of an execution provide secular services to the inmate, including facilitating his phone calls and providing him food. Exhibit 2 at 18 (Response to Interrogatory 21); Exhibit 8 at 14-15. These tasks are all completed by 5:00 pm, at which time all phone calls stop so the chaplains talk to the inmate, as much or as

11

little as the inmate would like. Exhibit 8 at 14-15; Exhibit 13 at 48. If an inmate asked a chaplain to pray with him during this time, the chaplain would. Exhibit 4 at 24-25; Exhibit 6 at 30-31; Exhibit 8 at 21. However, the Chaplains would not do anything during this time that they believed to be inconsistent with their personal religious faith. *See* Exhibit 4 at 32; Exhibit 6 at 31-32; Exhibit 8 at 23. Despite Defendants' continued assertion throughout these proceedings that chaplains are not employed in a faith-specific capacity, *see, e.g.*, ECF No. 26 at 11, it undisputed that what a chaplain is required, or even expected, to do is governed by his personal faith. Specifically, a chaplain is neither required nor expected to do anything that does not accord with his personal religious faith. Exhibit 9 at 2 (Paragraph II.A); Exhibit 4 at 10-11; Exhibit 6 at 12-13. Because TDCJ employs only Christian and Muslim clerics as chaplains, this policy favors Christian and Muslim inmates.[5] While all three of the Christian chaplains who currently work in the death house on the day of an execution would pray with a Christian inmate, none of the three would recite the declaration of faith with a Muslim inmate if asked to do so because each believes doing so would violate their faith. Exhibit 4 at 30-31; Exhibit 6 at 32; Exhibit 8 at 23. None of the three chaplains who regularly work in the death house would chant with Murphy in the way that he would, if allowed, chant with his spiritual advisor, or a different Buddhist minister. Exhibit 4 at 24-25; Exhibit 6 at

---

[5] It remains unclear after discovery whether a Muslim chaplain would currently be allowed to work in the death house on the day of an execution. This uncertainty, however, does not affect Murphy's entitlement to relief.

32; Exhibit 8 at 29-30.[6] No TDCJ chaplain would be expected to recite the declaration of faith with a Muslim inmate or chant with a Buddhist inmate if that chaplain believed doing so would violate his or her faith. Exhibit 9 at 2 (Paragraph II.A); Exhibit 4 at 10-11; Exhibit 6 at 12-13. TDCJ employs no Buddhist chaplains. Exhibit 4 at 12.

While at the April 18 pretrial conference Counsel for Defendants suggested a Buddhist spiritual advisor could be granted permission to remain in the death house after 4:00 pm, ECF No. 33 at 5, it is now undisputed that no spiritual advisor who is not a TDCJ employee would be allowed in the death house after 5:00 pm. Exhibit 2 at 19 (Answer to interrogatory 23).

A law or policy that is not neutral between religion and non-religion or among various religions, like TDCJ's policy, is inherently suspect, and strict scrutiny must be applied when determining whether the policy violates the First Amendment's Establishment Clause. *Larson*, 456 U.S. at 246. The policy can only survive this level of scrutiny only if it is narrowly tailored to a compelling interest. *Id.* at 247. While TDCJ has a compelling interest in maintaining security throughout the execution protocol, there is no evidence or reason to conclude TDCJ's discriminatory policy serves this interest. Defendants have asserted that a non-employee might be able to discover the identity of members of the drug team if allowed to stay in death house beyond 4:00 pm. Exhibit 2 at 6 (Answer to

---

[6] While Chaplain Moss did not testify definitively he would not chant with Murphy, he also would not definitively state he would. *See* Exhibit 8 at 29-30.

Interrogatory 5). But Defendants are undoubtedly able to move members of the drug team as needed without risking their identities being discovered by the inmate, and Defendants have offered no explanation regarding why these same procedures would be insufficient to ensure a spiritual advisor visiting the inmate would also be unable to discover the identities of the member of the drug team.

> ### 2. Even if the Court believes Murphy's Establishment Clause claim must be reviewed under the *Turner* factors, it should nonetheless find Murphy is entitled to relief.

Murphy should prevail on this claim even under the standard applied to prisoners' First Amendment claims under *Turner v. Safley*, 482 U.S. 78, 90 (1987) and *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348-50 (1987). As a threshold matter the Supreme Court has "found it important to inquire whether prison regulations restricting inmates' First Amendment rights operated in a *neutral* fashion, without regard to the content of the expression." *Turner*, 482 U.S. at 90 (emphasis added). In addition, a court is to consider four factors:

> (1) whether the challenged restrictions bear a "valid, rational connection" to a legitimate governmental interest";
>
> (2) whether alternative means are open to inmates to exercise the asserted right;
>
> (3) what impact an accommodation of the right would have on guards and inmates and prison resources; and
>
> (4) whether there are "ready alternatives" to the regulation.

*Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) (citing *Turner*, 482 U.S. at 89-91) (internal quotations omitted).

As demonstrated in greater detail above, Defendants' amended policy is not neutral between religions. While Defendants have asserted the amended policy is related to their security interests, they have failed to offer any evidence as to why the security measures in place in the death house are not sufficient to preserve those same interests if a non-employee spiritual advisor were allowed to visit with an inmate after 4:00 pm. The same three security officers who monitor the spiritual advisor from 3:00 – 4:00 pm remain in the death house from 4:00 until the time the inmate is taken to the execution chamber. Murphy believes he can be reborn in the Pure Land and work towards enlightenment only if he is able to remain focused on Buddha while dying. Being able to chant with his spiritual advisor until the moment he enters the execution chamber would greatly assist him in maintaining this focus. Allowing Murphy's spiritual advisor to remain in the death house after 4:00 pm would have no impact on prison resources. The security officers who are present in the death house from 3:00 to 4:00 pm already remain there until the inmate is transported to the execution chamber.

### 3. Defendants' amended policy evinces a hostility toward religion generally.

Moreover, Defendants' decision to prohibit all chaplains and spiritual advisors from the execution chamber in response to the Supreme Court's order evinces a hostility toward religion generally. According to the Defendants, TDCJ's policy of allowing only employees in the execution chamber during an execution was enacted to ensure the procedure is secure. Defendants have, under the previous

15

policy, followed a procedure through which they were able to be confident the chaplains approved to be present in the execution chamber were not a security threat.

That procedure, however, is not nearly as rigorous as Defendants suggested in previous pleadings. In a March 26, 2019 declaration, Defendant Davis asserted that she personally selects the warden and TDCJ chaplain who are present in the execution chamber and that she only selected individuals who had demonstrated many years of devoted service as TDCJ employees. ECF No. 8-4 at 2-3. Discovery in this matter has revealed Defendant Davis' assertion to be false. First, Chaplain Jones is the person who decides which three chaplains will work in the death house during an execution. Exhibit 4 at 27, 34.[7] Under the previous version of TDCJ's policy, those three chaplains would then decide who would serve in the execution chamber. *Id.* That person would have no interaction with Defendant Davis. Exhibit 4 at 33; Exhibit 6 at 30.

Second, it has been revealed during discovery that not all of the people who served in the execution chamber had demonstrated "years of devoted service" to TDCJ before being allowed to serve in the execution chamber. David Collier began his employment with TDCJ on December 15, 2006. Exhibit 5 at 5; Exhibit 10 at 3

---

[7] As the Chaplain in charge of religious support services, Chaplain Brouwer should be the person who oversees the chaplaincy department execution process. Exhibit 6 at 4; Exhibit 11 at 2 (Paragraph II.A). However, because Brouwer has been in this position for limited period of time, Chaplain Jones makes the decision about which chaplains will work in the death house during an execution. Exhibit 4 at 27.

(Interrogatory 2). He was allowed to accompany an inmate in the execution chamber less than four months later. Exhibit 10 at 3 (Interrogatory 2); see Exhibit 5 at 5. Chaplain Jones had worked for TDCJ less than two years before he was allowed to work in the execution chamber. *See* Exhibit 5 at 4. Perhaps recognizing that their ostensible criterion – years of devoted service – was a mere fig-leaf, Defendants have resisted providing the dates chaplains first worked in the execution chamber and the dates they began working for TDCJ and have provided this information for only the four chaplains discussed in this motion. But even that scant information reveals that two of these four did not work for TDCJ for years before being allowed to work in the execution chamber.

The training these chaplains received before being allowed to work in the execution chamber was minimal. First, before being hired by TDCJ, they were subjected to a criminal history check. Exhibit 2 at 11-12 (Answer to Interrogatory 11).[8] Before the execution, Chaplain Jones would walk the new chaplain through the execution process, and the Huntsville Unit warden would do the same. Exhibit 4 at 33.[9] That same process could easily have been used to clear spiritual advisors of other faiths. Doing so would have required Defendants to do no more than they

---

[8] After beginning their employment, chaplains receive the same six-week long security training given to new correctional officers. Exhibit 6 at 9-10. This training, however, does not deal with what happens during an execution, and is not specific to death row prisoners. Exhibit 6 at 10.

[9] *But see* Exhibit 6 at 30 (Chaplain Brouwer testifying he had no interaction from anyone in the correctional institutions division before first working in the execution chamber).

17

were already doing to clear TDCJ-employed chaplains. However, rather than allow spiritual advisors of other faiths to be present in the execution chamber, Defendants have enacted a new policy that is hostile to religion generally. By denying all religious inmates access to a spiritual advisor at the time they are dying and when many believe they will be entering some form of an afterlife, TDCJ's policy favors non-religious inmates.

**B.    The Court should grant Plaintiff's Motion for Summary Judgment because uncontested facts make clear TDCJ's policy unjustifiably interferes with Murphy's ability to practice his religion and therefore violates his First Amendment right to the Free Exercise of religion.**

The First Amendment also commands that "Congress shall make no law … prohibiting the free exercise of" religion. U.S. Const., amend. I. Like the Establishment Clause, the Free Exercise Clause's command is binding on the states. *See Cantwell*, 310 U.S. at 303.

TDCJ's policy will impermissibly interfere with Murphy's ability freely to exercise his religion. Specifically, it will prevent him from chanting with his spiritual advisor at the time of execution in an attempt to stay focused on the Buddha, as he believes is required if he is to enter the Pure Land after his execution. Murphy believes having Reverend Shih present with him in the execution chamber would significantly aid him in following and adhering to his faith because the reverend would chant with him (just as a Christian minister would pray with an inmate), and Murphy would be able to hear Shih's voice. Exhibit

13 at 40-42. Under TDCJ's new policy, however, Shih will only be allowed to be present in one of the rooms for witnesses. While this would still allow Shih to be within feet of Murphy, Murphy would not be able to hear Reverend Shih. ECF No. 26 at 12 & n.8. Shih would not be present in the chamber with Murphy, which is what is Murphy believes to be important for him to maintain the focused required for him to enter into the Pure Land after he is executed. Exhibit 13 at 40-42.

The level of scrutiny to be applied when reviewing policies that hinder an individual's ability freely to exercise his religion depends on whether the law is neutral and generally applicable. As Justice Kennedy explained in *Church of the Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520 (1993), "a law that is neutral and of general applicability need not be justified by a compelling government interest even if the law has the incidental effect of burdening a particular religious practice." *Lukumi Babalu Aye*, 508 U.S. at 531. A law that does not satisfy both of these requirements "must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest." *Id.*; *see also Masterpiece Cakeshop v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1734 (2018) (Gorsuch, J., concurring). TDCJ's amended policy is not neutral because it evinces a hostility toward religion and thereby favors non-religious inmates over religious inmates. Accordingly, the policy is permissible only if it can survive strict scrutiny.

The policy cannot survive strict scrutiny, at least not in cases like Murphy's where TDCJ is given ample time to take whatever measures are necessary to pre-

19

clear a spiritual advisor using the same process it used to pre-clear TDCJ-employed chaplains to be present in the execution chamber under the previous version of the policy. As explained in greater detail above, *see supra* Part VII.A.3, this process would include conducting a criminal background check of the spiritual advisor and then walking through the execution process with him or her.

Even under the standard applied to prisoners' First Amendment claims under *Turner v. Safley* and *O'Lone v. Estate of Shabazz*, Murphy is entitled to relief, because Defendants' amended policy is not neutral in that it evinces a hostility toward religion in general. The same procedure previously used to prepare TDCJ chaplains to serve in the execution chamber could be used to prepare a Buddhist reverend, and TDCJ's refusal to take that very modest step signifies and impermissible hostility to religion. Because Murphy believes he can be reborn in the Pure Land and work towards enlightenment only if he is able to remain focused on Buddha while dying, and that being able to chant with his spiritual advisor in the execution chamber would greatly assist him in maintaining this focus, TDCJ's newly hostile policy violates Murphy's First Amendment rights.

Particularly given the long history between Reverend Hui-Yong Shih (also known as Gerald Sharrock) and Murphy, and the fact TDCJ has allowed Rev. Shih to minister to Murphy for many years,[10] it is clear TDCJ's purported reasons for

---

[10]   Rev. Shih first began visiting Plaintiff as his spiritual advisor no later than November 25, 2013. Exhibit 12 at 145; Exhibit 13 at 52. Rev. Shih has visited Murphy on a regular basis since that time. Exhibit 12 at 92-146.

barring him from the execution chamber are pretextual; and the record as a whole demonstrates the real reason is a preference for Christianity.

### C. If the Court believes TDCJ's policy does not interfere with Murphy's rights pursuant to the Free Exercise Clause, it should nonetheless find the policy violates the RLUIPA.

"In RLUIPA, in an obvious effort to effect a complete separation from the First Amendment case law, Congress deleted the reference to the First Amendment and defined the 'exercise of religion' to include 'any exercise of religion, whether or not compelled by, or central to, a system of religious belief.'" *Burwell v. Hobby Lobby Stores*, 573 U.S. 682, 696 (2014) (quoting 42 U.S.C. § 2000cc-5(7)(A)). Accordingly, if the Court believes TDCJ's policy does not violate Murphy's rights pursuant to the Free Exercise Clause because Murphy's chanting with a Buddhist priest at the time of his death is not something he is compelled to do by his religion,[11] the Court should nevertheless find TDCJ's policy violates the RLUIPA. Murphy's belief in Buddhism is sincere. *See generally* Exhibit 13. Prohibiting Murphy from being guided at the time of death by a Buddhist reverend is an explicit and substantial burden on religious exercise. *See, e.g.*, *Holt v. Hobbs*, 135 S. Ct. 853, 862 (2015) (where prisoner shows exercise of religion "grounded in a sincerely held religious belief," enforced prohibition "substantially burdens his religious exercise").

---

[11] Counsel believe the Court should find Murphy's religion does compel him to engage in this activity because this is what Murphy believes he needs to do to maintain the focus that is required for him to enter the Pure Land after he is executed.

21

## VIII. Prayer for relief

WHEREFORE, Plaintiff Patrick Henry Murphy prays that the Court provide

relief as follows:

1.   Find that TDCJ's policy violates Murphy's rights under the First
     Amendment's Establishment and Free Exercise Clauses.

2.   Find that TDCJ's policy violates the RLUIPA.

3.   Enter an Order prohibiting Defendants from executing Murphy until
     they can do so in a way that does not violate his rights.

Respectfully submitted,

/s/ David R. Dow
_____
David R. Dow
Texas Bar No. 06064900
Jeffrey R. Newberry
Texas Bar No. 24060966
University of Houston Law Center
4604 Calhoun Rd.
Houston, Texas 77204-6060
Tel. (713) 743-2171
Fax (713) 743-2131

*Counsel for Patrick Henry Murphy*

22

### Certificate of Service

I certify that on July 19, 2019 a notice of electronic filing was delivered to Counsel for Defendants by the Court's Case Management/Electronic Case Filing system.

Amy L. Hunsucker Prasad
amy.prasad@oag.texas.gov
Leah Jean O'Leary
leah.oleary@oag.texas.gov
Office of the Attorney General
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548

s/ Jeffrey R. Newberry
_____
Jeffrey R. Newberry

23