IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| PATRICK HENRY MURPHY, JR., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION |
| | § | NO. 4:19-cv-1106 |
| BRYAN COLLIER, Executive | § | |
| Director of the Texas | § | |
| Department of Criminal Justice; | § | |
| LORIE DAVIS, Director of the | § | |
| Texas Department of Criminal | § | |
| Justice - Correctional | § | |
| Institutions Division; and | § | |
| BILLY LEWIS, Warden of the | § | |
| Huntsville Unit, | § | |
| | § | |
| Defendants. | § | |

*******************************************
ORAL DEPOSITION OF
TIMOTHY CLYDE JONES
JUNE 24, 2019
*******************************************

ORAL DEPOSITION of TIMOTHY CLYDE JONES, produced as

a witness at the instance of the Plaintiff, and duly

sworn, was taken in the above-styled and numbered cause

on June 24, 2019, from 10:13 a.m. to 11:06 a.m., before

Kerrienne L. Bond, CSR in and for the State of Texas,

reported by machine shorthand, in the boardroom of the

Huntsville Public Library, 1219 13th Street, Huntsville,

Texas, pursuant to the Federal Rules of Civil Procedure

and stipulations of counsel as set out herein or

attached hereto.

1                  A P P E A R A N C E S

2

3   FOR THE PLAINTIFF:

4         MR. JEFFREY R. NEWBERRY
          UNIVERSITY OF HOUSTON LAW CENTER
5         4604 Calhoun Road
          Houston, Texas  77204
6         Phone: (713) 743-6843
          E-mail: jrnewber@central.uh.edu
7

8   FOR THE DEFENDANTS:

9         MS. LEAH J. O'LEARY
               -and-
10        MS. AMY L. PRASAD
          OFFICE OF THE ATTORNEY GENERAL
11        LAW ENFORCEMENT DEFENSE DIVISION
          P.O. Box 12548
12        Austin, Texas  78711
          Phone: (512) 936-1292  Fax: (512) 370-9918
13        E-mail: leah.oleary@oag.texas.gov
                  amy.prasad@oag.texas.gov
14
               -and-
15
          MS. CALYSTA LANTIEGNE
16        TEXAS DEPARTMENT OF CRIMINAL JUSTICE
          OFFICE OF THE GENERAL COUNSEL
17        P.O. Box 13084, Capitol Station
          Austin, Texas  78701
18        Phone: (512) 475-4384  Fax: (512) 936-2159
          E-mail: calysta.lantiegne@tdcj.texas.gov
19

20

21

22

23

24

25

3

```
 1                    EXAMINATION INDEX

 2

 3   WITNESS:  TIMOTHY CLYDE JONES

 4   EXAMINATION                              PAGE

 5        By Mr. Newberry...........................4
          By Ms. O'Leary...........................36
 6
     WITNESS CORRECTIONS AND SIGNATURE..............41
 7
     REPORTER'S CERTIFICATION.......................43
 8

 9                    EXHIBIT INDEX

10                                              PAGE

11   JONES EXHIBIT NO. 1............................4
          TDCJ Organizational Structure
12
     JONES EXHIBIT NO. 2............................9
13        TDCJ Job Description, Chaplain I

14   JONES EXHIBIT NO. 3...........................19
          Table of involvement in executions
15        prepared by witness

16

17

18

19

20

21

22

23

24

25
```

```
 1                    TIMOTHY CLYDE JONES,
 2  having been first duly sworn, testified as follows:
 3                E X A M I N A T I O N
 4  BY MR. NEWBERRY:
 5       Q.   As I said earlier, I'm Jeff Newberry.  I'm an
 6  attorney who represents Patrick Murphy.
 7       A.   Yes, sir.
 8       Q.   I appreciate you coming out here for this
 9  deposition today.
10            For the record, can you state your full
11  name?
12       A.   Timothy Clyde Jones.
13       Q.   And, Mr. Jones, what's your current position
14  with TDCJ?
15       A.   Current official title is Manager IV, deputy
16  director of religious services.
17       Q.   Okay.  And what do you do as the deputy
18  director of religious services?
19       A.   Oversee all chaplaincy operations.
20       Q.   Okay.  I've got here an organizational chart
21  that I pulled off the TDCJ website.  I told your
22  attorneys today that every exhibit I'd use would be
23  something that I got from them.  That's true except for
24  this one.  I'm going to go ahead and mark it Exhibit 1.
25            (Marked Jones Exhibit No. 1.)
```

1    Q.   (BY MR. NEWBERRY)  Some of the organizational

2    charts that I can access online -- I'm going to go ahead

3    and show it to you.  I've got a copy there for your

4    attorneys.

5              Some of the organizational charts that I'm

6    able to access online have names associated with them.

7    I couldn't find one for the Rehabilitation Programs

8    Division, so I was just hoping you could help me figure

9    out where you fit in here.  Are you the deputy division

10   director or --

11   A.   No, sir.  This is an old chart.

12   Q.   Oh, okay.

13   A.   This is not up to date.

14   Q.   Well, then, who is your -- so as the -- and it

15   was director in charge of chaplains?

16   A.   Uh-huh.

17   Q.   Okay.  Who would be your supervisor?

18   A.   I report to the deputy director -- deputy

19   division director.

20   Q.   Okay.  And what is the name of that person?

21   A.   Christopher Carter.

22   Q.   Okay.  And then would Mr. Carter report to the

23   Rehabilitation Programs Division director?

24   A.   Mr. Hinojosa, yes, sir.

25   Q.   Is that Rene Hinojosa?

1      A.   Yes, sir.

2      Q.   And then Mr. Hinojosa would report directly to

3  Bryan Collier?

4      A.   I believe so.

5      Q.   Okay.  So you -- okay.  That's fine.

6           Can you tell me if the chaplaincy

7  department -- is that within the Correctional

8  Institutions Division or is it in a separate division of

9  TDCJ hierarchy?

10     A.   It's in the Rehabilitation Programs Division.

11     Q.   Okay.  And so you would not be -- so Ms. Lorie

12 Davis, the Correctional Institutions Division director,

13 she would not be somebody who is in your line of

14 hierarchy within the TDCJ structure.  Is that correct?

15     A.   Correct.

16     Q.   Okay.  I appreciate your looking at that

17 exhibit with me.  That's all that I wanted to kind of

18 get clear with the structure there.

19           Now, you first began with TDCJ July 12th,

20 2012.  Is that correct?

21     A.   Yes, sir.

22     Q.   And what was your original position then?

23     A.   I was a correctional officer.

24     Q.   Okay.  When then did you enter into the

25 chaplaincy division?

1        A.    February of 2013.

2        Q.    **Okay.  And when you worked as a correctional**

3  **officer, what unit or units did you work at?**

4        A.    I was at the Wynne Unit.

5        Q.    **The Wynne Unit?**

6        A.    Yes, sir.

7        Q.    **And that was the only unit you worked at as a**

8  **correctional officer before you made the transition to**

9  **the chaplaincy program?**

10       A.    Correct.

11       Q.    **And then when you began as a chaplain in**

12 **February of 2013, were you assigned to a particular**

13 **unit?**

14       A.    Yes.

15       Q.    **What unit was that?**

16       A.    Polunsky.

17       Q.    **And I've been given some job descriptions for**

18 **positions within the chaplaincy department.  Would you**

19 **have been classified as a Chaplain I, a Chaplain II, or**

20 **a Chaplain III at that point?**

21       A.    Started as a Chaplain I and moved to a

22 Chaplain II.

23       Q.    **And so February 2013 at the Polunsky Unit, you**

24 **were a Chaplain I?**

25       A.    Correct.

1    Q.   When did you move to Chaplain II,

2  approximately?

3    A.   Specific date, I couldn't give you.  Probably

4  about a year, 13, 14 months from the time I came on.

5    Q.   Okay.  So approximately April to May of 2014?

6    A.   Correct.

7    Q.   Just continuing on this line of questions,

8  then, after you were a Chaplain II, then did you become

9  a Chaplain III after that, or was it straight to the

10  position that you are now or --

11    A.   No.  I left -- I was at two separate units and

12  then promoted from my last unit to the assistant

13  director chaplaincy, which is a Chaplain III.

14    Q.   Okay.  And so when did you leave the Polunsky

15  unit?

16    A.   I was there four years.  '17, I believe it

17  was.

18    Q.   Early 2017?

19    A.   The latter part of -- it was either December

20  of '16 -- I left December of '16, but my official start

21  date at the Huntsville Unit was 2017.

22    Q.   And that was the Huntsville Unit?

23    A.   Correct.

24    Q.   When you were first hired on -- well, not when

25  you were first on, because you were first hired on as a

1    correctional officer.  But when you first made the

2    transition to Chaplain I in February of 2013 --

3         A.   Yes, sir.

4         Q.   -- did you interview with someone for that?

5         A.   Yes, sir.

6         Q.   Do you remember the name of that person?

7         A.   Yes.  Vance Drum.

8         Q.   In your current position -- and I think I have

9    a job description for your current position, but are you

10   involved at all in hiring new chaplains?  Is that

11   something that you do?

12        A.   I am involved in it, yes, sir.

13        Q.   Okay.  So you're familiar with the job

14   descriptions for the various jobs within the chaplaincy

15   department?

16        A.   I believe so.

17        Q.   Okay.  I'm going to go ahead and mark what's

18   been given to me, described as the TDCJ -- excuse me --

19   TDCJ Chaplain I job description.  I'm going to mark that

20   as Exhibit 2.

21             (Marked Jones Exhibit No. 2.)

22        Q.   (BY MR. NEWBERRY)  I'll hand that to you,

23   Mr. Jones, with a copy for your attorney.

24             MS. O'LEARY:  Thank you.

25             MR. NEWBERRY:  You're welcome.

1       Q.   (BY MR. NEWBERRY)  You can look it over and

2   tell me:  Does this look like the current job

3   description for the Chaplain I job position?

4       A.   It does.

5       Q.   Okay.  I'm looking at the -- actually, the

6   first page of the job description.  Not the affidavit,

7   but the page that's marked Murphy 791 in the bottom

8   right-hand corner.  Underneath Part IIA, it says that --

9   can you -- can you tell me, under IIA, what it

10  describes, the description of this Chaplain I position

11  in that one paragraph?

12      A.   Sure.  "Plans, schedules, and conducts

13  religious education worship services, programs, and

14  sacramental ministry in accordance with the practices

15  and customs of the chaplain's faith and according to

16  offender faith group representation; conducts regular

17  visits to offenders, administrative segregation housing

18  areas, and individuals who are critically ill; and

19  counsels offenders on religious problems, personal

20  issues, crisis intervention, grief, and institutional

21  adjustment."

22      Q.   And when it says that this person provides

23  these services in accordance with the practices and

24  customs of their faith --

25      A.   Uh-huh.

1   Q.   -- what does that mean?

2   A.   For instance, I'm not Roman Catholic, so I

3   couldn't do the sacraments.  I couldn't fill in for the

4   priest and do the sacraments for that -- that faith,

5   according to -- in other words, I wouldn't do it for

6   Neopagans or -- I'm not equipped to do it, is a better

7   word --

8   Q.   Okay.

9   A.   -- to do it for them, as well.  So I can only

10  practice within what my belief system is.

11  Q.   And so if the individual chaplain's belief

12  system dictates what they can do as a chaplain, is that

13  something that comes up in the interview process when

14  you're hiring a new chaplain, what their faith is?

15  A.   No, sir.

16  Q.   Then at what point do you ask them what their

17  faith is?

18  A.   Never.

19  Q.   So then how do you know who can perform

20  certain rites and who cannot?  Because you said you

21  could not --

22  A.   Usually, it's on their application.

23  Q.   Okay.  So it is information that is provided

24  to you, even if it's not something you ask for?

25  A.   Correct.

1     Q.   Okay.  When you're making decisions on who to

2  hire as chaplain, do you take that into consideration?

3     A.   We look at the one that's best qualified for

4  the job, no matter what their faith is.

5     Q.   But does the need to have a certain person who

6  is qualified to perform -- let's just use an example of

7  the Catholic Communion or the sacred rites there -- does

8  that -- the need for that, does that factor in at all

9  into the hiring decision?

10     A.   It doesn't on mine.  I pick the best available

11  candidate.

12     Q.   Okay.  But you are limited to what you can do,

13  based on what your faith is?

14     A.   Correct.

15     Q.   And the same would be true of other chaplains

16  in the department?

17     A.   Correct.

18     Q.   Okay.  So I know you said you don't ask about

19  it during the hiring process, but it is information

20  that's provided to you.  Do you know if there are any

21  chaplains employed that are Buddhist, currently?

22     A.   Not that I'm aware of.

23     Q.   Is there -- are there records maintained that

24  list the various faiths of all the chaplains that are

25  employed?

1    A.   You would have to check with human resources.

2 I don't have those.

3    Q.   **Is there a human resources office within the**

4 **chaplaincy department, or is it the broader TDCJ human**

5 **resources?**

6    A.   Broader.

7    Q.   **Do you happen to know the name of the person**

8 **that might have those records?**

9    A.   Not off the top of my head, no, sir.

10    Q.   **Okay.  Is there anyone else involved in hiring**

11 **chaplains within your department, or is that something**

12 **you do by yourself?**

13    A.   Usually, it's myself and the assistant

14 director.

15    Q.   **Okay.  And is that Mr. Carter?**

16    A.   Brouwer.

17    Q.   **Oh, Brouwer.  Okay.  Are you at all involved**

18 **in hiring or supervising the Muslim area chaplains?**

19    A.   Yes.

20    Q.   **Do you know why that one particular religion**

21 **was singled out as needing chaplains of that particular**

22 **faith?**

23    A.   No, sir.  That was done before I ever came in

24 the agency.

25    Q.   **Are there currently five Muslim area**

1    chaplains?  Is that correct?

2         A.   Correct.  Well, currently, there are four.

3         Q.   There are four?

4         A.   We have one that's retired, so there's an open

5    position.

6         Q.   And is it correct that even though their title

7    is area chaplain, that they actually go and they provide

8    services on the individual units, these four Muslim area

9    chaplains?

10        A.   Their job is to help out on those units that

11   need -- they're the -- they're the go-to person for that

12   faith in that region.

13        Q.   Okay.  Are you involved at all in contracting

14   with Native American chaplains?

15        A.   I haven't been, but that does fall under my

16   purview.

17        Q.   Is there currently a Native American chaplain

18   that TDCJ has a contractual relationship with?

19        A.   Currently, we have two.

20        Q.   Two.  Okay.  How long have these individuals

21   worked for you?

22        A.   That, I couldn't -- don't have the numbers.

23        Q.   Do you know their names, these two Native

24   American chaplains?

25        A.   Not their official names, no.  I know one's

1  name is Raul.  That's the only thing I know him by.

2      Q.    Okay.

3      A.    And the other one is female, who is retiring

4  in September.  She's not going to renew her contract.

5  And her name is Shawna Mitchell.

6      **Q.    So for Raul and Shawna Mitchell, is there a**

7  **set number of hours per period that they work for TDCJ?**

8  **What's the time commitment that they make in their**

9  **contract with you?  Is that determined by the contract?**

10     A.    I'm not -- I'm not sure if there's a time

11  commitment, but visits.  They get paid per visit, and

12  they're only allowed so many a month.

13     **Q.    How many visits are they allowed a month?**

14     A.    That, I don't have.  I know the contract, I

15  believe, says at least one a month, so -- that's for

16  different facilities, though.

17     **Q.    Okay.  And I know you don't know how many**

18  **visits they're allowed per month.  Do you know**

19  **approximately how many visits they conduct each month**

20  **for Raul and Shawna?**

21     A.    Not off the top of my head.  I couldn't give

22  you the exact number.

23     **Q.    I want to ask you similar questions for Jewish**

24  **chaplains.  Have you been involved in contracting with**

25  **any Jewish chaplains that currently work for TDCJ?**

1        A.    I have not, as yet.

2        Q.    And have you been involved in contracting with

3  any Jewish chaplains that work with TDCJ in the past but

4  don't currently work with TDCJ?

5        A.    No, sir.

6        Q.    Are there currently any Jewish chaplains that

7  work for TDCJ on a contract basis?

8        A.    Not that I'm aware of, Jewish.  We have

9  Messianic Jews, but we don't have Jewish.

10       Q.    So there are Messianic Jewish chaplains that

11  you enter into contractual agreements --

12       A.    Not contract.  They're hired.

13       Q.    Okay.  And they would just be Chaplain I?

14       A.    Yes.

15       Q.    Okay.  And I apologize for not knowing this.

16  Can you tell me what the difference is between a

17  Messianic Jew and a Jewish person?

18       A.    Jewish Orthodox Messianic believe in Christ as

19  the -- as the Messiah, and Jewish do not.

20       Q.    And, again, pardon my ignorance on that.

21  Would a Messianic Jewish person -- would that be someone

22  who is considered a Christian, then, if they believe in

23  Christ?

24       A.    Some call themselves that.

25       Q.    Let me ask -- I'm going to ask you about that,

1  then.  Well, first of all, before we close off this

2  topic of contracts, are there any other chaplains right

3  now that TDCJ has engaged in a contractual arrangement

4  with besides Shawna and Raul, the Native American

5  chaplains?

6       A.   Specifically for Native American, you're

7  speaking of, or --

8       Q.   No.  For any other groups.

9       A.   We do have a Jewish contract chaplain.

10      Q.   Okay.  And what is that person's name?

11      A.   Rabbi Goldstein.

12      Q.   And were you involved in entering into the

13  contract that Rabbi Goldstein works under?

14      A.   Not as of yet.

15      Q.   Is his arrangement similar to the Native

16  American chaplains, where he gets paid per visit?

17      A.   I haven't seen his contract, but I would think

18  it would be close to that.

19      Q.   Okay.  So besides this one rabbi and these two

20  native American chaplains, are there any other chaplains

21  that TDCJ currently has a contractual agreement with?

22      A.   Not that I'm aware of.

23      Q.   Would you expect Rabbi Goldstein to minister

24  to anyone who is not a Jew?

25      A.   No, sir.

1      Q.   Would he be acting outside of the terms of his

2   contract if he did that?

3      A.   Again, without seeing his contract, I don't

4   know.

5      Q.   Okay.  Same question with the two Native

6   American chaplains.  Would you expect either of them to

7   visit or otherwise minister to a

8   non-Native-American-religion-practicing inmate?

9      A.   There again, I don't know -- I know we have

10  offenders that will go to maybe a Native American

11  service to see what it's like, and they may talk to that

12  extent.  But I don't know that they travel the unit to

13  visit them.

14      Q.   You mentioned a couple of minutes ago that

15  there is, I believe, one chaplain who is a Messianic Jew

16  currently employed as a chaplain at TDCJ.  Is that

17  correct?

18      A.   One that I know of.

19      Q.   One that you know of.  Okay.  And, again, I

20  know you said this isn't information that you look at

21  when you're hiring, but do you know of any other persons

22  who are employed as chaplains that don't identify as

23  Christians besides this one Messianic Jew?

24      A.   We have Catholic chaplains, but off the top of

25  my head, no, sir, I don't know.

1       Q.   Okay.  I'm going to shift and talk about your

2   involvement in -- during executions.

3       A.   Yes, sir.

4       Q.   I believe you first aided in the execution

5   chamber on November 12th, 2013.  Is that correct?

6       A.   Correct.

7       Q.   Okay.  And I've got here a chart with 66 rows

8   on it that I'm going to mark as Exhibit 3.

9                 (Marked Jones Exhibit No. 3.)

10       Q.   (BY MR. NEWBERRY)  I'm going to hand that to

11   you, Mr. Jones, and a copy for your attorney.

12                 Is this a table that you provided to your

13   attorney in preparation for this deposition?

14       A.   Yes, sir, it looks like it.

15       Q.   Okay.  Are these from your own personal

16   records?

17       A.   Yes, sir.

18       Q.   So you keep up with your involvement in each

19   execution?

20       A.   (Nodding head up and down).

21       Q.   Do you know if there's any TDCJ process or

22   office that also keeps up with this information?

23       A.   Not that I'm aware of.

24       Q.   So as far as you know, you would be the only

25   source of information regarding the executions that

1  you've participated in?  In other words, no one could

2  get this information from anyone but you?

3      A.   No, sir.  There is a form that is sent out

4  every execution that shows who's coming from the CID

5  side, who's going to be witnessing from the offender's

6  side, the victim's side, and then there's a list that

7  shows the chaplains that are with the family and then

8  the chaplains that are with the offender.  So -- but it

9  doesn't designate who's in the chamber.

10     Q.   Okay.  But it does have -- so it designates

11  who's going to be with the offender and who's going to

12  be with the family?

13     A.   Correct.

14     Q.   Okay.  And it excludes the person that's in

15  the chamber, or it just doesn't specify which one?

16     A.   Doesn't specify which one.

17     Q.   But that person's name would be contained on

18  this form?

19     A.   Should be, yes, sir.

20     Q.   Okay.  Does this form have a particular

21  number?  I know that, you know, some forms have an

22  identifying number like -- I'm familiar with I-60s.

23     A.   No, sir.

24     Q.   Okay.

25     A.   No, sir, not that I'm aware of.

1      Q.   Okay.  Do you believe these forms are kept

2  after an execution?

3      A.   That, I don't know.

4      Q.   Do you have any idea, if they were kept, who

5  might be responsible for keeping up with them?

6      A.   Unless it would be the Huntsville Unit itself,

7  I don't know.

8      Q.   Okay.  So if it is the Huntsville Unit, in

9  that scenario, would you think it would be the

10 Huntsville Unit chaplain or someone else there?

11     A.   No, sir, not the chaplain.

12     Q.   Okay.  Now, looking at this list, I know that

13 the -- well, first of all, looking at the third column,

14 you have, I believe, three different designations:

15 WSL --

16     A.   Uh-huh.

17     Q.   -- DH and DC.

18     A.   Yes, sir.

19     Q.   Can you explain what each one of these means?

20     A.   Yes, sir.  WSL stands for witness support

21 liaison.  That's usually the designation when you're

22 with the family, when your -- your assignment is to be

23 with the offender's family during that time.  The DH is

24 when you're in the death house, is the abbreviation of

25 what they called it, and that's the holding area.

1      Q.   And then DC is death chamber?

2      A.   Correct.

3      Q.   Okay.  So for these rows marked WSL or witness

4  support liaison --

5      A.   Yes, sir.

6      Q.   -- would you have any contact with the inmate

7  at all when you're assigned as a witness support

8  liaison?

9      A.   Yes.  According to my sheet, if you look,

10  No. 24, I was back in the holding area, but then I also

11  went over to the other side, the witness support

12  section, to bring the family over.  I didn't do it all

13  the time, but when we were short or didn't have somebody

14  to cover it, we did that.

15      Q.   But, say, Rows 1 through 9, where it's --

16  you've only marked WSL and it's not also DH --

17      A.   Correct.

18      Q.   -- does that mean in those instances you did

19  not have any contact with the inmate?

20      A.   Only through the viewing -- through the

21  window, but no physical or verbal.

22      Q.   And that would have been from the -- his

23  family's viewing room?

24      A.   Correct.

25      Q.   Okay.  So then according to this chart, am I

1   correct that the first inmate who was executed that you

2   had contact with, then, on the day of his execution was

3   Robert Garza?

4        A.   That would be correct.

5        Q.   Okay.  And I notice -- and that's Row 10.  Is

6   that correct?

7        A.   Yes.

8        Q.   For Mr. Garza, there's a notation in the

9   fourth column that says "baptized."

10       A.   Yes, sir.

11       Q.   Can you tell me what that means on this table?

12       A.   Yeah.  That was just for my personal use.  He

13  asked me to baptize him before his execution.  So the

14  day before, that's what -- I was called in and baptized

15  him before the execution.

16       Q.   And that happened the day before?

17       A.   Correct.

18       Q.   So that would have been at the Polunsky unit?

19       A.   Correct.

20       Q.   Okay.  And that's going to be true for

21  everyone that you've made the notation of "baptized" in

22  the fourth column?

23       A.   Yes, sir.

24       Q.   And for all these individuals, it would have

25  happened the day before?

1    A.   Correct.

2    Q.   Okay.  Would that have been somewhere in

3 Building 12 there at the Polunsky unit?

4    A.   Yes, sir.

5    Q.   Okay.  And I take it these offenders, then,

6 all identified as Christians?

7    A.   I didn't ask them.  They just asked me to

8 baptize them, and I baptized them the way that I

9 normally would baptize somebody in the free world.

10    Q.   And what way is that?

11    A.   Submersion.

12    Q.   Okay.  Consistent with the Christian practice

13 of baptism?

14    A.   I would say, yes, sir.

15    Q.   Okay.  So I want to ask you about these

16 inmates where you indicated that you worked in the death

17 house.  So like Robert Garza on Row 10, Arturo Diaz on

18 Row 11, if these inmates asked you to pray with them

19 there at the death house, would you do that?

20    A.   If they requested me to and I could, yes.

21    Q.   And under what circumstances would you not be

22 able to?

23    A.   I could only pray according to my faith and my

24 belief.  If they have something that's different -- for

25 instance, Buddhists, I don't know their chants.  I don't

1  know what they say, so I couldn't offer them any

2  prayers.  I take that back.  I could offer them prayers,

3  but it wouldn't be the way they wanted it.

4      **Q.   Okay.  And I know in your answer just now, you**

5  **said that you wouldn't know their chants.  If they told**

6  **you what the chant was, would you be able to chant with**

7  **them?**

8      A.   I don't think that would be fair to them.

9      **Q.   Why is that?**

10     A.   Because it wouldn't be something that I

11  believe or something that I would practice.  So I don't

12  know that I could do it.

13     **Q.   Anytime that you've worked in the death**

14  **house -- and you don't have to specify inmates if you**

15  **don't want to -- do you remember any times when you**

16  **discussed scriptures with any of these inmates?**

17     A.   Unless they brought it up, no, sir.

18     **Q.   Okay.  But do you remember any instances where**

19  **they did bring it up and then you did discuss scriptures**

20  **with them?**

21     A.   The only one I can remember was Willie

22  Trottie, No. 22.

23     **Q.   And Mr. Trottie was executed on**

24  **September 10th?**

25     A.   Correct.

1       Q.   And can you tell me the types of scripture

2  that Mr. Trottie asked you to share with him?

3       A.   I couldn't give you the scriptures that I

4  gave, because I'm not sure.  They were -- one of them

5  was on peace.  I know that.  He asked me about the 23rd

6  Psalm, asked me if I knew it.  And I said, "Yeah," and

7  he quoted it to me.

8       Q.   And the 23rd Psalm is in the Christian Bible?

9       A.   It's "The Lord is my shepherd."

10      Q.   Right.  Which, again, though is -- and I'm

11 familiar with the Psalm, but just to clarify that, that

12 is a Psalm that is contained within the Christian Bible?

13      A.   It's contained in the Bible.

14      Q.   Okay, yeah.  And the passage about peace would

15 have also been contained in the Bible?

16      A.   Yes.

17      Q.   Okay.  For Mr. Trottie, you also worked in the

18 death chamber.  Did you have any interactions with him,

19 that you remember, when you were inside the death

20 chamber?

21      A.   No, sir.

22      Q.   I'll get back to the death chamber in just a

23 minute.  I want to talk a little bit more about your

24 role in the death house.

25           When you work in the death house, how many

1  other chaplains are in that area?

2     A.   We have a team of three, two to three at

3  least.

4     Q.   Okay.  And who selects who works in the death

5  house?  Is that a decision you would now make in your

6  current position, or --

7     A.   It's -- well, the assistant director is the

8  one who oversees the execution process.  That falls

9  under his level.

10    Q.   And that's Mr. Brouwer?

11    A.   Correct.

12    Q.   Okay.  And so Mr. Brouwer makes the decisions

13  about who's going to be in the death house?

14    A.   He hasn't currently, because he's fairly new

15  at the job.  So I've still been carrying that role.

16    Q.   Okay.  And I know I said I was going to wait

17  till later, but who makes that decision, with respect to

18  the death chamber?

19    A.   We rotate.

20    Q.   Okay.  Rotate among who?

21    A.   Among Chaplain Brouwer, myself, and Chaplain

22  Moss.

23    Q.   Okay.  And when you say "rotate," you rotate

24  in who makes the decision, or you rotate among the three

25  of you in actually being the person in the execution

1  chamber?

2        A.   The plan is to rotate among the three of us,

3  that I may do the first one; the next one, Chaplain

4  Brouwer would do; the next one, Chaplain Moss would do.

5  And we would just keep the rotation.

6               However, if -- if I'm in there with one of

7  the gentlemen or in the death house with one of the

8  gentlemen and he and I don't seem to be connecting, then

9  I would step back and let somebody else step up, see if

10 they can make a connection.  The whole -- our whole job

11 is to keep them relaxed.  So it's talking about

12 football, talking about family, where they're from,

13 those type things.

14       Q.   So when you say "make a connection," that's

15 not necessarily on a spiritual level?

16       A.   No, sir.

17       Q.   You could just be chatting about football?

18       A.   Could be anything.

19       Q.   Okay.  But you want the person who is in the

20 execution chamber, if possible, to be someone that there

21 is some kind of connection with?

22       A.   That was our goal when we were in there, yes,

23 sir.

24       Q.   Okay.  Would there ever be a circumstance that

25 would cause you to deviate from that plan of rotating

 1   among the three of you?

 2       A.   Not that I'm aware of.

 3       Q.   So in the time that you've been a part of this

 4   group, it's always been one of the three of you?

 5       A.   Well, there was one or two others who are no

 6   longer in that role that don't do that anymore.

 7       Q.   Okay.  And so, once again, just so I can get a

 8   complete list, since you started working in the

 9   execution chamber, can you tell me the names, again, of

10   all the chaplains that you know of who have worked in

11   the execution chamber?

12       A.   Would be Michael Rutledge -- Dr. Rutledge --

13   David Collier.  I think Dan Rose did one.

14       Q.   Is that "Rose" or --

15       A.   R-O-S-E, "Rose," like the flower.

16       Q.   Okay.

17       A.   And then myself, Brouwer, and Moss.

18       Q.   Okay.  And does Dr. Rutledge -- is he employed

19   by TDCJ?

20       A.   He is.

21       Q.   What is his position?

22       A.   He was the director of chaplaincy, and now he

23   is -- was the assistant director, then became director,

24   and now he is over evidence-based practice.

25       Q.   Okay.  And then what about Dan Rose?

1      A.    He was a regional chaplain.  He's retired.

2      Q.    **Okay.  Regional chaplain, is that the same as**

3  **Chaplain III or --**

4      A.    Chaplain III, yes.

5      Q.    **Okay.  I believe I know the answer to this,**

6  **but just to clarify:  If a Muslim inmate was to be**

7  **executed and he asked you in the execution chamber to**

8  **recite the Islamic declaration of faith with him, is**

9  **that something you'd be able to do?**

10      A.    In the death chamber, no.

11      Q.    **How about -- if I said "death chamber," I**

12  **misspoke.  I meant in the death house.  Would you be**

13  **able to do that in the death house?**

14      A.    No, sir, because I don't know it.

15      Q.    **If he was able to provide you material from**

16  **his property there in the death house, would that be**

17  **something you'd be able to say with him?**

18      A.    I could say it.  I wouldn't necessarily

19  believe it.  But if it would relax him and make him

20  calmer, as long as I don't have to make a profession,

21  then I could do that.

22      Q.    **But if the declaration of faith that he wanted**

23  **you to say with him was that there is one God, who is**

24  **Allah, is that then a declaration you could say with**

25  **him?**

1       A.    Probably not.

2       Q.    I've just got one final area of questions that

3    I want to discuss with you, Mr. Jones.

4                   During any time that you've worked either

5    in the death house or the death chamber, have you ever

6    known any clerical person to assault any other person

7    during an execution?

8       A.    Not that I'm aware of.

9       Q.    And for purposes of these questions, when I

10   say "clerical person," I mean someone working for TDCJ

11   or a spiritual advisor there for the inmate.

12                  Have you ever seen such a person attempt

13   to gain access to the drug team?

14      A.    No, sir.

15      Q.    Have you ever seen such a person taunt the

16   victim's family?

17      A.    Either a spiritual advisor or a chaplain?

18      Q.    Yes.

19      A.    No.

20      Q.    And have you ever seen a spiritual advisor for

21   an inmate or a TDCJ chaplain attempt to remove the

22   intravenous lines from the person who is to be executed?

23      A.    No.

24      Q.    Okay.  The first time that you worked in the

25   death chamber -- and I apologize for having to move

1   back -- was Jamie McCaskey on November 12th, 2013,

2   Line 13.  Is that --

3       A.   Yes, sir.

4       Q.   Okay.  Before you worked in the execution

5   chamber, did you receive any kind of special training?

6       A.   Just being walked through, showing what we do.

7   Had to view -- because if you'll notice, there was three

8   prior to that, that I had to watch to see how the

9   protocol was to make sure I knew the steps that we were

10  supposed to take, what was happening, what was the next

11  step, what was the next step.  So --

12      Q.   And that was -- I'm sorry to interrupt you.

13  Go ahead.

14      A.   No, you're fine.

15      Q.   Okay.  So that was something that happened

16  before you worked in the death house at all?

17      A.   Correct.

18      Q.   And so it was a process you were familiar with

19  before you worked in the death chamber?

20      A.   Correct.

21      Q.   Was that -- who went through those steps with

22  you?

23      A.   At the time, it would have been David Collier,

24  who was the Huntsville Unit chaplain, and Dr. Rutledge.

25      Q.   Is that something that still happens before a

1  chaplain works in the death house or the death chamber

2  for the first time?

3       A.    Correct.

4       Q.    And who is the person now that would walk them

5  through that?

6       A.    Myself.

7       Q.    Okay.  Would that person have any interaction,

8  as far as training, from Ms. Davis or whoever the

9  Correctional Institutions Division director is at that

10  time?

11      A.    Other than sitting down and speaking with the

12  warden and going over things with the warden on the

13  unit, no.

14      Q.    So besides yourself, that person would only

15  have instruction from the Huntsville Unit warden?

16      A.    I'm not -- I don't know that it would be

17  instruction, but they may talk to them about what's

18  going to take place.  Most of the instruction would come

19  from us, because we only deal with a certain part of it.

20  We don't deal with the whole thing.  So we have very

21  specific...

22      Q.    And I know currently the rotation is -- it's

23  really, I guess, position-based as to who's going to

24  work in the execution chamber -- is that right? --

25  whoever has one of these three positions?

1    A.   No, sir.  Currently, we're not doing any

2 anymore.

3    Q.   That's correct.  I'm sorry.

4         Just prior to the April 2nd amendment to

5 the execution procedures, am I correct in characterizing

6 the nature of deciding who would be in the execution

7 chamber is based on that person's position?

8    A.   No, sir.  It would be on the rotation schedule

9 that we would set up.

10    Q.   Uh-huh.  And so the rotation schedule -- and I

11 know you told me the three people that were on it --

12 that's not dictated by the position those people hold?

13    A.   No, sir.  If that was the case, I'd be in

14 every one of them, if we were going by position.

15 It's -- we rotate it just so we -- we three know what to

16 do.  We three have been through the process.  We've been

17 through the training.  And we rotate it so one person

18 doesn't have to do all of them.

19    Q.   And I apologize if I've covered this.  Who

20 makes the decision as to who's going to be in that

21 group?

22    A.   That would -- I guess would be through me.

23    Q.   Okay.  And besides going through the different

24 procedures that you had to go through before, I believe,

25 Robert Garza's execution, is there any other additional

1   training this person would receive?

2       A.   No, sir.

3       Q.   And is there any attempt to delve into that

4   person's past to find out if they're somebody who can be

5   trusted in this tense situation?

6       A.   We look at -- first of all, this is a

7   voluntary position.  They don't get paid extra for doing

8   this.  So it's if they want to volunteer.  The other

9   thing is we look at their work history, have they been

10  in -- had any disciplinaries while working for TDCJ;

11  their conduct; how long they get along with the unit

12  staff; how well they get along with offenders.  We look

13  at their professionalism all over.

14      Q.   Is there a minimum amount of time that someone

15  would have had to work for TDCJ before that person could

16  be considered to be eligible to work in the execution

17  chamber?

18      A.   I don't know that there's a minimum amount of

19  time.

20      Q.   Are you familiar with the first time that

21  David Collier worked in the execution chamber?

22      A.   No, sir.  I wasn't with the agency then.

23      Q.   Okay.

24           MR. NEWBERRY:  Well, thank you,

25  Mr. Jones.  I know I kind of jumped back there, but I am

1  now finished asking questions.  I'll go ahead and pass

2  to Ms. O'Leary.

3              MS. O'LEARY:  Do you mind if we take just

4  a five-minute break?

5              (Break from 10:54 a.m. to 11:01 a.m.)

6              E X A M I N A T I O N

7  BY MS. O'LEARY:

8      Q.   Okay, Chaplain Jones.  I want to refer back to

9  what has been previously marked for this deposition as

10  Exhibit 2, and that is the Chaplain I job description.

11  And you previously testified about Section IIA, which is

12  on Page Murphy 791 of that document.

13      A.   Uh-huh.

14      Q.   And you were asked about providing ministry as

15  to the chaplain's personal faith.  Do you recall that

16  testimony?

17      A.   I do.

18      Q.   Okay.  What I want to ask you is:  Aside from

19  providing some type of ministry specific to the

20  chaplain's personal faith, does the chaplain have some

21  other roles that are not specific to his faith?

22      A.   Yes, ma'am.  As a chaplain, we are to be

23  ecumenical in our -- in our practice, which means I may

24  not have that faith, but we can -- we are supposed to

25  facilitate for every faith group that we have.  We're

1  supposed to facilitate -- which, if I can't do it, my

2  job is find a volunteer or somebody on the outside who

3  can come in and do services for them.

4      Q.   And in performing -- is that a role that you

5  have performed in the past?

6      A.   Yes, ma'am.

7      Q.   In performing that role, have you ever done

8  any research or looked up information about a faith that

9  was not your own so that you could help facilitate that?

10     A.   I have.

11     Q.   You previously testified that you would be

12 unable to recite, for example, a Muslim prayer that

13 required you to profess something.  Do you recall that

14 testimony?

15     A.   I do.

16     Q.   Okay.  So in a situation -- and we can use the

17 death house as an example for context.  In the death

18 house, if an offender who was not of your personal

19 faith -- for example, a Muslim or Buddhist offender --

20 asked you if you would pray with him and he wanted to

21 recite either his Buddhist or Muslim prayer, what would

22 you do that in situation?

23     A.   Again, because I don't know the prayer, I

24 couldn't recite it with him, but I would stand outside

25 his holding area and I would bow my head in respect for

1  his faith.  So whatever he wants to say or whatever he

2  wants to chant, I'm not going to stop him and say, "No,

3  I can't do it."  I'll just be respectful of his faith.

4        Q.   Okay.  So you wouldn't walk away or say "I

5  can't participate in that."  You just -- you wouldn't

6  necessarily say it with him?

7        A.   Correct.

8        Q.   Okay.  And just to clarify for the record,

9  there were some questions earlier about the chaplain's

10  role or the selection of chaplains to be present in the

11  execution chamber, and when you answered those

12  questions, were you specifically talking about before

13  the policy changed in April?

14        A.   Correct.

15        Q.   Okay.  So just to make sure it's clear,

16  currently, and since the April change in the policy,

17  chaplains do not go into the execution chamber?

18        A.   That's correct.

19        Q.   Okay.  You testified previously in response to

20  some questions about training and how you train or how

21  you were trained to participate in execution procedures.

22  Have you received any training on security?

23        A.   Yes -- yes, ma'am.  Every -- every chaplain

24  that's hired by the State has to go through six weeks of

25  the academy pre-service.  They go through security, how

1   do to shakedowns, how to do -- everything a security

2   officer does, we go through that.

3        Q.   Okay.  And do you receive any kind of updated

4   training through the years of your employment?

5        A.   Every year.

6        Q.   Okay.  And you testified that you actually

7   started as a CO, correct?

8        A.   Correct.

9        Q.   Okay.  So does that mean that you received

10  more security training because you started as a CO, or

11  was it the same security training in the beginning as a

12  chaplain would receive?

13       A.   It's the same.  The only difference would be

14  as a chaplain, you don't necessarily have to do the gas

15  or shoot the -- the gun.  But we always recommend the

16  new hirees (sic) -- I do -- to go through it, because

17  when they're on the unit, they may have to go through

18  the gas experience and they need to know what it's like.

19       Q.   So when you say that they're not required to

20  do the gas, you mean the exercise where someone sprays

21  gas and you --

22       A.   Correct.

23       Q.   -- actually experience what that feels like?

24       A.   Correct.

25       Q.   Okay.

1          **MS. O'LEARY:  I pass the witness.**

2          MR. NEWBERRY:  I don't have anything

3  further.

4          (The deposition concluded at 11:06 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              WITNESS CORRECTIONS AND SIGNATURE

 2        Please indicate changes on this sheet of paper,
      giving the change, page number, line number and reason
 3    for the change.  Please sign each page of changes.

 4    PAGE/LINE        CORRECTION        REASON FOR CHANGE

 5    _____

 6    _____

 7    _____

 8    _____

 9    _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20    _____

21    _____

22    _____

23    _____

24    _____

25    _____
```

1          I, TIMOTHY CLYDE JONES, have read the

2     foregoing deposition and hereby affix my signature that

3     same is true and correct, except as noted above.

4

5          _____

6          TIMOTHY CLYDE JONES

7

8     STATE OF  _____     *

9     COUNTY OF _____     *

10

11          Before me, _____, on this
      day personally appeared TIMOTHY CLYDE JONES, known to me
12    (or proved to me under oath or through
      _____) (description of identity card or
13    other document) to be the person whose name is
      subscribed to the foregoing instrument and acknowledged
14    to me that they executed the same for the purposes and
      consideration therein expressed.
15          Given under my hand and seal of office on
      this, the _____ day of _____, 2019.

16

17

18          _____

19          NOTARY PUBLIC IN AND FOR THE
            STATE OF _____

20

21

22

23

24

25

1                    REPORTER'S CERTIFICATE

2

3          I, KERRIENNE L. BOND, CSR, hereby certify that this

4    transcript is a true record of the testimony given by

5    the witness named herein, after said witness was duly

6    sworn by me.

7          I further certify that I am neither attorney nor

8    counsel for, related to, nor employed by any of the

9    parties to the action in which this testimony was taken.

10   Further, I am not a relative or employee of any attorney

11   of record in this cause, nor do I have a financial

12   interest in the action.

13         Certified to by me on July 8, 2019.

14

15

16

17   _____

     KERRIENNE L. BOND, TEXAS CSR NO. 8537
18   Expiration Date:  12-31-20
     INTEGRITY LEGAL SUPPORT SOLUTIONS
19   Firm Registration No. 528
     P.O. Box 245
20   Manchaca, Texas  78652
     Phone: (512) 320-8690
21   Fax: (512) 320-8692

22

23

24

25



# TEXAS DEPARTMENT OF CRIMINAL JUSTICE
## ORGANIZATIONAL STRUCTURE
### Rehabilitation Programs Division

**Texas Board of Criminal Justice**

**Executive Director**
**Deputy Executive Director**

**Rehabilitation Programs Division Director**

- Quality Assurance
- Religious Services/Programs
- Volunteer Project Coordinator
- Operations and Evidence-Based Practices

Administrative Support

Business Office

**Deputy Division Director**

Administrative Support

- Special Population Programs and Services
- Sex Offender Programs
- Substance Abuse Programs

- - - - - - Coordination

22

Prepared by Executive Services - January 2019

EXHIBIT
Jones
PENGAD 800-631-6989



## AFFIDAVIT

THE STATE OF **TEXAS** §

COUNTY OF **WALKER** §

BEFORE ME, the undersigned authority, on this day personally appeared Kristy Jeter, who, being by me duly sworn, deposed as follows:

My name is Kristy Jeter and I am an employee of the Texas Department of Criminal Justice (TDCJ), a governmental agency.  I am over 21 years of age, of sound mind, capable of making this affidavit, and personally acquainted with the facts herein stated.

I am the Manager II for the Human Resources Division, a part of the TDCJ located in Huntsville, Texas.  Attached is a true and correct copy of *TDCJ Chaplain I Job Description*, which are kept by the TDCJ in the regular course of its business activity.  The entries of such records were made as a regularly conducted activity and a regular practice of the TDCJ, and were made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters.

I declare under penalty of perjury that the foregoing is true and correct.

"Further Affiant sayeth not."

**Kristy Jeter**
Manager II, Support Operations
Human Resources Division
Texas Department of Criminal Justice

SWORN TO AND SUBSCRIBED BEFORE ME, the undersigned notary public, on the 17th day of May, 2019.

NOTARY PUBLIC, STATE OF TEXAS

Sherri Jackson
Notary's Printed Name

SHERRI JACKSON
Notary Public State of Texas
Notary ID #13120395-4
Commission Exp. JULY 07, 2021
Notary without Bond

My Commission Expires:
July 7, 2021

Murphy 790

## TEXAS DEPARTMENT OF CRIMINAL JUSTICE
## JOB DESCRIPTION

POSITION TITLE:   CHAPLAIN I

SALARY GROUP:   B17

DEPARTMENT:   Rehabilitation Programs Division

Page 1 of 3

CERTIFICATION:   I certify that, to my knowledge, this is an accurate and complete description of the essential functions and the conditions required for this position.

APPROVED BY:   Rene Hinojosa                         DATE:   12/10/2018

POSITION #:   045140

I.   JOB SUMMARY

Performs routine ministerial clergy work. Work involves planning and conducting religious services and education classes; providing pastoral care and counseling to offenders and offender families; and training others. Works under moderate supervision with limited latitude for the use of initiative and independent judgment.

II.   ESSENTIAL FUNCTIONS

A.   Plans, schedules, and conducts religious education worship services, programs, and sacramental ministry in accordance with the practices and customs of the chaplain's faith and according to offender faith group representation; conducts regular visits to offenders, administrative segregation housing areas, and individuals who are critically ill; and counsels offenders on religious problems, personal issues, crisis intervention, grief, and institutional adjustment.

B.   Maintains liaison with unit administration, departments, staff, and chaplaincy headquarters; and assists in providing institutional staff information on various faiths, groups, denominations, and needs of offenders.

C.   Recruits, trains, and oversees chaplaincy program volunteers; and provides agency information regarding religious educational programs, worship services, sacramental ministries, visitation, counseling programs, and other agency programs.

D.   Prepares program correspondence, statistics, and reports; and maintains required chaplaincy records, files, and other documentation.

*   Performs a variety of marginal duties not listed, to be determined and assigned as needed.

**Murphy 791**

**TEXAS DEPARTMENT OF CRIMINAL JUSTICE**
**JOB DESCRIPTION**

POSITION TITLE:      CHAPLAIN I

SALARY GROUP:      B17

DEPARTMENT:      Rehabilitation Programs Division

Page 2 of 3

III.   MINIMUM QUALIFICATIONS

   A.   Education, Experience, and Training

      1.   Bachelor's degree from a college, university, or seminary accredited by an organization recognized by the Council for Higher Education Accreditation (CHEA) or by the United States Department of Education (USDE). Major course work in Ministry, Divinity, Religious Studies, a Behavioral Science, or a related field.

or

         Graduation from an accredited senior high school or equivalent or GED. Four years full-time, wage-earning or wage-equivalent ministry experience. A minimum of 2080 volunteer hours as a Texas Department of Criminal Justice (TDCJ) Certified Volunteer Chaplaincy Assistant (CVCA), with supporting documentation (validated by the TDCJ Deputy Director of Religious Services' office), may be substituted for one year of the required experience on a year-for-year basis. Thirty semester hours from a college, university, or seminary accredited by the CHEA or by the USDE may be substituted for one year of experience on a year-for-year basis.

      2.   Must possess a written ecclesiastical endorsement by the applicable religious authority.

         Must maintain valid ecclesiastical endorsement for continued employment in position.

   B.   Knowledge and Skills

      1.   Knowledge of religious beliefs and practices of various faiths, groups, and denominations.

      2.   Knowledge of professional literature and resources.

      3.   Knowledge of agency and departmental organizational structure, policies, procedures, rules, and regulations preferred.

      4.   Skill to communicate ideas and instructions clearly and concisely.

      5.   Skill to coordinate with other staff, departments, officials, agencies, organizations, and the public.

      6.   Skill in problem-solving techniques.

      7.   Skill in public address.

      8.   Skill in the use of computers and related equipment in a stand-alone or local area network environment.

      9.   Skill in individual and group counseling.

**Murphy 792**

**TEXAS DEPARTMENT OF CRIMINAL JUSTICE**
**JOB DESCRIPTION**

POSITION TITLE:     CHAPLAIN I

SALARY GROUP:     B17

DEPARTMENT:     Rehabilitation Programs Division

Page 3 of 3

     10. Skill to organize, assign, and review the work of others.

IV. ADDITIONAL REQUIREMENTS WITH OR WITHOUT REASONABLE ACCOMMODATION

    A. Ability to walk, stand, sit, kneel, push, stoop, reach above the shoulder, grasp, pull, bend repeatedly, climb stairs, identify colors, hear with aid, see, write, count, read, speak, analyze, alphabetize, lift and carry under 15 lbs., perceive depth, operate a motor vehicle, and operate motor equipment.

    B. Conditions include working inside, working around machines with moving parts and moving objects, radiant and electrical energy, working closely with others, working alone, working protracted or irregular hours, and traveling by car, van, bus, and airplane.

    C. Equipment (machines, tools, devices) used in performing only the essential functions include computer and related equipment, calculator, copier, fax machine, dolly, telephone, and automobile.

**Murphy 793**

EXHIBIT

3

Jones

PENGAD 800-631-6989

| | | | | |
|---|---|---|---|---|
| 1 | 4/9/13 | Rickey Lewis | WSL | |
| 2 | 4/16/13 | Ronnie Threadgill | WSL | |
| 3 | 4/26/13 | Richard Cobb | WSL | |
| 4 | 5/7/13 | Carrol Parr | WSL | |
| 5 | 5/15/13 | Jeffery Williams | WSL | |
| 6 | 6/12/13 | Elroy Chester | WSL | |
| 7 | 7/16/13 | John Quintanilla | WSL | |
| 8 | 7/18/13 | Vaughn Ross | WSL | |
| 9 | 7/31/13 | Douglas Feldman | WSL | |
| 10 | 9/19/13 | Robert Garza | DH | Baptized |
| 11 | 9/26/13 | Arturo Diaz | DH | Baptized |
| 12 | 10/9/13 | Michael Yowell | DH | |
| 13 | 11/12/13 | Jamie McCaskey | DH/DC | |
| 14 | 12/3/13 | Jerry Martin | DH | Baptized |
| 15 | 1/22/14 | Edgar Tamayo | DH | |
| 16 | 2/15/14 | Susanne Basso | DH | |
| 17 | 3/19/14 | Ray Jasper | DH | |
| 18 | 3/27/14 | Anthony Doyle | DH/DC | |
| 19 | 4/3/14 | Tommy Sells | DH | |
| 20 | 4/9/14 | Ramiro Hernandez | WSL | |
| 21 | 4/16/14 | Jose Villegas | WSL | |
| 22 | 9/10/14 | Willie Trottie | DH/DC | |
| 23 | 9/17/14 | Lisa Coleman | DH | |
| 24 | 10/28/14 | Miguel Paredes | DH/WSL | |
| 25 | 1/21/15 | Arnold Prieto | DH | |
| 26 | 1/29/15 | Robert Ladd | DH/DC | |
| 27 | 2/4/15 | Donald Newbury | DH | |
| 28 | 3/11/15 | Manuel Vasquez | DH/WSL | Baptized |
| 29 | 4/9/15 | Kent Spouse | DH/DC | |
| 30 | 4/15/15 | Manuel Garza | DH/WSL | |
| 31 | 5/12/15 | Derrick Charles | DH/WSL | |
| 32 | 6/3/15 | Lester Bower | DH | |
| 33 | 6/18/15 | Gregory Russeau | DH/WSL | |
| 34 | 8/12/15 | Daniel Lopez | DH/DC | Baptized |
| 35 | 10/6/15 | Juan Garcia | DH/WSL | |
| 36 | 10/14/15 | Licho Escamilla | DH | |
| 37 | 11/18/15 | Raphael Holiday | DH/DC | |
| 38 | 1/20/16 | Richard Masterson | DH/WSL | |
| 39 | 1/27/16 | James Freeman | DH | |
| 40 | 2/16/16 | Gustavo Garcia | DH/DC | |
| 41 | 3/9/16 | Coy Westbrook | DH/WSL | |
| 42 | 3/22/16 | Adam Ward | DH | |
| 43 | 4/6/16 | Pablo Vasquez | DH | |
| 44 | 10/5/16 | Barney Fuller | DH | |
| 45 | 1/11/17 | Christopher Wilkins | DH/DC | |
| 46 | 1/26/17 | Terry Edwards | DH | |

MURPHY  1731

| 47 | 3/7/17 | Rolando Ruiz | DH/DC | |
| 48 | 3/14/17 | James Bigby | DH | |
| 49 | 7/27/17 | Taichin Preyor | DH/DC | |
| 50 | 10/12/17 | Robert Pruett | DH | |
| 51 | 11/8/17 | Ruben Cardenas | DH/DC | |
| 52 | 1/18/18 | Anthony Shore | DH | |
| 53 | 1/30/18 | William Rayford | DH/DC | |
| 54 | 2/1/18 | John Battaglia | DH | |
| 55 | 3/27/18 | Rosendo Rodriquez | DH/DC | |
| 56 | 4/25/18 | Erick Davila | DH | |
| 57 | 5/16/18 | Juan Castillo | DH/DC | |
| 58 | 6/27/18 | Danny Bible | DH | |
| 59 | 7/17/18 | Christopher Young | DH/DC | |
| 60 | 9/26/18 | Troy Clark | DH/DC | |
| 61 | 9/27/18 | Daniel Acker | DH | |
| 62 | 11/14/18 | Robert Ramos | DH/DC | |
| 63 | 12/4/18 | Joseph Garcia | DH | |
| 64 | 12/11/18 | Alvin Braziel | DH/DC | |
| 65 | 1/30/19 | Robert Jennings | DH | |
| 66 | 2/28/19 | Billie Coble | DH | |

MURPHY 1732