IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| PATRICK HENRY MURPHY, JR., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION |
| | § | NO. 4:19-cv-1106 |
| BRYAN COLLIER, Executive | § | |
| Director of the Texas | § | |
| Department of Criminal Justice; | § | |
| LORIE DAVIS, Director of the | § | |
| Texas Department of Criminal | § | |
| Justice - Correctional | § | |
| Institutions Division; and | § | |
| BILLY LEWIS, Warden of the | § | |
| Huntsville Unit, | § | |
| | § | |
| Defendants. | § | |

*******************************************
ORAL DEPOSITION OF
LORIE DAVIS
JUNE 20, 2019
*******************************************


ORAL DEPOSITION of LORIE DAVIS, produced as a

witness at the instance of the Plaintiff, and duly

sworn, was taken in the above-styled and numbered cause

on June 20, 2019, from 8:59 a.m. to 10:49 a.m., before

Kerrienne L. Bond, CSR in and for the State of Texas,

reported by machine shorthand, at the TDCJ Conference

Center, 1206 Avenue I, Huntsville, Texas, pursuant to

the Federal Rules of Civil Procedure and stipulations of

counsel as set out herein or attached hereto.

1                   A P P E A R A N C E S

2

3   FOR THE PLAINTIFF:

4        MR. JEFFREY R. NEWBERRY
         UNIVERSITY OF HOUSTON LAW CENTER
5        4604 Calhoun Road
         Houston, Texas  77204
6        Phone: (713) 743-6843
         E-mail: jrnewber@central.uh.edu
7

8   FOR THE DEFENDANTS:

9        MS. LEAH J. O'LEARY
               -and-
10       MS. AMY L. PRASAD
         OFFICE OF THE ATTORNEY GENERAL
11       LAW ENFORCEMENT DEFENSE DIVISION
         P.O. Box 12548
12       Austin, Texas  78711
         Phone: (512) 936-1292  Fax: (512) 370-9918
13       E-mail: leah.oleary@oag.texas.gov
                 amy.prasad@oag.texas.gov
14
               -and-
15
         MS. CALYSTA LANTIEGNE
16       TEXAS DEPARTMENT OF CRIMINAL JUSTICE
         OFFICE OF THE GENERAL COUNSEL
17       P.O. Box 13084, Capitol Station
         Austin, Texas  78701
18       Phone: (512) 475-4384  Fax: (512) 936-2159
         E-mail: calysta.lantiegne@tdcj.texas.gov
19

20  ALSO PRESENT:

21       MS. AMY LEE, Texas Department of Criminal Justice,
         Office of the General Counsel
22

23

24

25

1                    EXAMINATION INDEX

2

3    WITNESS:  LORIE DAVIS

4    EXAMINATION                                    PAGE

5        By Mr. Newberry...........................5

6    WITNESS CORRECTIONS AND SIGNATURE..............75

7    REPORTER'S CERTIFICATION.......................77

8
                      EXHIBIT INDEX
9
                                                   PAGE
10
     DAVIS EXHIBIT NO. 1...........................40
11        Declaration of Lorie Davis

12   DAVIS EXHIBIT NO. 2...........................61
          TDCJ Execution Procedure
13
     DAVIS EXHIBIT NO. 3...........................71
14        Disciplinary records from 11/21/2003 to
          present for Offender Murphy, Patrick
15

16

17

18

19

20

21

22

23

24

25

4

1                    THE REPORTER:  This is the deposition of

2    Lorie Davis in the matter of Patrick Henry Murphy, Jr.,

3    versus Bryan Collier, Lorie Davis, and Billy Lewis.  Our

4    location is 1206 Avenue I in Huntsville, Texas, and we

5    are on the record at 8:59 a.m.  My name is Kerrie Bond,

6    and my business address is 11309 Pickard Lane, Austin,

7    Texas 78748.

8                    Would all persons present please

9    introduce themselves for the record?

10                   MS. DAVIS:  Lorie Davis.

11                   MS. O'LEARY:  I'm Leah O'Leary from the

12   Attorney General's Office.  I represent Ms. Davis.

13                   MS. PRASAD:  Amy Prasad, also from the

14   Attorney General's Office.

15                   MS. LANTIEGNE:  Calysta Lantiegne, Deputy

16   General Counsel for the Texas Department of Criminal

17   Justice.

18                   MS. LEE:  Amy Lee.  I work for the

19   General Counsel's Office for TDCJ.

20                   MR. NEWBERRY:  I'm Jeff Newberry.  I

21   represent Patrick Murphy, the plaintiff.

22                   (Witness sworn.)

23                                   *
                                     *
24                                   *
                                     *
25                                   *

1                        LORIE DAVIS,

2    having been first duly sworn, testified as follows:

3                      E X A M I N A T I O N

4    BY MR. NEWBERRY:

5        **Q.    Ms. Davis, I know we met a few minutes ago,**

6    **but once again, I'm Jeff Newberry.  I represent Patrick**

7    **Murphy, the plaintiff in this case.  I know the court**

8    **reporter has already asked you to state your name.**

9    **Could you, one more time, just state your full name for**

10   **the record?**

11       A.    Lorie Davis.

12       **Q.    And how are you employed, Ms. Davis?**

13       A.    I'm employed as the director of the

14   correctional institutions division for the Texas

15   Department of Criminal Justice.

16       **Q.    And how long have you worked in that position**

17   **as the director of the correctional institutions**

18   **division?**

19       A.    For about three years.

20       **Q.    Okay.  And how long have you been employed by**

21   **TDCJ?**

22       A.    A little over 30 years.

23       **Q.    Now, I assume, in your position, it's likely**

24   **that you've been deposed before.  Is that correct?  Or**

25   **have you been deposed before?**

1      A.    No, sir.

2      Q.    Okay.  Then I just want to talk about a few

3 things, generally, about depositions, then.

4           I want to remind you that you are under

5 oath, that the court reporter has put you under oath,

6 and that oath is similar in weight -- it's exactly the

7 same as you would take if you were in a courtroom

8 proceeding, so the importance of this is exactly the

9 same.

10           I want to remind you that you have a duty

11 to answer the questions.  Your counsel may object to

12 some things, but unless she instructs you not to answer

13 a question for a limited set of reasons, then you are --

14 I am entitled to an answer to my questions.  Her

15 objections might lead to the Court later finding the

16 information to be inadmissible, but no one's here to

17 make those rulings now.  So for the most part, I'm

18 entitled to an answer on my questions unless your

19 counsel instructs you not to object (sic).

20           I'm going to just get right into my

21 questions.  Looking at some of the documents that were

22 provided by you in preparation for this deposition, one

23 of the things that we've been provided is a list of all

24 the different religions that have been designated by

25 people who are currently on death row.

1      And one thing I wanted to ask you about on

2 that, the total number of people accounted for on that

3 list is 206, but according to the TDCJ website this

4 morning, the number of people on death row is 220, with,

5 I believe, 214 being the number of men and 6 being the

6 number of women.

7      And so I -- I guess my first question is:

8 Do you know what accounts for the difference between the

9 206 reported in the figures that we were given -- the

10 information we were given ahead of the deposition and

11 the number 220 reported on the website?

12      A.   I have not reviewed that document.

13      Q.   Let me show you what I'm talking about, then.

14 This is information that we were provided by your

15 counsel as relevant to information that we'd requested

16 you provide at this deposition.

17      That first table, my understanding, is a

18 breakdown of all the religions that have been designated

19 by persons currently on death row.  The next four or

20 five pages, however many pages remain, is the same

21 information but broken down by individual.

22      A.   Okay.

23      Q.   And so my question, once again, is:  Are you

24 aware of what accounts for the difference between the

25 206 number that is indicated on the first page there and

1  the 220, which is what I believe the current number of

2  people on death row is?

3      A.   I do not personally compile this list, so I

4  can't speak to why there's a difference in the two

5  numbers.

6      Q.   Can I ask you if you know of any other

7  religions being designated by anyone currently on death

8  row, whether man or woman, that is not reflected on that

9  list?

10     A.   I do not -- am not familiar with the

11 designated religions of the offenders on death row.

12 That's not something that I deal with in my purview.

13     Q.   Who would be familiar with that information?

14     A.   I would -- again, I don't know who produced

15 this document, if this was generated from executive

16 services off of information in the computer, or the

17 rehabilitation division has the responsibility for the

18 designation of the -- of the religious preference.

19     Q.   If I told you the document was given to me by

20 your attorney in preparation for this deposition, would

21 you have any reason to doubt that?

22     A.   I -- I would assume.  I don't know.

23     Q.   Do you have access to the records -- you know,

24 there are documents that are produced when inmates on

25 death row select a particular religion.  In your

1  **position, do you have access to those records?**

2      A.   That's a very generic question.  I don't know

3  what particular records that you're referring to.

4      **Q.   Do you have access to the records that reflect**

5  **what religious designations the prisoners on death row**

6  **make?**

7      A.   It depends on -- on the record and the

8  document, sir.

9      **Q.   Are there records that you don't have access**

10 **to?**

11     A.   There could be.  I don't have access to

12 everything.

13     **Q.   Do you have access to all documents related to**

14 **religious designations made by inmates?**

15     A.   I do not know whether I have access to all

16 documents or not, because I don't understand what all

17 documents you're referring to.

18     **Q.   I'm only referring to those by which prisoners**

19 **make their -- designate their choice of religion.**

20 **That's the only documents I'm talking about.**

21     A.   Those aren't documents that I would normally

22 review in my purview as the director of CID.

23     **Q.   You are aware that we asked for this**

24 **information ahead of this deposition, and we also asked**

25 **for this information in the interrogatories that we sent**

1   approximately 25 days ago.  Are you aware of that?

2       A.   I do not know the specifics of everything that

3   you requested.  I do not.

4       Q.   You have not been able to review the request

5   for documents that we sent to your attorney ahead of

6   today's deposition?

7       A.   I -- I looked at one of the requests that came

8   in, but I don't know -- I don't know what that was,

9   necessarily, as you -- as you are implying.

10      Q.   And have you looked at the interrogatories

11  that we sent to Ms. O'Leary, your counsel today?  I

12  think it was about 25 days ago.  Have you looked at

13  those?

14      A.   At the interrogatories?

15      Q.   Yes, ma'am, the questions.

16      A.   Yes, sir.

17      Q.   Do you remember this information being

18  contained in the interrogatories?

19      A.   Not specifically.

20      Q.   I'll move on to the next area.  I want to talk

21  next about the people who have been in the execution

22  chamber when somebody is executed.  I know we've

23  received four or five different copies of the execution

24  procedures document, and I note with this particular

25  interest, there has been a change made on April 2nd.

1                  My question is:  Prior to the April 2nd

2    amendment, is it true that three people would accompany

3    an inmate in the execution chamber, and those three

4    people would be either the -- well, excuse me -- the

5    correctional institution division director or designee,

6    who currently is you; the second person would be the

7    Huntsville unit warden or his designee; and the third

8    person would be the Huntsville unit chaplain or

9    designated, approved TDCJ chaplain?  Is that

10   understanding correct?

11        A.   That prior to April 2nd, those were the three

12   people that were allowed in the execution chamber?

13        Q.   Yes.  Is that correct?

14        A.   Yes, sir.

15        Q.   Would anyone other than those three people

16   have been allowed in the execution chamber during an

17   execution before the April 2nd amendment to the

18   execution procedures document?

19        A.   Not during my tenure as CID director, no, sir.

20        Q.   And then, of course, the April 2nd change was

21   to remove that third person, which would be the

22   Huntsville unit chaplain or designated, approved TDCJ

23   chaplain, from the people who were in the execution

24   chamber.  Is that -- is that correct?

25        A.   Yes, sir.

1      Q.   So after the April 2nd revision to the

2  execution procedures document, there will only be two

3  people accompanying the inmate in the execution chamber?

4      A.   After the --

5      Q.   After the April 2nd change.

6      A.   Yes.

7      Q.   And those two people would be the person

8  serving in your position or someone designated by you,

9  and the Huntsville unit warden or someone designated to

10  fill in that spot?

11      A.   Those are the two people authorized in the

12  execution chamber under the current procedure.

13      Q.   And I want to talk next about the people that

14  have been disclosed to us as people who have been

15  present in the execution chamber.  Of course, we asked

16  for this information going back to when executions

17  resumed in 1982.

18           Among the people that we've been told were

19  in the execution chamber during an execution, the first

20  person would be yourself.  You, of course, are in the

21  correctional institution division.  Is it correct that

22  the first execution where you were in the execution

23  chamber was April 6th, 2016?

24      A.   I believe so.

25      Q.   And you began working for TDCJ on

1  December 20th, 1988?

2      A.   Yes, sir.

3      Q.   For how many executions have you been in the

4  execution chamber?

5      A.   I believe 23.

6      Q.   During the time that you've been the director

7  of the correctional institutions division, have you

8  designated anyone to stand in your place during an

9  execution?  In other words, has there been any other

10  person besides you, during the time that you've been the

11  director, who's been in the execution chamber in that

12  capacity?

13      A.   There was one time when I was out of the

14  country, and Billy Hirsch was my designee.

15      Q.   Mr. Hirsch?

16      A.   Yes.

17      Q.   Okay.  Is that the only instance?

18      A.   Yes, sir.

19      Q.   And I believe we have Mr. Hirsch's

20  information.  So then going down to the next person, I

21  believe the person who served in your capacity as the

22  director before you was William Stephens.  Is that

23  correct?

24      A.   Yes, he was in my position prior to me.

25      Q.   Okay.  And according to the information we've

1   received, the first execution where he was present in

2   the execution chamber is June 2nd, 2009.  Do you believe

3   that's correct?

4        A.   I have no -- no reason to know that

5   information.  If it was provided in -- in documents,

6   then I would say that the documents provided were

7   correct.

8        Q.   If I told you that it was in the information

9   that was provided by your counsel in preparation for

10   this deposition, the information that we'd asked from

11   you, do you have any reason to doubt that?

12        A.   No.

13        Q.   Okay.  I believe Mr. Stephens began employment

14   June 1st, 1981.  Do you have any reason to believe

15   that's incorrect?

16        A.   No.

17        Q.   Now, we have not been provided the names of

18   any people who served as the director prior to

19   Mr. Stephens.  Is the person who served in that position

20   immediately before Mr. Stephens -- was that Mr. Thaler?

21        A.   Yes.

22        Q.   When did Mr. Thaler begin serving as the

23   director?

24        A.   I do not know those dates.

25        Q.   When did Mr. Thaler first participate in the

1   execution chamber during an execution?

2       A.   I do not know.

3       Q.   And you understand that this is in the

4   information that we've requested relevant to this case

5   that we've asked you to disclose?

6       A.   I understand that, but I do not have that list

7   in front of me.

8       Q.   And do you have access to that information in

9   your office, in your capacity as the director?

10      A.   Do I have access to what information?

11      Q.   Currently, right now, I'm asking you when

12  Mr. Thaler was first in the execution chamber.

13      A.   I have no records of when Mr. Thaler was in

14  the execution chamber.

15      Q.   How far back do you have records of who was

16  present in the execution chamber during an execution?

17      A.   We don't keep records of who is present in the

18  execution chamber during an execution.

19      Q.   There is no written record of that?

20      A.   Not to my knowledge.

21      Q.   And you have no personal recollection?

22      A.   No, sir, I do not.

23      Q.   So, TDCJ, I suppose that there are -- I would

24  assume there are a significant number of records kept

25  for each execution.  Is that correct?

1    A.   There are records that are kept.  It just
2  depends on which one you're referring to.
3    Q.   **There are records kept about who visits the**
4  **person both at the Polunsky Unit and at the Walls Unit.**
5  **Is that -- is that correct?**
6    A.   I would have to see the -- the records that
7  you're referring to.
8    Q.   **I'm just asking if those records exist.  Do**
9  **they exist?**
10    A.   I'm not sure.
11    Q.   **There are records of what the person who is**
12  **executed's last words are.  Are there not those records?**
13    A.   The offender's last words are -- are recorded.
14    Q.   **There are records related to the -- and I'm**
15  **not going to ask any specifics, but are there records**
16  **related to the drugs that are used during an execution,**
17  **that are kept?**
18    A.   Are there records relating to the drugs?
19    Q.   **Yeah.  I'm not asking you about the contents**
20  **of those records, but are records kept about that?**
21    A.   Yes.
22    Q.   **So there are records that are kept related to**
23  **executions?**
24    A.   Yes.
25    Q.   **But you do not believe there are records that**

1  are kept listing the TDCJ personnel that were in the

2  execution chamber at the time of the execution?

3                    MS. O'LEARY:  Objection.  Asked and

4  answered.

5       Q.   (BY MR. NEWBERRY)  You can answer the

6  question.

7       A.   No, there are not records kept for that.

8       Q.   And so you do not know how many executions

9  Mr. Thaler was present in the execution chamber for?

10      A.   I do not know.

11      Q.   I suppose the answer is the same for

12  Mr. Quarterman?

13      A.   The answer is the same.

14      Q.   And Mr. Quarterman is the person who preceded

15  Mr. Thaler as the director of the correctional

16  institutions division.  Is that correct?

17      A.   I believe so.

18      Q.   The next group of people who were disclosed to

19  us were the people who were serving in the capacity of

20  the Huntsville unit warden, I believe.  Is it correct

21  that Billy Lewis is the current warden at the Huntsville

22  unit?

23      A.   Yes.

24      Q.   And his -- the first execution that he

25  participated in was December 14th, 2018.  Is that

1  correct?

2       A.   I believe so.

3       Q.   Since that time, has there been anyone

4  designated to serve in his capacity in the execution

5  chamber?  In other words, in the time since his first

6  execution on December 14th, has anyone else filled that

7  position of the Huntsville unit chaplain or designee in

8  the execution chamber?

9       A.   No.

10      Q.   And he's been present for every one of the

11 executions that have occurred since December 14th, 2018?

12      A.   I believe so.

13      Q.   And I believe the person who was the

14 Huntsville unit -- I'm sorry.  I misspoke.  Let me clear

15 that up.

16           Billy Lewis is the Huntsville unit warden.

17 Is that correct?

18      A.   Yes.

19      Q.   I believe I said chaplain, but he's the

20 warden?

21      A.   He is the warden.

22      Q.   And the person who was the warden before

23 Mr. Lewis was James Jones.  Is that correct?

24      A.   Yes, sir.

25      Q.   I believe that the first execution that he was

1   present for was October 31st, 2010.  Is that correct?

2        A.   I'm not sure.  I don't know the specific date.

3        Q.   Is that in the information that you provided

4   us in preparation for this deposition?

5        A.   It -- again, I don't have the list that you're

6   referring to in front of me, but I have no reason to

7   doubt the information that's provided on the list.

8        Q.   Do you have any reason to doubt that Mr. Jones

9   was first employed by TDCJ December 27th, 1984?

10       A.   No.

11       Q.   Turning next to the persons that fill that

12  third spot in the execution chamber, and this would be

13  the Huntsville unit chaplain or designated, approved

14  TDCJ chaplain.  And I believe the -- Chaplain Jones has

15  been present in recent executions.  Is that correct?

16       A.   Yes.

17       Q.   And he was, at one time, the Polunsky Unit

18  chaplain.  Is that correct?

19       A.   I believe so.

20       Q.   And the first execution that he was present

21  for was November 12th, 2013?

22       A.   I have no reason to doubt that, if it's from

23  your list.

24       Q.   So this is the document that we were provided

25  by your counsel -- but I assume it was from you -- in

1  preparation for this deposition, related to Chaplain

2  Jones, when we asked for information about people who

3  have been present in the execution chamber.  I will show

4  you that.

5          Can you tell me when you've designated --

6  when you use WSL, what does WSL mean?

7      A.   This -- I don't know.

8      Q.   Is this a document that was provided by your

9  counsel as being responsive to requests for documents

10 that we had given to you?

11     A.   I assume, if that's what you're telling me.

12     Q.   But you've not seen this document?

13     A.   I have not looked at this document before.

14     Q.   And you cannot tell me what WSL means?

15     A.   I cannot.

16     Q.   And you have no knowledge of this document?

17     A.   I have not reviewed this document in

18 preparation for this deposition.

19     Q.   Do you have any idea what WSL might mean?

20     A.   No, sir, I do not.

21     Q.   If it was -- I mean, if the chaplain

22 apparently meant that he was either in the death house

23 or the death chamber or WSL, you do not know what that

24 means?

25     A.   I do not know what WSL means on this document.

1    Q.   In what capacity might this chaplain have

2    served during an execution, if not the death chamber or

3    the death house?

4    A.   What capacity?  Could you state your question

5    again, please?

6    Q.   Yes.  Based on the document, where there's

7    been -- there's no key, I believe that DH likely means

8    death house, DC likely means death chamber.  So I assume

9    this third column, which is not labeled, indicates the

10   capacity in which he served during that execution.

11            Besides death chamber or death house,

12   what -- in what other capacities do chaplains serve

13   during an execution?

14   A.   With the offender's family, with the

15   condemned's family.

16   Q.   And would that be in the hospitality house?

17   A.   It could be at the hospitality house or it

18   could be in the viewing room for the condemned at the

19   time of the execution.

20   Q.   And I'll get back to these questions in just a

21   minute, but when a chaplain says he served in the death

22   house, what is the death house?

23   A.   What is the --

24   Q.   Does death house -- when you and the chaplains

25   and anyone involved in an execution procedure use the

1  term "death house," does that have a particular meaning?

2      A.   It's the building in which we carry out the

3  executions or where the offender is held prior to the

4  execution.

5      Q.   So it would include the holding cell where he

6  is before --

7      A.   Yes.

8      Q.   -- he is taken to the execution chamber?

9      A.   It's all in one building.

10     Q.   And does the term "death house" -- would that

11  also encompass the death chamber, or would that not be

12  used when talking about the chamber?

13     A.   The death house is the building in its

14  entirety that has the execution chamber, the viewing

15  rooms, and the holding area and the drug room.

16     Q.   Okay.  Now, another chaplain that we were

17  given information about was Thomas Brouwer.  Are you

18  familiar with Chaplain Brouwer?

19     A.   Yes, sir.

20     Q.   Okay.  I believe that the first execution that

21  he participated in was February 28th, 2019.  Do you have

22  any reason to doubt that?

23     A.   I do not.

24     Q.   Do you know how many executions Mr. Brouwer

25  has participated in?

1    A.   I do not.

2    Q.   Has he been in more than the one on

3  February 28th, 2019?

4    A.   I do not have that information.

5    Q.   Have you been present at all the executions

6  since February 28th, 2019?

7    A.   Yes.

8    Q.   But you do not recall whether or not

9  Mr. Brouwer was present at any of those?

10    A.   I do not.

11    Q.   And you did not bring those records with you

12  today?

13    A.   I did not.

14    Q.   We were also provided information about a

15  Chaplain Moss.  Are you familiar with Wayne Moss?

16    A.   Yes.

17    Q.   And he's the member of a witness support

18  liaison team.  Is that correct?

19    A.   He is a member of the chaplaincy and would

20  serve in that role.

21    Q.   What does someone do who is -- serves in the

22  role of witness support liaison team?  What is that?

23    A.   That's the team that supports the condemned

24  and the condemned's family on the day of the execution.

25    Q.   And how do they provide that support?  What do

1  they do?

2      A.   They answer questions for the -- the family.

3  They accompany the family from the hospitality house to

4  the condemned viewing room at the death house.

5      Q.   And so the witness -- so someone who is a

6  member of the witness support liaison team deals only

7  with the person's family and not with the condemned

8  inmate himself?

9      A.   They may deal with the condemned inmate

10 himself.

11     Q.   And I believe Mr. Moss first began employment

12 with TDCJ on May 2nd, 2013.  Is that correct?

13     A.   I have no reason to doubt that.

14     Q.   And that the first execution he participated

15 in was September 27th, 2018?

16     A.   I have no reason to doubt that.

17     Q.   The final chaplain that we've been given

18 information about is David Collier.  I believe the first

19 execution he participated in was March 29th, 2007.  Do

20 you believe that's correct?

21     A.   I have no reason to doubt that.

22     Q.   And so as far as you know, that is correct?

23     A.   If that's the information that was provided to

24 you, I have no reason to doubt that.

25     Q.   And do you have any reason to doubt that he

1    began working for TDCJ on December 5th, 2006 -- excuse

2    me -- December 15th, 2006?

3         A.   No, sir.

4         Q.   And if those are correct, that would mean that

5    he was employed by TDCJ for approximately three and a

6    half months before first working in the execution

7    chamber.  Is that correct?

8         A.   I'm sorry.  Tell me the dates again?

9         Q.   If his first execution was March 29th, 2007,

10   and he began working for TDCJ on December 15th, 2006,

11   would that mean he had been employed by TDCJ for three

12   and a half months when he first served in the execution

13   chamber?

14        A.   I believe so, according to those dates that

15   you've provided.

16        Q.   Did you provide a declaration, a signed -- a

17   sworn statement in this proceeding that I believe was

18   signed by you on March 26th?  Do you remember that

19   declaration?

20        A.   Could I see what you're referring to, please?

21        Q.   Yes, you may.  And it's preceded by an exhibit

22   cover sheet that I assume the attorney working the case

23   at that time prepared.  You may recognize the cover

24   sheet.

25        A.   Yes, sir.

1    Q.    You do recognize that statement?

2    A.    Yes, sir.

3    Q.    In that statement, did you say that you --

4  when you personally select people to be in the execution

5  chamber, it's important that they've served for many

6  years with TDCJ?

7    A.    Yes.

8    Q.    Was Mr. Collier the only exception to this

9  rule?

10   A.    I was not the director during that time period

11 that you're referring to.

12   Q.    So you do not have any idea whether anyone

13 besides Mr. Collier was permitted to serve in the

14 execution chamber after only being employed by TDCJ for

15 three and a half months or a comparable time period?

16   A.    (No response).

17   Q.    Do you know whether any person besides

18 Mr. Collier was allowed to serve in the execution

19 chamber after being employed by TDCJ for three and a

20 half months or some comparable time period?

21   A.    I do not have that information.

22   Q.    Who would have that information?

23   A.    I believe that you said it's been provided to

24 you.

25   Q.    Mr. Collier's name has, and his information.

 1   Despite the fact that we've asked for this information

 2   going back to 1982, neither you nor any of the other

 3   defendants have provided that information to us.

 4              So I'm asking you:  Do you know who would

 5   have that information?

 6        A.   There are not records kept of who's present in

 7   the execution chamber.

 8        Q.   And there is no one employed by TDCJ who would

 9   have any recollection of this?

10              MS. O'LEARY:  Objection.  Calls for

11   speculation.

12        Q.   (BY MR. NEWBERRY)  I'll clean up the question.

13              Do you know of anyone in TDCJ who knows

14   this information?

15        A.   No, sir.

16        Q.   Also in that same statement, in addition to

17   saying that in order to serve in the execution chamber,

18   a person needs to have been employed for many years, you

19   also said that the people that serve in the execution

20   chamber go through extensive training.  Is that correct?

21        A.   Yes.

22        Q.   What does this extensive training entail?

23        A.   It entails going -- going through the process

24   involved and the logistics involved of carrying out an

25   execution.

1    Q.   And so if I was currently the Huntsville unit

2  chaplain and you had designated me to be the person

3  present at the next execution, whether it's July 31st or

4  whatever the date is, what would I have to go through

5  for you to demonstrate that to me?  What would that

6  process look like?  Can you describe it in greater

7  detail?

8    A.   It would involve going to the death house.  It

9  would involve conversations about the preparation and

10  the execution and the timing and the totality of the

11  events of the execution of that day, what your

12  responsibilities are when you move, what's important,

13  the details of -- of the process.

14    Q.   And how long would it take to go through that

15  training?

16    A.   It would -- it would vary.

17    Q.   The last time you provided this type of

18  training to a chaplain, how long did that take?

19    A.   I don't know that I can answer that.  I

20  believe that -- that -- I believe that it's a process,

21  and I believe that you could consider training to be the

22  totality of the time.  You may come -- a chaplain may

23  come and observe and serve in the death house before

24  they are -- would have served in the execution chamber.

25  And that -- that's different now because the protocol is

1  different now.

2       Q.   Right.  But let me clarify.

3            The specific procedure that you said that

4  I would have to go through if you had designated me to

5  be the chaplain at the July 31st execution, where you

6  would -- you know, we would go through and you would

7  explain exactly what's happening during an execution,

8  that specific procedure that you said is the training I

9  would have to get, how long would that take?

10      A.   I think you're mischaracterizing the -- the

11 training that it would take to -- to be in the chamber.

12 It's not just that day that counts as you being prepared

13 to participate in the execution process.  So I don't --

14 I disagree with the way that you're characterizing it or

15 I don't understand it, one or the other.

16      Q.   And it wasn't my intent to mischaracterize

17 anything.  Can you go back to my question, then?

18           If I was going to -- if you designated me

19 to be the chaplain at the July 31st execution, can you

20 tell me all of the training that would be entailed in

21 this training you described in this document that you're

22 looking at?

23      A.   You would participate and have a familiarity

24 with death row processes and death row offenders, and

25 you would have that for a long time.  There is no set

1 time that -- that would prepare you to then come and be

2 a part of the execution process.

3     **Q.   But it's fair to say that that could be**

4 **accomplished in three and a half months?**

5     A.   Absolutely.

6     **Q.   Could it be accomplished in two months?**

7     A.   It's very dependent on the person.   It's

8 dependent on their maturity level.   It's dependent on

9 their professionalism.   It's dependent on their

10 experience.   And that's why the -- the basis is done on

11 an individual basis.

12     **Q.   Have you ever designated someone to**

13 **participate in the execution chamber who you then**

14 **determined would not be able to serve in that capacity?**

15     A.   No.

16     **Q.   So every person you have looked at has passed**

17 **this training?**

18     A.   Yes.

19     **Q.   And you found them to be qualified?**

20     A.   Yes.

21     **Q.   Who is the last person that you found to be**

22 **qualified to serve in the execution chamber?**

23     A.   Bill Lewis.

24     **Q.   And can you describe what you went through**

25 **with him?**

1      A.    What I went through with him?

2      Q.    **The training, when you went through and you**

3    **explained to him what happens during an execution, this**

4    **process.**

5      A.    Say the question again?

6      Q.    **The process where you explain what happens in**

7    **an execution and that type of thing you said I would**

8    **have to go through, was there a particular day or set of**

9    **days when this happened with Bill Lewis?**

10     A.    It happened and occurred over a period of

11   time.

12     Q.    **What is the reason why this training -- if**

13   **there is a reason, why this training could not be given**

14   **to someone who is not a TDCJ employee?**

15     A.    A person who's not a TDCJ employee, I -- I do

16   not have the ability to assess them prior to their

17   participation in the execution process.  An execution is

18   a very stressful and intense event.  I have no way of

19   knowing how a person that has never been exposed to

20   that's going to react during that -- that process of the

21   execution.

22              There are security protocols that are in

23   place that maintain the integrity of the execution

24   process and the execution chamber itself.  The -- the

25   risk to that person, to the condemned, to our staff, are

1   great in -- in that scenario, and I do not believe that

2   you can predict how someone like that is going to react.

3                 And the -- the other difference between a

4   TDCJ employee, a TDCJ employee understands what our

5   mission is and what our role is as required in the

6   execution process.  We're employed by the agency, and we

7   understand what the mission is and what our role to that

8   is.  And a person from the outside is -- is not employed

9   by the agency so may -- may not have the same level of

10  professionalism and commitment to the mission as someone

11  who's not.

12       Q.   I'm going to unpack some of that.

13            Even TDCJ employees, there is a time when

14  they serve in the execution chamber that that is their

15  first time and they've never served before, correct?

16       A.   Correct.

17       Q.   And so for Bill Lewis, the first time he was

18  in the execution chamber was December 14th, 2018.  Is

19  that correct?

20       A.   As far as I know.

21       Q.   How were you able to know how he would react

22  if he'd never been in that situation before

23  December 14th, 2018?

24       A.   I know his professional background.  I know

25  his professional commitment.  I know his experience, his

1  respect.  I know that his work experience, he had

2  previous -- he had previous work experience being

3  assigned to the Walls Unit in different capacities, as

4  well as different capacities of Region 1.

5           So he had been in -- involved in different

6  parts of the execution process previously in his career.

7  I have much respect for him as a correctional

8  professional.

9      Q.   **But you talked about the -- being in the**

10 **execution chamber being something that's different --**

11     A.   Yes.

12     Q.   **-- and being a more stressful situation.  Is**

13 **that correct?**

14     A.   An execution in its entirety is a stressful

15 situation.

16     Q.   **And you specifically are worried that that**

17 **person would react badly in the execution chamber if**

18 **they'd never been there before?**

19     A.   It has to be a concern, absolutely.

20     Q.   **How did you know prior to December 14th, 2018,**

21 **since he'd never been there before, how Bill Lewis would**

22 **react?**

23     A.   Because I made a personal judgment, a

24 consideration, based on his professionalism and his

25 experience.

1    Q.   You talk about how you're able to assess

2  people that are TDCJ employees.  How do you do that?

3    A.   How do I assess them?

4    Q.   When I asked you why that -- why the same

5  check or the same -- why you could not determine

6  somebody who's not an employee is qualified to be in the

7  execution chamber, when I asked you that, I believe you

8  started your answer by saying you're not able to assess

9  them the same way that you are able to assess a TDCJ

10 employee.

11          So what I want to know now is:  What does

12 that assessment look like when you're assessing these

13 TDCJ employees?  Can you explain that to me?

14    A.   It can be the -- the totality of that person.

15 It can be my personal interaction with them, their

16 demeanor, their tone, their professionalism, their

17 commitment, their work history, my observation of how

18 they conduct and carry themselves.  All of those things

19 can go in that together to be part of the consideration.

20    Q.   And you can interact with people that are not

21 employees, right?

22    A.   I'm sorry?

23    Q.   You can have personal interaction with people

24 that aren't TDCJ employees, can't you?

25    A.   Absolutely.

1      Q.    And you can --

2      A.    But it's very -- the situations in which you

3  interact with them is different in a professional

4  setting, in a setting that is -- is not part of the --

5  the work environment.

6      Q.    But if someone came to you as a non-TDCJ

7  employee, but as someone who was applying, if you will,

8  to be someone to serve in an execution chamber, that

9  would still be in a professional capacity, would it not?

10     A.    I don't think that -- I don't think that it --

11  that is.  I don't -- I don't see that as the same thing.

12     Q.    I don't --

13     A.    They're not employed by the agency, and the

14  policy doesn't allow -- there wouldn't be an assessment

15  now, because the policy doesn't allow for them to be in

16  the chamber.

17     Q.    Yes.  But pre-April 2nd, pre-April 2nd, what

18  would stop you from assessing a non-employee's work

19  history?

20     A.    What would stop me?

21     Q.    Well, why could you not assess his work

22  history?

23     A.    It's not the same level of access or

24  knowledge.

25     Q.    When TDCJ employs anyone, do they look into

 1  that person's work history?

 2      A.   Yes.

 3      Q.   And so there's a process by which they do

 4  that?

 5      A.   Yes.

 6      Q.   And I assume that's a thorough process?

 7      A.   I believe it to be.

 8      Q.   And if there was anything that would cause any

 9  concern in that person's work history, I assume you

10  wouldn't hire them?

11      A.   I think that's probably a fair statement.

12      Q.   So it's fair to say TDCJ has processes in

13  place by which you can assess someone's work history?

14      A.   Yes.

15      Q.   What kind of background check is conducted on

16  people who are allowed to visit units as a spiritual

17  advisor?  And I mean not in the execution chamber, but

18  just on the units.  Like, say I was a person who wanted

19  to visit someone who was on death row at the Polunsky

20  Unit as their spiritual advisor.  What kind of check

21  would be done on my background?

22      A.   You have to provide a letter of credentials

23  from the religious affiliation.  There's not a

24  background check, in the sense of a criminal history

25  check that's done for employees.  So it's two separate

 1  things.

 2      Q.    What kind of check is done, or is there a

 3  criminal history check done, by Access to Courts when I

 4  send paperwork for interns to visit as my

 5  representatives at different TDCJ units?

 6      A.    I'm not sure.

 7      Q.    Are you familiar with the Access to Courts

 8  forms that I would fill out to have an intern approved

 9  to visit as my representative?  It's an I-164.

10      A.    I am not familiar with that form.

11      Q.    Would it surprise you if I told you that that

12  form specifically asks about my criminal history?

13      A.    I am not familiar with that form.

14      Q.    So you do not know whether Access to Courts

15  has processes by which they are able to look at

16  criminal -- people's -- a person's criminal history?

17      A.    I do not have that answer for you.

18      Q.    But you are telling me that someone to visit

19  as a spiritual advisor is not subjected to any criminal

20  history check?

21      A.    In the capacity of a spiritual advisor, is

22  not -- does not have to have a criminal history check to

23  be a spiritual advisor.

24      Q.    What office looks at someone's credentials and

25  approves them?  Is that -- is there a cental office that

```
 1    does that for all the units, or is that done on a
 2    unit-by-unit basis?
 3         A.   It's the rehabilitation division.
 4         Q.   Is that associated with the chaplaincy
 5    department or --
 6         A.   Yes.
 7         Q.   And who would be in charge of that process,
 8    currently?
 9         A.   I am not -- Rene Hinojosa is the division
10    director for the rehabilitation division.
11         Q.   And so Rene Hinojosa is the person in charge
12    of the rehabilitation division, and that's the division
13    that determines whether or not someone is qualified to
14    visit a unit as a spiritual advisor?
15         A.   Yes.
16         Q.   And so if there is any information about
17    whether criminal history checks are conducted on these
18    individuals, Mr. Hinojosa would know?  Is it
19    Mr. Hinojosa?  Ms. Hinojosa?
20         A.   Mr.
21         Q.   Mr. Hinojosa would be the one to know that?
22         A.   Spiritual advisors fall under the purview of
23    the rehabilitation division.
24         Q.   What kind of check would he do on a person's
25    credentials?  How would he know that my credentials are
```

1   legitimate and I have not just forged them?

2       A.   I don't believe that I'm in a position to

3   answer that.

4       Q.   **Would you assume that there is some process?**

5       A.   It is -- I know that the spiritual advisors,

6   according to the policy, have to provide some type of

7   credentials that are reviewed by staff in the

8   rehabilitation division.  They are responsible for that

9   process.  It is not under my purview.

10      Q.   **But you would not expect that the people at**

11  **the rehabilitation division would admit somebody in that**

12  **capacity without following up and checking on their**

13  **credentials.  Would you expect that would happen?**

14      A.   I would expect that they would follow the

15  agency's policy, yes, sir.

16      Q.   **But you're not familiar exactly with what**

17  **those policies are?**

18      A.   I do not know how they execute that policy.

19      Q.   **In your statement there, which is the**

20  **statement that you gave on March 26th, 2019 -- which,**

21  **before we go any further, I'd like to go ahead and mark**

22  **for purposes of this deposition as Exhibit 1.**

23           **And I know I've asked you this question**

24  **before, but now that I'm in the process of marking this**

25  **exhibit, you are familiar with this statement, again,**

1 the statement that you're looking at there?

2      A.   Yes.

3      Q.   And it's a statement that you gave on

4 March 26th, 2019?

5      A.   I believe so.

6      Q.   A sworn statement?

7      A.   Yes, sir.

8      Q.   And it's a true and correct copy of the

9 original that you signed that day?

10      A.   I believe so.

11      Q.   Okay.  I'm going to go ahead and mark that as

12 Exhibit 1, just so we know what I'm talking about in

13 this deposition.  I'm going to stick this sticker on it,

14 Ms. Davis, and return it to you.

15            (Marked Davis Exhibit No. 1.)

16      Q.   (BY MR. NEWBERRY)  In this statement -- I

17 believe it's on Page 2 -- you wrote:  "If there is any

18 sign that a person involved is losing the necessary

19 mental fortitude, then I will not permit them to

20 participate in future executions."

21      A.   I'm sorry.  What paragraph are you in?

22      Q.   I can find it for you.  I'm not sure what the

23 paragraph number is, but I can find it.  Yeah, it's

24 going to be in the first paragraph, and I'm talking

25 about the one that's just a partial paragraph there at

1   the top of that page.

2            MS. O'LEARY:  Jeff, did you bring copies

3   of the exhibits that you're using?

4            MR. NEWBERRY:  No.

5            MS. O'LEARY:  Okay.

6            MR. NEWBERRY:  But this is all -- this is

7   material that was entered by Mr. Ottoway, and you guys

8   entered this into the record on March 26th.

9            MS. O'LEARY:  But you didn't bring copies

10  for purposes of this deposition?

11           MR. NEWBERRY:  I did not bring that one.

12           MS. O'LEARY:  Is the original that you're

13  going to be handing to the court reporter?

14           MR. NEWBERRY:  Yeah.

15           MS. O'LEARY:  Okay.

16           MR. NEWBERRY:  And there's nothing that I

17  have with me today that is not a document that came from

18  you.

19      Q.   (BY MR. NEWBERRY)  Do you see in the top

20  paragraph there where it says:  "If there is any sign

21  that a person involved is losing the necessary mental

22  fortitude, then I will not permit them to participate in

23  future executions"?

24      A.   Yes.

25      Q.   How many people have you found to be losing

1  the necessary mental fortitude?

2      A.   None.

3      Q.   And so no one has not been allowed to

4  participate in future executions for this reason, at

5  least while you've been the director?

6      A.   Not to my knowledge.

7      Q.   And has there been anyone that you've

8  investigated to determine whether they were qualified to

9  be in the chamber but you subsequently determined they

10 were not allowed to be there?

11          MS. O'LEARY:  Objection.  Assumes facts

12 not in evidence and mischaracterizes the process that

13 she's explained to you.

14     Q.   (BY MR. NEWBERRY)  Has there been any person

15 that you've considered to be in the execution chamber

16 and then subsequently decided not to permit them to be

17 in the execution chamber?

18     A.   No.

19     Q.   I'm going to talk about instances --

20          THE WITNESS:  I need to take a break,

21 please.

22          MR. NEWBERRY:  Sure.

23          (Break from 9:46 a.m. to 9:56 a.m.)

24     Q.   (BY MR. NEWBERRY)  Ms. Davis, I just have a

25 few more areas that I want to explore.  I do want to

1  clarify one thing from the topics that I've already

2  asked you about, which is on the people who have been in

3  the execution chamber.

4           You said that there are no records kept on

5  that.  Are you certain that there are no records kept of

6  the people that have served in the execution chamber, or

7  is it just a matter that you do not have any personal

8  knowledge of these records?

9       A.   I do not have personal knowledge of any

10  records being kept.

11      Q.   So it is possible that these records do exist?

12      A.   If someone is keeping records, they're doing

13  it without my knowledge and they're doing it from a

14  personal standpoint or -- we don't keep records of who's

15  in the execution chamber, my office.

16      Q.   Just to follow up on that, is there an office

17  within TDCJ that might?

18      A.   Not that I know of.

19      Q.   But, again, is that a possibility and you just

20  don't have personal knowledge of it, or are you telling

21  me that it is not possible?

22      A.   I do not have knowledge of records being kept

23  for the execution chamber.

24      Q.   The next area I want to talk about is whether

25  or not you've witnessed instances of assault.  So can

1  you tell me any instances in which someone during the --

2  in the execution chamber during an execution has

3  assaulted any other person?

4        A.   We have -- we have had incidents where

5  victims -- or excuse me -- where the condemned witnesses

6  have become combative and aggressive during an

7  execution.

8        Q.   Are you referring to Mr. Coble's family?

9        A.   Yes.

10       Q.   Were they in the execution chamber?

11       A.   No.  They were in the condemned witness room.

12       Q.   Right now, I'm asking about the execution

13 chamber, and I will ask about witness rooms in a minute.

14 But are you aware of any times during an execution when

15 someone in the execution chamber assaulted anyone --

16       A.   Texas --

17       Q.   -- during an execution?

18       A.   I'm sorry?

19       Q.   During an execution.

20       A.   In Texas, we have been successful in

21 minimizing the disruptions and the distractions and any

22 aggression in the execution chamber because we have

23 stayed true to our best correctional practices and our

24 policies, and we've minimized the opportunity for any of

25 those things to happen.  And so we've been able to

1  prevent or deter any such event in the actual execution

2  chamber.

3      Q.   **And have there been any instances where**

4  **someone in the execution chamber has tried to gain**

5  **access to the drug team?**

6      A.   I'm sorry.  Say it again?

7      Q.   **Have there been any instances during an**

8  **execution when someone in the execution chamber has**

9  **attempted to gain access to the drug team?**

10     A.   No, because, again, Texas, we have protocols.

11  Those people are -- are chosen to be there, and, no,

12  we've not had any incidents where somebody has broken a

13  protocol and -- and tried to do that.  We -- we have

14  sound correctional practices that we continue to go back

15  to that are -- have been tested and perfected, and we

16  stay true to those practices so that we minimize any

17  opportunity for disruption or distractions.

18     Q.   **Has there been any instance where anyone in**

19  **the execution chamber, during an execution, has taunted**

20  **the victim's family?**

21     A.   Say it one more time?

22     Q.   **Are there any instances -- have there been any**

23  **instances where someone in the execution chamber, during**

24  **an execution, taunted the witness's family -- the**

25  **victim's family?  Excuse me.**

1        A.    The condemned, yes.

2        **Q.    And besides the one instance that was revealed**

3   **to me today in the objections I received, which would be**

4   **Mr. Ramiro Hernandez-Llanas, are you aware of any other**

5   **instances of that happening?**

6        A.    You know, I think -- I think that -- I think

7   that that's a specific case of the condemned taunting,

8   and I -- but I also believe that the condemned's final

9   words and what the victims hear, the victims may

10  interpret what a condemned says as taunting and -- and

11  aggressive and offensive, but that's from the

12  perspective of the victim.

13       **Q.    Have there been any instances where any**

14  **clerical person -- I'm talking about spiritual advisor**

15  **witnesses -- in the witness rooms have caused any**

16  **disruptions during an execution?**

17       A.    Can you restate your question so I can make

18  sure I understand what you're asking?

19       **Q.    I know earlier you were talking about**

20  **Mr. Coble's family.**

21       A.    Yes.

22       **Q.    But this question, I'm asking you specifically**

23  **about any clerical persons who were witnesses, and I**

24  **would assume that these would be the condemned person's**

25  **spiritual advisor.**

1              **Are you aware of any instances where a**
2   **person in that capacity, during an execution, assaulted**
3   **any other person?**
4        A.   In the condemned's witness room?
5        **Q.   Yes.**
6        A.   No, sir.
7        **Q.   Are you aware of any instances when such a**
8   **person -- and, again, I'm talking about a clerical**
9   **person in the condemned's witness room -- has attempted**
10  **to gain access to the drug team?**
11       A.   The -- the condemned's witness room, those
12  people that are in the condemned witness room, we have
13  custody staff, we have TDCJ staff, we have law
14  enforcement officers, our office of the inspector
15  general.  We have the chaplaincy representative.  We
16  keep many agency representatives with -- with that group
17  of people that are the condemned witnesses.
18              And we go to great lengths to make sure
19  that they are kept separate and apart from anybody else
20  that's participating or assisting with the execution
21  process so that, again, we use a best correctional
22  practice to make sure that we minimize the opportunity
23  for them to -- to create any such disruption.
24       **Q.   And so then there have been a lot of people**
25  **who could have witnessed this happening.  And so are you**

1  aware of anyone witnessing a clerical person in the

2  condemned person's witness room attempting to gain

3  access to the drug team?

4      A.   No, sir.

5      Q.   Are you aware of any instances of a clerical

6  person and the condemned person's witness room taunting

7  the victim's family?

8      A.   Say your question again?

9      Q.   I'm still asking about clerical persons or

10 spiritual advisors in the condemned person's witness

11 room.  Have you ever witnessed or are you aware of any

12 such person taunting the victim's family during an

13 execution?

14     A.   Because of our processes and the extents that

15 we go to, to keep the condemned's witnesses and the

16 victim's witnesses separate, we've minimized the

17 opportunity for that to occur.

18     Q.   And in a similar way, is it true that persons

19 in the execution chamber are walled off or in a

20 different location than the victim's family?

21     A.   The victim's family can see into the execution

22 chamber, so they can see who's in the execution chamber,

23 as -- as do the condemned witnesses.

24     Q.   But my question is:  You talked about how your

25 procedures are set up to where the condemned person's

 1  witnesses are in a separate room --

 2      A.   Yes.

 3      Q.   -- and that minimizes opportunities to taunt.

 4  Isn't it also true that the execution chamber and the

 5  victim's witnesses' room are separate rooms?

 6      A.   The execution chamber, the victim's witness

 7  room, and the condemned witness room are three separate

 8  rooms.

 9      Q.   And so then my question is:  How would there

10  be a greater opportunity to taunt the victim's family

11  from the execution chamber than there would be from the

12  condemned person's witness room?

13      A.   I'm sorry.  State your question again?

14      Q.   If I'm understanding your answers correctly --

15  and let me know if I'm not -- I believe you're saying

16  that there's a higher likelihood that someone in the

17  execution chamber would taunt the victim's family, their

18  witnesses.

19              MS. O'LEARY:  Objection.  Misstates the

20  testimony.

21      Q.   (BY MR. NEWBERRY)  I'm merely asking if you're

22  understanding -- if I'm understanding correctly.  So my

23  question, Ms. Davis, is:  Am I stating your testimony

24  correctly?  And -- and that question once again is:  I

25  understand you to be saying -- and, again, please tell

 1  me if this is wrong.  That's the point of this question.

 2              I understand you to be saying that there

 3  is greater opportunity to taunt the victim's family from

 4  inside the execution chamber than there is in the

 5  condemned person's witness room.  Is that what you were

 6  saying?  Am I misunderstanding now?

 7      A.   I believe that you're misunderstanding.  The

 8  opportunity to taunt the victims, I believe, exists

 9  anywhere in that -- in those two areas.

10      Q.   So what is it -- you talked about how the

11  condemned person's witness room, the reason that there

12  aren't instances of taunting, did I understand you

13  correctly to say it's because there are things in place,

14  including keeping them walled off from the victim's

15  witnesses?  Did I misunderstand what you said?

16      A.   We -- we try -- we have protocols so that we

17  keep the condemned witnesses separate from the victim's

18  witnesses.  Once they're secured in that room, in the

19  condemned witness room, then even though they can't see

20  the -- the victim's witnesses, they could still become

21  disruptive in that area.

22      Q.   So the condemned witnesses could still become

23  disruptive?

24      A.   Yes.

25      Q.   But you're not aware of any such disruption

1  from a clerical person in that room?

2      A.    From a clerical person in that room?

3      Q.    Yes.

4      A.    No, sir.

5      Q.    And is it true that the -- you talked about it

6  being walled off.  Is it true that the execution chamber

7  is similarly walled off from the victim's witnesses'

8  room?

9      A.    The infrastructure of the space is equitable.

10     Q.    Are you aware of any person who was a clerical

11 witness in the condemned person's room attempting to

12 gain access to the drug lines and remove them from the

13 person?

14     A.    Say it one more time?

15     Q.    I'm, again, asking about clerical persons or

16 witnesses in the condemned witness room.  I'm still

17 asking about that group of people.

18            Are you aware of any instances of any such

19 person attempting to remove the intravenous drug lines

20 from the condemned person?

21     A.    If they are in the condemned witness room,

22 they are not in the chamber, so they could not reach the

23 drug lines.

24     Q.    So you're not aware of that happening?

25     A.    No.

52

1       Q.   In the death house, outside the death chamber,

2  are you aware of any instances of a clerical person

3  visiting any inmate at the holding cell outside the

4  execution chamber where they attempted to gain access to

5  the drug team, any such person visiting the person in

6  the holding cell?

7       A.   We have protocols and processes in place to

8  move that spiritual witness -- as I -- as I understand

9  it, you're talking about the spiritual witness visiting

10 the offender in the holding area.  Is that correct?

11      Q.   Yes.  What are those processes?

12      A.   We make sure that the area is secure and that

13 the spiritual witness is taken back to the holding area,

14 obviously under security escort, and their visit is --

15 is watched and supervised by correctional custody staff

16 to make sure that everything is fine and secure and we

17 minimize any opportunity for disruption or distraction

18 for the -- the process.  And then the spiritual advisor

19 is escorted back out of the -- the death house, out of

20 the facility.

21      Q.   Are those same security staff that keep an eye

22 on the spiritual advisor from, I guess, 3:00 to 4:00 --

23 are they still present from, say, 4:00 to 6:00 p.m. that

24 day?

25      A.   Yes.

53

1    Q.   So they are still present in the death house

2  area?

3    A.   Yes.

4    Q.   And can I ask:  What is the reason why

5  spiritual advisors are only allowed to visit between

6  3:00 and 4:00 p.m.?

7    A.   Well, the spiritual advisors are allowed to

8  visit with the condemned offender in -- more than just

9  3:00 to 4:00 p.m.  The spiritual advisors begin to get

10 special or extra visits up to 30 days out.

11          In the three days prior to the execution

12 or the two and a half days, the offender has the ability

13 to visit with his spiritual advisor as much as he

14 chooses during normal working business hours.  The

15 condemned can choose to spend all of his time leading up

16 to his execution with his spiritual advisor, if he so --

17 so choses to do so.

18    Q.   And I should actually clarify my question,

19 because I am aware that -- I believe it's for -- two and

20 a half days or so before an execution, that there is a

21 lot of visitation.  In fact, there are certain rooms at

22 the Polunsky Unit that are ordinarily attorney rooms

23 that are reserved off for that purpose.

24          But what I meant to ask is:  Once the

25 inmate is moved to the Walls Unit -- which, I believe,

1  **happens early in the afternoon of the execution -- why**

2  **is it necessary to limit his visit with his spiritual**

3  **advisor to the one-hour window of 3:00 to 4:00 p.m.?**

4      A.   We have to begin -- we have to prepare the --

5  the execution area.  We have to prepare the offender for

6  the execution.  And that takes time.  We have to feed

7  him his last meal.  There's many secular tasks that are

8  done.  There are phone calls that are facilitated.  The

9  offender may have people that he still wants to talk to,

10  so we provide that opportunity.

11          We provide him the opportunity to shower

12  and to dress for the execution.  We have to prepare the

13  area, the chamber, and -- and the drugs.  We have to get

14  everything ready to be able to -- to complete the

15  execution if it moves forward.

16      **Q.   On March 28th, 2019, the day Mr. Murphy was**

17  **scheduled to be executed, did you visit the death house**

18  **prior to -- well, I assume you were there by -- when did**

19  **you arrive at the death house that day, on March 28th,**

20  **2019?**

21      A.   At the death house?

22      **Q.   Yes.**

23      A.   I did not personally go to the death house

24  that day.

25      **Q.   So you're not aware of anything that would**

1  have happened in the holding cell or outside of the

2  holding cell that afternoon?

3      A.   Not that comes to mind right now.

4      Q.   With any prior -- I mean, when you say "not

5  that comes to mind right now" -- I'm sorry -- are you

6  saying that it's possible that you were in that holding

7  cell area that afternoon?

8      A.   No, I was not there.

9      Q.   Okay.  In any previous executions, have you

10  visited the holding cell area the afternoon that -- of a

11  scheduled execution?

12      A.   I do not personally go to the holding area

13  prior to the execution.

14      Q.   What persons do?

15      A.   The TDC chaplain is there, as well as our

16  custody staff.  The warden goes and -- and speaks with

17  the condemned, as well as the public information

18  officer.

19      Q.   And who -- who controls the access to that

20  holding cell area?  Who makes the decisions as to who's

21  allowed to be there?

22      A.   Warden Lewis and our established protocol that

23  I just said to you.

24      Q.   Okay.  And are there records kept of who all

25  is in the holding cell area on the afternoon of the

1  execution?

2       A.   No.

3       Q.   And that is true even of spiritual advisor

4  visits?

5       A.   I'm not sure.

6       Q.   But you have no knowledge of any records of

7  people who are in the holding -- allowed to visit the

8  holding cell area?

9       A.   I have no knowledge.

10      Q.   Is it possible that more than one TDCJ

11  chaplain would be present in the holding cell area the

12  afternoon of an execution?

13      A.   It's possible, yes, sir.

14      Q.   Is it possible there could be as many as four?

15      A.   It's possible.

16      Q.   So if Mr. Murphy told me that on the afternoon

17  of his execution, there were four TDCJ chaplains there,

18  you do not know that that's incorrect?

19      A.   I'm sorry?

20      Q.   So if Mr. Murphy told me that there were four

21  TDCJ chaplains there that afternoon in the holding cell

22  area, do you have any reason to think that is incorrect?

23      A.   No, sir.

24      Q.   Would that be uncommon for there to be four

25  TDCJ chaplains?

1      A.   That would not be uncommon.

2      Q.   **And would they be allowed to stay in that area**

3   **after 4:00 p.m.?**

4      A.   They are in the area because they perform

5   many -- many tasks for us.  They perform the

6   facilitation of the phone calls.  They're there to

7   provide comfort to the offender.  They -- they answer

8   any questions that they may -- may have.  If the

9   offender needs something out of his property, they may

10  go and get something out of the offender's property.

11  They could, again, answer any questions, just provide a

12  calming, soothing presence to that offender.

13     Q.   **And could they also provide religious**

14  **instruction to that offender during that time?**

15     A.   I don't understand what you mean by "religious

16  instruction."

17     Q.   **Do you think it's possible that they might**

18  **also talk about what someone would need to do to prepare**

19  **himself to enter into Heaven, as that term is used in**

20  **the Christian religion?**

21     A.   They are not there specifically to perform a

22  spiritual process, as -- as you're describing it to me.

23  The offender may ask them anything that the offender

24  wants to, and the chaplains are going to respond with

25  the compassion and dignity that you would to any human

 1  being.

 2      Q.   Are you then saying that a chaplain would

 3  never initiate a conversation with the inmate without

 4  being asked a question?

 5      A.   I don't know that I'm in a position to -- to

 6  answer that the way that -- that you ask it.  I don't --

 7  I don't understand.

 8      Q.   I know the TDCJ enters into contracts with

 9  Jewish chaplains and Native American chaplains.  Would a

10  Jewish chaplain who is in a contractual arrangement with

11  TDCJ -- would he be permitted to be in the holding cell

12  area after 4:00 p.m.?

13      A.   Possibly, yes.

14      Q.   Has that ever happened?

15      A.   Not to my knowledge.

16      Q.   He would be allowed to be in that area even

17  though he was not an employee?

18              MS. O'LEARY:  Objection.  Assumes facts

19  not in evidence.

20      A.   I don't think I --

21      Q.   (BY MR. NEWBERRY)  Okay.  These chaplains that

22  we're talking about that your website says you enter

23  into contractual agreements with to provide services,

24  are they TDCJ employees or are they independent

25  contractors?

59

1      A.   I don't -- that seems a very technical term.

2  I don't -- to me, they're an employee.  We contract with

3  them.  We -- we have an agreement with them.  So I

4  don't -- I don't know that I understand how to answer

5  your question.

6      **Q.   How does any background check that you do with**

7  **these people you contract with -- how does that compare**

8  **to people that you employ?**

9      A.   A contract employee goes through the same

10 background check process as a regular employee.

11     **Q.   But with a contract employee, do you have the**

12 **same access to assess their performance as you would a**

13 **regular employee?**

14     A.   Yes, because they work in our institutions.

15     **Q.   These Jewish chaplains, do you know -- well,**

16 **first of all, how many are -- Jewish chaplains are there**

17 **that are in a contractual agreement -- a contractual**

18 **arrangement with TDCJ?**

19     A.   I don't have that information.

20     **Q.   Do you have information related to how many**

21 **hours per week they work?**

22     A.   I do not.

23     **Q.   Do you know who would have that information?**

24     A.   The rehabilitation division.

25     **Q.   And that would be Mr. Hinojosa?**

1    A.   Mr. Hinojosa.

2    Q.   **Okay.  And I assume, but let me just ask:**

3  **Would it also be possible for one of these Native**

4  **American chaplains that TDCJ enters into a contractual**

5  **agreement with to be present in the holding cell area**

6  **after 4:00?**

7    A.   I would say that it would -- could be

8  possible.

9    Q.   **And then --**

10   A.   They, to my knowledge, have not been, ever.

11   Q.   **But there is no TDCJ policy that would**

12 **prohibit them from being in that area after 4:00 p.m.**

13 **Is that correct?**

14   A.   They would have to go through the same

15 consideration process as -- as anyone else to be a part

16 of the execution team.

17   Q.   **And it is possible for these people who are --**

18 **work with TDCJ on a contract basis to go through that**

19 **process?**

20   A.   I just am unfamiliar with -- with that.  I

21 just don't know that we've ever had anybody in that

22 role, as a contract employee, go through that process.

23   Q.   **But you're unaware of any reason why they**

24 **could not go through that process.  Is that correct?**

25   A.   I'm unaware.

1      Q.   And shifting -- I know I've got a policy --

2  and I don't believe I brought a copy of it with me, but

3  a policy that pertains to the handful of Muslim

4  chaplains that are employed, and I understand they're

5  employed by TDCJ.  Is that correct?

6      A.   We do have Muslim chaplains.

7      Q.   Okay.  And they're employees and they're not

8  contractors, right?

9      A.   As I understand it.  I'm not sure.

10      Q.   Would it be possible for one of them to be

11  present in the holding cell area after 4:00 p.m.?

12      A.   The people that are present in the holding

13  cell area go through the -- the consideration process to

14  be a part of the execution team.  And so we wouldn't

15  randomly start picking people to be a part of -- of that

16  and be in the execution holding area.

17      Q.   I want to talk to you now about how changes

18  are made to the execution protocol, and I think maybe it

19  might be easier to start with the most recent change

20  that was made.  So I want to talk to you about the

21  April 2nd amendment to the execution procedure document.

22           MR. NEWBERRY:  I'm going to go ahead and

23  mark what I'm holding as Exhibit 2.

24           (Marked Davis Exhibit No. 2.)

25      Q.   (BY MR. NEWBERRY)  And then I'm going to hand

1   it to you, Ms. Davis.

2              MS. O'LEARY:  You don't have any copies

3   for counsel, Jeff?

4              MR. NEWBERRY:  No.

5              MS. O'LEARY:  All right.

6              MR. NEWBERRY:  But as I said before,

7   these are documents that I got from you, Ms. O'Leary.

8              MS. O'LEARY:  Right.  But you're supposed

9   to bring copies for counsel, just like at trial.

10             May I see this, Ms. Davis --

11             THE WITNESS:  Yes.

12             MS. O'LEARY:  -- and then I'll hand it

13   back to you.

14       Q.   (BY MR. NEWBERRY)  Do you recognize that

15   document, Ms. Davis?

16       A.   Yes.

17       Q.   Okay.  And what is it?

18       A.   It is the execution procedure.

19       Q.   And is it the April 2nd, 2019, version of the

20   execution procedures you're talking about?

21       A.   Yes, sir.

22       Q.   And that first page, is that an affidavit from

23   you?

24       A.   This?

25       Q.   Uh-huh.

1    A.   Yes, sir.

2    Q.   And what does that affidavit -- what is the

3  point of that affidavit?  In that affidavit, are you

4  promising that is an accurate copy of the April 2nd

5  execution procedure?

6    A.   Yes, it's a true and correct copy of the

7  execution procedure.

8    Q.   Now, when -- who made the decision to amend

9  the execution procedures in a way that resulted in the

10 document that you're looking at there, which is

11 Exhibit 2?

12         MS. O'LEARY:  And I'll assert the

13 attorney-client privilege and instruct you not to talk

14 about anything that you discussed with counsel with

15 regard to that -- in response to that question.  If

16 there's a part of the question you can answer that is

17 not an attorney-client communication --

18    Q.   (BY MR. NEWBERRY)  If you are aware of who

19 made the decision to change that document before

20 speaking with Ms. O'Leary, can you tell me -- or excuse

21 me -- your counsel, can you please tell me who was

22 involved in that decision?

23    A.   I made the decision to change the execution

24 procedures as a result of the -- I don't know what legal

25 term you use, but as a result of the Supreme Court's

1  ruling that we received the night of Murphy's stay.  And

2  as a result of it, I made the decision to -- to change

3  the execution procedures.

4      Q.   And when did you make that decision?

5      A.   April the 2nd.

6      Q.   **And so you were able to make the -- from the**

7  **time you made the decision until the time the new**

8  **procedure was adopted, that was all -- that all**

9  **transpired within one day?**

10     A.   I don't remember the exact dates that -- the

11  date that it was finalized and that I signed the new

12  procedure is April the 2nd.

13     Q.   **Well, that document purports to have been**

14  **signed April 2nd.  Is that correct?**

15     A.   Yes.

16     Q.   **Okay.  And did you -- all I'm trying to ask --**

17  **all I'm trying to clear up is:  Did you make the**

18  **decision to make the change before that date?  That's**

19  **all I'm trying to clear up.**

20     A.   I don't -- I don't understand the question

21  that you're asking.

22     Q.   **Yeah.  So the -- you told me that you made the**

23  **decision to make the change, and my question is:  Did**

24  **that decision -- when you first decided you were going**

25  **to change the execution procedures document, did you**

1  decide that on April 2nd or at some point before that?

2      A.   I believe that -- that I reviewed and

3  considered the best way that I felt like we could

4  accomplish what the directive that we received from the

5  Supreme Court was and went through the process and

6  updated the procedures and made the final signature on

7  April the 2nd.

8      Q.   Is there any kind of oversight committee that

9  you have to consult with before you can make a change

10  like that?

11      A.   I discussed the change orally with

12  Mr. Collier, my supervisor.

13      Q.   Was anyone, any other TDCJ or government

14  employee, involved in that discussion to make the

15  change?

16              MS. O'LEARY:   And under the

17  attorney-client privilege, I'll again instruct you not

18  to discuss conversations with counsel.

19      Q.   (BY MR. NEWBERRY)   Besides counsel, which I'm

20  not intending to ask you about, were there any other

21  people -- again, who weren't your attorneys -- who you

22  consulted with about this decision?

23      A.   There was no one else other than the attorney,

24  Ms. Howell.

25      Q.   Did you have to seek permission from any

1   congressional oversight committee to make these changes?

2       A.   I did not.  I discussed it with Mr. Collier

3   and the attorney, Ms. Howell.

4       Q.   **Are there any rules in place that prevent you**

5   **from making a change like this within two weeks of a**

6   **scheduled execution?**

7       A.   I'm sorry?

8       Q.   **If there was an execution scheduled for two**

9   **weeks from today, is there any rule that would prevent**

10  **you from, today, changing that execution procedure**

11  **document?**

12      A.   Not to my knowledge.

13      Q.   **Let me ask a tighter time frame.  If there was**

14  **an execution scheduled for two days from today, is there**

15  **any rule that would prevent you from making a change to**

16  **the execution procedure document today?**

17      A.   I don't -- I don't know of a rule that would

18  prevent it.  I can tell you that -- as a correctional

19  professional, that that wouldn't occur.  I would have no

20  reason -- I don't see a reason to change the execution

21  procedures.  They're not changed that often, because

22  they've been tested.  It works.  It's a process that

23  works.  We've been able to use best correctional

24  practices.

25               And so I don't -- I don't see where I

1  would just up and change a procedure that has to do with

2  executions, in your example, two days before an

3  execution.   That's not -- that's just not something that

4  I believe that -- that we would do.

5       **Q.   And so as a correctional professional, then,**

6  **what is the minimum number of days before an execution**

7  **that you would see it -- that you would think it's**

8  **permissible for you to make changes to the document?**

9       A.   There's no need to make changes to the

10  document.

11       **Q.   But there has been need to make changes to the**

12  **document in the immediate past, right?**

13       A.   On this day, as a result of the Supreme Court

14  ruling.   But there's not a need to change the procedure

15  if there's not an impetus for that change.

16       **Q.   And I'm not meaning to suggest you would make**

17  **a change to the document unless you thought there was a**

18  **reason to do so.**

19             **All I'm trying to establish is:   Is there**

20  **a set amount of time before an execution before which,**

21  **even if it was for a good reason, you would not make a**

22  **change to the execution because it was too close to a**

23  **scheduled execution?**

24       A.   It depends on what the impetus was.

25       **Q.   But there's no rules that would prevent you**

 1  **from making a change immediately before an execution if**

 2  **you thought there was good reason to do so, which I know**

 3  **is the only reason you would make changes?**

 4       A.   It is my understanding there is not a rule

 5  that -- that tells me how far away from an execution I

 6  can make a change.

 7       **Q.   Okay.**

 8       A.   I, again, believe that it's important to state

 9  that we don't make changes to the execution procedure

10  often.

11       **Q.   And I understand that.  I think I've got four**

12  **or five, at most, versions that have been provided to**

13  **me, and they cover a time period going back over**

14  **11 years, and I believe that they constitute all of the**

15  **changes that have been made.  So, no, I don't doubt**

16  **that.  I recognize that once every two years -- and I**

17  **know that that's not every two years, but that seems to**

18  **be about the rate that you change it.  So I'm not trying**

19  **to suggest that to you.**

20            **Is there a rule that mandates that you**

21  **make that discussion -- that you have that discussion**

22  **with Mr. Collier?  Could you have made the change**

23  **without having that discussion with him?**

24       A.   I am the signature authority on the -- on the

25  policy, and I believe that it was a professional

1  decision to -- to consult with the executive director

2  orally on the change.

3      Q.   Did you consult with anyone else who is not

4  your attorney?

5      A.   No one else that's not my attorney.  I

6  consulted with the attorney.

7      Q.   Okay.  Are you aware of Mr. Murphy's

8  disciplinary history while he's been incarcerated on

9  death row?

10     A.   I have not specifically reviewed his personal

11  disciplinary history.  I know that Mr. Murphy has every

12  security precaution designator that our agency has

13  because of his behavior while incarcerated.  He has

14  taken hostages.  He has been staff-assaultive.  He's

15  escaped from our custody.  He's used security restraints

16  inappropriately.

17              And because of his actions and because of

18  his level of being a very dangerous individual, he has

19  every security precaution designator that we have.

20     Q.   Do you have any records of him attempting any

21  escape in the time that he's been on death row, which

22  began, I believe, in 2003?

23     A.   I have not reviewed his disciplinary records

24  while he's been on death row.

25     Q.   Are you aware of him making any attempt to

1  escape from anywhere other than the Connally Unit in, I

2  believe, December 1999?

3      A.   I have not reviewed Offender Murphy's

4  disciplinary records.  I have knowledge that the escape

5  of the Texas 7 from the Connally Unit, he was involved

6  in, and successfully got out and assaulted staff and

7  took them hostage.

8      Q.   Right.  But are you aware of any -- him doing

9  anything like that in the 20 -- well, excuse me --

10  19 1/2 years since then?

11      A.   I have not personally reviewed Offender

12  Murphy's disciplinary records.

13      Q.   Are you aware that one of the things that we

14  asked you to be aware of and to provide in preparation

15  for this were his disciplinary records?

16      A.   If they were --

17              MS. O'LEARY:  Objection.  That misstates

18  your request.

19      Q.   (BY MR. NEWBERRY)  Did we ask you for any

20  disciplinary records reflecting any violent actions

21  taken by Mr. Murphy in the time that he's been on death

22  row?

23      A.   What was the question?

24      Q.   In preparation -- in advance of this

25  deposition, did we ask you to provide any records of any

1   violent conduct by Mr. Murphy in the time that he's been

2   on death row?

3        A.   I am not sure what -- what was provided.

4        Q.   I'm going to mark what was provided by your

5   counsel -- and, again, I did not bring them another copy

6   of the document that they sent me, but I am showing you

7   what was provided by your counsel that I have now marked

8   as Exhibit 3.

9                  (Marked Davis Exhibit No. 3.)

10        Q.   (BY MR. NEWBERRY)  On Exhibit 3, is the first

11   page an affidavit signed by the assistant warden at the

12   Polunsky Unit and --

13        A.   Yes, sir.

14        Q.   -- notarized by law librarian Kerry Cooper?

15        A.   Yes, sir.

16        Q.   Okay.  Does the document, on its affidavit,

17   purport to be a record of Mr. Murphy's disciplinary

18   history at the Polunsky Unit from November 2003 to

19   present?

20        A.   I believe that that's what the affidavit said.

21   "Attached are copies of the disciplinary records from

22   11/21/2003 till present for offender Murphy, Patrick,"

23   and his number.

24        Q.   Have you had an opportunity to review those

25   before now?

1    A.   Not before now.

2    Q.   **If you can review them, can you tell me:  Is**

3  **it true that those records reflect exactly two**

4  **instances?**

5    A.   Yes, there are two cases attached to this

6  exhibit --

7    Q.   **And --**

8    A.   -- packet, whatever you call it.

9    Q.   **And is it correct that one of those was where**

10  **Mr. Murphy had excess material beyond what was allowed,**

11  **I believe extra pairs of socks?**

12    A.   There is one case for socks and sheets that

13  were in excess of the amount authorized.

14    Q.   **And the other incident was an incident where**

15  **he gave another inmate something in an envelope?**

16    A.   Yes.

17    Q.   **And that would be --**

18    A.   He made an unauthorized commodity transfer,

19  receiving a big envelope from a different cell.

20    Q.   **Is there anything in that set of records that**

21  **reflects Mr. Murphy being cited for any assaultive**

22  **conduct since November of 2003?**

23    A.   No, not since November of 2003.  But I think

24  it's important to point out that just because he hasn't

25  had an assaultive record since then doesn't make him a

1  not dangerous person.

2      Q.   But do you have any record of him being cited

3  for anything dangerous since the November -- excuse

4  me -- the December 1999 escape?

5      A.   No, sir.

6      Q.   And do you have any reason to doubt that that

7  is a complete set of his disciplinary infractions from

8  the time that he's been on death row?

9      A.   I don't have a reason to doubt that.

10      Q.   Besides the statement that you gave on

11  March 26th, 2019, that I've marked as Exhibit 1 during

12  this deposition, have you -- have any other statements

13  been taken from you or on your behalf relating to the

14  facts that are the subject of this litigation?

15      A.   I do not believe so.

16      Q.   But you would know whether you gave a

17  statement besides the March 26th one, wouldn't you?

18      A.   Yes, I believe so.

19      Q.   And --

20      A.   But I didn't -- the way -- I didn't -- maybe I

21  didn't understand your question.

22      Q.   Have you given any other statements, besides

23  Exhibit 1, related to this proceeding?

24      A.   No, sir.

25               MR. NEWBERRY:  I believe those are all

1  the questions I have.  I'll pass her to you.

2              MS. O'LEARY:  Can we take a five-minute

3  break?

4              MR. NEWBERRY:  Sure.

5              (Break from 10:41 a.m. to 10:49 a.m.)

6              MS. O'LEARY:  Mr. Newberry has passed the

7  witness, and we reserve our questions for trial.

8              THE REPORTER:  And signature?

9              MS. O'LEARY:  We'd like to sign and

10  return, please.

11              THE REPORTER:  And send it to?

12              MS. O'LEARY:  You can send it to me.

13              (The deposition concluded at 10:49 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1        WITNESS CORRECTIONS AND SIGNATURE

2        Please indicate changes on this sheet of paper,
giving the change, page number, line number and reason
3   for the change.  Please sign each page of changes.

4   PAGE/LINE        CORRECTION        REASON FOR CHANGE

5   _____

6   _____

7   _____

8   _____

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24  _____

25  _____

76

1        I, LORIE DAVIS, have read the foregoing

2   deposition and hereby affix my signature that same is

3   true and correct, except as noted above.

4

5        _____

6        LORIE DAVIS

7

8   STATE OF _____   *

9   COUNTY OF _____   *

10

11       Before me, _____, on this
    day personally appeared LORIE DAVIS, known to me (or
12  proved to me under oath or through _____)
    (description of identity card or other document) to be
13  the person whose name is subscribed to the foregoing
    instrument and acknowledged to me that they executed the
14  same for the purposes and consideration therein
    expressed.
15       Given under my hand and seal of office on
    this, the _____ day of _____, 2019.

16

17

18       _____

19       NOTARY PUBLIC IN AND FOR THE
        STATE OF _____

20

21

22

23

24

25

1                    REPORTER'S CERTIFICATE

2

3        I, KERRIENNE L. BOND, CSR, hereby certify that this

4   transcript is a true record of the testimony given by

5   the witness named herein, after said witness was duly

6   sworn by me.

7        I further certify that I am neither attorney nor

8   counsel for, related to, nor employed by any of the

9   parties to the action in which this testimony was taken.

10  Further, I am not a relative or employee of any attorney

11  of record in this cause, nor do I have a financial

12  interest in the action.

13       Certified to by me on July 3, 2019.

14

15

16

17  _____

18  KERRIENNE L. BOND, TEXAS CSR NO. 8537
    Expiration Date:  12-31-20
19  INTEGRITY LEGAL SUPPORT SOLUTIONS
    Firm Registration No. 528
    P.O. Box 245
20  Manchaca, Texas  78652
    Phone: (512) 320-8690
21  Fax: (512) 320-8692

22

23

24

25



# Exhibit D

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| PATRICK HENRY MURPHY, JR., | § § | |
| *Plaintiff,* | § | |
| | § | ACTION NO. 4:19-CV-1106 |
| v. | § | |
| | § | |
| BRYAN COLLIER, et al., | § | |
| *Defendants.* | § | |

### DECLARATION OF LORIE DAVIS

My name is Lorie Davis.  I am over 21 years of age, of sound mind, capable of making this declaration, and personally acquainted with the facts as stated herein.

I am employed by the Texas Department of Criminal Justice ("TDCJ") as the Director of the Correctional Institutions Division ("CID").  I started as a correctional officer at the Ellis Unit in 1988 and worked my way up to the highest ranking CID official.  During this time, I have served as: (1) senior warden at eleven CID units, (2) the CID Region III Director, (3) Director of Correctional Training and Staff Development, (4) CID Management Operations Deputy Director, and (5) Deputy Director of CID Support Operations.  I have extensive knowledge of the TDCJ prison system and the constant need to be vigilant against both internal and external threats to security.

It is my understanding that the TDCJ has been named as a defendant in the above titled lawsuit.  I have been asked to provide this affidavit describing the relevant current execution procedures.

Texas has executed 23 prisoners since I became Director of the CID.  I am familiar with every detail that takes place on the day of an execution, and I am required by state law to supervise the execution.  The general process used by the TDCJ has been in place since 1982, and a successful execution depends on the TDCJ maintaining control over every aspect of the process.

An execution is intense.  Emotions are heightened throughout the day, and they peak in the minutes leading up to and during the execution of the condemned.  Every person involved in the process is hand-picked after many years of devoted service because it is extremely difficult to

1

know how anyone will handle that uniquely high level of stress – including the condemned, TDCJ staff, and the executioners. A tie-down team secures the condemned to the gurney, and an execution team prepares the condemned for intravenous injection. I personally select the warden and TDCJ chaplain who are present in the execution chamber during the execution. These individuals go through extensive training, including practice runs prior to an execution. If there is any sign that a person involved is losing the necessary mental fortitude, then I will not permit them to participate in future executions. There is no room for error, and uncertainty about how a person will perform on the day of execution is unacceptable.

A successful execution revolves around two things: (1) the victims of the crime, and (2) security. The process is important to each one.

Once the condemned is secured to the gurney, the victim's family and friends are escorted to their viewing area. The condemned's chosen witnesses are then brought into a separate, adjacent viewing area. The two groups never see or otherwise interact with each other. The only persons the victim's family and friends see are the condemned, the TDCJ chaplain, the warden, and myself. This enables the victim's family and friends the opportunity to experience the execution in a way that promotes justice and closure.

Once the victim's and condemned's family and friends are in their respective viewing areas, I determine whether the area is secure and the execution may proceed. If I give the warden approval to proceed, I leave the execution chamber and join the execution team in an adjacent room. At this time, there are only three people in the execution chamber – the condemned, the warden, and the TDCJ chaplain. The room is as secure as possible, and potential disruptions are minimized. The condemned is given an opportunity to say his final words, and when finished, a lethal amount of pentobarbital is administered. The warden and TDCJ chaplain remain in the execution chamber until the condemned is deceased.

State law permits the condemned's spiritual advisor or clergyman to visit the condemned at all proper times prior to the execution. State law also permits that person to be present during the execution. However, under no circumstance would it be safe or feasible for the condemned's clergyman or spiritual advisor be present in the execution chamber.

The risks created by permitting an outside spiritual advisor to be present in the execution chamber are numerous and significant. For example, the person could pull the intravenous lines out of the condemned, thereby interrupting the execution. The person could taunt the victim's family and friends, causing immense emotional harm. The person could create a disruption or assault the warden or TDCJ chaplain inside the execution chamber. The person could attempt to gain access to the execution team and jeopardize exposing their identities. Any of these actions would require the opening of the execution chamber door, which is an unacceptable security risk, and the intervention of correctional staff and/or peace officers.

Even if the condemned's spiritual advisor does not have malicious intentions, I cannot permit that person to be in the execution chamber. It is very difficult to know how someone will react when placed in such an intense environment. Peaceful witnesses have turned violent, and

2

other observers have fainted.   A spiritual advisor who faints or otherwise requires medical attention during the execution would create an unnecessary security risk.

The TDCJ is successful in its daily operations because of the agency's ability to be flexible and adapt.   However, the execution process is one area where there is no flexibility.   The general process used by the TDCJ has been tested and perfected since 1982.   Any deviation from the execution process would jeopardize the lives of TDCJ officials, the respect for the dignity of the condemned, the experience for the victim's family and friends, and justice for the State of Texas.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 26, 2019.

Lorie Davis
Director
Correctional Institutions Division
Texas Department of Criminal Justice

3



EXHIBIT
2
Davis

AFFIDAVIT

THE STATE OF **TEXAS** §

COUNTY OF **WALKER** §

BEFORE ME, the undersigned authority, on this day personally appeared Lorie Davis, who, being by me duly sworn, deposed as follows:

My name is Lorie Davis and I am an employee of the Texas Department of Criminal Justice (TDCJ), a governmental agency.  I am over 21 years of age, of sound mind, capable of making this affidavit, and personally acquainted with the facts herein stated.

I am the Director for the Correctional Institutions Division, a part of the TDCJ located in Huntsville, Texas.  Attached is a true and correct copy of the *TDCJ Execution Procedure*, which is kept by the TDCJ in the regular course of its business activity.  The entry of such record was made as a regularly conducted activity and a regular practice of the TDCJ, and was made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters.

I declare under penalty of perjury that the foregoing is true and correct.

"Further Affiant sayeth not."

Lorie Davis
Director VII
Correctional Institutions Division
Texas Department of Criminal Justice

SWORN TO AND SUBSCRIBED BEFORE ME, the undersigned notary public, on the 15th day of April, 2019.

NOTARY PUBLIC, STATE OF TEXAS

MONICA JACKSON
Notary's Printed Name

My Commission Expires:
OCTOBER 19, 2020

MONICA JACKSON
ID# 12016283-9
Notary Public, State of Texas
My Commission Expires
10/19/2020
Notary Without Bond

**Murphy 748**

# TEXAS DEPARTMENT OF CRIMINAL JUSTICE

## Correctional Institutions Division



# EXECUTION PROCEDURE

## April 2019

**Murphy 749**

## *ADOPTION OF EXECUTION PROCEDURE*

In my duties as Division Director of the Correctional Institutions Division, I hereby adopt the attached Execution Procedure for use in the operation of the Texas Department of Criminal Justice Death Row housing units and perimeter functions. This Procedure is in compliance with Texas Board of Criminal Justice Rule §152.51; §§492.013(a), 493.004, Texas Government Code, and Article 43.14 – 43.20, Code of Criminal Procedure.


_Lorie Davis_
Lorie Davis
Director, Correctional Institutions Division

4·2·19
Date

# EXECUTION PROCEDURES

## PROCEDURES

I. **Procedures Upon Notification of Execution Date**

    A. The clerk of the trial court pursuant to Tex Code of Criminal Procedure art. 43.15 shall officially notify the Correctional Institutions Division (CID) Director, who shall then notify the Death Row Unit Warden, and the Huntsville Unit Warden of an offender's execution date. Once an execution date is received, the Death Row Unit Warden's office shall notify the Unit Classification Chief, and the Death Row Supervisor.

    B. The Death Row Supervisor shall schedule an interview with the condemned offender and provide him with the Notification of Execution Date (Form 1). This form provides the offender with a list of the information that shall be requested from him (2) two weeks prior to the scheduled execution.

    C. The condemned offender may be moved to a designated cell. Any keep-on-person (KOP) medication shall be confiscated and administered to the offender as needed by Unit Health Services staff.

II. **Stays of Execution**

    A. Official notification of a stay of execution shall be delivered to the CID Director, the Death Row Unit Warden, and the Huntsville Unit Warden through the Huntsville Unit Warden's Office. **Staff must not accept a stay of execution from the offender's attorney.** After the official stay is received, the Death Row Unit Warden's office shall notify the Unit Classification Chief and Death Row Supervisor.

    B. Designated staff on the Death Row Unit shall notify the offender that a stay of execution has been received.

III. **Preparation of the Execution Summary and Packet**

    A. Two Weeks (14 days) Prior to the Execution

        1. The Death Row Unit shall begin preparation of the Execution Summary. The Execution Summary (Form 2) and the Religious Orientation Statement (Form 3) shall be forwarded to the Death Row Supervisor or Warden's designee for completion. A copy of the offender's current visitation list and recent commissary activity shall also be provided.

        2. The Death Row Supervisor shall arrange an interview with the condemned offender to gather the information necessary to complete the Execution Summary and Religious Orientation Statement.

3.   An offender may request to have his body donated to the Texas State Anatomical Board for medical education and research. The appropriate paperwork shall be supplied to the offender upon request.

4.   The Execution Summary must be completed and returned by the Death Row Supervisor or Warden's designee in sufficient time to be forwarded to the CID Director's Office by noon of the 14th day.  After approval by the CID Director, the summary shall be forwarded to the Death Row Unit Chaplain, the Huntsville Unit Warden's Office, and the Communications Department.

5.   If the offender wishes to change the names of his witnesses, and it is less than fourteen (14) days prior to the scheduled execution, the offender shall submit a request in writing to the CID Director through the Death Row Unit Warden, who shall approve or disapprove the changes.

6.   The Death Row Unit is responsible for completion of the  Execution Packet which shall include:
     a.   Execution Summary;
     b.   Religious Orientation Statement;
     c.   Copy of the Offender Travel Card;
     d.   Current Visitation List;
     e.   Execution Watch Notification;
     f.   Execution Watch Logs;
     g.   I-25 Offender's Request for Trust Fund Withdrawal;
     h.   Offender Property Documentation (PROP-05 and PROP-08); and
     i.   Other documents as necessary.

7.   The Death Row Supervisor or the Warden's designee shall notify staff (Form 4) to begin the Execution Watch Log (Form 5).

8.   The Execution Watch Log shall begin at 6:00 a.m. seven (7) days prior to the scheduled execution.  The seven (7) day timeframe shall not include the day of the execution.  The offender shall be observed, logging his activities every 30 minutes for the first six (6) days and every 15 minutes for the remaining 36 hours.  The Communications Department may request information from the Execution Watch Log on the day of execution.

9.   The original Execution Packet and the offender's medical file shall be sent with the condemned offender in the transport vehicle to the Huntsville Unit or the Goree Unit for a female offender.  The Death Row Unit Warden shall maintain a copy of the Execution Packet on the Death Row Unit.

10.  If there are any changes necessary to the Execution Packet, staff shall notify the CID Director's Office and the Huntsville Unit Warden's Office.

B.  The Day of Execution

1.  On the morning of the day of the execution prior to final visitation, all of the offender's personal property shall be packed and inventoried.  The property officer shall complete an "Offender Property Inventory" (PROP-05) detailing each item of the offender's property.  The property officer shall also complete a "Disposition of Confiscated Offender Property" (PROP-08) indicating the offender's choice of disposition of personal property.

   a.  If disposition is to be made from the Huntsville Unit a copy of the property forms should be maintained by the Death Row Unit Property Officer and the originals forwarded to the Huntsville Unit with the property.

   b.  If disposition is to be made from the Death Row Unit a copy of the property forms will be placed in the Execution Packet and the original forms maintained on the Death Row Unit through the completion of the disposition process.

   c.  The Mountain View Unit Warden shall ensure that a female offender brings personal hygiene and gender-specific items to the Huntsville Unit as appropriate.

2.  Designated staff shall obtain the offender's current Trust Fund balance and prepare the Offender's Request for Trust Fund Withdrawal (I-25) for completion by the offender.

   a.  The following statement should be written or typed on the reverse side of the I-25, "In the event of my execution, please distribute the balance of my Inmate Trust Fund account as directed by this Request for Withdrawal." The offender's name, number, signature, thumbprint, date, and time should be below this statement.  Two (2) employees' names and signatures should be below the offender's signature as witnesses that the offender authorized the form.

   b.  This Request for Withdrawal form shall be delivered to the Inmate Trust Fund for processing by 10:00 a.m. CST the next business day following the execution.

3.  A female offender may be transported to the Goree unit prior to the day of the execution.  The Execution Transport Log for Female Offenders (Form 7) shall be initiated at the Mountain View Unit.  The Goree Unit staff will initiate the Execution Watch Log upon arrival on the Goree Unit, permit visitation as appropriate and transport the offender to the Huntsville Unit.

12. The offender may have visits with a TDCJ Chaplain(s), a Minister/Spiritual Advisor who has the appropriate credentials and his attorney(s) on the day of execution at the Huntsville Unit; however, the Huntsville Unit Warden must approve all visits.

13. There shall be no family or media visits allowed at the Huntsville Unit.

## IV. Drug Team Qualifications and Training

A. The drug team shall have at least one medically trained individual. Each medically trained individual shall at least be certified or licensed as a certified medical assistant, phlebotomist, emergency medical technician, paramedic, or military corpsman. Each medically trained individual shall have one year of professional experience before participating as part of a drug team, shall retain current licensure, and shall fulfill continuing education requirements commensurate with licensure. Neither medically trained individuals nor any other members of the drug team shall be identified.

B. Each new member of the drug team shall receive training before participating in an execution without direct supervision. The training shall consist of following the drug team through at least two executions, receiving step-by-step instruction from existing team members. The new team member will then participate in at least two executions under the direct supervision of existing team members. Thereafter, the new team member may participate in executions without the direct supervision of existing team members.

C. The Huntsville Unit Warden shall review annually the training and current licensure, as appropriate, of each team member to ensure compliance with the required qualifications and training.

## V. Pre-execution Procedures

A. The Huntsville Unit Warden's Office shall serve as the communication command post and entry to this area shall be restricted.

B. Inventory and Equipment Check

1. Designated staff on the Huntsville Unit are responsible for ensuring the purchase, storage, and control of all chemicals used in lethal injection executions for the State of Texas.

2. The drug team shall obtain all of the equipment and supplies necessary to perform the lethal injection from the designated storage area.

3. An inventory and equipment check shall be conducted.

4.   Expiration dates of all applicable items are to be checked on each individual item. Outdated items shall be replaced immediately.

C.   Minister/Spiritual Advisor and attorney visits shall occur between 3:00 and 4:00 p.m. CST unless exceptional circumstances exist. Exceptions may be granted under unusual circumstances as approved by the Huntsville Unit Warden.

D.   The offender shall be served his last meal at approximately 4:00 p.m. CST.

E.   The offender shall be afforded an opportunity to shower and shall be provided with clean clothes at some time prior to 6:00 p.m. CST.

F.   Only TDCJ security personnel shall be permitted in the execution chamber. The CID Director or designee and the Huntsville Unit Warden or designee shall accompany the offender while in the Execution Chamber. TDCJ Chaplains and Ministers/Spiritual Advisors designated by the offender may observe the execution only from the witness rooms.

## VI.   Set up Preparations for the Lethal Injection

A.   One (1) syringe of normal saline shall be prepared by members of the drug team.

B.   The lethal injection drug shall be mixed and syringes shall be prepared by members of the drug team as follows:

Pentobarbital - 100 milliliters of solution containing 5 grams of Pentobarbital.

C.   The drug team shall have available a back-up set of the normal saline syringe and the lethal injection drug in case unforeseen events make their use necessary.

## VII.   Execution Procedures

A.   After 6:00 p.m. CST and after confirming with the Office of the Attorney General and the Governor's Office that no further stays, if any, will be imposed and that imposition of the court's order should proceed, the CID Director or designee shall give the order to escort the offender into the execution chamber.

B.   The offender shall be escorted from the holding cell into the Execution Chamber and secured to the gurney.

C.   A medically trained individual shall insert intravenous (IV) catheters into a suitable vein of the condemned person. If a suitable vein cannot be discovered in an arm, the medically trained individual shall substitute a suitable vein in another part of the body, but shall not use a "cut-down" procedure to access a suitable vein. The medically trained individual shall take as much time as is needed to properly insert the IV lines. The medically trained individual shall connect an IV administration set, and start a normal saline solution to flow at a slow rate through

one of the lines. The second line is started as a precaution and is used only if a potential problem is identified with the primary line. The CID Director or designee, the Huntsville Unit Warden or designee, and the medically trained individual shall observe the IV to ensure that the rate of flow is uninterrupted.

D. Witnesses to the execution shall be brought into the appropriate viewing area ONLY AFTER the Saline IV has been started and is running properly, as instructed by the Huntsville Unit Warden or designee.

E. The CID Director or designee shall give the order to commence with the execution.

F. The Huntsville Unit Warden or designee shall allow the condemned person to make a brief, last statement.

G. The Huntsville Unit Warden or designee shall instruct the drug team to induce, by syringe, substances necessary to cause death.

H. The flow of normal saline through the IV shall be discontinued.

I. The lethal dose of Pentobarbital shall be commenced. When the entire contents of the syringe have been injected, the line shall be flushed with an injection of normal saline.

J. The CID Director or designee and the Huntsville Unit Warden or designee shall observe the appearance of the condemned individual during application of the Pentobarbital. If, after a sufficient time for death to have occurred, the condemned individual exhibits visible signs of life, the CID Director or designee shall instruct the drug team to administer an additional 5 grams of Pentobarbital followed with a saline flush.

K. At the completion of the process and after a sufficient time for death to have occurred, the Warden shall direct the physician to enter the Execution Chamber to examine the offender, pronounce the offender's death, and designate the official time of death.

L. The body shall be immediately removed from the Execution Chamber and transported by a coordinating funeral home. Arrangements for the body should be concluded prior to execution.

VIII. Employee participants in the Execution Process shall not be identified or their names released to the public. They shall receive an orientation with the Huntsville, Goree, Polansky, or Mountain View Unit Wardens, who shall inform the employees of the TDCJ ED-06.63, "Crisis Response Intervention Support Program" (CRISP). The employees shall be encouraged to contact the Regional CRISP Team Leader following the initial participation in the execution process.



**AFFIDAVIT**

STATE OF TEXAS                    )
                                  )
COUNTY OF ___POLK___              )

    BEFORE ME, the undersigned authority, personally appeared Jerry Bell, who, being duly sworn by me, deposed as follows:

    "My name is <u>Jerry Bell</u>. I am of sound mind; capable of making this affidavit; and I am authorized to make this affidavit in the capacity herein state. I am personally acquainted with the facts herein stated."

    "I am employed as the <u>Assistant Warden</u> for the Texas Department of Criminal Justice ("TDCJ") <u>Polunsky Unit</u> located in <u>Livingston, Texas</u>, and do hereby certify that I am the custodian of records maintained in the regular course of business of the TDCJ."

    "I have reviewed the records you have requested; and hereby certify that the attached copies of documents are true and correct copies of the original records now on file in my custody. I further certify that the records attached here to are maintained in the usual and regular course of business at the TDCJ. The entries made and/or documents created were created at or about the time of the occurrence, or reasonable soon thereafter, by an employee or representative of TDCJ with knowledge of the act, event, condition, opinion, or diagnosis reflected in the records, and that such records are maintained on each and every offender confined here."

    "Attached are copies of the disciplinary records from 11/21/2003 till present for offender Murphy, Patrick #999461."



Jerry Bell, Affiant

    SWORN TO AND SUBSCRIBED BEFORE ME on June 19, 2019, by the said Jerry Bell, to certify which witness my hand and seal of office.

_____
Notary Public in and for the State of Texas

KERRY COOPER
Notary Public, State of Texas
Notary ID # 131188524
Comm. Exp. 06-22-2021
NOTARY WITHOUT BOND

# BUSINESS RECORDS
## AFFIDAVIT

MURPHY 1721

TEXAS DEPARTMENT OF CRIMINAL JUS.   E

**OFFENSE REPORT**

| Informal Resolution App? | |
|---|---|
| Officer | Y (N) |
| Supervisor | Y (N) |

| Case No. _____ | |
|---|---|
| MHMR Rest? | Y   N |
| PHD | Y   N |

Pre-level

(1) TDCJ-No. _999461_   (2) Offender _Murphy Patrick_   (3) Unit _Polunsky_
(Last Name, First)

(4) Housing Assign: _12 Bldg A E 66 cell_   (5) Job Assignment: _None_

(6) Offense Level, Code Title: _Level 2, Code 16.0 Possession of Contraband_

OFFENSE DESCRIPTION:  On _1-7-06_ at _2033_ AM/PM, and at _12 Bldg A E 66 cell_
(7) Date   (8) Time   (9) Enter Specific Location

Offender _Murphy, Patrick_   TDCJ No. _999461_

did possess contraband, namely three pair of socks and three sheets, which is in excess of the amount authorized, such amount being two pair of socks and two sheets.

(10) Additional Information:

While doing a cell shakedown, on the date and time listed above, and at 12-Bldg, A-Pod, E-Section, 2-Row, 66 cell, Offender Murphy Patrick, TDCJ No 999461, did possess contraband, namely three pair of socks and three sheets, which is in excess of the amount authorized, such amount being two pair of socks and two sheets.

JAN 0 9 2006

(Continue on additional sheet if necessary)

(11) Witnesses: _N/A_

(12) Accusing Officer/Employee:  Printed Name/Rank _HADNOT, B. CO4_

(13) Signature: _Hadnot, B._   (14) Shift/Card _2/2_   (15) Date _1-8-06_   (16) Time _0050_

(17) Approving Supervisor's Printed Name: _STERN_   (18) Date _1-08-06_

(19) Grading Official (Print) _Hinsch_   (20) Rank _ALW_   (21) Date _1/9/06_

(22) Grade: (Circle One)   IR   UP  (MI)  MA   (23) Justification to override Informal Resolution: _____

v1-210 (rev. 01/98)

MURPHY 1722

## ,ELIMINARY INVESTIGATION REPORT

This report is to be completed on each Offense Report for review by the grading official. The purpose of this report is to obtain any other pertinent information about the incident prior to grading the Offense Report. The Preliminary investigation should not be completed by the charging officer or a person involved in the incident.

Offender: _Murphy, Patrick_     TDCJ No. _999461_

Date & Time Investigation started: _1-08-06     0441_

1.   **ELEMENTS OF CHARGE.**   Does the offense description support the elements of each charge (the things that had to be done in order to commit an offense). If "No," have charging officer add needed information.

Offense Code _16.0_:   Yes [✓] No [  ]     Offense Code _____:   Yes [  ] No [  ]
Offense Code _____:   Yes [  ] No [  ]     Offense Code _____:   Yes [  ] No [  ]

2.   **ADDITIONAL INFORMATION.**   Has the charging officer included supporting information or evidence to supplement the standardized pleading such as items listed below? (Write "Yes," "No," or "NA" [not applicable] by each item).

_NO_ a.   listing other witnesses to the incident,
_NO_ b.   documentary evidence, e.g., photographs of contraband, etc.
_YES_ c.   additional information about the offense.

3.   **ACCUSED OFFENDER** states that: (Print interpreter's name if applicable):

_Yeah I had it._

4.   **ACCUSING OFFICER** states that: _As stated in the additional information._

5.   **WITNESS STATEMENTS** (List employee or offender; attach statements to report): _N/A_

6.   **DOCUMENTATION.**   Documents reviewed (lay-ins, appointments, medical records, etc.)
☐ Lay-ins, ☐ Roster, ☐ Medical Records, ☐ Picture, ☐ Other (List & attach to report)
_N/A_

_S. GOINS_                    _SGT._          _1-08-06     0443_
Name of Investigating Officer (Print)          Rank          Date & Time Investigation Completed

7.   **INFORMAL RESOLUTION** was not appropriate or not possible because:

_This type of behavior will not be tolerated_

_STERN_                    _LT._          _1-08-06_
Approving Supervisor's Printed Name          Rank          Date

MURPHY  1723

TDCJ   SCIPLINARY REPORT AND HEA   IG RECORD

CASE: 20060125839 TDCJNO: 00999461 NAME: MURPHY,PATRICK HENRY JR          EA: 7.7
UNIT: TL   HSNG: 12AE2   66 12b-37 JOB: DR SEG LEVEL I                     IQ: 096
CLASS: L3  CUST: D1  PRIMARY LANGUAGE: ENGLISH          MHMR RESTRICTIONS:    NO
GRADE: MI / BH   OFF.DATE: 01/07/06   08:33 PM   LOCATION: TL 12 BLDG A POD E SECT
TYPE: ID

### OFFENSE DESCRIPTION

ON THE DATE AND TIME LISTED ABOVE, AND AT 12 BLDG AE 66 CELL, OFFENDER:  MURPHY,
PATRICK HENRY JR, TDCJ-ID NO. 00999461,   DID  POSSESS CONTRABAND, NAMELY, THREE
PAIR OF SOCKS AND THREE SHEETS,  WHICH IS IN   EXCESS OF THE AMOUNT AUTHORIZED,
SUCH AMOUNT BEING TWO PAIR OF SOCKS AND TWO SHEETS.

CHARGING OFFICER: HADNOT, B CO IV              SHIFT/CARD: 2 2

### OFFENDER NOTIFICATION

TIME & DATE NOTIFIED: 1952 1/12/06 BY:(PRINT) Wood, A. COIV   IF APPLICABLE, INTERPRETER,
YOU WILL APPEAR BEFORE A HEARING OFFICER 24 HOURS OR MORE AFTER RECEIPT OF THIS
NOTICE.  YOU HAVE THE RIGHT TO SUBMIT A WRITTEN STATEMENT AND MAKE A VERBAL
STATEMENT.  DO YOU WANT TO ATTEND THE HEARING? YES NO     IF NO, HOW DO YOU
PLEAD? GUILTY  NOT GUILTY
OFFENDER NOTIFICATION SIGNATURE: X Patrick Murph 999461      DATE: Jan 12, 06
BY SIGNING BELOW, YOU GIVE UP YOUR RIGHT TO 24-HOUR NOTICE AND AUTHORIZE THE
HEARING OFFICER TO PROCEED WITH THE HEARING.
OFFENDER WAIVER SIGNATURE: X Patrick Murph  999461          DATE: Jan 12, 06

### HEARING INFORMATION

HEARING DATE: 1-12-06 TIME: 2116   INTERPRETER SIGNATURE:_____
EXPLAIN BELOW IF HEARING WAS NOT HELD WITHIN SEVEN DAYS, EXCLUDING WEEKENDS AND
HOLIDAYS, AFTER THE OFFENSE DATE:_____

OFFENDER STATEMENT:   I WAS COLD.

| OFFENSE CODES: | 16.0 | | | |
| OFFENDER PLEA: (G, NG, NONE) | G | | | |
| FINDINGS: (G, NG, DS) | G | | | |

### PUNISHMENT

LOSS OF PRIV(DAYS)_____   REPRIMAND_____
*RECREATION(DAYS)_____   EXTRA DUTY(HOURS)_____
*COMMISSARY(DAYS)_____   CONT.VISIT SUSP THRU ___/___/___
*PROPERTY(DAYS)..._____   CELL RESTR(DAYS)  10
*_____(DAYS)_____

OFFENDER SIGNATURE FOR RECEIPT OF FINAL REPORT: OFFENDER IN RESTRAINTS
LT. J. CHICAS
HEARING OFFICER (PRINT)
(FORM I-47MI)CONTACT A STAFF MEMBER IF YOU DO NOT UNDERSTAND THIS FORM
(REV. 03-02) COMUNIQUESE CON UN MIEMBRO DEL PERSONAL SI NO ENTIENDE ESTA FORMA

MURPHY 1724

```
CSDSP005                 T.D.C.J. - INSTITUTIONAL DIVISION              01/09/06
TL  - TL27                    MAJOR GRADING REPORT                      09:06:56
                                                                        PAGE    1
TDCNO: 00999461    NAME: MURPHY,PATRICK HENRY JR        GOOD TIME: 0000 00 00
CLASS: L3          CUSTODY: D1                           WORK TIME: 0000 00 00
RESTRICTIONS:


**** LAST 180 DAYS CONVICTIONS
 OFF    HEAR  REPORT        OFF                ************PENALTY(S)************
 DATE   DATE  NUMBER        CODE DESCRIPTORS LVL    REP/SOL/CLASS/ TIME/XD/CR/PR/CU

    NO CONVICTIONS ON FILE FOR LAST 180 DAYS


***** PENDING CASES
  OFF DATE       CASE NUMBER       OFF CODE     DESCRIPTORS     GRADE    DISPOSITION

   010706        20060125839         16.0
        END OF PENDING CASES
```

MURPHY  1725

TEXAS DEPARTMENT OF CRIMINAL JUSTICE

**OFFENSE REPORT**

Informal Resolution App?
Accusing Officer    Y    N
Supervisor    Y    N

Interpreter Required?    Y    N
MHMR Rest?    Y    N
PHD    Y    N

(1) TDCJ-No: *999461*    (2) Offender: *MURPHY, Patrick*    (3) Unit: *TL*
(Last Name, First)

(4) Housing Assign: *12 Building B Pod cell 12*    (5) Job Assignment: *Death - Row*

(6) Offense Level, Code Title: *Level 3, code 15.0 Trafficking and Trading*

OFFENSE DESCRIPTION: On *6-26-12* at *1049* AM/PM, and at *12 Building B Pod cell 12*
(7) date    (8) time    (9) Enter Specific Location

Offender *MURPHY, Patrick*    TDCJ No. *999461*

*did make an unauthorized commodity transfer from offender*
*▓▓▓▓ TDCJ number ▓▓▓▓ by recieving a big*
*envelope from cell ▓▓*

(10) Additional Information: *While observing the pod I Officer*
*Kelly watch offender Murphy take a big envelope from*
*cell ▓▓*

*JUN 27 2012*

(Continue on an additional sheet if necessary)

(11) Witnesses: *NA*

(12) Accusing Officer/Employee: Printed Name/Rank *Kelly CO2*

(13) Signature: *(signature)*    (14) Shift/Card *H*    (15) Date *6-26-12*    (16) Time *1312*

(17) Approving Supervisor's Printed Name: *Lt. J. McHu*    (18) Date *6/26/12*

(19) Grading Official (Print) *V. MM*    (20) Rank *Capt*    (21) Date *JUN 27 2012*

(22) Grade: (Circle One)  IR  UP  MI  MA   (23) Justification to override Informal Resolution: _____

I-210 (Rev. 04/10)

MURPHY  1726

TEXAS DEPARTMENT OF CRIMINAL JUSTICE
PRELIMINARY INVESTIGATION REPORT

This report is to be completed on each Offense Report for review by the grading official. The purpose of this report is to obtain any other pertinent information about the incident prior to grading the Offense Report. The Preliminary Investigation should not be completed by the charging officer or a person involved in the incident.

Offender: _Murphy, Patol_   TDCJ No. _999961_
Date & Time Investigation started: _6-26-12    1610_

1.   **ELEMENTS OF CHARGE.** Does the offense description support the elements of each charge (the things that had to be done in order to commit an offense). If "no", have charging officer add needed information.

Offense Code _11.0_ : Yes [✓] No [ ]   Offense Code _____ : Yes [ ] No [ ]
Offense Code _____ : Yes [ ] No [ ]   Offense Code _____ : Yes [ ] No [ ]

2.   **ADDITIONAL INFORMATION.** Has the charging officer included supporting information or evidence to supplement the standardized pleading such as items listed below? (Write "Yes","No", or "NA" [not applicable] by each item).

_N_ a.   listing other witnesses to the incident,
_N_ b.   documentary evidence, e.g. photographs of contraband, etc.
_y_ c.   additional information about the offense.

3.   **ACCUSED OFFENDER STATES THAT:** (Printed and signed interpreter's name if applicable):

"_I didn't do it, I was in my cell all day._"

4.   **ACCUSING OFFICER** states that _said offender did Traffic & Trade_

_this poem_

5.   **WITNESS STATEMENTS** (List employee or offender name and attach statements to report)

_None_

6.   **DOCUMENTATION.**   Documents reviewed (lay-ins, appointments, medical records, etc.)
[ ] lay-ins, [ ] Roster, [ ] Medical Records, [ ] Picture, [ ] Other (List & attach to report)

_None_

_G. Smith_              _Sgt_         _6-26-12    1613_
Name of Investigating Officer (Print)       Rank        Date & Time Investigation Completed

7.   **INFORMAL RESOLUTION** was not appropriate or not possible because:

_This behavior will not be tolerated_

_J. McGee_              _Lt._         _6/26/12_
Approving Supervisor's Printed Name        Rank          Date

Back side of I-210 (rev. 04/10)

MURPHY 1727

CASE: 201206980 TDCJ NO. 00499461 NAME: MURPHY, PATRICK HENRY JR
UNIT: TL   HSNG: 12BA2   12   JOB: DR SEG LEVEL: 2
CLASS:   CUST: A1 PRIMARY LANGUAGE: ENGLISH   PREP NOTIFICATION:
SKOF: M1 / M1   OFF.DATE: 06/26/12   10:49 AM   LOCATION: TL DEATH ROW HOUSING
TYPE: ID

### OFFENSE DESCRIPTION

ON THE DATE AND TIME LISTED ABOVE, AND AT 12 BLDG B POD CELL 12, OFFENDER,
MURPHY,PATRICK HENRY JR, TDCJ-ID NO. 00499461, DID MAKE AN UNAUTHORIZED
COMMODITY TRANSFER FROM OFFENDER ▇▇▇▇▇▇▇▇▇ TDCJ NUMBER ▇▇▇▇▇▇ BY
RECIEVING A BIG ENVELOPE FROM CELL ▇▇

CHARGING OFFICER: KELLY, M. COII                    SHIFT/CARD: 1 1

### OFFENDER NOTIFICATION

                                              IF APPLICABLE INTERPRETER
TIME/DATE NOTIFIED: 2106 6-27-12 BY:(PRINT) R. Lee COIII
YOU WILL APPEAR BEFORE   HEARING OFFICER 24 HOURS OR MORE AFTER RECEIPT OF THIS
NOTICE.   YOU HAVE THE RIGHT TO SUBMIT A WRITTEN STATEMENT AND MAKE A VERBAL
STATEMENT.   DO YOU WANT TO ATTEND THE HEARING?   YES (NO)   IF NO, HOW DO YOU
PLEAD? (GUILTY) NOT GUILTY
OFFENDER NOTIFICATION SIGNATURE: X Patrick Murphy          DATE: 6-27-12
BY SIGNING BELOW, YOU GIVE UP YOUR RIGHT TO 24 HOUR NOTICE AND AUTHORIZE THE
HEARING OFFICER TO PROCEED WITH THE HEARING.
OFFENDER WAIVER SIGNATURE:                                  DATE:

### HEARING INFORMATION

HEARING DATE: 6/28/12 TIME: 2220 INTERPRETER SIGNATURE:
EXPLAIN BELOW IF HEARING WAS NOT HELD WITHIN SEVEN DAYS, EXCLUDING WEEKENDS
AND HOLIDAYS, FROM THE OFFENSE DATE:

OFFENDER STATEMENT: Refused to Attend

OFFENSE CODES:                    15.0
OFFENDER PLEA: (G) NG, NONE)        G
FINDINGS: (G) NG, DS)
                            PUNISHMENT
LOSS OF PRIV(DAYS)         REPRIMAND
*RECREATION(DAYS)          EXTRA DUTY(HOURS)
*COMMISSARY(DAYS) 15       CONT.VISIT SUSP THRU  /  /
*PROPERTY(DAYS)            CELL RESTR(DAYS) 15
* (DAYS)
OFFENDER SIGNATURE FOR RECEIPT OF FINAL REPORT: Refused to attend
                                                 D. Muniz
HEARING OFFICER (PRINT)                          WARDEN

(FORM I-47MI)CONTACT A STAFF MEMBER IF YOU DO NOT UNDERSTAND THIS FORM
(REV. 06-03) COMUNIQUESE CON UN MIEMBRO DEL PERSONAL SI NO ENTIENDE ESTA FORMA)

MURPHY 1728

```
7340 /7LB3                    OFFENDER DISCIPLINARY SYSTEM                    06/06/05
                              OFFENDER CASE GRADING REPOR
TDCJ: 00003461 NME: MURPHY,PATRICK HENRY JR        UNIT: TL GOODTME: 0000 00 00
CLASS:         CUST: D1 TYPE: ID PRO REL DTE: 0000-00-00  WORKTIME: 0000 00 00
RESTRICTIONS:
```

```
******************************************************************************
 REPORT REFLECTS OFFENDER AND CASE INFORMATION AS OF:   2012-06-27    06:48:03
******************************************************************************
```

NO CONVICTIONS ON FILE FOR LAST 180 DAYS

```
******************************************************************************
```

PENDING CASES FOR LAST 180 DAYS

```
OFF          CASE       CODE DESCRIPTOR LV GRADE   NOTES

052612       20120293912 15.0              3       COMPUTER RECOMMENDED GRADE: M3
```

END OF PENDING CASES

MURPHY 1729

TEXAS DEPARTMENT OF CRIMINAL JUSTICE
INSTITUTIONAL DIVISION
## DISCIPLINARY HEARING RESULTS NOTIFICATION

Inmate _Murphy, Patrick_   Date _6/28/12_

TDCJ - ID No. _999461_

From (De) _Lt. Helm_   Subject: _Disciplinary Hearing Record_
     Hearing Officer (Oficial de Audiencia)   (Registro de Audiencia Disciplinaria)

_Polunsky_   Unit (Unidad)

This is to inform you that a major/minor disciplinary hearing involving your case, report number _20120293912_ , was held _6/28_ , 20 _12_ at approximately _2220_ am/(pm.) Your copy of the Disciplinary Report and Hearing Record is attached.

   If you were found guilty, you have the right to appeal the decision of the hearing officer with respect to the determination of guilt and/or the punishment imposed. You may appeal the decision by filing an I-127 with the warden. If you are dissatisfied with the response, you may then file an I-128. If the hearing was a major disciplinary hearing, your counsel substitute will assist you in the appeals process if you need and request assistance. If you need assistance, send an I-60 request to your counsel substitute.

Attachment

---

### NOTIFICACION DE RESULTADOS DE AUDIENCIA DISCIPLINARIA

Esto es para informarle que una audiencia disciplinaria mayor/menor respecto a su caso, numero de reporte _____ , se llevo a cabo el dia _____, 20 _____, aproximadamente a las _____am/pm. Su copia del reporte disciplinario y registro de audiencia viene pegada.

   Si se le encontró culpable, usted tiene el derecho de apelar la decisión del oficial de audiencia, con respecto a la determinación de culpabilidad y/o el castigo impuesto. Usted puede apelar la decisión al archivar la forma I-127 con el guardián. Si no esta satisfecho con la respuesta, puede archivar la forma I-128. Si la audiencia disciplinaria fue mayor, su abogado substituto le asistirá en su proceso de apelación, si necesita y pide asistencia. Si usted necesita asistencia, mande una petición I-60 a su abogado substituto.

Suplemento

MURPHY  1730

I-217 (Rev. 4/00)