IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION

| | | |
|---|---|---|
| PATRICK HENRY MURPHY, JR., | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Civil Action No.4:19-CV-1106 |
| | § | |
| BRYAN COLLIER, ET AL. | § | |
| *Defendant*. | § | |
| | § | |

## David Collier's Responses to Plaintiff's First Set of Interrogatories

To: Patrick Henry Murphy, through his attorney of record, David R. Dow and Jeffrey R. Newberry, University of Houston Law Center, 4604 Calhoun Road, Houston Texas 77204, ddow@central.uh.edu and jrnewber@central.uh.edu

  David Collier, through the Attorney General for the State of Texas, by agreement of the parties, submits the following **Response to Plaintiff Patrick Henry Murphy's Interrogatories to Witness David Collier.**

          Respectfully Submitted,

          **KEN PAXTON**
          Attorney General of Texas

          **JEFFREY C. MATEER**
          First Assistant Attorney General

          **DARREN L. MCCARTY**
          Deputy Attorney General for Civil Litigation

          **SHANNA E. MOLINARE**
          Division Chief
          Law Enforcement Defense Division

/s/ Leah O'Leary
**LEAH O'LEARY**
Assistant Attorney General
Law Enforcement Defense Division
Texas State Bar No. 24079074
Southern District ID No. 1563191

Office of the Attorney General
Law Enforcement Defense Division
P. O. Box 12548, Capitol Station
Austin, Texas 78711
(512) 463-2080 / Fax (512) 370-9918
Leah.Oleary@oag.texas.gov

**ATTORNEY FOR DEFENDANTS AND RETIRED CHAPLAIN DAVID COLLIER**

# CERTIFICATE OF SERVICE

I, **LEAH O'LEARY**, Assistant Attorney General of Texas, do hereby certify that on June 24, 2019, a true and correct copy of the foregoing was served by email to the following counsel of record, who consented in writing to accept service of documents document by electronic means:

David R. Dow
Jeffrey R, Newberry
UNIVERSITY OF HOUSTON LAW CENTER
4604 Calhoun Road
Houston, Texas 77204
*ddow@central.uh.edu*
*jrnewber@central.uh.edu*

/s/ Leah O'Leary
**LEAH O'LEARY**
Assistant Attorney General

# DAVID COLLIER'S RESPONSES TO PLAINTIFF'S INTERROGATORIES

**Interrogatory 1:** Identify each person answering these interrogatories, supplying information, or assisting in any way with the preparation of the answers to these interrogatories.

**Answer:** David Collier

**Interrogatory 2:** a) How long had you been employed by TDCJ when you first were allowed to be present in the execution chamber during an execution?  b) Did your employment with TDCJ begin on December 15, 2006? c) Were you first present in the chamber during an execution on March 29, 2007?

**Answer:** a) Approximately 3 and ½ months.
b) Yes.
c) Yes.

**Interrogatory 3:** a) Describe any background check that was performed on you before you were allowed to be present in the execution chamber during an execution.  b) When were you first notified you would participate in the execution chamber during Roy Pippin's execution on March 29, 2007?  c) Was any background check conducted to determine whether you would be allowed to be present in the chamber conducted before or after that date?

**Answer:** a) I have knowledge of the criminal history background check that was conducted as a pre-condition of my employment with TDCJ.  I am not aware of what information is received during the background check. I am not aware of what updates TDCJ may perform with regard to the criminal backgrounds of employees.
b) Based on my best recollection, approximately 14 days before the execution date.

c) As stated in response 3(a), a background check was conducted at or around the time I was hired by TDCJ. I am not aware of additional or updated criminal background checks may be conducted on TDCJ employees.

**Interrogatory 4:** a) Is it correct that you were the Polunsky Unit Chaplain beginning on December 15, 2006? b) If so, did you remain in that position until you retired? c) Please list any other positions you held while employed by TDCJ and the dates you held those positions.

**Answer:** a) Yes, that is correct.
       b) No.
       c) I was a Chaplain I at the Polunsky Unit from December 14, 2006 until April 2007, at which time I was promoted to Chaplain II. I remained at the Polunsky Unit as a Chaplain II until November 15, 2012, and then transferred to the Huntsville Unit, with an official first day of work, after a vacation, of December 1, 2012. From September 2007 to February 2013, in addition to my chaplaincy duties, I was also a trained hostage negotiator.

**Interrogatory 5:** In the documents you provided, you indicated that you were present in the "death house" for 67 executions. a) What role did you play in these executions? b) Do you mean you interacted with the inmate when he was in the holding cell outside of the execution chamber? c) Were you also present in the execution chamber during these executions? d) Were you present at the Walls Unit on these occasions because the condemned person designated you to be their spiritual adviser? e) If not, in what capacity did you serve that day?

**Answer:** a) Regardless of whether I was assigned to the "death house" or designated to enter the execution chamber for a given execution, my role was to be a calming presence and to provide aid and comfort to the offender. Shortly after his or her arrival and placement in the "death house" at the Huntsville Unit, I would have a conversation with the offender to let him or her know what to expect as to what was going to occur during the course of the day. Ministers, Chaplains, Clergy, etc. call this "Ministry Of Presence". The very first thing after the condemned

arrives to the death house is: Finger printed, showered, change clothes and then placed in the holding cell. Then the Warden, Chaplains and Public Information Director hold a brief meeting with the condemned about the upcoming process. At this point the Chaplains begin their duties. I also assisted with whatever needs the offender had to best ensure that he or she was comfortable. This included getting the offender beverages or snacks throughout the day, helping the offender place calls to friends or loved ones—I would access the phone list provided by the offender and place the calls, but would move away from the cell during the call to allow the offender some measure of privacy—and providing approved items to the offender from his or her property, such as any religious texts the offender may have packed. Between 3:00 to 4:00 p.m., I would go to the hospitality house to meet with the offender's family to assist with preparing them about what to expect and what was allowed and disallowed during the execution process. This is also the time for the offender to meet with his or her spiritual advisor or attorney with correctional staff supervision. In addition, I would convey any messages from the offender to his or her loved ones, who were at the hospitality house, if he or she asked me to do so. Upon my return from the hospitality house at 4:00 p.m., and until 5:00 p.m., I would resume assisting the offender with placing phone calls or bringing him or her snacks or beverages upon their request. During this hour, the offender would also receive his or her last meal and would be given the opportunity to shower.

     b) Yes.

     c) No.

     d) No.

     e) My role was to be a calming presence and to provide aid and comfort to the offender. For the most part, the offender dictates how I may be of service to him and comfort him, within the bounds of security. Performing that role is not dependent on my personal faith preference.

Unless the offender knows me from a different unit, knows me by reputation, or specifically asks what my personal faith is, there is nothing I say or do during the execution process that would alert the condemned as to my personal faith preference.

**Interrogatory 6:** For the 67 executions for which you were present in the death house, were you only allowed to visit with the condemned person from 3:00 to 4:00 pm on the day of his or her execution or were you allowed to visit them beyond this one-hour window on the day of their execution?

**Answer:**  From 3:00 to 4:00 p.m., chaplains visit with the offender's family at the hospitality house, so I would not be with the offender during that time period.  From his or her arrival at the Huntsville Unit to 3:00 p.m., and then from 4:00 p.m. until the offender entered into the execution chamber, I would be in the area outside the cell where the offender was being held in order to help him or her in the manner as discussed in response to interrogatory number 5. My role during those times is not spiritual advisement; rather, it is to comfort and encourage the offender.

**Interrogatory 7:** For the 67 executions for which you were present in the death house, did you ever do any of the following with the person who was to be executed while at the Walls Unit on the day he or she was scheduled to be executed: 1) discuss scriptures from the Christian Bible; 2) discuss any requirements for that person to enter into Heaven, as that term is understood in the Christian religion, such as asking for forgiveness for his or her sins; 3) pray with that person to either the Christian God or Jesus Christ; 4) have any conversations with the condemned person on any Christianity-related subjects?
Provide as many details as you can recall related to any such interactions. Did any of these activities occur at any time that was not between 3:00 and 4:00 pm? Approximately, with how many of these 67 individuals did you engage in any of these activities at a time that was not between 3:00 and 4:00 pm on the day of the person's execution?

**Answer:**  For all components of the above interrogatory, the answer is no, unless specifically requested by the offender. In many of the executions with which I was in attendance, the offender, regardless of their chosen faith, would ask at some time before they were escorted to the chamber for me to say a prayer for them. I do not recall with

6

specificity each of those times. These requests were not specific to Christianity, and the requests were not to pray with the offender; rather, the requests were for me to pray for him on my own.

I can recall one offender, who had become Muslim during his incarceration, asked the other chaplain and me if he could ask for forgiveness and return to Christianity. We told him that he could. The offender, whose name I am unable to remember, asked that we let his parents know that he had asked for forgiveness at the end. When the other chaplain and I took the offender's property to his family at the hospitality house, we conveyed the message to his parents as he had requested. His request was not the result of the chaplains' urging or any suggestions by the chaplains. Matters of faith are not brought up by the chaplains—only the offenders initiate those conversations, and more frequently, the offender wants to tell me about his faith and I listen.

Most of my "interactions" or conversations with the offenders were general in nature about their lives. I tried to keep them on topics that were positive or were about good memories, so as to lessen any cause for agitation. Usually that involves discussions about their family and friends, their interests, and other topics. Very seldom did we ever directly discuss matters of faith, and only if the offender wanted to discuss it. If an offender directly asked for me to pray for him or her, or just listen to him or her as they prayed, I would honor that request, regardless of the offender's chosen faith. If an offender wanted to tell me about his faith, I would actively listen and encourage him if it is a comforting topic for him. Oftentimes, an offender would not like to talk about anything and would choose to lie down, instead, which was also respected.

**Interrogatory 8:** For the 67 executions for which you were present in the death house, did the Walls Unit chaplain (or any other TDCJ chaplain) also have any interaction with the condemned person on the day of his or her execution? If so, do you recall any instances in which the Walls Unit Chaplain either: 1) discussed scriptures from the Christian Bible; 2) discussed any requirements for that person to enter into Heaven, as that term is understood in the Christian religion, such as asking for forgiveness for his or her sins; 3) prayed with that person

7

to either the Christian God or Jesus Christ; 4) have any conversations with the condemned person on any Christianity-related subjects? Provide as many details as you recall related to any such interactions, including the identity of the chaplain you observed. Approximately, with how many of these 67 individuals did you witness another chaplain engage in any of these activities with the condemned person?

**Answer:** See response to interrogatory number 7 above. The Walls unit chaplain is not always the chaplain who was inside the execution chamber. Like myself, the other chaplains assigned to the death house or those designated to enter into the execution chamber, when that was still allowed under the execution protocol, were there in the capacity to provide assistance to the offender in placing phone calls, bring him or her comforting items such as beverages or snacks, or otherwise be a calming presence. The "interactions" that I witnessed between other chaplains and offenders were very similar to those that I had with the offenders. The role of the chaplain is not specific to any faith. In the instances where the offender wishes to practice his religion by praying, reading religious texts, or other practice, the role of the chaplain is to facilitate that within the bounds of security. That is our responsibility for all offenders of all faiths.

**Interrogatory 9:** a) For the 67 executions for which you were present in the death house, what other things would you do to provide comfort to the condemned person on the day of his or her execution that was of a religious nature? b) What did you do to provide comfort that was not of a religious nature?

**Answer:** a) I would not provide comfort of a "religious nature" unless specifically asked by the offender to do so, and any said comfort of this nature was limited to the request made by the offender. The role of the chaplain is not specific to any faith. In the instances where the offender wishes to practice his religion by praying, reading religious texts, or other practice, the role of the chaplain is to facilitate that within the bounds of security. That is our responsibility for all offenders of all faiths. An offender may have asked for me to retrieve their specific religious literature from their property, which I would do. If the offender wanted

8

to talk to me about their religious faith, I would be an active listener and encourage him or her to discuss his faith if that is comforting to him. I would not initiate or lead any discussions with the offender about religious matters as that was not the purpose for my or any other TDCJ Chaplains' presence on the day of the execution.
b) See responses to interrogatories 7 and 8, above.

**Interrogatory 10:** For the 71 executions for which you were present in the execution chamber, if you were not at that time employed as the Walls Unit chaplain, why were you designated to be present in the execution chamber?

**Answer:** Two chaplains acted an alternating or rotating basis to be in the execution chamber, so that if one of the chaplains was sick or on a scheduled vacation, the other chaplain would be available. I can recall at least one time where the offender requested that the chaplain designated for his execution not be in the chamber because he disliked that particular chaplain, so the alternate chaplain was there, instead. If an offender and a chaplain are not connecting or for whatever reason, the offender doesn't like a particular chaplain, a different chaplain may be called to that duty instead. Again, the goal is to be a calming and comforting presence. The Walls Unit chaplain was not always the chaplain who was inside the execution chamber.

**Interrogatory 11:** For the 71 executions for which you were present in the execution chamber, was your contact with the condemned person limited to inside the execution chamber or did you also have contact with the condemned person before entering the execution chamber? If you had contact with the person before entering the execution chamber, was this contact limited to between the hours of 3:00 and 4:00 pm on the day of the execution?

**Answer:** See response to interrogatory number 5. For some offenders, I would interact with the offender in the death house as well as serve as the chaplain inside the execution chamber. Being there for the offender

and comforting and supporting him during the time in the death house is part of what gives the offender comfort once inside the execution chamber.

**Interrogatory 12:** Besides any initial background check conducted before you were present in the execution chamber during the execution on March 29, 2007, were any subsequent background checks conducted on you before any of the other 70 executions during which you were present in the execution chamber?

**Answer:** Defendants object to this interrogatory on the grounds that it assumes contested facts not in evidence and mischaracterizes the process.

Mr. Collier's response: I do not know.

**Interrogatory 13:** For the 71 executions for which you were present in the execution chamber, did you ever do any of the following with the person who was to be executed on the day of his or her execution while he was at the Walls Unit: 1) discuss scriptures from the Christian Bible; 2) discuss any requirements for that person to enter into Heaven, as that term is understood in the Christian religion, such as asking for forgiveness for his or her sins; 3) pray with that person to either the Christian God or Jesus Christ; 4) have any conversations with the condemned person on any Christianity-related subjects?
Provide as many details as you recall related to any such interactions. If so, did any of these activities occur at any time that was not between 3:00 and 4:00 pm that day? Approximately, with how many of these 71 individuals did you engage in any of these activities at a time that was not between 3:00 and 4:00 pm on the day of the person's execution?

 **Answer:** Defendants object to this Interrogatory as duplicative. See responses to interrogatories 5, 7, and 8 above.
There was no conversation in the Death Chamber once the curtains opened and witnesses were visible EXCEPT the condemned's Last Statement.

10

**Interrogatory 14:** For the 71 executions for which you were present in the death house, did you ever do any of the following with the person who was to be executed on the day of his or her execution while inside the execution chamber: 1) discuss scriptures from the Christian Bible; 2) discuss any requirements for that person to enter into Heaven, as that term is understood in the Christian religion, such as asking for forgiveness for his or her sins; 3) pray with that person to either the Christian God or Jesus Christ; 4) have any conversations with the condemned person on any Christianity-related subjects? Provide as many details as you recall related to any such interactions. Approximately, with how many of these 71 individuals did you engage in any of these activities inside the execution chamber?

**Answer:** Defendants object to this Interrogatory as duplicative. See responses to interrogatories 5, 7, and 8 above. Upon entering the chamber, I had little to no verbal interaction with the offender, and no offender ever asked me to say a prayer over him or her while in the chamber. I have never had a discussion about religion, or any other discussion with an offender in the execution chamber. The words I said in the execution chamber typically included only phrases such as "here comes your family," or "door is opening," "door is closing."

**Interrogatory 15:** To the extent you know, describe the difference between the background check performed on ministers who are allowed to visit death row inmates in that capacity in the visiting area at the Polunsky Unit and the check performed on chaplains who were allowed to be present in the execution chamber.

**Answer:** Defendants object to this interrogatory on the grounds that it assumes contested facts not in evidence and mischaracterizes the process. It is vague in that it requires the responder to compare incomparable processes.

Mr. Collier's response: I do not know.

**Interrogatory 16:** To the extent you know, identify any people who were investigated to determine whether they could be present in the chamber but were subsequently denied.

**Answer:** Defendants object to this interrogatory on the grounds that it assumes contested facts not in evidence and mischaracterizes the process. The term "investigated" is vague and is a mischaracterization of the process.

Mr. Collier's response: I do not know.

**Interrogatory 17:** Identify any instances in which you witnessed or otherwise knew of any person in the execution chamber during an execution assault any other person in the execution chamber, attempt to gain access to the execution team, attempt to pull the intravenous lines out of the condemned, taunt the victim's family and friends, or create any other disruption during an execution. For each of these instances, identify the person who caused the disruption, whether the person was employed by TDCJ, the date of the disruption, the date the person began working for TDCJ, and the nature of the disruption.

**Answer:** None.

**Interrogatory 18:** Identify any instances in which you witnessed or otherwise knew of any clerical person in the witness room during an execution assault any other person in the witness room, attempt to gain access to the execution team, taunt the victim's family and friends, or create any other disruption during an execution. For each of these instances, to the extent you know, identify the person who caused the disruption, whether the person had been approved to visit TDCJ inmates as a minister, the date the person was approved in that capacity, the date of the disruption, and the nature of the disruption.

**Answer:** TDCJ was thorough in educating witnesses, including spiritual advisors, on what to expect during the execution process and that disruptive behavior was not tolerated. There are also law enforcement or security staff present inside the viewing room to deter bad behavior. So fortunately, no disruptions of this kind occurred during any of the executions in which I was present.

**Interrogatory 19:** Identify any instances in which you witnessed or otherwise knew of any clerical person visiting any inmate at the holding cell outside of the execution chamber the afternoon of a scheduled execution assault any other person, attempt to gain access to the execution team, taunt the victim's family and friends, or create any other disruption during an execution. For each of these instances, to the extent you know, identify the person who caused the disruption, whether the person had been approved to visit TDCJ inmates as a minister, the date the person was approved in that capacity, the date of the disruption, and the nature of the disruption.

**Answer:** None of which I am aware. The chaplains are not usually present during the time when the offender meets with the outside spiritual advisor, because that is the time we go meet with the offender's family.

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION

| | | |
|---|---|---|
| PATRICK HENRY MURPHY, JR., | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Action No.4:19-CV-1106 |
| | § | |
| BRYAN COLLIER, ET AL. | § | |
| *Defendant.* | § | |
| | § | |

<u>VERIFICATION FOR RESPONSES TO INTERROGATORIES</u>

I, *David D. Collier Sr.*, CERTIFIY UNDER PENALTY OF PERJURY THAT THE INTERROGATORY RESPONSES ATTACHED HERETO ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

*[signature: David D. Collier Sr.]*
SIGNATURE OF CLAIMANT
DATE: 07-24-2019