IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

PATRICK HENRY MURPHY, JR.,    §
   §
    Plaintiff,    §
   §
v.    §   CIVIL ACTION
   §   NO. 4:19-cv-1106
BRYAN COLLIER, Executive    §
Director of the Texas    §
Department of Criminal Justice;    §
LORIE DAVIS, Director of the    §
Texas Department of Criminal    §
Justice - Correctional    §
Institutions Division; and    §
BILLY LEWIS, Warden of the    §
Huntsville Unit,    §
   §
    Defendants.    §

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
ORAL DEPOSITION OF
PATRICK HENRY MURPHY, JR.
JUNE 21, 2019
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION of PATRICK HENRY MURPHY, JR.,

produced as a witness at the instance of the Plaintiff,

and duly sworn, was taken in the above-styled and

numbered cause on June 21, 2019, from 9:10 a.m. to

10:31 a.m., before Kerrienne L. Bond, CSR in and for the

State of Texas, reported by machine shorthand, at the

Texas Department of Criminal Justice Polunsky Unit,

3872 FM 350, Livingston, Texas, pursuant to the Federal

Rules of Civil Procedure and stipulations of counsel as

set out herein or attached hereto.

```
 1              A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFF:

 4        MR. JEFFREY R. NEWBERRY
          UNIVERSITY OF HOUSTON LAW CENTER
 5        4604 Calhoun Road
          Houston, Texas  77204
 6        Phone: (713) 743-6843
          E-mail: jrnewber@central.uh.edu
 7

 8   FOR THE DEFENDANTS:

 9        MS. LEAH J. O'LEARY
               -and-
10        MS. AMY L. PRASAD
          OFFICE OF THE ATTORNEY GENERAL
11        LAW ENFORCEMENT DEFENSE DIVISION
          P.O. Box 12548
12        Austin, Texas  78711
          Phone: (512) 936-1292  Fax: (512) 370-9918
13        E-mail: leah.oleary@oag.texas.gov
                  amy.prasad@oag.texas.gov
14
               -and-
15
          MS. CALYSTA LANTIEGNE
16             -and-
          MR. MATTHEW DENNIS OTTOWAY
17        TEXAS DEPARTMENT OF CRIMINAL JUSTICE
          OFFICE OF THE GENERAL COUNSEL
18        P.O. Box 13084, Capitol Station
          Austin, Texas  78701
19        Phone: (512) 475-4384  Fax: (512) 936-2159
          E-mail: calysta.lantiegne@tdcj.texas.gov
20                matthew.ottoway@tdcj.texas.gov

21             -and-

22        MR. ERIK BROWN
          TEXAS DEPARTMENT OF CRIMINAL JUSTICE
23        OFFICE OF THE GENERAL COUNSEL
          P.O. Box 4004
24        Huntsville, Texas  77342
          Phone: (936) 437-6292  Fax: (936) 437-6994
25        E-mail: erik.brown@tdcj.texas.gov
```

```
 1              A P P E A R A N C E S (CONTINUED)

 2

 3   ALSO PRESENT:

 4        MS. WANGMU DANZENG, Law Intern
          MR. MATT HUDSON, Law Intern
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Patrick Murphy, Jr.   6/21/2019

4

EXAMINATION INDEX

WITNESS:  PATRICK HENRY MURPHY, JR.

EXAMINATION                                    PAGE

     By Ms. O'Leary...........................5
     By Mr. Newberry..........................52

WITNESS CORRECTIONS AND SIGNATURE..............56

REPORTER'S CERTIFICATION.......................58

```
1                PATRICK HENRY MURPHY, JR.,

2    having been first duly sworn, testified as follows:

3                    E X A M I N A T I O N

4    BY MS. O'LEARY:

5         Q.    Good morning.  Will you please state your name

6    for the record?

7         A.    My full name?

8         Q.    Yes, sir.

9         A.    I'm Patrick Henry Murphy, Jr.

10        Q.    My name is Leah O'Leary, and I'm an attorney

11   with the Attorney General's Office and I represent TDCJ

12   and its officials in the lawsuit that you have brought

13   related to the execution procedures.

14                     Have you ever been deposed like this

15   before?

16        A.    I've had a video deposition, but that was it.

17        Q.    Okay.  So I'll kind of go over the ground

18   rules.  This nice lady right here is typing down

19   everything that anybody in the room says, so make sure

20   if you have an answer that's maybe "yes" or "no," that

21   you're not just nodding or shaking your head, because

22   she can't type that down.

23        A.    Yes, ma'am.

24        Q.    And that's just for purposes of making sure

25   that the record is clear.
```

1              If I ask a question, then you're free to

2    think about it, but let's try not to talk over each

3    other, because, again, it's difficult for her to type if

4    we are both speaking at the same time.  And I'll try do

5    the same.

6         A.   Yes, ma'am.

7         Q.   Did you -- were you able to have breakfast

8    that morning?

9         A.   Yes, ma'am.

10        Q.   Have you taken any medication this morning?

11        A.   I'm not on any medication.

12        Q.   Okay.  So do you feel confident that you can

13   give complete testimony today?

14        A.   Yes, ma'am.

15        Q.   Okay.  When did you come to TDCJ for the first

16   time?

17        A.   November 1984.

18        Q.   Okay.  And then you came back a second time.

19   When was that?

20        A.   I left on bench warrant shortly after coming

21   to TDCJ, went back to Dallas County, and I came back, I

22   believe, in early December.

23        Q.   Of the same year?

24        A.   Of the same year, yes, ma'am.  That was on

25   a -- just on a bench warrant.

1        Q.    How long were you gone for that?

2        A.    Maybe a week.

3        Q.    Okay.

4        A.    It wasn't very -- very lengthy at all.

5        Q.    How old were you when you first came to TDCJ?

6        A.    I was 23 at the time.

7        Q.    And how old are you now?

8        A.    I'm 57.

9        Q.    Okay.  Were you out of prison altogether in

10  the free world during any of that time?

11       A.    No, ma'am.  I've been incarcerated the entire

12  time, except for the escape.

13       Q.    Yes, sir.  Before you came to TDCJ, did you

14  live with your family?

15       A.    Yes, ma'am, I did.

16       Q.    Okay.  What parts of your family did you live

17  together with?

18       A.    At the time of my original arrest, my address

19  was with my aunt, Linda Goodman, in Balch Springs,

20  Texas.

21       Q.    And what was that like, living with your aunt?

22       A.    Just a normal family atmosphere.

23       Q.    Okay.  Did you work at that time?

24       A.    Yes, ma'am, I did.

25       Q.    What kind of job did you have?

1        A.    I was an electrician's helper for the city --

2    Jay Electric in Dallas, Texas.  I worked there for

3    several years.

4        Q.    And is that the job that you held until you

5    came to TDCJ?

6        A.    Yes, ma'am.

7        Q.    Before you came to TDCJ, was religion part of

8    your life back then?

9        A.    No, it wasn't.

10        Q.    Okay.  Was your aunt religious in any way?

11        A.    Somewhat.  She did attend church occasionally,

12    and I would occasionally go with the family.  But it

13    wasn't -- it wasn't a -- necessarily a part of my life.

14        Q.    When you first came into TDCJ in the '80s, did

15    you begin practicing any particular faith right away?

16        A.    Not particularly.  I believe I listed -- at

17    that time, I believe I listed my official religion as

18    Christianity, but at the time, I was also practicing

19    meditation and yoga.

20        Q.    Okay.  How did -- who taught you how to do

21    meditation and yoga?

22        A.    Self-taught through books.

23        Q.    Okay.  So once you came into TDCJ, those were

24    books that were available in the library?

25        A.    No, they were available through -- you had to

1  write to the organization and get the books from them.

2      Q.   Okay.  What kind of organization was it?

3      A.   The Human Kindness Organization (sic).

4      Q.   Okay.

5      A.   The first book was called "We're All Doing

6  Time" by Bo Lozoff, and he spoke about meditation and --

7  and doing -- he had one chapter of yoga in his book.

8      Q.   Okay.  So you would write to them, and they

9  would send -- did they only have books about --

10 faith-specific books, or was it any kind of books you

11 wanted?

12     A.   It was faith-based books, but it wasn't a

13 specific faith --

14     Q.   Right.

15     A.   -- because he wasn't advocating a specific

16 faith.

17     Q.   Okay.

18     A.   It was more advocation -- advocating the --

19 the meditation, the peacefulness of the meditation, and

20 things of that nature.

21     Q.   Okay.

22     A.   But it was not specific to a specific faith.

23     Q.   Do you remember when -- approximately when you

24 changed your faith designation within TDCJ through

25 paperwork?

1    A.   To Buddhism?

2    **Q.   Well, if you started as Christianity, did you**

3  **switch to something else first before Buddhism?**

4    A.   I can't remember if I actually changed the --

5  officially before my escape, because at one time, I was

6  looking at Odinism.

7    **Q.   Okay.**

8    A.   And I'm not sure if I ever changed my faith at

9  that time.  And that was in, like, probably the

10 mid '90s.

11   **Q.   What was drawing you to Odinism?**

12   A.   There was a large group of -- of inmates that

13 were interested in Odinism.  We had some books that were

14 being passed around, and it was somewhat interesting at

15 the time.

16   **Q.   So did you attend any of the religious**

17 **services for Odinism?**

18   A.   No, ma'am.  We didn't have any organization.

19   **Q.   Oh, okay.**

20   A.   It was just, you know, sharing information

21 back and forth.

22   **Q.   Okay.  What unit was that at?**

23   A.   It probably began in Ferguson in the early

24 '90s, and then it continued at McConnell, when I was

25 transferred to the McConnell Unit, because there was a

1  large group from -- from Ferguson that went to

2  McConnell.

3      **Q.   Besides Ferguson and McConnell, have you lived**

4  **at any other TDCJ units?**

5      A.   The Connally Unit.

6      **Q.   Connally?**

7      A.   Yes, ma'am.  I was at Ferguson from '84 to

8  '92, from '92 to '95 at the McConnell Unit, the old

9  McConnell Unit, and then in '95, they opened the

10  Connally Unit.

11      **Q.   Okay.  And then when you -- you escaped from**

12  **Connally.  Is that right?**

13      A.   Yes, ma'am.

14      **Q.   So when you came back, did you come straight**

15  **to Polunsky?**

16      A.   Came straight to Polunsky.

17      **Q.   And you've been at Polunsky ever since?**

18      A.   Yes, ma'am.

19      **Q.   Do you have family or friends that come visit**

20  **you here at Polunsky?**

21      A.   Yes, ma'am.  Family, my half-sister, Kristina

22  Rogers, visits me regularly, and my son, Patrick III,

23  visits me.  My grandson, he comes with my son.

24      **Q.   Okay.**

25      A.   Friends would be Linda Heughan, Shannon

1  Hutton.  Those are the two main -- I've also had a visit

2  from Switzerland, Angelina Heeb.

3      Q.   Who do you know from Switzerland?

4      A.   Her name is --

5      Q.   Is she a friend?

6      A.   -- Angelina Heeb.  Well, she was -- she was a

7  member of one of the -- like, Lifeline Organization does

8  pen pals for -- for inmates.  And we've been writing --

9  I really couldn't tell you how long it's been.  It's

10 been many, many years.  She was one of my first pen pals

11 after coming to Polunsky.

12     Q.   So she -- you met her through the pen pal

13 program, and she's actually come here to visit?

14     A.   Yes -- yes, ma'am, several times.

15     Q.   The other friends that you listed, are those

16 people that you met while you were in prison or were

17 they friends before you came to --

18     A.   They were -- they were --

19     Q.   -- TDCJ?

20     A.   -- friends in -- after I came to prison,

21 specifically to death row.

22     Q.   Okay.

23          THE REPORTER:  Could you make sure she

24 finishes her question completely before you start to

25 answer?

1              THE WITNESS:  Oh, I'm sorry.  Yes.

2              THE REPORTER:  That's okay.  Thank you.

3              THE WITNESS:  Do I need to repeat

4   anything?

5              THE REPORTER:  No, no, no.  You're fine.

6   Just for future.  Thank you.

7       **Q.   (BY MS. O'LEARY)  And I'm sorry.  You might**

8   **have told me the date already, but do you recall when**

9   **you switched your religious designation within TDCJ to**

10  **Buddhism?**

11      A.   I was just looking that up, trying to find

12  that information this morning.  My earliest record of

13  correspondence is a correspondence course from

14  February 2013.  I remember it was a -- so I'm saying at

15  least probably around 2011, perhaps even earlier.

16      **Q.   Okay.  So you mentioned a correspondence**

17  **course that you took in 2013 that was a Buddhist-related**

18  **correspondence course?**

19      A.   Yes, ma'am.

20      **Q.   Okay.  And are you required to take the course**

21  **in order to switch your faith designation?**

22      A.   No, ma'am.

23      **Q.   Okay.**

24      A.   You can -- TDC -- you can just switch your

25  faith designation whenever you want to at TDC.  I think

1  it's, like, once every six months.  And this -- that was

2  the only time I've switched to -- my faith designation

3  since being on death row.

4      **Q.   Okay.  So the correspondence course that you**

5  **took is just something that you were interested in?**

6      A.   That was probably the beginning of my true

7  interest in Buddhism.

8      **Q.   Okay.  When you switched your designation in**

9  **2011, between that time and when you took the**

10  **correspondence course in 2013, were you not truly**

11  **interested in it, to use your words?**

12      A.   I was interested, but because I had no -- no

13  knowledge of Buddhism, so I didn't know how to start.

14  And at that time, the chaplain's office, when I switched

15  faiths, sent me a -- three addresses that I could write

16  to, and one of them was for that one correspondence

17  course -- I forget the other two addresses -- that had

18  to do with -- with Buddhism.  And the correspondence

19  course, when I wrote to them, he sent me a resource list

20  of organizations I could write to for -- about Buddhism.

21      **Q.   Okay.**

22      A.   And at that time, I wrote several of them, but

23  because I had no -- no foundation for starting --

24  looking at it, I had no idea where to start.  So I had

25  too much material at one time, too many books, and so I

1 basically didn't know -- I was confused for a while.

2    Q.   Okay.

3    A.   Then once I started this correspondence

4 course, it gave me someplace to start.

5    **Q.   I understand.  So tell me about what you had**

6 **to do in order to change your designation, your faith**

7 **designation, to Buddhism.  You mentioned you went to the**

8 **chaplain's office?**

9    A.   No, I just had to send him an I-60 --

10    **Q.   Okay.  So did --**

11    A.   -- which is an inmate request form.

12    **Q.   Did you talk to the chaplain after you sent**

13 **the I-60 form?**

14    A.   No, ma'am, there was no conversation.

15    **Q.   So how did you receive the addresses from the**

16 **chaplain?**

17    A.   Once I sent him the -- the I-60 requesting my

18 faith be changed, he then sent me the information about

19 Buddhism that -- that he had in his office at that time.

20    **Q.   Okay.  So by saying that he sent it to you,**

21 **you received some kind of paperwork that had that**

22 **material on it?**

23    A.   Yes, ma'am.  It was like one sheet of paper

24 with three addresses listed on it.

25    **Q.   Okay.  Do you remember who the chaplain was at**

 1  the time?

 2       A.   I believe it was Chaplain Collier.

 3       Q.   David Collier?

 4       A.   I wouldn't know his first name, ma'am.

 5       Q.   Oh, okay.  I'm sorry.  So he did not try to

 6  talk you out of changing your faith designation?

 7       A.   No, ma'am.  I think this was towards the end

 8  of -- of his being on this unit, and he was rather busy.

 9  So I never did -- even though I'd seen him before, I

10  knew who he was, but he never did come speak to me about

11  this.

12       Q.   Okay.  But he offered some resources --

13       A.   Yes, ma'am.

14       Q.   -- in response to your I-60 request to change

15  your designation?

16       A.   Yes, ma'am.

17       Q.   I want to ask you about Reverend Shih.  And

18  please tell me how you pronounce that.

19       A.   Reverend Hui-Yong.  Hui-Yong.

20       Q.   Hui-Yong.  Okay.

21       A.   Shih, actually, would be the last name, Shih.

22       Q.   Okay.

23       A.   I think it's like the Chinese equivalent to

24  Smith.

25       Q.   Okay.  So --

1    A.   So -- but we refer to him as Reverend

2  Hui-Yong.

3    **Q.   Hui-Yong.  Okay.**

4    A.   Yes, ma'am.

5    **Q.   Let me write that down, because I will forget**

6  **how to say it.  Hui-Yong.  You said "we" refer to him**

7  **that way.  Who is "we"?**

8    A.   Actually, I think he's visiting six inmates on

9  death row now, and I know all of them.

10   **Q.   How did you first meet Reverend Hui-Yong?**

11   A.   I had a secondary correspondence course I had

12 signed up for, and they sent me a listing of the

13 Buddhist temples in Texas.  Not all the Buddhist

14 temples, but probably the major temples in Texas.

15   **Q.   Okay.**

16   A.   And I believe, like, one of the -- one or --

17 the first or second address on the list was the Jade

18 Buddha Temple in Houston, Texas.  So I wrote to them --

19 I think it's actually listed as the Texas Buddhist

20 Association.

21           And I wrote to them requesting information

22 about Buddhism, and they referred -- passed my letter on

23 to the reverend, because the reverend is -- is English,

24 or he's -- he's a native Texas, so he was able to

25 correspond with me in English.  So that's how I first

1  came to -- I also found an early letter from him that

2  was dated June 2013.

3      Q.   Okay.  So you know that at least in June of

4  2013, you had started communicating with?

5      A.   Corresponding with him.

6      Q.   When you wrote to that particular temple where

7  Reverend Hui-Yong was, what were you hoping to get?

8  Just additional written materials or something else?

9      A.   I'm really not -- couldn't recall what my

10  reason for writing them was.  Because they -- I think

11  because they were in Houston, perhaps they could send a

12  minister to -- or a teacher to speak to me, you know.

13      Q.   Do you know if Reverend Hui-Yong lives in

14  Houston?

15      A.   Oh, yes, ma'am.

16      Q.   He does.  Okay.  Do you know if he does

17  anything as a job besides working with the temple?

18      A.   No, ma'am.  He's a retired Marine veteran,

19  Vietnam, and he's on VA benefits.  So that's -- that's

20  his source of income there along with the temple.

21      Q.   And when he first reached out to you in

22  response to your inquiry to the temple, what did he say?

23      A.   It was just general correspondence, trying to

24  figure out what it was I was looking for.  And I was --

25  basically, I was looking for a teacher of Buddhism.

1       Q.    Okay.  So you told him as much?

2       A.    Yes, ma'am.

3       Q.    And do you remember how long after you started

4  corresponding with him that he came to visit you for the

5  first time?

6       A.    It was -- I want to say it was almost a year,

7  perhaps even longer.

8       Q.    Were you corresponding frequently by letter?

9       A.    I would -- yes, ma'am, at that time.

10      Q.    Maybe -- were you sending a letter -- I'm

11  sorry -- sending a letter every week?

12      A.    I wouldn't say every week, but I would say

13  possibly monthly --

14      Q.    Okay.

15      A.    -- just to be on the safe side.

16      Q.    And when you were corresponding with him

17  before you met him, did you know of any other offenders

18  here at the unit who were also corresponding with him?

19      A.    No, ma'am.  I was the first.

20      Q.    So did you introduce him to the six -- five or

21  six others here that also correspond with him?

22      A.    No.  As a matter of fact, the other men were

23  introduced by their visitors in the visitation room.

24  "Oh, there's a Buddhist monk.  Would you like to visit

25  with the Buddhist monk?"  And that's how he began

1  visiting others.

2      Q.   Does he wear traditional robes that make it

3  obvious that he is --

4      A.   Yes, ma'am.

5      Q.   Okay.  Has he ever -- well, let me ask you

6  this:  When he comes to visit you, does he -- do you

7  pray together or does he just kind of lecture you about

8  what Buddhism is about and what Buddhist people believe?

9      A.   With myself and the reverend, it's more of a

10  general conversation.  We -- we do speak about Buddhism

11  and the different points of Buddhism.  He does instruct

12  me in that.  But our -- our visitation also is more

13  along the lines of just general life, you know,

14  visitation, because we were both -- we were both

15  soldiers.  So we often talk about being in the military,

16  things of that nature.  But we do -- I do get

17  instruction from him about Buddhism.

18      Q.   So would you describe your relationship?

19  Would you say he's a friend?

20      A.   No.  He's a minister first --

21      Q.   Okay.

22      A.   -- and friend secondary.

23      Q.   Do you consider the discussions about your

24  military background or about life in general -- do you

25  think that is part of him ministering to you?

1    A.    There -- there are times when we use it as

2 examples; for instance, when we're discussing trying to

3 live by the precepts of Buddhist.  Precepts are like --

4 you could compare them to, like, the Ten Commandments.

5    **Q.    Okay.**

6    A.    And we often discuss living by the five basic

7 precepts of Buddhist.

8    **Q.    Do you know what those are?**

9    A.    Yes, ma'am.

10    **Q.    Would you tell them to me?**

11    A.    They are:  Do not kill, do not steal, do not

12 lie, do not use intoxicants, and do not have

13 inappropriate sex.

14    **Q.    So do not kill, do not steal, do not lie, do**

15 **not use intoxicants, and do not have inappropriate sex?**

16    A.    Yes, ma'am.

17    **Q.    Okay.  Now, you mentioned Chaplain Collier**

18 **earlier.  Was he the chaplain here at Polunsky for**

19 **several years while you were also here?**

20    A.    Yes, ma'am.

21    **Q.    Okay.  And so you know that he's retired now?**

22    A.    I didn't know why he left, but --

23    **Q.    Okay.  Before he left, did you speak to him**

24 **frequently?**

25    A.    Chaplain Collier was perhaps the last chaplain

1  for Polunsky Unit to regularly visit the men on death

2  row, and --

3      Q.   He mentioned that you liked to read.

4      A.   Oh, yes, ma'am.  I would write to his office,

5  and he would send me books quite often.

6      Q.   I think he said that you enjoy history books

7  and that you could read through them really quickly.

8      A.   Well, I read just about anything, and I -- and

9  if it's a well written book, I can -- I can read

10 500 pages a day.

11     Q.   So when you requested books and the chaplain

12 had them sent to you, they weren't necessarily religious

13 books?

14     A.   No, ma'am.  He had access to fictional books

15 and other -- other materials, but he also had a very

16 good library on religion, faith-based books.

17     Q.   Did you request religious books sometimes, as

18 well?

19     A.   No, because I had a good source of books

20 through my correspondence, not with the reverend, but

21 through other organizations.  As a matter of fact, I

22 even donated books to the chaplain.

23     Q.   Was he happy to accept them?

24     A.   Well, he never did respond about them.

25     Q.   Okay.  They were books about Buddhism?

1        A.    Buddhist, yes, ma'am.

2        Q.    **And so you had them sent to the chaplain, and**

3   **you assume that he incorporated them in --**

4        A.    He put them on his bookshelf or, you know,

5   where inmates have books that they can use.

6              THE REPORTER:  Once again, if you could,

7   let her finish her question before you answer.

8              THE WITNESS:  I'm sorry.

9              THE REPORTER:  That's okay.  Thank you.

10       Q.    **(BY MS. O'LEARY)  Aside from asking for books**

11  **and him having those sent to you, what other**

12  **interactions did you have with Chaplain Collier?**

13       A.    At some point after I changed my faith -- TDC

14  allows different faiths to have certain religious items,

15  such as the -- the bead -- the prayer beads I'm wearing

16  now.  And I was attempting to order religious items, but

17  my -- my first order was denied because it was just -- I

18  had no idea what to be ordering, and it was just over

19  the top.  So they just denied the entire order.

20             Buddhism -- Buddhism has -- the prayer

21  beads are listed as an official item.  A prayer rug and

22  a yoga mat is also listed.  And I was, at one time,

23  trying to get the yoga mat to help me practice with

24  yoga, but that's been denied to -- that's been denied to

25  solitary practitioners.  That's only for group practice.

1      Q.   Okay.  So is it the chaplain that reviews

2   those requests for religious items?

3      A.   Yes, ma'am.

4      Q.   Okay.  And so you said your first request was

5   denied because it was over the top.  It was -- was it

6   because you were requesting things that were not

7   approved items?

8      A.   Yes, ma'am.

9      Q.   Okay.

10     A.   Yes, ma'am.

11     Q.   Other than assessing the appropriateness of

12  the religious items you were requesting, would you agree

13  that Chaplain Collier was helping you or working to

14  facilitate what items you could have?

15     A.   Oh, yes, ma'am.  He was actually very helpful

16  at the time.

17     Q.   Before, you said that he was one of the last

18  chaplains to come around and visit on death row.  Can

19  you describe what he would do when he would come visit?

20     A.   He would often come -- have, like, one of them

21  small clear plastic backpacks with materials, and he

22  would bring them around, visit different men, and hand

23  out religious faith-based material or even, you know,

24  the fictional books people had requested.

25              And he would -- you know, he would try to

1   visit, like, people in all six pods of the building, the

2   entire building.  Of course, you can't visit all 504

3   cells, but he would visit a significant number.

4        Q.   He wasn't only visiting the Christian

5   offenders, was he?

6        A.   Oh, no, ma'am.  He would visit anybody who

7   wanted to speak to him, you know.

8        Q.   Did you ever want to speak to him when he was

9   coming around?

10       A.   I never requested specifically to speak to

11  him, but whenever he did, I was always cordial towards

12  him and -- because -- polite.  And whenever he came

13  around, I was always polite towards him.

14       Q.   Did you ever talk to him about life or your

15  background or the Texas 7 incident?  Did he ever talk to

16  you about that stuff?

17       A.   I know I never spoke about the Texas 7 with

18  him, but, you know, maybe -- perhaps we might have had a

19  couple brief conversations about life in general.

20       Q.   And I'm sorry.  If you would like some water,

21  since you're doing all the talking --

22       A.   I'm fine.

23       Q.   -- we have some water here, so just ask if you

24  need some.

25       A.   Thank you.  I'm good.  Thank you.

1     Q.    After Chaplain Collier left, who became the

2   primary chaplain that you deal with?

3     A.    I believe it was Chaplain Vitalia (phonetic).

4     Q.    Vitalia?

5     A.    But I'm not sure -- Vitalia.  I'm not sure how

6   you pronounce the name.  But I do know he was a deacon

7   in the Catholic church.

8     Q.    When Chaplain Collier was still here, do you

9   know of any offenders who were some other faith that he

10   was helping to get them items or books and things like

11   that, besides Buddhist and besides Christian?

12     A.    I would say that just about -- well, anybody

13   who wanted a religious item had to go through the

14   chaplain's office.  It had to be approved through the

15   chaplain's office.  So off the top of my head, I know of

16   two men that -- maybe three men that have yoga mats that

17   were approved before they shut that door on them.  And

18   there's -- the Wiccans -- there's several who are

19   Wiccans on death row.  They have religious items.

20     Q.    Okay.  And so it would have been the chaplain

21   that helped to get them those items?

22     A.    Yes, ma'am.  They -- all requests for

23   religious items have to go through the chaplain's

24   office.

25     Q.    And it sounds like he also helps to get books

1   and things even that are not of a religious nature.  Is

2   that right?

3        A.   If -- if he has them available in his office,

4   yes, ma'am.

5        Q.   What do you think Chaplain Collier's role was

6   when he was here?  What was he supposed to do?

7        A.   Are you asking my personal opinion?

8        Q.   Yes.

9        A.   My personal opinion is that the chaplain's

10  role is to -- to help with your -- with your spiritual

11  life, regardless of what your faith is.  And I believe

12  Chaplain Collier tried to do that with the -- with all

13  of the -- with all of the faiths.

14       Q.   Do you think it was helpful to have him there

15  to help you get items, help you get information?

16       A.   Oh, it had to be, you know.  As a good

17  example, Chaplain Vitalia, he never came back to visit

18  people, even if we requested information.  They would

19  just send it to us in the mail.

20       Q.   Okay.  So maybe --

21       A.   I've never -- I don't -- I can't remember the

22  last time I saw Chaplain Vitalia on death row.

23       Q.   So it's fair to say that some chaplains are

24  better than others?

25       A.   Yes, ma'am.

1      Q.   Did you ever talk to Chaplain Collier about

2   Buddhism and tell him about your new faith?

3      A.   No, ma'am.  He -- we never did have that kind

4   of discussion.

5      Q.   Let's -- let's switch gears and let's talk

6   about your experience when you had your previous

7   execution date.  If Chaplain Collier was still here and

8   not retired, is he someone that you would want to be

9   there at the Huntsville Unit to help you get things that

10   you need or anything like that?

11      A.   You mean in the death house?

12      Q.   Yes.

13      A.   Looking on my experience there on the 28th,

14   their role basically was -- and there was four chaplains

15   there at one time.  I think their role at that time was

16   basically just try to keep -- make -- keep me calm and

17   help me with phone calls and things of that nature.

18   Would I have preferred Chaplain Collier to have been

19   there?  I'm not sure.  Perhaps so, because I did know

20   him.  But he -- I don't think it was a very significant

21   role, either.

22      Q.   Okay.  You mentioned that there were four

23   chaplains.  Do you know their names?

24      A.   I don't know their -- I can't recall their

25   names, but one of them was the director of chaplaincy.

1      **Q.   Does Chaplain Jones sound familiar --**

2      A.   Yes, I believe so.

3      **Q.   -- as the director?  Okay.**

4      A.   The other one was the chaplain from the Walls

5  Unit.  I couldn't tell you their -- his name.

6      **Q.   Okay.**

7      A.   And there was two volunteers.

8      **Q.   Okay.  Walls Unit chaplain and two volunteers.**

9  **What do you mean by "volunteers"?**

10     A.   They -- from what I understand, they were

11  perhaps from other units, but they weren't -- they

12  were there at that time just as volunteers.

13     **Q.   What made you think they were there as**

14  **volunteers?  Or what does that mean, that they are**

15  **volunteers?**

16     A.   They normally wouldn't be assigned to that

17  job.

18     **Q.   Okay.**

19     A.   And that was the impression I had.

20     **Q.   How did you know they were chaplains?**

21     A.   They introduced themselves as chaplains.

22     **Q.   Okay.  Now, you said -- you mentioned before**

23  **that their main role was to just keep you calm and to**

24  **help you make phone calls.  Did they help you do**

25  **anything else?**

1    A.    Well, they basically just kept me company
2  while we waited.  It was a conversation.
3    **Q.    Did they ask if you wanted to talk about**
4  **anything?**
5    A.    Specific reference, did they ask for anything?
6    **Q.    Or maybe --**
7    A.    They may -- they might have just -- you know,
8  I want to say just, you know -- you know, just, I
9  guess -- I can't think of what I'm trying to say.  It
10 was just, like, simultaneous conversation.  You know,
11 not specifically -- anybody asked anything specifically,
12 but we were just being polite.
13   **Q.    Okay.  At some point when you were taken to**
14 **the Huntsville Unit, did one -- at least one of the**
15 **chaplains sit down with you and kind of tell you what to**
16 **expect through the process?**
17   A.    I believe it was -- did you say Chaplain Gray
18 was the director of chaplaincy?
19   **Q.    Chaplain Jones is the director of chaplaincy.**
20   A.    Oh, Chaplain Jones.  Okay.
21   **Q.    Yes, sir.**
22   A.    Chaplain Jones did visit on death watch a
23 couple times while I was on death -- waiting for my
24 date.
25   **Q.    When you were still here?**

1    A.   Yes, ma'am, in Polunsky.  And he did give a

2   general outline about what things would happen and with

3   the hospitality house, with the families.  So he -- he

4   was helpful in that nature.  And, also, in the death

5   house, the -- he did not speak that much about the

6   procedure and things of that nature.  The one who spoke

7   about that would have been the director and the wardens

8   when they came to visit me.  They specifically talked

9   about what -- what was -- the procedure was and what was

10  going to happen.

11   **Q.   Did anyone tell you that the chaplains are**

12  **here if you need anything, they're kind of the ones to**

13  **ask?**

14   A.   Right.  I think -- I think that was the --

15  Chaplain Jones who said that, you know.  That was -- if

16  I needed anything, any food or drink, they were usually

17  the ones who brought it to me.

18   **Q.   Okay.  Did you ask them to bring you any**

19  **religious texts or anything like that from your**

20  **property?**

21   A.   No, ma'am, I did not.  I didn't realize I

22  could ask for that.

23   **Q.   Did you have a religious text in your**

24  **property?**

25   A.   All my property was there, and, yes, I did

1  have religious texts in my property.

2      Q.   Did any of the chaplains deliver any messages

3  from you to your family in the hospitality house?

4      A.   Not to the hospitality house.  There was one

5  incident.  I have a younger half-sister, Sheryl.  She's

6  in a nursing home in Indiana, and she had called the

7  prison to try to speak to me.  And there was messages

8  back and forth there, asking if I wanted to speak to my

9  sister, and, of course, I wanted to speak to my sister.

10     Q.   So it was the chaplain that was helping you

11 facilitate that phone call?

12     A.   Yes.

13     Q.   Did you make other phone calls?

14     A.   Oh, yes, ma'am.

15     Q.   And was it one of the chaplains that helped

16 you make the other phone calls, as well?

17     A.   Yes, ma'am.

18     Q.   Okay.  Did any of the chaplains sit down and

19 say anything about, "Are you sure you don't want to

20 convert back to Christianity," or, "Do you want me to

21 read to you from the Bible," anything like that?

22     A.   It was not specifically stated, but I

23 definitely felt pressured to make a conversion.

24     Q.   Specifically how?

25     A.   After 5:00 o'clock, they more or less -- they

1   take the phone away from you at 5:00 o'clock.  The food

2   is taken away from me.  I don't know if I could actually

3   have had more food if I wanted to, but the food I was --

4   the plate I had was taken away from me.

5                  And then the chaplains came and sat --

6   actually physically sat down in front of my cell and

7   began talking to me after 5:00 o'clock.  And at that

8   time, it was -- at first, it was just general

9   conversation.  And --

10       **Q.   What kind -- sorry.  Let me kind of break it**

11   **up.**

12                  **The general conversation, what were they**

13   **talking about?**

14       A.   It would be very difficult to be specific

15   about -- I'm just saying general, polite conversation.

16       **Q.   Okay.  Did you get the feeling that they were**

17   **just trying to keep you calm, like you said before?**

18       A.   Yes, ma'am.

19       **Q.   Okay.  So besides the general conversation,**

20   **what else did they talk about?  Or did you -- did you**

21   **want to talk about something that you brought up?**

22       A.   I really don't recall anything that I

23   specifically brought up about -- the -- the

24   conversations almost always, at one point, would turn

25   towards religion and -- or different faiths.

1    Q.    Different faiths?

2    A.    Yes, ma'am.

3    Q.    Like Buddhism?

4    A.    Buddhism and Christianity, because I'm dealing

5    with two Christian chaplains there.

6    Q.    Okay.  Do you recall saying to someone that

7    you considered yourself Buddhist-Christian or

8    Christian-Buddhist?

9    A.    I've often received to myself in that manner,

10   yes, ma'am, because I have a Christian background.

11   Q.    So can you be specific about how the

12   conversation turned to different faiths?

13   A.    I think one of the chaplains may have asked me

14   about my background.

15   Q.    About your background, or did he ask you what

16   is your religion?

17   A.    He may have asked me what is my religion.

18   Q.    Okay.

19   A.    Okay?  And we began talking about Buddhism a

20   little bit and why I would convert to Buddhism.

21   Q.    Was he listening and kind of asking you

22   questions to --

23   A.    To kind of --

24   Q.    -- facilitate the conversation?

25   A.    Yes, ma'am.  Yes, ma'am.  And at one point,

1  the conversation turned to, like, my -- my personal --

2  my youth, when -- talking about, you know, when I was a

3  Christian, attending churches.

4          Q.   Okay.

5          A.   Yeah.  And even though it was never

6  specifically stated, like, "Would you like to convert

7  again," that question never actually came up.  But there

8  was an underlying current of a little bit of pressure.

9  "Are you sure you" -- "are you sure you're on the right

10  path you want to be on?"  You understand what I'm trying

11  to say?  It was --

12          Q.   **Well, is that what they said?  I'm not sure I**

13  **understand the undercurrent.**

14          A.   It's -- I'm not -- I'm not sure what the

15  specific wording was, but I did feel pressured to make a

16  last-minute conversion to Christianity, maybe, you know,

17  confess my sins and accept Christ.

18          Q.   **Okay.  But they never said:  Do you want to**

19  **convert to Christianity and --**

20          A.   No, it was never --

21          Q.   **-- accept --**

22          A.   -- never specifically stated.

23                  THE WITNESS:  I'm sorry.  I'm sorry about

24  that.

25                  THE REPORTER:  It's okay.

1      Q.   (BY MS. O'LEARY)  They never said:  "Do you

2   want to accept Christ?"

3      A.   No, ma'am.

4      Q.   They never said:  "Do you want to confess your

5   sins" --

6      A.   No, ma'am.

7      Q.   -- "or convert to Christianity?"

8      A.   No, ma'am.

9      Q.   So when they were -- when you -- the

10  conversation went to talking about your youth and you

11  were maybe Christian when you were a youth, did that

12  conversation come from them just kind of asking, "How

13  did you grow up?  Tell me about your life before

14  prison"?

15     A.   Yes, ma'am, that's how the conversation came

16  up.

17     Q.   On that day, did Reverend -- I'm sorry --

18  Reverend Hui-Yong come visit you?

19     A.   Yes, ma'am, he did.

20     Q.   Okay.  And did he visit you for about an hour

21  in the holding area?

22     A.   I believe it was more like 30 minutes.

23     Q.   Okay.  And then did you talk to him about how

24  your lawyers were trying to get you a stay?

25     A.   We -- we may have -- of course, he already

 1  knew about that.

 2       Q.   How did he know about that?

 3       A.   Because they -- my attorneys had already

 4  spoken to him about the -- the issue.  So he was

 5  familiar with that.  But our conversation at that time

 6  was basically -- he was just checking on my -- my mental

 7  and spiritual health, you know, making sure I -- you

 8  know, I was okay, how I was handling it or how I was

 9  doing.  And I have to say I was very calm about the

10  whole situation, very -- very at peace.

11       Q.   Okay.  And at some point the reverend had to

12  leave the holding area, correct?

13       A.   Yes, ma'am.

14       Q.   Okay.  Was he planning to stay and go into the

15  witness room?

16       A.   Yes, ma'am, he was my spiritual advisor in the

17  witness room.

18       Q.   When he left the holding area, did you feel

19  like you wanted to talk to him some more?

20       A.   I think it could have been helpful.

21       Q.   Okay.

22       A.   I would have rather had conversation with my

23  reverend than with the chaplains I had there, yes.

24       Q.   Do you feel like you know him better than the

25  chaplains that were there?

1      A.   I don't think it's a case of necessarily

2  knowing the person, but the reverend would have been

3  very helpful to -- we -- excuse me.  With -- our branch

4  of Buddhism is called Pure Land Buddhism.

5      Q.   Okay.

6      A.   Okay?  And in Pure Land, we practice what we

7  call Buddha recitation, and that's basically reciting

8  the Buddha's name.  We do this to help in our meditation

9  and our focus.  I feel that the reverend being back

10  there with me would have been helpful, that he could

11  have led me or helped me with the chant, to help me

12  continue my focus on Buddhism.

13      Q.   Did you -- once he left the holding area, did

14  you call him so that you could continue talking to him

15  and reciting the chants?

16      A.   No, ma'am, I did not call him.

17      Q.   Did you ask to call him?

18      A.   No, ma'am, I didn't.  I could have, because he

19  was at the hospitality house, plus I had his phone

20  number, you know.  So I could have called him, yes,

21  ma'am.

22      Q.   Did you make other phone calls during that

23  time after he left?

24      A.   Yes, ma'am, I did.

25      Q.   Okay.  When the reverend was there meeting

1   with you, do you know where the chaplain was, or the

2   chaplains?

3        A.   No, ma'am, I do not.

4        Q.   Did they --

5        A.   They were not --

6        Q.   -- disappear?

7        A.   -- in my sight.

8        Q.   Do you know if they went to talk to your

9   family?

10       A.   I would assume that they did, but I'm not

11   sure.

12       Q.   They didn't -- did they bring any messages

13   back from your family when they returned?

14       A.   No, ma'am.

15       Q.   Okay.  After the reverend had to leave the

16   holing area, did the chaplain continue to ask if you

17   needed anything, if you wanted coffee, or if you wanted

18   to talk?

19       A.   Yes, ma'am, they -- they did continue to bring

20   me food and drink and help me with the phone calls.

21       Q.   Okay.  In Pure Land Buddhism, you said that

22   the meditation is reciting the Buddha's name?

23       A.   Yes, ma'am.

24       Q.   I assume you don't mean just saying "Buddha"

25   over and over again?  And I -- please excuse my

1   ignorance.  I'm not trying to be funny.

2        A.   Oh, no, I'm not -- it's -- a basic chant is

3   "Amituofo."

4        Q.   Okay.

5        A.   It's Chinese.  I have no idea what it -- what

6   it means.

7        Q.   Okay.

8        A.   "Fo" is the end of the Buddha's name, where we

9   put more stress on the "fo" part.  And one of the ways

10  that we do this is we just say -- say that over and over

11  again, "Amituofo, Amituofo, Amituofo."  And I

12  often use -- using my beads in meditation, will say it

13  with each bead.  And I have -- my -- my mala has 108

14  beads.

15       Q.   So does that help you calm yourself and

16  meditate, when you use your beads and recite that

17  phrase?

18       A.   It helps me -- my focus, because the whole

19  idea is to focus upon the Buddha.

20       Q.   And that's something that you practice now on

21  your own in your cell?

22       A.   Oh, yes, ma'am.

23       Q.   I want to talk a little bit about the things

24  that you're asking for as part of your lawsuit.  What do

25  you want to get out of all of it, filing your lawsuit?

1      A.   Well, I believe the lawsuit has to deal with

2  having a minister in the actual execution with me, and

3  that -- that is it.  That's what I'm asking for.  And

4  the reason why is to help me with -- I believe his

5  presence will help me with the focus for my transition.

6      **Q.   So is that all you're asking for as part of**

7  **your lawsuit?**

8      A.   That's all I'm asking.

9      **Q.   Okay.  So if you could have it the way that**

10 **you wanted it in the execution chamber, what exactly**

11 **would the reverend do in that room?**

12     A.   I believe he would probably just chant --

13 chant along with me as I was -- as I was chanting.

14     **Q.   And would you envision that you would recite**

15 **the chant that you just taught to me?**

16     A.   Yes, ma'am.

17     **Q.   Okay.  Would you want him to touch you in any**

18 **way?**

19     A.   No, ma'am.

20     **Q.   Okay.**

21     A.   Our -- Buddhism -- as a matter of fact, I

22 requested that I not be touched for seven minutes on my

23 death, just representative of -- Buddhism, they actually

24 prefer seven days of not being touched.  But I'm not

25 going to get that, so seven minutes was more or less a

1   representation of the seven days.

2          Q.   And did TDCJ agree to the seven minutes?

3          A.   Yes, ma'am.

4          Q.   So in the execution chamber, if the reverend

5   was in there, do you say these chants with your eyes

6   closed or would you look at each other and say the

7   chants?

8          A.   No, ma'am.  I wouldn't even say that I

9   might -- I would chant with my eyes closed.  Probably

10  with my eyes open.  And we wouldn't necessarily be

11  looking at one another, you know, but I would hear him,

12  you know.

13         Q.   Okay.  So is hearing him what is important to

14  his presence?

15         A.   I think knowing he is there is what's

16  important.  It's more -- more relaxing to -- you know,

17  knowing that he is there to represent our faith and help

18  me in this transition.

19         Q.   Okay.  Is there any significance in your

20  beliefs to how many inches he has to stand away from

21  you?  Like, does it need to be 7 inches from you or

22  anything significant that about?

23         A.   No, ma'am.

24         Q.   Okay.

25              MS. O'LEARY:  Could we take just a

 1  five-minute break off the record?

 2                    (Break from 10:02 a.m. to 10:10 a.m.)

 3       Q.   (BY MS. O'LEARY)  Okay, Mr. Murphy.  I want to

 4  talk about the days when you had your first execution

 5  date and you were still at the Polunsky Unit.  Do you

 6  receive your date about 30 days out, or is it -- do you

 7  know your date with more time than that?

 8       A.   Actually, I received notification either the

 9  very first -- first week of December or the last week of

10  November.  It was after Thanksgiving.

11       Q.   Okay.  So you had your date in advance?

12       A.   Yes, ma'am.

13       Q.   When you get close to about 30 days out, does

14  the visitation schedule change for you?  For example,

15  what I mean is are you allowed more spiritual advisor

16  visits or more family services, if you know that?

17       A.   I wouldn't know about 30 days out.  Okay?  The

18  week of the execution, with -- my execution was on a

19  Thursday.  The warden allowed me all-day visits on

20  Monday and Tuesday, and then Wednesday I had a half day

21  of visits and then Thursday I had a half day of visits.

22       Q.   Okay.  On Wednesday, do you understand -- do

23  you know anything about media day being on Wednesday?

24       A.   Yes, ma'am.

25       Q.   Okay.  Were you interviewed by media on that

1  Wednesday?

2       A.   No, ma'am.  They would -- they did not

3  schedule any that last week.

4       Q.   Okay.  So you had all-day visits for two days

5  and then a half day and then a half day?

6       A.   Yes, ma'am.

7       Q.   Okay.  And during those all-day visits, you

8  are allowed to meet with your outside spiritual advisor

9  for the whole time if you want to, right?

10      A.   Yes, ma'am.  He was here every day.

11      Q.   Okay.  And did that help you to start to focus

12  and --

13      A.   Yes, ma'am.

14      Q.   -- as you described to me before?

15      A.   Yes, ma'am.

16      Q.   Okay.  And then on the day that you are

17  actually brought to the Huntsville Unit, you're allowed

18  visitation in the morning while you're still here at

19  Polunsky, correct?

20      A.   Yes, ma'am.

21      Q.   Okay.  And so on that -- the day of your

22  execution, you can meet with your outside spiritual

23  advisor for the time that you're still here at Polunsky?

24      A.   Yes, ma'am.

25      Q.   Okay.  Did you take advantage of that, as

1   well?

2        A.   Yes, ma'am.

3        Q.   Okay.  So on the day of the execution, you

4   were able to meet with the reverend in the morning for

5   some time and then again for the time that he visited

6   you in the holding area at the Huntsville Unit?

7        A.   Yes, ma'am.

8        Q.   Okay.  When you were here at the Huntsville

9   Unit, were you able to bring your beads with you?

10       A.   They were in my property.

11       Q.   Okay.

12       A.   I didn't know if I could ask for them.  Nobody

13  volunteered that information.

14       Q.   Okay.  So when the chaplain talked to you, did

15  he explain that you needed to create some kind of phone

16  list so that he could help you make your phone calls?

17       A.   Actually, that was told to me weeks in

18  advance.

19       Q.   Okay.  So do you turn that in, or do you leave

20  that in your property and the chaplain grabs it for you?

21       A.   It was -- it was in my property.  It was -- I

22  had it in an envelope with my dictionary.  I have a

23  large dictionary, and I told the chaplain to send the

24  dictionary in the envelope.  And he went to the property

25  and -- I never saw him, but he brought the envelope

1  back.

2      Q.   Okay.  So when -- I think you mentioned before

3  that Chaplain Jones came to the Polunsky Unit maybe a

4  week ahead of the execution date and told you about the

5  process a little bit?

6      A.   Actually, he visited -- I would say he

7  probably visited three, maybe four times.

8      Q.   Okay.

9      A.   But -- it wasn't just specifically me, but he

10  visited all the men on -- on death watch.

11      Q.   Okay.  And during those visits, he was telling

12  you about what to expect, what the process was going to

13  be?

14      A.   Yes, ma'am.

15      Q.   And he told you, "Leave your phone list

16  somewhere where I'm going to be able to find it in your

17  property"?

18      A.   Yes, ma'am.

19      Q.   Okay.  Did he say anything else that you might

20  need from your property, to leave it at the top of the

21  bag or something like that?

22      A.   No, ma'am.

23      Q.   Okay.  You didn't ask for your beads and were

24  denied.  You just didn't realize that you could ask for

25  them.  Is that right?

1      A.   That is correct.

2      Q.   Okay.  So, going forward, if someone tells you

3  you'll be permitted to have those or maybe -- do you

4  have a religious text in your property?

5      A.   I do have a religious text, yes, ma'am.

6      Q.   Okay.  If someone told you, "If there's

7  something that you're going to want, leave it at the top

8  of the bag and the chaplain will get that for you," what

9  would you request to have, if anything?

10      A.   I would request my beads.

11      Q.   Okay.  And I'm not saying that they will allow

12  that.  You know, there might -- I'm sure there's rules

13  about what someone can have in that holding area.

14      A.   Yes, ma'am.

15      Q.   But a religious text, is that something that

16  you would want to have?

17      A.   I would say yes.  Yes.

18      Q.   Okay.  If you're not able to have your beads

19  in the holding area at the Huntsville Unit, is there

20  another way that you can recite your phrase and be able

21  to focus yourself, even though you won't have the beads

22  to be able to do that with?

23      A.   Yes, ma'am.  The -- the beads are more or less

24  just a way of keeping track of -- of how long I've been

25  doing it, because, like I said, it's 108 beads.  So I

1  know if I go all the way through, that's 108

2  recitations.

3      Q.   Okay.  You used the term "death watch" before.

4  Can you tell me what that means?

5      A.   All the men who have execution dates are

6  segregated from the rest of death row, and we're placed

7  on a section -- a housing section by ourselves.  And we

8  call that death watch.

9      Q.   Okay.  You spoke to me before about -- about

10  5:00 o'clock is when the phone calls are cut off, and at

11  that point you're just kind of waiting and the chaplains

12  came to talk to you.  Is that right?

13     A.   Yes, ma'am.

14     Q.   And you said before there was two during that

15  time period.  Is that right?

16     A.   Yes, ma'am.

17     Q.   Okay.  Can you give me any details about them

18  to help me figure out who that might have been?  What --

19     A.   The first --

20     Q.   I'm sorry.

21     A.   The first two were the -- the director and the

22  Walls Unit chaplain.

23     Q.   Okay.

24     A.   Those were the first two.

25     Q.   And by "first two," do you mean that those

 1   were two of the chaplains that were talking to you from

 2   about 5:00 o'clock onward?

 3        A.   They -- yes, ma'am.

 4        Q.   Okay.  From the 5:00 o'clock onward time

 5   period, did other chaplains come by, as well, to talk to

 6   you?

 7        A.   Yes, ma'am.

 8        Q.   Okay.

 9        A.   Basically what they would do is they -- they

10   set up two chairs outside the cell, and just -- they

11   would speak for a little while.  And then one of them

12   would get up and perhaps go get something to drink, and

13   one of the other chaplains would come back.  So there

14   was -- almost always was two chaplains at all times

15   there.

16        Q.   Okay.  You testified earlier that you felt

17   like their role was to keep you calm.  Did you feel like

18   maybe they were just trying not to let you be alone so

19   that you would have someone to talk to if you wanted to

20   during that critical time?

21        A.   Yes, ma'am.

22        Q.   Okay.  Did they ask you a lot of questions to

23   try to figure out things that you might want to talk

24   about?

25        A.   No, ma'am, it wasn't a lot of questions, but

1  they -- just general questions, you know, that would

2  lead to more conversation.

3      **Q.   Okay.  And you testified earlier that they had**

4  **asked you about maybe your family and your background**

5  **and how you grew up as a youth, things like that, right?**

6      A.   Yes, ma'am.

7      **Q.   Okay.  Did you at some point explain to them**

8  **the difference between Buddhism and Taoism?**

9      A.   I don't think so.

10     **Q.   Okay.  Do you recall that being something that**

11 **you talked about maybe -- maybe not in the 5:00 o'clock**

12 **hour, but earlier in the day?**

13     A.   I'm not sure.

14     **Q.   Okay.**

15     A.   That would have been very brief.  If I did

16 speak of that, it might have been just a brief

17 comparison.

18     **Q.   Okay.**

19     A.   So I don't recall that conversation, no,

20 ma'am.  I'm not denying it.  I just don't recall because

21 it was so brief.

22     **Q.   Understood.**

23          **You mentioned earlier that -- you were**

24 **referring to two chaplains, that they were both**

25 **Christian chaplains.  How do you know what their**

1  personal faith is?

2       A.   At one point, they did specifically tell me

3  what their church was.  I can't recall what it was, but

4  they -- they did mention specifically what -- what their

5  faith was.

6       Q.   Was that during a conversation where you were

7  telling them about how you believed in Buddhism and what

8  those beliefs were and then they said, "My church is

9  'X'"?

10      A.   Right, yes.

11      Q.   Is that somewhat how the conversation went?

12      A.   Yes, ma'am.

13      Q.   Okay.

14           MS. O'LEARY:  Okay, Mr. Murphy.  Thank

15  you so much for answering all my questions today.

16  Hopefully the court reporter didn't get too frustrated

17  with us.

18           That's all I have.  Those are all the

19  questions I have, so I'll pass the witness.

20           MR. NEWBERRY:  I'm going to need to speak

21  with him for a few minutes, however we need to

22  accomplish that.

23           (Break from 10:22 a.m. to 10:27 a.m.)

24                          *
                            *
25                          *

```
 1                E X A M I N A T I O N

 2   BY MR. NEWBERRY:

 3        Q.   Mr. Murphy, I just have a couple of questions.

 4   The first one:  Obviously, we talked a lot about

 5   Reverend Hui-Yong today.  Is it possible that he's known

 6   in the TDCJ records by another name?

 7        A.   Yes.  He's known as Gerald Sharrock.

 8        Q.   So any visitation records indicating you

 9   visited Gerald Sharrock would be visits with who'd been

10   referred to as Reverend Hui-Yong today?

11        A.   Yes, sir.

12        Q.   Okay.  Also, on March 28th, there's been a lot

13   of focus on the time between 5:00 and 6:00 p.m.  Was

14   that the only time during that period when you were at

15   the Walls Unit that you interacted with the chaplains?

16        A.   No.  The chaplains -- I interacted with the

17   chaplains from -- I can't remember the exact time when

18   the director and the warden came in to speak to me, but

19   there was a group of official witnesses that came in

20   with the warden who spoke to me about what the procedure

21   was and what to expect.

22             And this was -- I'm going to say there was

23   at least six or more men in this group.  One of them was

24   the media director.  Okay?  And that was when they --

25   the warden actually asked me if I would make a written
```

1  statement, if I was going to prepare a final statement,

2  if I would write it down.  And I said, "Yes, I

3  definitely will write it down for you."

4             Then once they left -- and I'm going to

5  say that was probably between -- sometime between 1:30

6  and 2:00 o'clock when they came in.  But from that point

7  on, all the way up till, I'd say, 7:30, there was almost

8  always a chaplain there, at least one, to help me.

9       Q.   7:30 p.m.?

10      A.   About 7:30 p.m., I noticed that they -- about

11  that time range, I noticed they left.  And then one of

12  the guards who was -- worked in the death house, he came

13  and sat with me and talked to me for a while.  As a

14  matter of fact, he was talking to me up until the warden

15  came back and told us that I had a stay.

16      Q.   **Okay.  So just to kind of clear things up, you**

17  **said that there was a chaplain around all the way, you**

18  **think, from before 2:00 until 7:30?**

19      A.   Yes, sir.

20      Q.   **Would that include the time when you were with**

21  **Hui-Yong, or were they elsewhere then?**

22      A.   They -- they were not present when I was

23  speaking with the reverend.

24      Q.   **Do you remember about how long after you**

25  **finished talking with him that one or more of the**

1    chaplains returned?

2         A.   Can I clarify something --

3         Q.   Yes.

4         A.   -- briefly?  I don't know if y'all are aware

5    of this, but when you have a chaplain's visit in the

6    death house, they move you from one cell to another

7    cell.  Okay?  The cell that I was moved to has heavy

8    steel screen mesh welded onto the bars so that we

9    can't -- there's no contact.

10                    I was moved to this cell for -- for my

11   visit with the reverend.  Then after he left, I was

12   moved back to the other cell, which was open bars.

13   Okay?  And then once I was moved, then the chaplains

14   came back to -- to assist me.

15        Q.   And do you remember when that would have been

16   that you were moved?  Would it have been at 4:00 or --

17        A.   Well, the reverend visited me at 3:00 o'clock,

18   so I was -- I was moved a few minutes before 3:00.  And

19   he left about 3:30, and that was -- I was moved back to

20   the other cell.

21        Q.   So you talked about this holding cell that you

22   saw Reverend Hui-Yong in.  Were you in that area when

23   you interacted with any of the other chaplains?

24        A.   No, sir, just strictly when the reverend was

25   there.

1      Q.    You were only in there for that 30-minute

2  period?

3      A.   Yes, sir.

4              MR. NEWBERRY:  Okay.  That's all the

5  questions I have.

6              MS. O'LEARY:  I have no further

7  questions.

8              (The deposition concluded at 10:31 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            WITNESS CORRECTIONS AND SIGNATURE

2       Please indicate changes on this sheet of paper,
  giving the change, page number, line number and reason
3  for the change.  Please sign each page of changes.

4  PAGE/LINE       CORRECTION      REASON FOR CHANGE

5  _____

6  _____

7  _____

8  _____

9  _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 _____

23 _____

24 _____

25 _____

1        I, PATRICK HENRY MURPHY, JR., have read the

2  foregoing deposition and hereby affix my signature that

3  same is true and correct, except as noted above.

4

5        _____

   PATRICK HENRY MURPHY, JR.

6

7

8  STATE OF  _____    *

9  COUNTY OF _____    *

10

11        Before me, _____, on this
   day personally appeared PATRICK HENRY MURPHY, JR., known
12  to me (or proved to me under oath or through
   _____) (description of identity card or
13  other document) to be the person whose name is
   subscribed to the foregoing instrument and acknowledged
14  to me that they executed the same for the purposes and
   consideration therein expressed.
15        Given under my hand and seal of office on
   this, the _____ day of _____, 2019.
16

17

18        _____
   NOTARY PUBLIC IN AND FOR THE
19  STATE OF _____

20

21

22

23

24

25

1                    REPORTER'S CERTIFICATE

2

3        I, KERRIENNE L. BOND, CSR, hereby certify that this

4   transcript is a true record of the testimony given by

5   the witness named herein, after said witness was duly

6   sworn by me.

7        I further certify that I am neither attorney nor

8   counsel for, related to, nor employed by any of the

9   parties to the action in which this testimony was taken.

10  Further, I am not a relative or employee of any attorney

11  of record in this cause, nor do I have a financial

12  interest in the action.

13        Certified to by me on July 3, 2019.

14

15

16

17   _____
     KERRIENNE L. BOND, TEXAS CSR NO. 8537
18   Expiration Date:  12-31-20
     INTEGRITY LEGAL SUPPORT SOLUTIONS
19   Firm Registration No. 528
     P.O. Box 245
20   Manchaca, Texas  78652
     Phone: (512) 320-8690
21   Fax: (512) 320-8692

22

23

24

25