IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

PATRICK HENRY MURPHY, JR., §
    *Plaintiff,* §
     §
v. §     CIVIL ACTION NO. 4:19-cv-1106
     §
BRYAN COLLIER, Executive Director §
of the Texas Department of Criminal §
Justice, LORIE DAVIS, Director of §
the Texas Department of Criminal §
Justice–Correctional Institutions §
Division, and BILLY LEWIS, §
Warden of the Huntsville Unit, §
    *Defendants.* §

---

## MOTION FOR SUMMARY JUDGMENT BY
### DEFENDANTS BRYAN COLLIER, LORIE DAVIS, AND BILLY LEWIS

---

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

DARREN L. MCCARTY
Deputy Attorney General for
Civil Litigation

SHANNA E. MOLINARE, Chief of the
Law Enforcement Defense Division

LEAH O'LEARY *
*Attorney-in-Charge*
State Bar No. 24079074
Leah.OLeary@oag.texas.gov

AMY PRASAD
Assistant Attorney General
State Bar No. 24037295

COUNSEL FOR DEFENDANTS

**OFFICE OF THE ATTORNEY GENERAL**
P.O. Box 12548 (MC 012)
Austin, Texas 78711-2548
(512) 463-2080/Fax: (512) 936-2109

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... 3

Nature of the Case and Stage of Proceeding ......................................................................... 5

Standard of Review and Issues to be Ruled Upon ................................................................ 8

Summary of the Argument ...................................................................................................... 9

Argument .................................................................................................................................. 9

    I.    This suit should be dismissed for failure to exhaust administrative remedies .................... 9

    II.   Murphy fails to meet his burden of demonstrating a substantial burden on his religious exercise. ...................................................................................................................... 11

        A.  Requiring Murphy's Buddhist spiritual advisor to stand behind plexi-glass in the viewing room rather than inside the execution chamber is not a substantial burden on Murphy's religious exercise ...................................................................... 11

        B.  There is no evidence that the reasonable restrictions on Murphy's access to his spiritual advisor in the pre-execution hours will substantially burden his religious exercise. ...................................................................................................... 12

    III.  The competent summary judgment evidence demonstrates that the execution procedure is the least restrictive means of furthering compelling government interests. ................. 13

        A.  TDCJ has compelling interests in safety and security relating to execution ................. 13

        B.  TDCJ's execution protocols are the least restrictive means of furthering. .................. 19

    IV.  Murphy fails to demonstrate that TDCJ's limitation on persons inside the execution chamber is hostile to all religions in violation of the Establishment Clause. ..................... 21

    V.   The competent summary judgment evidence demonstrates that the procedure restricting access during the pre-execution hours does not favor one religion over another, and therefore, does not violate the Establishment Clause. ......................................................... 24

    VI.  Murphy fails to demonstrate that TDCJ's execution procedure is congruous with Murphy's First Amendment right to freely practice his religion. ............ 30

    VII.  Murphy's claims are barred by the applicable statutes of limitations. ............................... 31

    VIII. Murphy's requested relief is not narrowly drawn as required under the PLRA. ............. 32

Conclusion ............................................................................................................................... 32

Notice of Electronic Filing ..................................................................................................... 34

Certificate of Service .............................................................................................................. 34

TABLE OF AUTHORITIES

**Cases**

*Adkins v. Kaspar,*
　393 F.3d 559 (5th Cir. 2004) ....................................................................................... 11, 12
*Am. Legion v. Am. Humanist Assoc.,*
　588 U.S. _, 139 S. Ct. 2067 (2019) .................................................................21, 22, 24, 26
*Anderson v. Liberty Lobby, Inc.,*
　477 U.S. 242 (1986) ........................................................................................................... 8
*Baze v. Rees,*
　553 U.S. 35 (2008) ........................................................................................................... 16
*Booth v. Churner,*
　532 U.S. 731 (2001) ......................................................................................................... 10
*Brown v. Collier,*
　No. 14-20249, _ F.3d _, 2019 WL 2754965 (5th Cir. July 2, 2019) ..................... passim
*Celotex Corp. v. Catrett,*
　477 U.S. 317 (1986) ........................................................................................................... 8
*Cruz v. Beto,*
　405 U.S. 319 (1972) ......................................................................................................... 25
*Cutter v. Wilkinson,*
　544 U.S. 709 (2005) .............................................................................................. 14, 15, 19
*Davis v. Davis,*
　826 F.3d 258 (5th Cir. 2016) ............................................................................................ 18
*Dillon v. Rogers,*
　596 F.3d 260 (5th Cir. 2010) ............................................................................................ 11
*Fegans v. Johnson,*
　No. H-09-4019, 2010 WL 1425766 (S.D. Tex. April 8, 2010) ......................................... 10
*Glossip v. Gross,*
　135 S. Ct. 2726 (2015) ..................................................................................................... 16
*Gonzalez v. Seal,*
　702 F.3d 785 (5th Cir. 2012) ............................................................................................ 10
*Holt v. Hobbs,*
　135 S. Ct. 853 (2015) ....................................................................................................... 14
*Jones v. Bock,*
　549 U.S. 199 (2007) ......................................................................................................... 12
*Jones v. RR. Donnelly & Sons Co.,*
　541 U.S. 369 (2004) ......................................................................................................... 31
*Little v. Liquid Air Corp.,*
　37 F.3d 1069 (5th Cir. 1994) ...................................................................................... 14, 28
*Lyng v. Nw. Indian Cemetery Protective Assoc.,*
　485 U.S. 439 (1988) ......................................................................................................... 12
*McCallum Highlands, Ltd. v. Wash. Capital Dus, Inc.,*
　66 F.3d 89 (5th Cir. 1995) .................................................................................................. 8
*Murphy v. Collier,*
　No. 18A985, 139 S. Ct. 1111 (March 28, 2019) .............................................................. 24

3

*Murphy v. Collier*,
    No. 18A985, 587 U.S. __, 139 S. Ct. 1475 (2019) ................................................... passim
*Murphy v. State*,
    No. AP-74,851, 2006 WL 1096924 (Tex. Crim. App. April 26, 2006) ........................ 31
*Nelson v. Campbell*,
    541 U.S. 637 (2004) ................................................................................................ 10
*Ross v. Blake*,
    136 S. Ct. 1850 (2016) ............................................................................................ 10
*Sherbert v. Verner*,
    374 U.S. 398 (1963) ................................................................................................ 11
*Sossamon v. Lone Star State of Tex.*,
    560 F.3d 316 (5th Cir. 2009) ................................................................................... 19
*Tex. Dep't of Crim. Just. v. Levin*,
    572 S.W.3d 671 (2019) ........................................................................................... 20
*Thorne v. Jones*,
    765 F.2d 1270 (5th Cir. 1985) ................................................................................. 16
*Turner v. Safley*,
    482 U.S. 78 (1987) ............................................................................................ 22, 23
*Walker v. Epps*,
    550 F.3d 407 (5th Cir. 2008) ................................................................................... 31
*Wallace v. Tex. Tech Univ.*,
    80 F.3d 1042 (5th Cir. 1996) ................................................................................... 13
*Whitley v. Albers*,
    475 U.S. 312 (1986) ................................................................................................ 14
*Woodford v. Ngo*,
    548 U.S. 81 (2006) .................................................................................................. 10

**Statutes**

18 U.S.C. § 3626 ............................................................................................................. 32
28 U.S.C. § 1658(a) ......................................................................................................... 31
42 U.S.C. § 1983 ............................................................................................................... 5
42 U.S.C. § 1997(e)(a) .................................................................................................... 10
42 U.S.C. § 2000cc-1(a) ............................................................................................ 11, 19
Tex. Civ. Prac. & Rem. Code Ann § 16.003(a) (West 2017) ........................................... 31
Tex. Code of Crim. Pro. Art. 43.14 ........................................................................... 20, 21
Tex. Gov't Code § 501.008 .............................................................................................. 11

**Rules**

Fed. R. Civ. P. 56 ...................................................................................................... 5, 8, 9

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| PATRICK HENRY MURPHY, JR.,<br>*Plaintiff,* | § § § | |
| v. | § § | CIVIL ACTION NO. 4:19-cv-1106 |
| BRYAN COLLIER, Executive Director<br>of the Texas Department of Criminal<br>Justice, LORIE DAVIS, Director of<br>the Texas Department of Criminal<br>Justice–Correctional Institutions<br>Division, and BILLY LEWIS,<br>Warden of the Huntsville Unit,<br>*Defendants.* | § § § § § § § § | |

---

## MOTION FOR SUMMARY JUDGMENT BY
## DEFENDANTS BRYAN COLLIER, LORIE DAVIS, AND BILLY LEWIS

Pursuant to Federal Rule of Civil Procedure 56, Defendants Collier, Davis, and Lewis move for summary judgment and dismissal of the claims against them. There are no genuine issues of material fact as to Defendants' affirmative defenses and Murphy's RLUIPA and constitutional claims.

### NATURE OF THE CASE AND STAGE OF PROCEEDING

Two days before the date he was scheduled for execution, Plaintiff Patrick Henry Murphy, Jr. ("Murphy") filed this lawsuit pursuant to 42 U.S.C. § 1983 and RLUIPA. ECF No. 1. The U.S. Supreme Court granted Murphy a stay of execution pending resolution of this lawsuit. *Murphy v. Collier*, No. 18A985, 587 U.S. ___, 139 S. Ct. 1475 (2019). In its opinion, the Court instructed that Murphy's claim could be mooted by removing chaplains from the execution chamber altogether. *Id.* at 1475. TDCJ followed the Supreme Court's directive and amended the execution procedure in the manner prescribed by the Court. Exh. A at 8, § V.F. Following the policy change on April

5

2, 2019, Murphy amended his complaint to challenge the new policy, despite the Supreme Court's directive: "States therefore have a strong interest in tightly controlling access to an execution room in order to ensure that the execution occurs without any complications, distractions, or disruptions. The solution to that concern would be to allow religious advisers only into the viewing room." *Murphy*, No. 18A985, 139 S. Ct. at 1475–76.

Murphy's suit essentially challenges two components of the execution procedure: First, Murphy complains that TDCJ's refusal to allow any spiritual advisor inside the execution chamber at the time of his execution is hostile to all religions in violation of the Establishment Clause, violates his right to freely exercise his religion, and violates his rights protected under RLUIPA. ECF No. 22 at 8; Exh. A at 8, § V.F. Second, Murphy complains that the TDCJ-employed chaplains—who he claims are Christian or Muslim—are available to the condemned without restriction before the execution, while an outside spiritual advisor may only visit from 3:00 to 4:00 p.m. ECF No. 22 at 17–18; Exh. A at 8, § V.C. He claims that this pre-execution policy violates RLUIPA and the Establishment Clause because it favors Christianity or Islam over other faiths.

The relevant TDCJ procedure states that the Correctional Institutions Director or her designee and the Huntsville Unit Warden or his designee are the only two employees who may be inside the execution chamber during an execution.[1] ECF No. 22-1 at 8–9; Exh. A at 8, § V.F. An outside spiritual advisor[2] may be present in the viewing room immediately adjacent to the execution chamber, which is separated by a clear plexi-glass window. Exh. H at 3 (depicting execution chamber and adjacent viewing room). In the hours preceding an execution, when the

---

[1]     Members of the confidential drug team enter and exit the execution chamber during the time immediately prior to administration of the execution drugs.

[2]     This filing refers to an "outside spiritual advisor" as a member of the clergy or an individual approved in accordance with policy and who serves an offender in a religious capacity at the offender's request but is not a TDCJ employee.

offender is held in a holding area at the Huntsville Unit, the procedure permits an outside spiritual advisor or lawyer to visit the offender from 3:00–4:00 p.m. Exh. A at 8, § V.C. The procedure also provides for unrestricted access to an outside spiritual advisor (during business hours) in the two and-one-half days preceding an execution, which includes hours of access to the spiritual advisor on the morning of the execution when the offender is still at the Polunsky Unit. Exh. L at 6.

In asserting that offenders have greater access to Christian and Muslim TDCJ chaplains than outside spiritual advisors, Murphy mischaracterizes the TDCJ chaplain's role. While the TDCJ chaplains are periodically present throughout the day of an execution, their role is not to provide religion-specific pastoral care. Rather, they are present to provide human comfort and to perform secular tasks such as facilitating phone calls for the offender, answering questions about the execution process for the offender and offender's family, and facilitating access for the offender's family to witness the execution. Exh. O at 4–5; Exh. Q generally (delineating TDCJ chaplains' responsibilities with no mention of a specific religion). Retired TDCJ Chaplain David Collier, who aided in 138 executions in either the pre-execution holding area or in the chamber, testified that his role was "to be a calming presence and to provide aid and comfort to the offender. For the most part, the offender dictates how I may be of service to him and comfort him, within the bounds of security. Performing that role is not dependent on my personal faith preference." Exh. O at 5. Murphy testified that he believes the chaplains' role in the holding area prior to his execution was to "just try to keep me calm and help me with phone calls and things of that nature." Exh. E at 7:15–17.[3] "[T]hey basically just kept me company while we waited." *Id.* at 8:1–2. Chaplains are charged with these responsibilities—as opposed to correctional staff—because they

---

[3]      When citing to deposition testimony, this motion cites to the page number located at the bottom-center of the page, followed by the line designations.

have demonstrated an ability to communicate and comfort others—not because they provide religious guidance of a particular faith.[4] Prior to a policy change on April 2, 2019, the role of the TDCJ chaplain inside the execution chamber was to be a calming presence and to aid the Warden with certain protocols. The chaplains were essentially silent inside the chamber during execution procedures. Exh. K at 18:1–20.

## STANDARD OF REVIEW AND ISSUES TO BE RULED UPON

Summary judgment should be granted when the moving party conclusively establishes that there is no genuine issue of material fact. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). Summary judgment is precluded under Fed. R. Civ. P. 56(c) only when the dispute is genuine and the disputed facts might affect the outcome of the suit. *Anderson*, 477 U.S. at 248. A court will "not, in the absence of any proof, assume that the non-moving party could or would prove the necessary facts." *McCallum Highlands, Ltd. v. Wash. Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir. 1995). This standard applies to the following issues to be ruled upon by the Court:

(1)     Whether Murphy failed to exhaust administrative remedies as required under the PLRA.

(2)     Whether Murphy has demonstrated that the challenged TDCJ execution procedure substantially burdens his religious exercise.

(3)     Whether TDCJ's execution procedure is the least restrictive means of furthering its compelling interests in security.

(4)     Whether TDCJ's execution procedure is hostile to all religions in violation of the Establishment Clause.

(5)     Whether TDCJ's execution procedure violates the Establishment Clause by favoring one religion over others.

---

[4]     For example, TDCJ chaplains are responsible for delivering news of family member deaths to staff and offenders. These types of responsibilities make chaplains particularly equipped to serve as a calming and comforting presence to the condemned. Exh. Q at 4, ¶ 11.

(6)      Whether Murphy's claims are barred by the applicable statute of limitations.

## SUMMARY OF THE ARGUMENT

Murphy's failure to file prison grievances as required under the PLRA prior to filing this lawsuit requires dismissal. Murphy also fails to demonstrate that the TDCJ procedure governing the execution chamber and the pre-execution holding area substantially burdens his religious exercise. And there exists no genuine dispute of material fact that TDCJ's execution procedures are the least restrictive means of furthering its compelling interests in security. Murphy's RLUIPA and Free Exercise claims, therefore, should be dismissed.

Murphy's Establishment Clause claims should be dismissed because he can offer no evidence of discriminatory intent to support his hostility-to-all-religions theory. There is also no evidence that the challenged procedure favors one religion over another. TDCJ-employed chaplains do not serve a faith-specific role and their personal faith preference does not dictate their conduct in execution procedures.

Lastly, Murphy's claims are time barred under the applicable statute of limitations and his prayer for relief is not narrowly tailored as required under the PLRA. For all of these reasons, Murphy's claims against Defendants Collier, Davis, and Lewis should be dismissed with prejudice.

## ARGUMENT

Pursuant to Federal Rule of Civil Procedure 56, Defendants move for summary judgment, because there are no genuine issues of material fact as to Defendants' affirmative defenses and Murphy's RLUIPA and constitutional claims.

## I.      This suit should be dismissed for failure to exhaust administrative remedies.

Murphy has never submitted a prison grievance relating to the claims he now pursues in federal court. Section 1997(e) of the PLRA provides that "[n]o action shall be brought with respect

to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997(e)(a). Exhaustion is mandatory, "irrespective of the forms of relief sought and offered through administrative avenues." *Booth v. Churner*, 532 U.S. 731, 739, 740–41 n.6 (2001). The Fifth Circuit in *Gonzalez v. Seal*, 702 F.3d 785 (5th Cir. 2012) held: "After *Woodford* and *Jones,* there can be no doubt that pre-filing exhaustion of [the] prison grievance processes is mandatory." *Id.* at 788 (citing *Woodford v. Ngo*, 548 U.S. 81 (2006); *Jones v. Bock*, 549 U.S. 199 (2007)).

The TDCJ execution procedure that Murphy now challenges has been in place for decades. For years, Murphy knew he would be executed in a manner consistent with the written execution procedure and that his Buddhist advisor would not be permitted in the chamber, and he had abundant time to submit grievances as to the claims he now raises in federal court. The PLRA's exhaustion requirement applies to Murphy's challenges to the execution procedure. *See Nelson v. Campbell*, 541 U.S. 637, 643 (2004) (concluding that a prisoner's complaint about the procedure used to find a vein during execution procedures was indeed a § 1983 civil rights complaint and was therefore subject to the PLRA exhaustion requirement); *Ross v. Blake*, 136 S. Ct. 1850, 1862 (2016) ("Courts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement.").

Murphy's attorney emailed TDCJ General Counsel twenty-eight days before his execution, raising Murphy's request relating to his Buddhist advisor for the first time. ECF No. 1-3.[5] These emails do not satisfy the mandatory grievance requirement under the PLRA. *See, e.g.*, *Fegans v.*

---

[5]     Although the Supreme Court rejected the State's argument that Murphy should be denied equitable relief based on his inexcusably dilatory litigation tactics, the PLRA exhaustion requirement has not been addressed. *Murphy*, No. 18A985, 139 S. Ct. at 1478 (Alito, J., dissenting)

*Johnson*, No. H-09-4019, 2010 WL 1425766, at *13 (S.D. Tex. April 8, 2010) (concluding that a prisoner's attorney sending a notice of claims to the jail did not satisfy the PLRA exhaustion requirement). The exclusive manner of exhausting administrative remedies in TDCJ is for the offender to submit a Step 1 and Step 2 grievance. Tex. Gov't Code § 501.008; Exh. G at 7–9, § VIII; *Dillon v. Rogers*, 596 F.3d 260, 268 (5th Cir. 2010) ("Under our strict approach, we have found that mere 'substantial compliance' with administrative remedy procedures does not satisfy exhaustion.").

Because Murphy failed to exhaust administrative remedies prior to pursuing his claims in federal court, the PLRA mandates dismissal of his suit.

## II. Murphy fails to meet his burden of demonstrating a substantial burden on his religious exercise.

To state a claim under RLUIPA, Murphy must first meet his burden of demonstrating that the challenged government conduct substantially burdens his religious exercise. 42 U.S.C. § 2000cc-1(a) ("No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution."); *Brown v. Collier*, No. 14-20249, _ F.3d _, 2019 WL 2754965, at *5 (5th Cir. July 2, 2019); *Adkins v. Kaspar*, 393 F.3d 559, 569–70 (5th Cir. 2004) (adopting the Supreme Court's interpretation of "substantial burden" as one that forces the person to choose between following the precepts of his religion or receiving some otherwise available benefit, and truly pressures the adherent to substantially modify his religious behavior) (citing *Sherbert v. Verner*, 374 U.S. 398 (1963)).

### A. Requiring Murphy's Buddhist spiritual advisor to stand behind plexi-glass in the viewing room rather than inside the execution chamber is not a substantial burden on Murphy's religious exercise.

Murphy may recite his chant during the entirety of the execution. Murphy does not want his spiritual advisor to touch him and is not concerned with the distance at which he will stand.

Exh. E at 18:17–19; 19:19–23. The spiritual advisor may stand at the front of the viewing room, separating him from Murphy by three feet and by plexi-glass. Exh. H at 2–3.  Because each will know the chant to be recited ahead of time, if Murphy wishes to watch his spiritual advisor through the glass, this will enable them to chant in unison and maintain togetherness.[6] Murphy testified that he doesn't necessarily want to see his spiritual advisor during the execution; just "knowing he is there" to represent Buddhism is what's important. Exh. E at 19:10–18. Murphy's religious behavior will be the same with his spiritual advisor behind the plexi-glass as it would be if his advisor were in the chamber. Murphy fails to demonstrate that the TDCJ policy would truly force him to "substantially modify his religious behavior." *Adkins*, 393 F.3d at 570. "Incidental effects of government programs, which may make it more difficult to practice certain religions, but which have no tendency to coerce individuals into acting contrary to their religious beliefs" are not a substantial burden within the meaning of RLUIPA. *Lyng v. Nw. Indian Cemetery Protective Assoc.*, 485 U.S. 439, 450–51 (1988) (concluding that a state road built through Native American ceremonial grounds was an incidental effect of a government program and not a substantial burden on religious exercise). Murphy will not be forced to choose between his religious exercise and some benefit; the incidental effect of the plexi-glass separation will not cause Murphy to substantially alter his religious exercise.

### B. There is no evidence that the reasonable restrictions on Murphy's access to his spiritual advisor in the pre-execution hours will substantially burden his religious exercise.

Murphy may meet with his spiritual advisor all day for several days at the Polunsky Unit preceding his execution date. Exh. E at 21:4–10; Exh. D at 3:11–17. On the day of his execution,

---

[6]    Murphy testified that he wants to recite the one-word chant, "Amituofo" or "O mi to Fo," with his spiritual advisor during his execution. Exh. E at 17:3, 10–11.

Murphy may meet with his spiritual advisor for several hours in the morning. Exh. E at 21:16–24; Exh. D at 3:11–17 (referring to the first half of the day on the day of execution); Exh. L at 6. Once Murphy is transported from the Polunsky Unit to the Huntsville Unit on the afternoon of his execution, he may spend one hour with his spiritual advisor in person, and the remainder of his time speaking to him on the phone if he wishes. Exh. E at 15:13–21. When asked, Murphy's sole request for relief in this lawsuit was to have his spiritual advisor in the execution chamber to help him focus. Exh. E at 17:23–25; 18:1–8. Murphy made no complaint in his deposition relating to pre-execution procedures and expressed no concern regarding access to his spiritual advisor prior to execution.[7] There is no competent summary judgment evidence that Murphy's religious exercise is substantially burdened by the current procedures regarding access to a spiritual advisor in the hours preceding an execution.

Because Murphy fails to demonstrate a substantial burden on his religious exercise, the burden does not shift to the government to make any showing. *Brown*, 2019 WL 2754965, at *5 (dismissing a RLUIPA claim where the offenders failed to demonstrate a substantial burden imposed by the challenged policy). The Court should accordingly dismiss Murphy's RLUIPA claims.

**III.   The competent summary judgment evidence demonstrates that the execution procedure is the least restrictive means of furthering compelling government interests.**

**A.   TDCJ has compelling interests in safety and security relating to execution protocols.**

Even assuming *arguendo* that Murphy could demonstrate a substantial burden on his

---

[7]      Plaintiff Murphy's First Amended Complaint is not evidence and cannot serve as the basis of a factual dispute. Factual controversies exist only "when both parties have submitted evidence of contradictory facts." *Wallace v. Tex. Tech Univ.,* 80 F.3d 1042, 1048 (5th Cir. 1996). The nonmovant's burden may not be satisfied by conclusory allegations or unsubstantiated assertions. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

religious exercise, he fails to raise a genuine issue of material fact that contravenes TDCJ's compelling penological interests in security as implemented through its execution procedure. As the Supreme Court predicts, "States have a compelling interest in controlling access to the execution room, which means that an inmate likely cannot prevail on a RLUIPA or free exercise claim." *Murphy*, No. 18A985, 139 S. Ct. at 1476 (Kavanaugh, J., concurring). There exists no summary judgment evidence here to unsettle the Supreme Court's forecasted conclusion.

The U.S. Supreme Court cautions that context matters in the application of the compelling government interest standard required under RLUIPA. *Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005). Courts are instructed to apply this standard with "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." *Id.* (citing 146 Cong. Rec. 16699 (2000). The Supreme Court did not abandon deference in *Holt v. Hobbs*; rather, it emphasized that state officials must provide evidence to satisfy their burden rather than to expect "unquestioning deference." 135 S. Ct. 853, 858 (2015). RLUIPA does not prevent a prison from taking prophylactic measures or require them to wait for a security breach before adopting prison policies. *See, e.g.*, *Whitley v. Albers*, 475 U.S. 312, 322 (1986) (commenting that deference to prison officials extends to prophylactic or preventative measures intended to reduce breaches in prison security).

RLUIPA envisions that inmates' requests for religious accommodations will be scrutinized in the context of the prison environment and the paramount security concerns involved with incarcerated felons. *See Cutter*, 544 U.S. at 717, 722. Here, Murphy's requests must be considered in the context of the tense and careful process of carrying out an execution. RLUIPA does not elevate accommodation of religious observances over a prison's need to maintain order and safety;

14

any accommodation must be measured so that it does not override other significant interests. *Id.* at 722. TDCJ's execution procedure is the least restrictive means of furthering its compelling governmental interest in security.

Mere steps outside the Huntsville Unit on the day of an execution, the scene is often frenzied. Exh. I at 1–2. Members of the media begin arriving earlier in the day, and often, demonstrators mount on the streets surrounding the unit. *Id.* As the family of the victim and family of the condemned arrive, TDCJ takes careful and controlled steps to ensure they never come in contact or see each other. *Id.* TDCJ staff coordinate with local law enforcement during this time to ensure that the chaotic scene occurring outside the unit does not impact the controlled and secure process within. *Id.* at 2.

Once the condemned arrives in Huntsville on the day of execution, he or she may meet with his or her spiritual advisor from 3:00 to 4:00 p.m. After 4:00 p.m., all non-law enforcement, non-TDCJ employees are asked to leave the pre-execution areas so that final execution preparations may be made. Exh. D at 4:1–15. The condemned, however, may continue to speak to his spiritual advisor on the phone if he wishes. Exh. E at 15:17–21.

Time is of the essence in the period leading up to the execution. In those two remaining hours, there are many secular tasks that take place. Exh. D at 4:1–15. TDCJ employees work to facilitate phone calls and to keep the offender calm. The condemned is offered his last meal and an opportunity to shower and dress prior to the execution. *Id.* at 4:6–7. Additionally, the execution chamber and drugs are prepared by the confidential drug team. *Id.* at 4:11–15.

TDCJ's general execution process has been in place since 1982. As the U.S. Supreme Court has recognized, carrying out an execution without disruption and in the most humane manner depends on maintaining control over every aspect of the process. *Murphy*, No. 18A985, 139 S. Ct.

at 1475–76. Director Davis explains that the execution process as a whole is intense. Exh C at 1. Emotions are heightened throughout the day for all involved, and they peak in the minutes leading up to and during the execution. *Id.* "Security concerns peak in the hours before an execution, and the introduction of contraband that could be used to harm staff or for the offender to harm himself is a great concern." Exh. R at 1. When an outside visitor enters the pre-execution holding area, TDCJ is not able to strip search that person absent some level of suspicion. *Id.* at 1–2; *see Thorne v. Jones*, 765 F.2d 1270, 1276 (5th Cir. 1985) (requiring reasonable suspicion to strip search a prison visitor). Instead, a pat search, which is not as thorough as a strip search, is conducted on the outside visitor. This leaves an unabated security concern that the outside visitor will be able to smuggle contraband to the offender in the pre-execution holding area. That someone is visiting in a religious capacity does not lessen the concern that he or she may smuggle contraband. Exh. R at 1 (citing incidents where religious volunteers have been caught smuggling contraband onto prison units). In response to this concern, security staff in the pre-execution holding area must be vigilant in supervising and observing the outside visitor during the 3:00 to 4:00 p.m. visitation hour. Exh. R at 2. If the outside visitor had more time in the pre-execution holding area, he or she would have more opportunity to make the exchange of contraband. *Id.* Limiting opportunities for contraband to be passed to the condemned by limiting their contact with outsiders is the only means of minimizing that risk. *Id.*

It is difficult to imagine a governmental responsibility requiring more precision or control than carrying out an execution. Mistakes or disruptions cannot be tolerated, for there is no corrective action to remedy a miscarried execution. Exh. C at 3.[8] The exclusion of individuals

---

[8]     Executions, additionally, are and litigious, so it is imperative that TDCJ carry out the responsibility with precision. *See, e.g., Glossip v. Gross*, 135 S. Ct. 2726 (2015); *Baze v. Rees*, 553 U.S. 35, 40 (2008).

from the pre-execution holding area, who have not earned the trust and confidence of TDCJ through experience in corrections, serves to minimize the risk of jeopardizing the execution process. Exh. C at 2–3; *see also Murphy*, No. 18A985, 139 S. Ct. at 1475–76 (Kavanaugh, J., concurring). Likewise, there is no circumstance in which it would be safe or controlled for a non-TDCJ employee to be present in the execution chamber during an execution. Exh. C at 2. The risks of permitting an unknown person in the execution chamber are significant. *Id.* at 2–3.

Through careful and thoughtful consideration, Director Lorie Davis selects only trusted and capable TDCJ employees to serve a role in the pre-execution holding area or in the chamber.[9] In fact, not all TDCJ employees would be appropriate. Only trusted TDCJ employees, who have demonstrated an ability to serve the State with integrity and treat offenders with dignity are deemed capable. Exh. L at 5–6. TDCJ's consideration is based on the employee's demonstrated service in the TDCJ correctional context; his disciplinary history; his character; observations of the employee's maturity and ability to maintain professional discretion; his demonstrated ability to conduct himself in a stressful situation such as reacting to a violent offender; his professionalism and good judgment; and many other immeasurable factors.[10] Exh. M at 11:6–13; Exh. L at 5–6. If the TDCJ employee is not known well-enough and has not been observed in the correctional setting to an extent that these factors can be confidently determined, then that employee will not be selected for this role. Exh. L at 5–6.

The significant risks of allowing an outsider in the execution chamber include risks to the

---

[9]   Only Director Davis and the Huntsville Unit Warden, or their designees are permitted in the execution chamber during an execution. Exh A at 8, § V.F. Careful consideration when selecting a designee or a warden for the Huntsville Unit, therefore, is required.

[10]   All TDCJ employees are subjected to a comprehensive criminal background check when hired. Continuously through employment, TDCJ receives an automatic flash alert if there is an update to any employees' criminal history. Exh. P at 4, § III.A.

condemned offender, risks to the TDCJ employees involved, a risk of disclosing the confidential identities of the drug team, risks to the unprepared and untrained outsider, and a risk of disrupting the closure for the victim's family witnessing the execution. Exh. L at 5–6; Exh. C at 2. The unknown outsider could pull the intravenous lines out of the condemned, could taunt the victim's family and friends, could create a disruption, or assault the warden. Exh C. at 2–3. The outsider could also attempt to gain access to the execution team and jeopardize exposing their identities. *Id.* Any of these actions would require the opening of the execution chamber door, which is an unacceptable security risk. *Id.*

It cannot be known whether an outsider has nefarious intent in requesting to attend an execution. Exh. K at 25:4–8. Even if the outsider does not have malicious intentions, it is difficult to know how someone will react when placed in such an intense environment. Exh. C at 2. The outsider could faint—as some witnesses in the viewing rooms have done—causing the TDCJ staff to focus their attention on the outsider instead of focusing on their role in carrying out the execution.  *Id.* "There is no room for error, and uncertainty about how a person will perform on the day of execution is unacceptable." *Id.* at 2.

TDCJ's security concerns and need for strict control over the process are even more critical when applied specifically to Murphy. *Davis v. Davis*, 826 F.3d 258, 265 (5th Cir. 2016) (explaining that the governmental interest must be evaluated based on the individual characteristics of the plaintiff, and the security risks implicated by accommodating him in particular). Due to his escape from the Connally Unit in 2000, Murphy is assigned every security precaution designator that exists in TDCJ. Exh. D at 6:11–19. Security precaution designators are signals to all staff that an offender is dangerous and presents an increased risk. Murphy has taken hostages, assaulted staff, used security restraints inappropriately, and escaped from TDCJ custody.

*Id.* at 6:11–19. The compelling security interests explained above are particularly furthered and tailored when the policies are applied to Murphy.

### B.   TDCJ's execution protocols are the least restrictive means of furthering its compelling security interests.

The final step of the RLUIPA analysis is whether the challenged regulation is the least restrictive means of furthering the compelling government interest. 42 U.S.C. § 2000cc-1(a)(2). "[L]east restrictive means' has its plain meaning." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 332 (5th Cir. 2009).  But, "[s]hould inmate requests for religious accommodations . . . jeopardize the effective functioning of an institution, the facility would be free to resist the imposition." *Cutter*, 544 U.S. at 726.

Murphy suggests that TDCJ could conduct a background check on a non-employee and then allow that outsider into the chamber, thereby maintaining security over the execution process. As explained above, however, TDCJ's fluid consideration process could not be duplicated for a person who is not a TDCJ employee. Exh. L at 6. A criminal background check would do nothing to inform TDCJ of the person's character or good judgment, professionalism, discretion, likelihood of verbally or physically disrupting an execution, their ability to handle a tense situation, or to alleviate the unknown factors. Nor would a criminal background check inform TDCJ of non-criminal disciplinary problems the outsider may have had.

A background check, additionally, would not help to prepare someone for the execution process. The TDCJ employees who serve a role in the pre-execution or execution process are thoroughly trained and prepared. Exh. L at 5–6. For instance, all TDCJ-employed chaplains complete the same six-week pre-service security training as correctional staff. Exh. M at 14:23–25, 15:1–18; Exh. N at 2:17–22, 3:1–16. They also complete annual in-service security training, and they work in a correctional institution on a daily basis. Exh. M at 15:3–5. This helps to prepare

them for how to de-escalate a tense situation and react to a belligerent offender. Through training and experience, TDCJ employees learn how to recognize cues that an offender is becoming agitated and how to avoid escalation. Before participating on the team that aids in execution procedures, each chaplain must first observe multiple executions and will shadow another chaplain in the pre-execution holding area. Exh. K at 12:1–18; Exh. M at 10:4–25. This training and preparation could not be replicated for a non-employee. A mere criminal background check would be wholly insufficient to reduce the risks of allowing an outsider in the chamber. Exh. L at 5.

In the pre-execution holding area, TDCJ employs the least restrictive policy while ensuring un-rushed execution preparations and protecting the confidentiality of the drug team. TDCJ does not restrict all access to outside spiritual advisors on the day of execution. The least restrictive means of furthering its compelling government interests is to permit the condemned to spend several hours with his outside spiritual advisor in the morning on the date of execution, an additional hour from 3:00 to 4:00 p.m., and several hours on the phone if desired. Exh. A at 8, § V.C.; Exh. E at 15:17–21. The extended presence of an outsider in the pre-execution holding area would disrupt the execution preparations by the drug team who must remain confidential. Exh. D at 4:11–15; Tex. Code of Crim. Pro. Art. 43.14; *Tex. Dep't of Crim. Just. v. Levin*, 572 S.W.3d 671, 680–85 (2019) (concluding that disclosing the identity of people or companies involved in the execution-drug process would cause them a substantial risk of harm). When an outsider arrives and departs from the holding area, he must be escorted through corridors in which he may cross paths with members of the confidential drug team. Accordingly, if an outsider were permitted to remain in the holding area beyond 4:00 p.m., Director Davis would delay further preparations until the outsider is clear of the area, thereby causing them to rush through the remaining preparations. Exh. L at 21.  Execution preparations and protocols should not be rushed because,

as previously mentioned, there can be no corrections made after the fact. *Id.* at 21.

Moreover, when an outsider is present in the pre-execution holding area, TDCJ security staff must focus their attention on the outsider. Security concerns peak in the hours before an execution, and the introduction of contraband that could be used to harm staff or for the offender to harm himself is a great concern. Exh. R at 1. As stated, TDCJ cannot strip search a visitor as a preventative measure, so a less-through non-strip search is performed. When the spiritual advisor meets with the condemned from 3:00 to 4:00 p.m., the available security staff must focus their attention on the outsider and condemned. Beyond 4:00 p.m., security staff must direct their attention on the other activities occurring within the holding area: food is brought in, the offender showers and changes clothing, he continues to make phone calls, and the chamber and drug room are prepared. Maintaining strict control over movement and activity in the holding area and chamber are paramount and become increasingly tense as the time nears 6:00 p.m.[11]

There is no alternative means of maintaining the confidentiality of the drug team or the security and control of the pre-execution activity than to maintain a cut-off time at which no outsiders may be present in the pre-execution holding area.

## IV.   Murphy fails to demonstrate that TDCJ's limitation on persons inside the execution chamber is hostile to all religions in violation of the Establishment Clause.

Both the Supreme Court and the Fifth Circuit recently applied the "reasonableness test" rather than the *Lemon* Test in Establishment Clause challenges. *Am. Legion v. Am. Humanist Assoc.*, 588 U.S. _, 139 S. Ct. 2067, 2087 (2019); *Brown*, 2019 WL 2754965, at *16.[12] The Fifth Circuit

---

[11]    Statutorily, executions may begin at 6:00 p.m. Tex. Code Crim. Pro. Art. 43.14(a).

[12]    Although Judge King wrote a concurring opinion rather than joining in Part VII of the published opinion, she specified that she did not join in Part VII only because she disagreed with the conclusion that TDCJ's "housing policy" violates the Establishment Clause. *Brown*, 2019 WL 2754965, at *24 (King, J., concurring in part). Part VII is cited for the part of the analysis with which Judge King took no issue.

emphasized that "to ensure that courts afford appropriate deference to prison officials, we have determined that prison regulations alleged to infringe constitutional rights are judged under a 'reasonableness test.'" *Brown*, 2019 WL 2754965, at *16 (citing *Turner v. Safley*, 482 U.S. 78, 86–87 (1987)). Rejecting the strict-scrutiny test utilized in other circuits and in other contexts, the Fifth Circuit analyzed a prisoner's Establishment Clause claim that certain TDCJ religious policies favored some faiths over others under *Turner*'s deferential standard. *Id.* at *16. In attempting to accommodate the religious exercise of over 140,000 inmates and nearly 300 faith groups, "prison officials must operate within the zone of reasonableness." *Id.* at *17. The right implicated by Murphy here—a right to have his Buddhist spiritual advisor in the chamber instead of behind the plexi-glass—is a right that "must necessarily be limited in the prison context." *Id.* Likewise, the Supreme Court in *American Legion* reasoned that the *Lemon* test is inconsistent with the Establishment Clause's tolerance of government action that recognizes religious traditions and religious values. *Am. Legion*, 139 S. Ct. at 2080–81. The Supreme Court noted that Establishment Clause cases have moved away from the *Lemon* analysis and toward application of a "presumption of constitutionality." *Id.* at 2085. The reasoning in *Brown* and *American Legion* mandate the *Turner* deferential standard here.

First, the rational connection between the challenged policy and TDCJ's legitimate government interest is that allowing an outsider in the chamber would substantially compromise security. *Turner*, 482 U.S. at 89. As discussed above, maintaining control over security in the chamber and minimizing the possibility of someone seeing the drug team cannot be accomplished with an outsider present inside the chamber.

Second, Murphy has alternative means of practicing his religion in the time before and during his execution. When in the chamber, Murphy will be able to recite his chant and may

maintain eye contact with his spiritual advisor who may chant along with him, if he wishes, to help him to "focus upon the Buddha." Exh. E at 17:18–19. As Murphy testified, "knowing he is there" is what is important to help him relax and focus. *Id.* at 19:13–16. That importance will be accomplished under the current execution chamber procedure.

Third, as discussed, allowing an outsider to be present in the execution chamber would put TDCJ staff and the drug team at an unacceptable risk. *Turner*, 482 U.S. at 90. The CID Director and Warden would have to focus their attention on the outsider in the chamber rather than focusing on the practiced and controlled protocols that ensure safe and humane executions. The risk of disturbing the execution—from the condemned's perspective, the involved prison officials' perspective, and the victim-witnesses' perspective—is too great. The risk of disclosing the drug team's identities to an outsider in the execution chamber is an additional unacceptable risk.

Fourth, there are no ready alternatives that would allay the security risks of allowing an outsider in the execution chamber during an execution. *Turner*, 482 U.S. at 90. The drug team finalizes the procedures in the execution chamber before witnesses are allowed in the viewing rooms, ensuring the confidentiality of their identities and minimizing the risk of someone attempting to intervene with the drug team's process. Exh. C at 2. The CID Director must open the door that separates the execution chamber from the drug room at the moment immediately before the condemned says his final words and the lethal drugs are administered. Exh. C at 2; Exh. H at 4 (depicting the door separating the drug room and the execution chamber). At the moment the door to the drug room is opened, only the condemned and the Warden are in the execution chamber, rendering the chamber and drug room as secure as possible. Exh. C at 2. If an outsider were present in the execution chamber, he would observe the drug team, and the open door to the drug room would expose the drug team to the outsider, creating a risk that could not be

alleviated. The risk of exposing the drug team to an unknown outsider, with no expectation of how the outsider will act or react, is a risk that would substantially jeopardize the entire process and the safety of everyone involved. Exh. C at 2. There are no ready alternatives to alleviate this substantial risk. Exh. C at 2 ("Under no circumstance would it be safe or feasible to for the condemned's clergyman or spiritual advisor [to] be present in the execution chamber."). Under the *Turner* factors, there is no genuine dispute of material fact that TDCJ's execution chamber protocols are reasonably related to legitimate penological interests in security.

TDCJ's decision to remove the TDCJ chaplain from the list of persons authorized to be inside the execution chamber was responsive to comments from the U.S. Supreme Court. *Murphy v. Collier*, No. 18A985, 139 S. Ct. 1111 (March 28, 2019). There is no evidence that TDCJ was motivated by discriminatory intent or an intent to exclude one or all religions. To state a religious hostility claim under the Establishment Clause, Murphy must demonstrate that TDCJ acted with discriminatory intent or was motivated to "scrub[] away any reference to the divine" rather than some secular motivation. *See Am. Legion*, 139 S. Ct. 2067, 2084–85. There is no summary judgment evidence suggesting such nefarious intent.

## V.   The competent summary judgment evidence demonstrates that the procedure restricting access during the pre-execution hours does not favor one religion over another, and therefore, does not violate the Establishment Clause.

As with his claim related to the execution chamber, Murphy's claim related to the pre-execution holding area must be analyzed under the *Turner* deferential standard. Murphy complains that limiting access to his outside spiritual advisor during the hours prior to execution, while allowing TDCJ-employed chaplains in the holding area without limitation, favors Christianity and Islam over other faiths.[13]

---

[13]   Murphy assumes that the personal faith of TDCJ-employed chaplains involved in executions is

To the extent Murphy complains that TDCJ has not hired a Buddhist chaplain to serve on the team of chaplains who aid in execution procedures, that argument has been rejected by the courts. The Supreme Court has held that prison facilities are not required to provide "identical facilities or personnel" to "every religious sect or group within a prison." *Cruz v. Beto*, 405 U.S. 319, 325 n.2 (1972); *Brown*, 2019 WL 2754965, at *16. The Fifth Circuit specifically disclaimed a requirement under the Establishment Clause that a prison be required to hire chaplains specific to every faith. *Brown*, 2019 WL 2754965, at *16 ("[N]or must a chaplain . . . be provided without regard to the extent of the demand."). TDCJ's practice of hiring non-faith-specific chaplains to administer and facilitate opportunities for prisoners of every faith to worship satisfies the First and Fourteenth Amendments without offending the Establishment Clause. *Id.* at *16–17.

TDCJ-employed chaplains are hired to serve three distinct roles in prison: (1) to personally conduct religious worship services and education in his or her own faith where there is a need; (2) to facilitate and encourage religious exercise for all faiths; and (3) secular administrative tasks such as notifying an offender of a family member death. Exh. J at 2, § II(A); Exh K at 6:18–25; 7:1–13 ("We're chaplain to all the faiths."); Exh. K at 11:12–19; Exh. M at 12:22–25; Exh. Q at 4, ¶¶ 8–12.  To perform these duties, chaplains are expected to have knowledge of religious beliefs and practices of various faiths, and to have knowledge of religious literature and resources for various faiths. Exh. J at 3, § III(B). Chaplain Moss, for example, testified that he serves as the Islamic Chaplain during the month of Ramadan and is involved in the active Pagan religious group at the Huntsville Unit, even though Chaplain Moss's personal faith is Christian. Exh K at 7:1–13; 10:19–25.

---

Christian. For purposes of summary judgment only, Defendants do not contest Murphy's assertion that the chaplains' personal faith preference is some variation of Christianity.

The role of TDCJ chaplains in the execution process is primarily secular and is driven by the condemned's wishes. The chaplains' role is to act as a consistent and calming presence for the condemned throughout the day, retrieving items requested by the condemned, offering and serving coffee and pastries to the condemned, facilitating phone calls, answering questions about the process, and serving as an active listener should the condemned want to talk. Exh. K at 14:19–25; 15:1–7; Exh. O at 4–5. The chaplains selected to serve in this role are uniquely qualified in calming and compassionately interacting with offenders. Exh. Q at 4, ¶ 9 (utilizing chaplains as members of the Crisis Response Intervention Support Programs team); *Id.* at 4, ¶ 11 (designating chaplains as first responders when staff receive bad news such as a family death). Chaplains are utilized as opposed to security staff, because offenders view security staff as their captors or custodians, while chaplains are viewed as offender advocates. Exh. K at 12:21–25; 13:1–8. Based on this perspective, chaplains are in a better position than security staff to keep offenders calm and to avoid escalating situations. Exh. K at 13:1–8 (explaining that chaplains are there to serve and are a neutral presence that are distinct from TDCJ security). Although there may be a general religious connotation associated with chaplains, that plays little or no part in their presence and role during executions.

In *American* Legion, the Supreme Court recently concluded that where a government practice is merely a "benign acknowledgment of religion's role in society," it does not violate the Establishment Clause. 139 S. Ct. at 2087. Declining to apply the *Lemon* test[14], the Supreme Court analyzed an Establishment Clause challenge to a World War I monument of a large Latin cross on public land and maintained by public funds. *Id.* at 2080–82. The Court reasoned that the cross

---

[14]    The Court determined that the *Lemon* test is not well suited for every Establishment Clause case or circumstance.

monument had grown to primarily embody secular symbolism and purpose—to memorialize the lost dead solders of WWI. The community had come to value the monument for its historical and traditional purposes without necessarily embracing its religious roots. *Id.* at *2082–84. Applying that reasoning to this case, TDCJ's use of chaplains in the pre-execution process is a "benign acknowledgment of religion's role" at the end of a person's life. Should a condemned person wish to discuss his faith in the hours before his execution, a chaplain will serve as an active listener and encourage the conversation—regardless of which faith the condemned adheres to. Exh. K at 14:19–25; 15:1–7; Exh. O at 7, 9. TDCJ-employed chaplains are trained to facilitate all religious exercise and are encouraged to learn about the many faiths represented in TDCJ. Exh. J at 3, § III(B). Murphy testified that in his opinion, "the chaplain's role is to help with your spiritual life, regardless of what your faith is." Exh. E at 6:9–13. In Murphy's experience, the TDCJ-employed chaplain facilitated his change to Buddhism, offered him Buddhist resources and books, and helped him obtain Buddhist religious items. *Id.* at 2:12–25; 3:1–24. Despite the chaplain's personal Christian faith, Chaplain Collier facilitated Murphy's exercise of his Buddhist faith, and "was very helpful" to Murphy in helping him grow spiritually. *Id.* at 5:15–16.

TDCJ-employed chaplains' personal faith is not discussed when they are interviewed, is not a factor in the hiring decision, and does not drive their contributions to TDCJ. Exh. M at 3:13–18; 4:3–11. In the execution context, the secular value of using chaplains to comfort and accompany offenders in the time leading up to their executions is accomplished, and the offender is not asked or pressured to subscribe to the chaplain's personal faith. Murphy testified that no chaplain asked him to convert to Christianity or asked him to confess his sins. Exh. E at 13:1–16; Exh. K at 20:16–25 ("Chaplain Jones [was] very, very concerned about us not doing anything that

would offend [Murphy's] faith.").[15] During the hours prior to his execution, Murphy testified that they had "general conversations;" that the chaplains were trying to keep him calm; they asked him about his childhood; and they actively listened to Murphy tell them about his Buddhist faith. Exh. E at 11:6–25.[16] The offender dictates what he wants to talk about or whether he wants to talk at all. *See, e.g.*, Exh. E at 13:9–16 (asking Murphy how he grew up, to which Murphy responded with conversation about being Christian in his youth and explaining his current Buddhist faith); Exh. K at 15:1–7, 18–20; Exh. M at 5:6–18 ("Our whole job is to keep them relaxed. So it's talking about football, talking about family, where they're from, those types of things.").

Although the title of "chaplain" may traditionally be viewed as having a religious connotation, and although the TDCJ chaplains have a personal faith, their role is to comfort. *See, e.g.*, Exh. E at 26:9–21 (explaining that the chaplains stayed with him so he wouldn't be alone and would have someone to talk to). TDCJ policy explicitly prohibits any TDCJ-employed chaplain from pressuring or compelling an offender to make a change of faith preference. Exh. F at 2. After Murphy received news of his stay of execution at the end of the evening, Murphy thanked Chaplain Moss and the other chaplains for helping him through the night. Exh. K at 22:11–17. In fact, offenders often express gratitude for the chaplains' assistance and presence during the process. *Id.* at 22:2–10.

Removing the TDCJ chaplain from the pre-execution process in the holding area would

---

[15] Although Murphy testified that he felt pressured to convert, he explained it was not anything that the chaplains said to him that pressured him. Exh. E at 12–13. In fact, Murphy could not articulate any statement or conduct by the chaplains that made him feel pressured. *Id.* at 11–12. Rather, it was merely his knowledge that the chaplains were personally Christian that seems to have made him feel pressured. *Id.* at 11–13. It was not the conduct of the chaplains, but rather a "feeling" that Murphy experienced but could not articulate why. This cannot serve to raise a material and genuine factual dispute. A nonmovant's burden may not be satisfied by conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a scintilla of evidence. *Little*, 37 F.3d at 1075.

[16] Murphy often referred to himself as "Buddhist-Christian." Exh. E at 11:6–10.

not increase Murphy's opportunities to practice his Buddhist faith; nor would it eliminate alleged religious favoritism given the primarily secular purpose fulfilled by the chaplain. TDCJ's responsibility of facilitating religious exercise to all faiths "within the zone of reasonableness" not only permits faith-neutral chaplains under the Establishment Clause, but requires them under the Free Exercise Clause. *Brown*, 2019 WL 2754965, at *17.

Because the TDCJ chaplains involved in execution procedures do not serve a faith-specific role, Christian or otherwise, the policy does not favor Christianity over other faiths. During the pre-execution hours, the condemned is not prompted to discuss Christianity or any other religion with the TDCJ chaplain. But the offender is free to speak with his outside spiritual advisor in person for one hour and for additional time over the phone. The TDCJ-employed chaplains' personal faith is not relevant to their role in executions, just as the warden's personal faith is not relevant to his role in executions.

Murphy's complaint—that TDCJ favors Christianity by allowing TDCJ-employed chaplains in the holding area while limiting an outside spiritual advisor's presence in the holding area—is not truly grounded in the Establishment Clause. If TDCJ removed TDCJ chaplains from the holding area, Murphy's opportunities for religious exercise would not increase. Rather, all condemned offenders would lose the human comfort of an advocate during that time, replaced instead with another security officer. *See Brown*, 2019 WL 2754965, at *17–18.[17]

In the pre-execution holding area, the condemned may choose to discuss his own faith,

---

[17]    In *Brown*, the Fifth Circuit rejected the district court's conclusion that TDCJ policy violated the Establishment Clause by utilizing resources for religious groups that had volunteers available, such as Protestant and Catholic volunteers, while withholding resources from groups that lacked volunteers, such as the Muslim group. *Brown*, 2019 WL 2754965, at *17–18. In so concluding, the Fifth Circuit commented that the inmate's claim was not truly grounded in the Establishment Clause. The Court commented, "[i]f . . . fewer resources were expended to support volunteer efforts, inmates, including Muslim inmates, would have fewer opportunities for worship and religious study."). *Id.* at *17.

such as Buddhism, and the chaplain will encourage that discussion by asking questions, respectfully listening, and may pray with the condemned in the offender's faith if he so requests. Exh. K at 21:10–25; 22:1–10; 24:1–14; Exh. M at 6:15–21; Exh Q at 2–3, § III(A–C). Because TDCJ chaplains are responsible for facilitating religious exercise for all faiths, the TDCJ chaplain will often have some general knowledge about the offender's chosen faith should he wish to discuss it. Exh. J at 3, § III(B); Exh. O at 8.

There is no evidence that the challenged policy is motivated by discriminatory intent or that it favors Christianity. The personal religious preferences of the TDCJ employees who serve as the condemned's advocate and calming presence during the pre-execution process is not relevant to the role they perform. There exists no genuine dispute of material fact that the use of TDCJ-employed chaplains to serve and calm offenders during the pre-execution process is consistent with the Establishment Clause.

## VI.   There exists no genuine dispute of material fact that TDCJ's execution procedure is congruous with Murphy's First Amendment right to freely practice his religion.

As discussed, TDCJ's practice of hiring non-faith-specific chaplains to administer and facilitate opportunities for prisoners of every faith to worship satisfies the First and Fourteenth Amendment without offending the Establishment Clause. *Brown*, 2019 WL 2754965, at *17. TDCJ's legitimate penological interests in security during executions are rationally related to TDCJ's restriction on the officials who may be present inside the execution chamber. Exh. C at 1–2. Likewise, TDCJ's policy—which allows the condemned to meet with his outside spiritual advisor all day for the two and a half days preceding an execution, for one hour in the pre-execution holding area, and on the phone for several hours leading up to an execution—is rationally related to TDCJ's legitimate interests in protecting the confidentiality of the drug team, ensuring sufficient time for preparations, and ensuring security and control in the hours of

escalating tension before an execution. Exh. C at 1–2. There are no genuine factual disputes precluding summary judgment in Defendants' favor as to Murphy's Free Exercise claim.

## VII.   Murphy's claims are barred by the applicable statutes of limitations.

Claims challenging an execution protocol and raised in a civil rights action are subject to a state's personal injury statute of limitations. *Walker v. Epps*, 550 F.3d 407, 412–14 (5th Cir. 2008). Texas's personal injury statute of limitations is two years. Tex. Civ. Prac. & Rem. Code Ann § 16.003(a) (West 2017). A claim concerning execution protocols accrues on the later of two dates: when direct review is complete or when the challenged protocol was adopted. *Walker*, 550 F.3d at 414–15.

Murphy's direct appeal was decided by the Court of Criminal Appeals on April 26, 2006. *Murphy v. State*, No. AP-74,851, 2006 WL 1096924 (Tex. Crim. App. April 26, 2006). Using that accrual date, Murphy limitations period would have run on April 26, 2008. The alternative accrual date is July 9, 2012 at the latest, because the challenged procedures have been in place at least since that date. *See* Exh. A at 8, §§ V(C)(F); Exh. B at 8, §§ V(C)(F).[18] RLUIPA claims are subjected to a four-year statute of limitations. 28 U.S.C. § 1658(a); *Jones v. RR. Donnelly & Sons Co.*, 541 U.S. 369, 382 (2004) (subjecting all acts of Congress post-1990 to a four-year limitations period). Several years have passed since Murphy's two and four-year limitations period for challenges to the execution procedures accrued.

The statute of limitations on Murphy's challenges to the execution policies ran in July of

---

[18]    Although TDCJ changed a portion of the procedure on April 2, 2019—removing the TDCJ chaplain from the execution chamber—Murphy's challenge to the protocol is that he is not permitted to have his Buddhist spiritual advisor in the chamber. That complaint did not change when the policy changed in April. *Compare* Exh. B at p. 8, § V.F., *with* Exh. A at 8, § V.F.  The policy limiting meetings with an outside spiritual advisor in the pre-execution holding area to 3:00–4:00 has been in place since at least 2012. *Compare* Exh. B at p. 8, § V.C., *with* Exh. A at p. 8, § V.C.

2014. His claims, therefore, should be dismissed as a matter of law.

## VIII.   Murphy's requested relief is not narrowly drawn as required under the PLRA.

Under the PLRA, "Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." 18 U.S.C. § 3626. A court shall not order prospective relief unless "the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." *Id.*  In the prison context, courts must "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief."  *Id.*

Here, Murphy's requested relief—to allow his outside spiritual advisor unlimited access to the pre-execution holding area and into the execution chamber—would not be narrowly tailored to Murphy's actual complaints. Although pled by his counsel, Murphy himself makes no complaints about the time he is permitted with his Buddhist advisor in the pre-execution holding area. Exh. E at 15:17–21; 18:1–8. Moreover, Murphy's religious behavior will not change at all if his Buddhist advisor were permitted inside the chamber. *Id.* at 17:18–22; 19:10–23. Accordingly, the sought injunctive relief is not necessary to redress his complaints.

## CONCLUSION

There are no genuine disputes of material fact as to Defendants' affirmative defenses that Murphy failed to exhaust administrative remedies and his claims are barred under the applicable statute of limitations. Murphy cannot satisfy his evidentiary requirement of demonstrating a substantial burden on his religious exercise. And the competent summary judgment evidence demonstrates TDCJ's execution procedure is the least restrictive alternative of furthering its compelling interests in security, entitling Defendants to summary judgment as to Murphy's

constitutional and RLUIPA claims.

For these reasons, Defendants Collier, Davis, and Lewis pray that the claims against them be dismissed with prejudice and for all other relief to which they may be justly entitled.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

DARREN L. MCCARTY
Deputy Attorney General for Civil Litigation

SHANNA E. MOLINARE
Chief, Law Enforcement Defense Division

*/s/ Leah O'Leary*
LEAH O'LEARY
Deputy Chief,
Law Enforcement Defense Division
Attorney in Charge
Texas Bar No. 24079074
Southern District No. 1563191
Leah.Oleary@oag.texas.gov

AMY L. PRASAD
Assistant Attorney General
Co-Counsel
Texas Bar No. 24037295
Southern District No. 563045
Amy.Prasad@oag.texas.gov

Law Enforcement Defense Division
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548
Austin, Texas 78711-2548
(512) 463-2080 / Fax (512) 370-9918

ATTORNEYS FOR DEFENDANTS
COLLIER, DAVIS, AND LEWIS

## NOTICE OF ELECTRONIC FILING

I, **LEAH O'LEARY**, Assistant Attorney General of Texas, certify that I have electronically submitted for filing a true and correct copy of the foregoing in accordance with the Electronic Case Files system of the Southern District of Texas, on July 19, 2019.

*/s/ Leah O'Leary*
**LEAH O'LEARY**
Assistant Attorney General


## CERTIFICATE OF SERVICE

I, **LEAH O'LEARY**, Assistant Attorney General of Texas, certify that a true and correct copy of the foregoing has been served on all attorneys of record by electronic notification through the ECF system for the Southern District of Texas on July 19, 2019, to:

David R. Dow
ddow@central.uh.edu

Jeffrey R. Newberry
jrnewber@central.uh.edu

Attorneys for Plaintiff Murphy

*/s/ Leah O'Leary*
**LEAH O'LEARY**
Assistant Attorney General