IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| PATRICK HENRY MURPHY, JR.,<br>    *Plaintiff,*<br><br>v.<br><br>BRYAN COLLIER, Executive Director<br>of the Texas Department of Criminal<br>Justice, LORIE DAVIS, Director of<br>the Texas Department of Criminal<br>Justice–Correctional Institutions<br>Division, and BILLY LEWIS,<br>Warden of the Huntsville Unit,<br>    *Defendants.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO. 4:19-cv-1106 |

**MOTION FOR SUMMARY JUDGMENT BY
DEFENDANTS BRYAN COLLIER, LORIE DAVIS, AND BILLY LEWIS**

# Exhibit O

Relevant Portion of Retired Chaplain David Collier's Responses

to Plaintiff's Interrogatories

IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION

| | | |
|---|---|---|
| PATRICK HENRY MURPHY, JR., | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Civil Action No.4:19-CV-1106 |
| | § | |
| BRYAN COLLIER, ET AL. | § | |
| *Defendant*. | § | |
| | § | |

## David Collier's Responses to Plaintiff's First Set of Interrogatories

To:   Patrick Henry Murphy, through his attorney of record, David R. Dow and Jeffrey R. Newberry, University of Houston Law Center, 4604 Calhoun Road, Houston Texas 77204, ddow@central.uh.edu and jrnewber@central.uh.edu

   David Collier, through the Attorney General for the State of Texas, by agreement of the parties, submits the following **Response to Plaintiff Patrick Henry Murphy's Interrogatories to Witness David Collier.**

Respectfully Submitted,

**KEN PAXTON**
Attorney General of Texas

**JEFFREY C. MATEER**
First Assistant Attorney General

**DARREN L. MCCARTY**
Deputy Attorney General for Civil Litigation

**SHANNA E. MOLINARE**
Division Chief
Law Enforcement Defense Division

1



**Interrogatory 5:** In the documents you provided, you indicated that you were present in the "death house" for 67 executions. a) What role did you play in these executions? b) Do you mean you interacted with the inmate when he was in the holding cell outside of the execution chamber? c) Were you also present in the execution chamber during these executions? d) Were you present at the Walls Unit on these occasions because the condemned person designated you to be their spiritual adviser? e) If not, in what capacity did you serve that day?

**Answer:** a) Regardless of whether I was assigned to the "death house" or designated to enter the execution chamber for a given execution, my role was to be a calming presence and to provide aid and comfort to the offender. Shortly after his or her arrival and placement in the "death house" at the Huntsville Unit, I would have a conversation with the offender to let him or her know what to expect as to what was going to occur during the course of the day. Ministers, Chaplains, Clergy, etc. call this "Ministry Of Presence". The very first thing after the condemned

arrives to the death house is: Finger printed, showered, change clothes and then placed in the holding cell. Then the Warden, Chaplains and Public Information Director hold a brief meeting with the condemned about the upcoming process. At this point the Chaplains begin their duties. I also assisted with whatever needs the offender had to best ensure that he or she was comfortable. This included getting the offender beverages or snacks throughout the day, helping the offender place calls to friends or loved ones—I would access the phone list provided by the offender and place the calls, but would move away from the cell during the call to allow the offender some measure of privacy—and providing approved items to the offender from his or her property, such as any religious texts the offender may have packed. Between 3:00 to 4:00 p.m., I would go to the hospitality house to meet with the offender's family to assist with preparing them about what to expect and what was allowed and disallowed during the execution process. This is also the time for the offender to meet with his or her spiritual advisor or attorney with correctional staff supervision. In addition, I would convey any messages from the offender to his or her loved ones, who were at the hospitality house, if he or she asked me to do so. Upon my return from the hospitality house at 4:00 p.m., and until 5:00 p.m., I would resume assisting the offender with placing phone calls or bringing him or her snacks or beverages upon their request. During this hour, the offender would also receive his or her last meal and would be given the opportunity to shower.

    b) Yes.

    c) No.

    d) No.

    e) My role was to be a calming presence and to provide aid and comfort to the offender. For the most part, the offender dictates how I may be of service to him and comfort him, within the bounds of security. Performing that role is not dependent on my personal faith preference.

Unless the offender knows me from a different unit, knows me by reputation, or specifically asks what my personal faith is, there is nothing I say or do during the execution process that would alert the condemned as to my personal faith preference.



**Interrogatory 7:** For the 67 executions for which you were present in the death house, did you ever do any of the following with the person who was to be executed while at the Walls Unit on the day he or she was scheduled to be executed: 1) discuss scriptures from the Christian Bible; 2) discuss any requirements for that person to enter into Heaven, as that term is understood in the Christian religion, such as asking for forgiveness for his or her sins; 3) pray with that person to either the Christian God or Jesus Christ; 4) have any conversations with the condemned person on any Christianity-related subjects?
Provide as many details as you can recall related to any such interactions. Did any of these activities occur at any time that was not between 3:00 and 4:00 pm? Approximately, with how many of these 67 individuals did you engage in any of these activities at a time that was not between 3:00 and 4:00 pm on the day of the person's execution?

**Answer:** For all components of the above interrogatory, the answer is no, unless specifically requested by the offender. In many of the executions with which I was in attendance, the offender, regardless of their chosen faith, would ask at some time before they were escorted to the chamber for me to say a prayer for them. I do not recall with

specificity each of those times. These requests were not specific to Christianity, and the requests were not to pray with the offender; rather, the requests were for me to pray for him on my own.

I can recall one offender, who had become Muslim during his incarceration, asked the other chaplain and me if he could ask for forgiveness and return to Christianity. We told him that he could. The offender, whose name I am unable to remember, asked that we let his parents know that he had asked for forgiveness at the end. When the other chaplain and I took the offender's property to his family at the hospitality house, we conveyed the message to his parents as he had requested. His request was not the result of the chaplains' urging or any suggestions by the chaplains. Matters of faith are not brought up by the chaplains—only the offenders initiate those conversations, and more frequently, the offender wants to tell me about his faith and I listen.

Most of my "interactions" or conversations with the offenders were general in nature about their lives. I tried to keep them on topics that were positive or were about good memories, so as to lessen any cause for agitation. Usually that involves discussions about their family and friends, their interests, and other topics. Very seldom did we ever directly discuss matters of faith, and only if the offender wanted to discuss it. If an offender directly asked for me to pray for him or her, or just listen to him or her as they prayed, I would honor that request, regardless of the offender's chosen faith. If an offender wanted to tell me about his faith, I would actively listen and encourage him if it is a comforting topic for him. Oftentimes, an offender would not like to talk about anything and would choose to lie down, instead, which was also respected.

**Interrogatory 8:** For the 67 executions for which you were present in the death house, did the Walls Unit chaplain (or any other TDCJ chaplain) also have any interaction with the condemned person on the day of his or her execution? If so, do you recall any instances in which the Walls Unit Chaplain either: 1) discussed scriptures from the Christian Bible; 2) discussed any requirements for that person to enter into Heaven, as that term is understood in the Christian religion, such as asking for forgiveness for his or her sins; 3) prayed with that person

7

to either the Christian God or Jesus Christ; 4) have any conversations with the condemned person on any Christianity-related subjects? Provide as many details as you recall related to any such interactions, including the identity of the chaplain you observed. Approximately, with how many of these 67 individuals did you witness another chaplain engage in any of these activities with the condemned person?

**Answer:** See response to interrogatory number 7 above. The Walls unit chaplain is not always the chaplain who was inside the execution chamber. Like myself, the other chaplains assigned to the death house or those designated to enter into the execution chamber, when that was still allowed under the execution protocol, were there in the capacity to provide assistance to the offender in placing phone calls, bring him or her comforting items such as beverages or snacks, or otherwise be a calming presence. The "interactions" that I witnessed between other chaplains and offenders were very similar to those that I had with the offenders. The role of the chaplain is not specific to any faith. In the instances where the offender wishes to practice his religion by praying, reading religious texts, or other practice, the role of the chaplain is to facilitate that within the bounds of security. That is our responsibility for all offenders of all faiths.

**Interrogatory 9:** a) For the 67 executions for which you were present in the death house, what other things would you do to provide comfort to the condemned person on the day of his or her execution that was of a religious nature? b) What did you do to provide comfort that was not of a religious nature?

**Answer:** a) I would not provide comfort of a "religious nature" unless specifically asked by the offender to do so, and any said comfort of this nature was limited to the request made by the offender. The role of the chaplain is not specific to any faith. In the instances where the offender wishes to practice his religion by praying, reading religious texts, or other practice, the role of the chaplain is to facilitate that within the bounds of security. That is our responsibility for all offenders of all faiths. An offender may have asked for me to retrieve their specific religious literature from their property, which I would do. If the offender wanted

8

to talk to me about their religious faith, I would be an active listener and encourage him or her to discuss his faith if that is comforting to him. I would not initiate or lead any discussions with the offender about religious matters as that was not the purpose for my or any other TDCJ Chaplains' presence on the day of the execution.
b) See responses to interrogatories 7 and 8, above.



**Interrogatory 11:** For the 71 executions for which you were present in the execution chamber, was your contact with the condemned person limited to inside the execution chamber or did you also have contact with the condemned person before entering the execution chamber? If you had contact with the person before entering the execution chamber, was this contact limited to between the hours of 3:00 and 4:00 pm on the day of the execution?

**Answer:** See response to interrogatory number 5. For some offenders, I would interact with the offender in the death house as well as serve as the chaplain inside the execution chamber. Being there for the offender

9

and comforting and supporting him during the time in the death house is part of what gives the offender comfort once inside the execution chamber.

██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████████████

██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████

████████████████████████████████

██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████████████████████████████

██████████████████████████████████████████████████
██████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
████████████

10



IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION

| | |
|---|---|
| PATRICK HENRY MURPHY, JR., §<br>*Plaintiff,* §<br>§<br>v. §<br>§<br>BRYAN COLLIER, ET AL. §<br>*Defendant.* §<br>§ | Civil Action No.4:19-CV-1106 |

## VERIFICATION FOR RESPONSES TO INTERROGATORIES

I, _David D. Collier Sr._, CERTIFIY UNDER PENALTY OF PERJURY THAT THE INTERROGATORY RESPONSES ATTACHED HERETO ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

_[signature: David D. Collier Sr.]_
SIGNATURE OF CLAIMANT

DATE: 07-24-2019