IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

PATRICK HENRY MURPHY, JR., §
  *Plaintiff,* §
    §
v. §   CIVIL ACTION NO. 4:19-cv-1106
    §
BRYAN COLLIER, Executive Director §
of the Texas Department of Criminal §
Justice, LORIE DAVIS, Director of §
the Texas Department of Criminal §
Justice–Correctional Institutions §
Division, and BILLY LEWIS, §
Warden of the Huntsville Unit, §
  *Defendants.* §

---

## RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT BY DEFENDANTS BRYAN COLLIER, LORIE DAVIS, AND BILLY LEWIS

---

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

DARREN L. MCCARTY
Deputy Attorney General for
Civil Litigation

SHANNA E. MOLINARE,
Chief of the Law Enforcement
Defense Division

LEAH O'LEARY *
*Attorney-in-Charge*
State Bar No. 24079074
Leah.OLeary@oag.texas.gov

AMY PRASAD
Assistant Attorney General
State Bar No. 24037295

COUNSEL FOR DEFENDANTS

**OFFICE OF THE ATTORNEY GENERAL**
P.O. Box 12548 (MC 012)
Austin, Texas 78711-2548
(512) 463-2080/Fax: (512) 370-9918

i

## TABLE OF CONTENTS

Table of Authorities ............................................................................................................. iii

Nature of the Case and Stage of Proceeding ......................................................................... 1

Standard of Review and Issues to be Ruled Upon ................................................................. 1

    A.   Murphy's assertion that strict scrutiny applies to his constitutional claims is  not supported in fact or law. ...................................................................................................2

    B.   Exhaustion of Administrative Remedies is at Issue.................................................3

Summary of the Argument..................................................................................................... 3

Argument and authorities ..................................................................................................... 3

    I.   Murphy fails to demonstrate that the pre-execution procedure favors any religion over another. ...............................................................................................................4

        A.   The TDCJ chaplain's role in execution procedures is not faith-specific. ............................4

        B.   The pre-execution procedures are security driven. .........................................................7

    II.   Murphy fails to demonstrate that the execution-chamber procedure is hostile to religion. 11

    III.   Murphy fails to produce competent summary judgment evidence that the execution policy violates his right to free exercise under the First Amendment. .........................................15

    IV.   Murphy fails to produce competent summary judgment evidence to demonstrate he is entitled to prevail on his RLUIPA claim. .........................................................................16

        A.   Murphy fails to satisfy his evidentiary burden under RLUIPA and his claim, therefore, should be dismissed. ....................................................................................................... 16

        B.   TDCJ has compelling interests in safety and security relating to execution protocols. .... 18

        C.   TDCJ's execution protocols are the least restrictive means of furthering its compelling security interests. ................................................................................................................ 21

Conclusion ......................................................................................................................... 23

Notice of Electronic Filing.................................................................................................. 25

Certificate of Service .......................................................................................................... 25

# TABLE OF AUTHORITIES

Cases

*Adkins v. Kaspar*,
  393 F.3d 559 (5th Cir. 2004) ................................................................. 16, 17
*Am. Legion v. Am. Humanist Assoc.*,
  588 U.S. _, 139 S. Ct. 2067 (2019)............................................ 2, 5, 13, 15
*Baze v. Rees*,
  553 U.S. 35 (2008) ..................................................................................... 9
*Brown v. Collier*,
  929 F.3d 218 (5th Cir. 2019) ............................................................ *passim*
*Cutter v. Wilkinson*,
  544 U.S. 709 (2005)....................................................................... 18, 19, 21
*Davis v. Davis*,
  826 F.3d 258 (5th Cir. 2016) ..................................................................... 20
*Glossip v. Gross*,
  135 S. Ct. 2726 (2015) ................................................................................ 9
*Gonzalez v. Seal*,
  702 F.3d 785 (5th Cir. 2012) ....................................................................... 3
*Holt v. Hobbs*,
  135 S. Ct. 853 (2015) ................................................................................ 18
*Jones v. Bock*,
  549 U.S. 199 (2007)..................................................................................... 3
*Little v. Liquid Air Corp.*,
  37 F.3d 1069 (5th Cir. 1994) ..................................................................... 17
*Murphy v. Collier*,
  No. 18A985, 139 S. Ct. ...................................................................... *passim*
*Sherbert v. Verner*,
  374 U.S. 398 (1963).................................................................................... 16
*Sossamon v. Lone Star State of Tex.*,
  560 F.3d 316 (5th Cir. 2009) ..................................................................... 21
*Tex. Dep't of Crim. Just. v. Levin*,
  572 S.W.3d 671 (2019)............................................................................... 22
*Thorne v. Jones*,
  765 F.2d 1270 (5th Cir. 1985) ..................................................................... 8
*Turner v. Safley*,
  482 U.S. 78 (1987)............................................................... 2, 4, 13, 14
*Wallace v. Tex. Tech Univ.*,
  80 F.3d 1042 (5th Cir. 1996) ..................................................................... 17
*Whitley v. Albers*,
  475 U.S. 312 (1986).................................................................................... 18
*Woodford v. Ngo*,
  548 U.S. 81 (2006)....................................................................................... 3

iii

Statutes

42 U.S.C. § 1997(e) .................................................................................................. 3
42 U.S.C. § 2000cc-1(a)(2) ..................................................................................... 21
Tex. Code Crim. Pro. Art. 43.14(a) ........................................................................ 23
Tex. Code of Crim. Pro. Art. 43.14 ........................................................................ 22

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| PATRICK HENRY MURPHY, JR., | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:19-cv-1106 |
| | § | |
| BRYAN COLLIER, Executive Director | § | |
| of the Texas Department of Criminal | § | |
| Justice, LORIE DAVIS, Director of | § | |
| the Texas Department of Criminal | § | |
| Justice–Correctional Institutions | § | |
| Division, and BILLY LEWIS, | § | |
| Warden of the Huntsville Unit, | § | |
| *Defendants.* | § | |

---

### RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT BY DEFENDANTS BRYAN COLLIER, LORIE DAVIS, AND BILLY LEWIS

---

On July 19, 2019, the parties filed cross-motions for summary judgment. ECF Nos. 38 and 39. In response to Plaintiff Murphy's motion for summary judgment, Defendants respond as follows:

### NATURE OF THE CASE AND STAGE OF PROCEEDING

Both Plaintiff and Defendants have accurately described the nature of the case, the issues before the court, and the stage of proceedings in their respective motions for summary judgment. For succinctness, those are not repeated here.

### STANDARD OF REVIEW AND ISSUES TO BE RULED UPON

The parties have accurately identified the summary judgment standard of review in their respective motions. Defendants disagree, however, with Murphy's assertion as to the level of scrutiny to be applied and whether exhaustion of administrative remedies is at issue.

1

**A.      Murphy's assertion that strict scrutiny applies to his constitutional claims is not supported in fact or law.**

Plaintiff Murphy incorrectly asserts that strict scrutiny should be applied to his constitutional claims. In doing so, Murphy ignores the recent caselaw assessing Establishment Clause and Free Exercise claims under the *Turner* reasonableness standard. ECF No. 38 at 11–12.[1] Both the Supreme Court and the Fifth Circuit recently applied the "reasonableness test" rather than strict scrutiny in Establishment Clause and Free Exercise challenges. *Am. Legion v. Am. Humanist Assoc.*, 588 U.S. _, 139 S. Ct. 2067, 2087 (2019); *Brown v. Collier*, 929 F.3d 218, 243 (5th Cir. 2019).

The Fifth Circuit emphasized that "to ensure that courts afford appropriate deference to prison officials, we have determined that prison regulations alleged to infringe constitutional rights are judged under a 'reasonableness test.'" *Brown*, 929 F.3d at 243 (citing *Turner v. Safley*, 482 U.S. 78, 86–87 (1987)). Rejecting the strict-scrutiny test utilized in other circuits and in other contexts, the Fifth Circuit analyzed a prisoner's Establishment Clause claim that certain TDCJ religious policies favored some faiths over others under *Turner*'s deferential standard. *Id.* In attempting to accommodate the religious exercise of over 140,000 inmates and nearly 300 faith groups, "prison officials must operate within the zone of reasonableness." *Id.* at 244. The right asserted by Murphy here—to have his Buddhist spiritual advisor in the chamber instead of behind the plexi-glass—is a request that "must necessarily be limited in the prison context." *Id.* Likewise, the Supreme Court in *American Legion* reasoned that the *Lemon* test is inconsistent with the Establishment Clause's tolerance of government action that recognizes religious traditions and religious values. *Am. Legion*, 139 S. Ct. at 2080–81. The Supreme Court noted that Establishment Clause cases have moved away from the *Lemon* analysis and toward application of a "presumption of constitutionality." *Id.* at 2085. The reasoning in *Brown* and

---

[1] In this filing, citations to prior pleadings and previously filed exhibits are cited to the clerk's pagination as stamped at the top of each page.  Citations to deposition testimony are cited to the clerk's pagination followed by the line designations.

*American Legion* mandate that the deferential *Turner* standard be applied here.

**B.      Exhaustion of Administrative Remedies is at Issue.**

Murphy misconstrues the Court's comments at the initial scheduling conference regarding exhaustion. ECF No. 38 at 14 n.4. At the conference, defense counsel inquired as to whether an initial motion limited to the threshold issue of exhaustion could be filed. The Court responded that only one motion for summary judgment would be permitted. Murphy misinterprets the Court's comment to mean that the affirmative defense of failure-to-exhaust would not be considered. Rather, Defendants understood the Court's comment to mean that exhaustion should be addressed in the sole motion for summary judgment rather than in a bifurcated motion limited to exhaustion.

Indeed, a court lacks discretion to excuse or ignore a prison litigant's failure to exhaust administrative remedies prior to filing suit. *Woodford v. Ngo*, 548 U.S. 81 (2006); *Jones v. Bock*, 549 U.S. 199 (2007); *Gonzalez v. Seal*, 702 F.3d 785, 788 (5th Cir. 2012). Exhaustion of administrative remedies is mandatory under the Prison Litigation Reform Act (PLRA). 42 U.S.C. § 1997(e). Defendants moved for dismissal of Murphy's claims based on his failure to exhaust administrative remedies in their motion for summary judgment. ECF No. 39 at 9. Murphy cites no authority to support his assertion that the Court may disregard the issue of exhaustion.

### SUMMARY OF THE ARGUMENT

Murphy has produced no competent summary judgement evidence that TDCJ's pre-execution and execution procedures violate the First Amendment or RLUIPA.  Accordingly, Murphy's motion for summary judgment should be denied in its entirety.

### ARGUMENT AND AUTHORITIES

Plaintiff Murphy is not entitled to summary judgment in his favor, because he has not shown that factual disputes are resolved in favor of his asserted legal conclusions.

I.     **Murphy fails to demonstrate that the pre-execution procedure favors any religion over another.**

A.     **The TDCJ chaplain's role in execution procedures is not faith-specific.**

Murphy complains that limiting access to his outside spiritual advisor during the hours prior to execution while allowing TDCJ-employed chaplains in the holding area without limitation, favors Christianity and Islam over other faiths. ECF No. 38 at 16–17. Murphy's claim related to the pre-execution holding area must be analyzed under the deferential standard articulated in *Turner v. Safley*. "[A] prison regulation that impinges on an inmate's constitutional rights is valid if it is reasonably related to legitimate penological interests." *Turner*, 482 U.S at 89.

In asserting that condemned offenders have greater access to Christian and Muslim TDCJ chaplains than outside spiritual advisors, Murphy mischaracterizes the TDCJ chaplains' role. While the TDCJ chaplains are periodically present throughout the day of an execution, their role is not to provide religion-specific pastoral care. Rather, they are present to provide human comfort and to perform secular tasks such as facilitating phone calls for the offender, answering questions about the execution process for the offender and offender's family, and facilitating access for the offender's family to witness the execution. ECF No. 39-16 at 3–4; ECF No. 39-18 at 3–4 (delineating TDCJ chaplains' responsibilities with no mention of a specific religion). Retired TDCJ Chaplain David Collier, who aided in 158 executions in either the pre-execution holding area or in the chamber, testified that his role was "to be a calming presence and to provide aid and comfort to the offender. For the most part, the offender dictates how I may be of service to him and comfort him, within the bounds of security. Performing that role is not dependent on my personal faith preference." ECF No. 39-16 at 4. Murphy testified that he believes the chaplains' role in the holding area prior to his scheduled execution was to "just try to keep me calm and help me with phone calls and things of that nature." ECF No. 39-6 at 8:15–17. "[T]hey basically just kept me company while we waited." *Id.* at 9:1–2. Chaplains are charged with these responsibilities—as opposed to correctional staff—because

4

they have demonstrated an ability to communicate and comfort others, not because they provide religious guidance of a particular faith.[2] ECF No. 39-12 at 13:21–25; 14:1–8.

The chaplains selected to serve in this role are uniquely qualified in calming and compassionately interacting with offenders. ECF No. 39-18 at 5, ¶ 9 (utilizing chaplains as members of the Crisis Response Intervention Support Programs team); *Id.* at 5, ¶ 11 (designating chaplains as first responders when staff receive bad news such as a family death). Based on this perspective, chaplains are in a better position than security staff to keep offenders calm and to avoid escalating situations. ECF No. 39-12 at 14:1–8 (explaining that chaplains are there to serve and are a neutral presence that are distinct from TDCJ security). Although there may be a general religious connotation associated with chaplains, that plays little or no part in their presence and role during executions.

In *American Legion*, the Supreme Court recently concluded that where a government practice is merely a "benign acknowledgment of religion's role in society," it does not violate the Establishment Clause. 139 S. Ct. at 2087. Declining to apply the *Lemon* test[3], the Supreme Court analyzed the Establishment Clause challenge to a World War I monument of a large Latin cross located on public land and maintained by public funds. *Id.* at 2080–82. In a footnote, the Court advised that most Establishment Clause cases can be divided into six rough categories. *Id.* at n. 16. The Court went on to note that the case before them fell into the first category: it involved religious references or imagery in public monuments, symbols, mottos, displays, and ceremonies. *Id.* Considering this context, the Court reasoned that the cross monument had grown to primarily embody secular symbolism and purpose—to memorialize the lost dead soldiers of WWI. The community had come to value the monument for its historical and traditional purposes without necessarily embracing its religious roots.

---

[2] For example, TDCJ chaplains are responsible for delivering news of family member deaths to staff and offenders. These types of responsibilities make a chaplain uniquely equipped in the correctional setting to serve as a calming and comforting presence to the condemned. *See* ECF No. 39-18 at 5, ¶ 11.

[3] The Court determined that the *Lemon* test is not well suited for every Establishment Clause case or circumstance.

*Id.* at 2082–84. Applying the reasoning of *American Legion* to the case before this Court, TDCJ's use of chaplains in the pre-execution process is a "benign acknowledgment of religion's role" at the end of a person's life. Should a condemned person wish to discuss his faith in the hours before his execution, a chaplain will serve as an active listener and encourage the conversation—regardless of the particular faith to which the condemned adheres. ECF No. 39-12 at 15:19–25; 16:1–7; ECF No. 39-16 at 6, 8.

TDCJ-employed chaplains' personal faith is not discussed when they are interviewed for employment with TDCJ, is not a factor in the hiring decision, and does not drive their contributions to TDCJ. ECF No. 39-14 at 4:13–18 and 5:3–11. TDCJ policy explicitly prohibits any TDCJ-employed chaplain from pressuring or compelling an offender to make a change of faith preference. ECF No. 39-7 at 3. This policy applies in the execution context as well. After Murphy received news of his stay of execution at the end of the evening, Murphy thanked Chaplain Moss and the other chaplains for helping him through the night. ECF No. 39-12 at 23:11–17. In fact, offenders often express gratitude for the chaplains' assistance and presence during the process. *Id.* at 23:2–10.

Removing the TDCJ chaplain from the pre-execution process in the holding area would not increase Murphy's opportunities to practice his Buddhist faith; nor would it eliminate alleged religious favoritism given the primarily secular purpose fulfilled by the chaplain. TDCJ's responsibility of facilitating religious exercise to all faiths "within the zone of reasonableness" not only permits faith-neutral chaplains under the Establishment Clause, but requires them under the Free Exercise Clause. *Brown*, 929 F.3d at 244.

In support of his claim, Murphy points to the testimony of the chaplains when asked whether they would recite an inmate's prayers with him. ECF. No. 38 at 18. Specifically, the chaplains testified that if asked, they would not recite a Muslim prayer that required them to profess to the offender's individual faith. ECF No. 38-4 at 30:5–25, 31:1. (explaining that he would say a prayer with an offender of any faith, so long as the words of the prayer did not require the chaplain to make a profession); *but*

6

*see* ECF No. 38-8 at 24:1–8, 25:12–17 (explaining that he would probably be willing to recite Murphy's Buddhist chant—"Amituofo"—with him, in order to be supportive). Each of them explained that if an offender asked them to pray with them, the chaplains would bow their heads and silently support the offender as he prayed. ECF No. 38-4 at 38:1–7; ECF No. 38-8 at 21:1–17.

Murphy's focus on this detail is misguided. TDCJ is not required, under any constitutional provision, to provide a faith-specific chaplain for every offender, and their failure to do so does not evince preference of one religion over others. Adhering to the offender's personal faith is not the purpose or role of the chaplains in executions. As a useful comparison, it would be equally illogical to make this argument with respect to the warden, who, like the chaplains, performs secular tasks during executions. For example, employment of a warden who happens to have a Catholic personal faith preference,[4] does not evidence a preference for one religion over another.

Moreover, Murphy did not request that anyone pray with him during his pre-execution time. Murphy testified as to his satisfaction with the time he spent with his Buddhist advisor and the fact that he could continue to talk to his Buddhist advisor on the phone if he wants someone to recite Buddhist chants with him. ECF No. 39-6 at 16:18–21. The chaplain's personal beliefs in a particular religious tenet are not material to religious exercise.

### B.    The pre-execution procedures are security driven.

Murphy asserts that Defendants failed to offer any evidence as to why the security measures in place in the death house could not be preserved even with the presence of a non-employee spiritual advisor after 4:00 p.m. *See* ECF No 38 at 21. Contrary to Murphy's assertion, Defendants have offered significant and uncontroverted evidence on this issue. And from the perspective of Murphy's summary judgment burden, he has not demonstrated through competent evidence that his suggested alternative policy would satisfy TDCJ's substantial security interests with regard to executions.

---

[4] Defendants do not know the warden's personal faith preference.

Once the condemned arrives in Huntsville on the day of execution, he or she may meet with his or her spiritual advisor from 3:00 to 4:00 p.m. After 4:00 p.m., the condemned may continue to speak to his spiritual advisor on the phone if he wishes, but all non-law enforcement, non-TDCJ employees are asked to leave the pre-execution area so that final execution preparations may be made. ECF No. 39-6 at 16:17–21; ECF No. 39-5 at 5:1–15. As the U.S. Supreme Court has recognized, carrying out an execution without disruption and in the most humane manner depends on maintaining control over every aspect of the process. *Murphy*, No. 18A985, 139 S. Ct. at 1475–76. Director Davis explains that the execution process as a whole is intense. ECF No. 39-4 at 3. Emotions are heightened throughout the day for all involved, and they peak in the minutes leading up to and during the execution. *Id.* "Security concerns peak in the hours before an execution, and the introduction of contraband that could be used to harm staff or for the offender to harm himself is a great concern." ECF No. 39-19 at 2.

When an outside visitor enters the pre-execution holding area, TDCJ is not able to strip search that person as a preventative measure absent some level of suspicion. *Id.* at 2–3; *see Thorne v. Jones*, 765 F.2d 1270, 1276 (5th Cir. 1985) (requiring reasonable suspicion to strip search a prison visitor). Instead, a pat search, which is not as thorough as a strip search, is conducted on the outside visitor. This leaves an unabated security concern that the outside visitor will be able to smuggle contraband to the offender in the pre-execution holding area. That someone is visiting in a religious capacity does not lessen the concern that he or she may smuggle contraband. ECF No. 39-19 at 2 (citing incidents where religious volunteers have been caught smuggling contraband onto prison units). In response to this concern, security staff in the pre-execution holding area must be vigilant in supervising and observing the outside visitor during the 3:00 to 4:00 p.m. visitation hour. *Id.* at 3. If the outside visitor had more time in the pre-execution holding area, he or she would have more opportunity to make the exchange of contraband. *Id.* Limiting opportunities for contraband to be passed to the condemned by

limiting their contact with outsiders is the only means of minimizing that risk. *Id.*

Murphy briefly argues that because the drug team is able to protect their identities from the condemned offender while making preparations prior to executions, they should be able to do so with an outside spiritual advisor present as well. ECF 38 at 20. Because the condemned offender is inside a cell from which he has a limited view and does not come out, the concerns regarding the condemned offender discovering the drug team's identities are minimal, and are not comparable to the concerns relating to an outsider being in the holding area or walking in the various corridors around the death house. Murphy further argues that having his spiritual advisor in the holding area until the moment he is walked in to the execution chamber would "have no impact on prison resources." Murphy offers no evidence to support this conclusion. It is not a matter of resources to allow the spiritual advisor to linger in and about the death house in the two hours leading up to an execution. Rather, as discussed, it is the unmitigable security risk during this time and place where tension is at its highest, that justifies the reasonable restrictions on outsiders in the execution holding area.

It is difficult to imagine a governmental responsibility requiring more precision or control than carrying out an execution. Mistakes or disruptions cannot be tolerated, for there is no corrective action to remedy a miscarried execution. ECF No. 39-4 at 4.[5] As the execution hour approaches, the exclusion of individuals from the pre-execution holding area who have not earned the trust and confidence of TDCJ through experience in corrections, serves to minimize the risk of jeopardizing the execution process. *Id.* at 3–4; *see also Murphy*, No. 18A985, 139 S. Ct. at 1475–76 (Kavanaugh, J., concurring).

Murphy's claim—that TDCJ favors Christianity by allowing TDCJ-employed chaplains in the holding area while limiting an outside spiritual advisor's presence in the holding area—is not truly

---

[5] Executions, additionally, are frequently subject to litigation, so it is imperative that TDCJ carry out the responsibility with precision. *See, e.g.*, *Glossip v. Gross*, 135 S. Ct. 2726 (2015); *Baze v. Rees*, 553 U.S. 35, 40 (2008).

grounded in the Establishment Clause. If TDCJ removed TDCJ chaplains from the holding area, Murphy's opportunities for religious exercise would not increase. Rather, all condemned offenders would lose the human comfort of an advocate during that time. *See Brown*, 929 F.3d at 246.[6] In the pre-execution holding area, the condemned may choose to discuss his own faith, such as Buddhism, and the chaplain will encourage that discussion by asking questions, respectfully listening, and may pray with the condemned in the offender's faith if he so requests. ECF No. 39-12 at 22:10–25; 23:1–10; 25:1–14; ECF No. 39-14 at 7:15–21; ECF No. 39-18 at 3–4, § III(A–C). Because TDCJ chaplains are responsible for facilitating religious exercise for all faiths, the TDCJ chaplain will often have some general knowledge about the offender's chosen faith should he wish to discuss it. ECF No. 39-11 at 4, § III(B); ECF No. 39-16 at 7.

Finally, Murphy offers no evidence that the challenged policy is motivated by discriminatory intent or that it favors Christianity. The personal religious preferences of any of the TDCJ employees who serve as the condemned's advocate and calming presence during the pre-execution process is not relevant to the roles they perform. Murphy has not demonstrated that TDCJ's neutral policy is inconsistent with the Establishment Clause. Because the TDCJ chaplains' role, both in practice and by policy, is not faith-specific to any religion, the procedure of utilizing chaplains as human comfort during the pre-execution time does not favor one religion over another.

---

[6] In *Brown*, the Fifth Circuit rejected the district court's conclusion that TDCJ policy violated the Establishment Clause by utilizing resources for religious groups that had volunteers available, such as Protestant and Catholic volunteers, while withholding resources from groups that lacked volunteers, such as the Muslim group. *Brown*, 929 F.3d at 246. In so concluding, the Fifth Circuit commented that the inmate's claim was not truly grounded in the Establishment Clause. The Court commented, "[i]f . . . fewer resources were expended to support volunteer efforts, inmates, including Muslim inmates, would have fewer opportunities for worship and religious study."). *Id.*

II.     **Murphy fails to demonstrate that the execution-chamber procedure is hostile to religion.**

Similarly, Murphy fails to present evidence to resolve factual disputes in his favor as to his legal argument that the execution chamber policy, which permits only the CID Director and Warden inside the execution chamber during an execution, is not neutral and generally applicable. ECF No. 38 at 20. In attempting to minimize TDCJ's security interests, Murphy downplays the selection process, training, and preparation that TDCJ employees undergo before being permitted inside the execution chamber. Every TDCJ employee, including chaplains, undergoes six-weeks of intensive security training when hired. ECF No. 38-4 at 38:23–25 and 39:1–2. TDCJ employees work in prison *daily*; interact with inmates *daily*; react to agitated inmates *daily*. For chaplains, delivering bad news to inmates and staff and attempting to comfort and de-escalate is a frequent part of their daily responsibilities. ECF No. 39-18 at 5. That experience in the correctional setting is imperative for an official who will aid in executions.

Murphy argues that a mere background check of an outside spiritual advisor would be a sufficient manner of furthering TDCJ's security interests.   ECF No. 38 at 26. In support of this conclusion, Murphy points to the employment history of now-retired chaplain, David Collier. Collier, who was selected by a previous CID Director and not by Director Davis, began aiding in executions after three and a half months of employment. During his many years of service in TDCJ, Chaplain Collier aided in 158 executions. Though Director Davis, in her own judgment, would not generally select a chaplain with a tenure as short as David Collier's, length of employment is only one of the many variables in selecting an employee who is trustworthy and capable of the immense task of aiding in executions. ECF No. 39-13 at 4. Chaplain Collier completed the six-week pre-service security training and worked as the chaplain at the Polunsky Unit—where death row offenders live—for several months before he was approached about serving a role in executions. ECF No. 38-10 at 4 (Interrogatory Response No. 4). Murphy testified about Chaplain Collier's helpfulness and conduct

when he was the chaplain at the Polunsky Unit. ECF No. 38-13 at 21:17–25 and 22:1–22. Chaplain Collier was quite beloved and trusted by the offenders during his time there, and the aid and advocacy he provided to offenders was not related to Collier's personal faith preference. *Id.*

Murphy also draws the Court's attention to the fact that Director Lorie Davis trusts her Director of Chaplaincy, Chaplain Jones, to select the other two chaplains who serve in executions procedures[7] rather than making the selection herself. ECF No. 38 at 22. This detail does not detract from the necessity and effectiveness of TDCJ's decision process. The Director of Chaplaincy would have much more familiarity and experience with the potential chaplains than Ms. Davis, which better informs the decision.

Murphy also argues that the training TDCJ-employed chaplains receive prior to an execution is "minimal." ECF No. 38 at 23. Murphy erroneously asserts that the sole training process entails (1) a background check, and (2) being walked through the execution process prior to the execution. ECF No. 38 at 23. Murphy's oversimplification of the process is patently incorrect. First, Murphy ignores the training and preparation that a chaplain receives merely by being employed by TDCJ. Six weeks of full-time security boot camp followed by on-the-job training, and then daily experience working in the correctional setting, are invaluable in preparing an employee for executions. ECF No. 38-4 at 38:23–25 and 39:1–2. First, interacting with offenders on a daily basis prepares an employee for handling high-stress and sometimes violent situations, for de-escalating tense situations, and for knowing and actually utilizing security protocols such as lock-downs and use-of-force protocols. *See* ECF No. 38-3 at 5. An employed chaplain is not even considered until he has been through this preparation. *Id.* (explaining that an employee must be observed and have experience in the correctional setting before being considered). Then, once approached about aiding in executions, Chaplain Jones

---

[7] New chaplains are not selected for each execution. Rather, the same three chaplains aid in every execution and rotate the roles among the three of them.

or Lorie Davis will have conversations with the prospective chaplain to gauge his willingness and feelings about the responsibility. ECF No. 38-3 at 5; ECF. No. 38-7 at 28:1–25. Next, Chaplain Jones will explain the entire execution process from the perspective of the chaplain and his role. A chaplain may be asked to serve a role in the hospitality house interacting with the condemned offender's family during the day of execution; observe executions; and shadow another chaplain throughout the days of executions. ECF. No. 38-8 at 12:12–18. Chaplains are walked through the execution process verbally. ECF No. 38-7 at 28:1–25. Every chaplain must observe executions and shadow other chaplains. ECF. No. 38-8 at 12:11–18.

Under the *Turner* factors, the policy passes constitutional scrutiny. As discussed above, both the Supreme Court and the Fifth Circuit recently applied the "reasonableness test" rather than the *Lemon* Test in Establishment Clause challenges. *Am. Legion v. Am. Humanist Assoc.*, 588 U.S. _, 139 S. Ct. 2067, 2087 (2019); *Brown*, 929 F.3d at 243–44.[8]

First, the rational connection between the challenged policy and TDCJ's legitimate government interest is that allowing an outsider in the chamber would substantially compromise security. *Turner*, 482 U.S. at 89. Maintaining control over security in the chamber and minimizing the possibility of someone seeing the drug team cannot be accomplished with an outsider present inside the chamber. Murphy argues, but does not substantiate with evidence, that having an outsider present in the chamber will not compromise security. Without evidence, Murphy's assertion defies rationality.

Second, Murphy has alternative means of practicing his religion in the time before and during his execution. When in the chamber, Murphy will be able to recite his chant and may maintain eye contact with his spiritual advisor who may chant along with him, if he wishes, to help him to "focus

---

[8] Although Judge King wrote a concurring opinion rather than joining in Part VII of the published opinion, she specified that she did not join in Part VII only because she disagreed with the conclusion that TDCJ's "housing policy" violates the Establishment Clause. *Brown*, 929 F.3d at 254 (King, J., concurring in part). Part VII is cited for the part of the analysis with which Judge King took no issue.

upon the Buddha." ECF No. 39-6 at 18:18–19. As Murphy testified, "knowing [my advisor] is there" is what is important to help him relax and focus. *Id.* at 20:13–16. Murphy's stated religious needs will be met under the current execution chamber procedure.

Third, allowing an outsider to be present in the execution chamber would put TDCJ staff and the drug team at an unacceptable risk. *Turner*, 482 U.S. at 90. The CID Director and Warden would have to focus their attention on the outsider in the chamber rather than focusing on the practiced and controlled protocols that ensure safe and humane executions. The risk of disturbing the execution— from the condemned's perspective, the involved prison officials' perspective, and the victim-witnesses' perspective—is too great. The risk of disclosing the identities of the members of the drug team to an outsider in the execution chamber is an additional unacceptable risk.

Fourth, there are no ready alternatives that would allay the security risks of allowing an outsider in the execution chamber during an execution. *Turner*, 482 U.S. at 90. The drug team finalizes the procedures in the execution chamber before witnesses are allowed in the viewing rooms, ensuring the confidentiality of their identities and minimizing the risk of someone attempting to intervene with the drug team's process. ECF No. 39-4 at 3. The CID Director must open the door that separates the execution chamber from the drug room at the moment immediately before the condemned says his final words and the lethal drugs are administered. *Id*; ECF No. 39-9 at 5 (depicting the door separating the drug room and the execution chamber). At the moment the door to the drug room is opened, only the condemned and the warden are in the execution chamber, rendering the chamber and drug room as secure as possible. ECF No. 39-4 at 3. If an outsider were present in the execution chamber, he would observe the drug team, and the open door to the drug room would expose the drug team to the outsider, creating a risk that could not be alleviated. The risk of exposing the drug team to an unknown outsider, with no expectation of how the outsider will act or react, is a risk that would substantially jeopardize the entire process and the safety of everyone involved. *Id.* There are no ready

alternatives to alleviate this substantial risk. *Id.* ("Under no circumstance would it be safe or feasible to for the condemned's clergyman or spiritual advisor [to] be present in the execution chamber."). Under the *Turner* factors, there is no genuine dispute of material fact that TDCJ's execution chamber protocols are reasonably related to legitimate penological interests in security. TDCJ's decision to remove the TDCJ chaplain from the list of persons authorized to be inside the execution chamber was responsive to comments from the U.S. Supreme Court. *Murphy v. Collier*, No. 18A985, 139 S. Ct. 1111 (March 28, 2019). There is no evidence that TDCJ was motivated by discriminatory intent or an intent to exclude one or all religions. To state a hostility to religion claim under the Establishment Clause, Murphy must demonstrate that TDCJ acted with discriminatory intent or was motivated to "scrub [] away any reference to the divine" rather than some secular motivation. *See Am. Legion*, 139 S. Ct 2067 204-85. There is no summary judgment evidence suggesting such nefarious intent. The competent summary judgment evidence demonstrates that TDCJ has not violated the Establishment Clause.

### III. Murphy fails to produce competent summary judgment evidence that the execution policy violates his right to free exercise under the First Amendment.

TDCJ's practice of hiring non-faith-specific chaplains to administer and facilitate opportunities for prisoners of every faith to worship satisfies the First and Fourteenth Amendment without offending the Establishment Clause. *Brown*, 292 F.3d at 245. TDCJ's legitimate penological interests in security during executions are rationally related to TDCJ's restriction on the officials who may be present inside the execution chamber. ECF No. 39-4 at 2–4. Likewise, TDCJ's policy—which allows the condemned to meet with his outside spiritual advisor all day for the two and a half days preceding an execution, for one hour in the pre-execution holding area, and on the phone for several hours leading up to an execution—is rationally related to TDCJ's legitimate interests in protecting the confidentiality of the drug team, ensuring sufficient time for preparations, and ensuring security and control in the hours of escalating tension before an execution. *Id.*

Murphy fails to produce competent summary judgment evidence to support his conclusion that the accommodation he demands would not compromise security. The current pre-execution procedure is reasonably related to TDCJ's legitimate interests in security. Accordingly, Murphy's motion for summary judgment on this issue should be denied.

**IV.     Murphy fails to produce competent summary judgment evidence to demonstrate he is entitled to prevail on his RLUIPA claim.**

     **A.   Murphy fails to satisfy his evidentiary burden under RLUIPA and his claim, therefore, should be dismissed.**

To maintain a claim under RLUIPA, Murphy must demonstrate, through competent summary judgment evidence, that the challenged policy substantially burdens his religious exercise. *Brown*, 929 F.3d at 229; *Adkins v. Kaspar*, 393 F.3d 559, 569–70 (5th Cir. 2004) (adopting the Supreme Court's interpretation of "substantial burden" as one that forces the person to choose between following the precepts of his religion or receiving some otherwise available benefit, and truly pressures the adherent to substantially modify his religious behavior) (citing *Sherbert v. Verner*, 374 U.S. 398 (1963)).

Because Murphy fails to offer any evidence at all to meet this threshold issue, no further analysis is necessary to dismiss his RLUIPA claim. The evidence in the record demonstrates that Murphy may recite his chant during the entirety of the execution. Murphy does not want his spiritual advisor to touch him and is not concerned with the distance at which he will stand. ECF No. 39-6 at 19:17–19; 20:19–23. The spiritual advisor may stand at the front of the viewing room, separating him from Murphy by three feet and by plexi-glass. ECF No. 39-9 at 3–4.  Because each will know the chant to be recited ahead of time, if Murphy wishes to watch his spiritual advisor through the glass, this will enable them to chant in unison and maintain togetherness.[9] Murphy testified that he doesn't necessarily want to see his spiritual advisor during the execution; just "knowing he is there" to

---

[9] Murphy testified that he wants to recite the one-word chant, "Amituofo" or "O mi to Fo," with his spiritual advisor during his execution. ECF No. 39-6 at 18:3–11.

represent Buddhism is what's important. ECF No. 39-6 at 20:10–18. Murphy's religious behavior will be the same with his spiritual advisor behind the plexi-glass as it would be if his advisor were in the chamber. Murphy fails to demonstrate that the TDCJ policy would truly force him to "substantially modify his religious behavior." *Adkins*, 393 F.3d at 570.

There is likewise no evidence that Murphy has any complaint with the pre-execution procedures. Murphy may meet with his spiritual advisor all day for several days at the Polunsky Unit preceding his execution date. ECF No. 39-6 at 22:4–10; ECF No. 39-5 at 4:11–17. On the day of his execution, Murphy may meet with his spiritual advisor for several hours in the morning. ECF No. 39-6 at 22:16–24; ECF No. 39-5 at 4:11–17 (referring to the first half of the day on the day of execution); ECF No. 39-13 at 5. Once Murphy is transported from the Polunsky Unit to the Huntsville Unit on the afternoon of his execution, he may spend one hour with his spiritual advisor in person, and the remainder of his time speaking to him on the phone if he wishes. ECF No. 39-6 at 16:13–21. When asked, Murphy's sole request for relief in this lawsuit was to have his spiritual advisor in the execution chamber to help him focus. ECF No. 39-6 at 18:23–25; 19:1–8. Murphy made no complaint in his deposition relating to pre-execution procedures and expressed no concern regarding access to his spiritual advisor prior to execution.[10] There is no competent summary judgment evidence that Murphy's religious exercise is substantially burdened by the current procedures regarding access to a spiritual advisor in the hours preceding an execution.

Murphy offers no evidence[11] that the challenged policy forces him to choose between exercising his religion or some generally available privilege, or that it would cause him to alter his

---

[10] Plaintiff Murphy's First Amended Complaint is not evidence and cannot serve as the basis of a factual dispute. Factual controversies exist only "when both parties have submitted evidence of contradictory facts." *Wallace v. Tex. Tech Univ.,* 80 F.3d 1042, 1048 (5th Cir. 1996). The nonmovant's burden may not be satisfied by conclusory allegations or unsubstantiated assertions. *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994).

[11] The sole Exhibit referenced in Murphy's RLUIPA argument is his deposition "generally." ECF No. 38 at 27. He points to no pages or lines of his deposition, and indeed there are none, that evidence a burden on his religious exercise.

religious behavior at all. *Adkins*, 393 F.3d at 569–70. Accordingly, he is not entitled to summary judgment in his favor as to his RLUIPA claim.

### B. TDCJ has compelling interests in safety and security relating to execution protocols.

Even assuming *arguendo* that Murphy could demonstrate a substantial burden on his religious exercise, he fails to raise a genuine issue of material fact that contravenes TDCJ's compelling penological interests in security as implemented through its execution procedure. As the Supreme Court affirms, "States have a compelling interest in controlling access to the execution room, which means that an inmate likely cannot prevail on a RLUIPA or free exercise claim." *Murphy*, No. 18A985, 139 S. Ct. at 1476 (Kavanaugh, J., concurring). There exists no summary judgment evidence here to unsettle the Supreme Court's forecasted conclusion.

The U.S. Supreme Court cautions that context matters in the application of the compelling government interest standard required under RLUIPA. *Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005). Courts are instructed to apply this standard with "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." *Id.* (citing 146 Cong. Rec. 16699 (2000). The Supreme Court did not abandon deference in *Holt v. Hobbs*; rather, it emphasized that state officials must provide evidence to satisfy their burden rather than to expect "unquestioning deference." 135 S. Ct. 853, 858 (2015). RLUIPA does not prevent a prison from taking prophylactic measures or require them to wait for a security breach before adopting prison policies. *See, e.g.*, *Whitley v. Albers*, 475 U.S. 312, 322 (1986) (commenting that deference to prison officials extends to prophylactic or preventative measures intended to reduce breaches in prison security).

RLUIPA envisions that inmates' requests for religious accommodations will be scrutinized in the context of the prison environment and the paramount security concerns involved with incarcerated felons. *See Cutter*, 544 U.S. at 717, 722. Here, Murphy's requests must be considered in

the context of the tense and careful process of carrying out an execution. RLUIPA does not elevate accommodation of religious observances over a prison's need to maintain order and safety; any accommodation must be measured so that it does not override other significant interests. *Id.* at 722. TDCJ's execution procedure is the least restrictive means of furthering its compelling governmental interest in security.

Mere steps outside the Huntsville Unit on the day of an execution, the scene is often frenzied. ECF No. 39-10 at 2–3. Members of the media begin arriving earlier in the day, and often, demonstrations mount on the streets surrounding the unit. *Id.* As the family of the victim and family of the condemned arrive, TDCJ takes careful and controlled steps to ensure they never come in contact or see each other. *Id.* TDCJ staff coordinate with local law enforcement during this time to ensure that the chaotic scene occurring outside the unit does not impact the controlled and secure process within. *Id.* at 3.

Once the condemned arrives in Huntsville on the day of execution, he or she may meet with his or her spiritual advisor from 3:00 to 4:00 p.m. After 4:00 p.m., all non-law enforcement, non-TDCJ employees are asked to leave the pre-execution areas so that final execution preparations may be made. ECF No. 39-5 at 5:1–15. The condemned, however, may continue to speak to his spiritual advisor on the phone if he wishes. ECF No. 39-6 at 16:17–21.

Time is of the essence in the period leading up to the execution. In those two remaining hours, there are many secular tasks that take place. ECF No. 39-5 at 5:1–15. TDCJ employees work to facilitate phone calls and to keep the offender calm. The condemned is offered his last meal and an opportunity to shower and dress prior to the execution. *Id.* at 5:6–7. Additionally, the execution chamber and drugs are prepared by the confidential drug team. *Id.* at 5:11–15.

As recognized by the United States Supreme Court, and as explained in detail above in Section I. of this response, carrying out an execution without disruption and in the most humane manner

depends on maintaining control over every aspect of the process. *Murphy*, No. 18A985, 139 S. Ct. at 1475–76; *see section I, supra*; at 5–7. There is no circumstance in which it would be safe or controlled for a non-TDCJ employee to be present in the execution chamber during an execution. ECF No. 39-4 at 3. The risks of permitting an unknown person in the execution chamber are significant. *Id.* at 3–4. In addition to the previously referenced risks associated with a non-TDCJ employee having unlimited time in the pre-execution holding area, the significant risks of allowing an outsider in the execution chamber include risks to the condemned offender, risks to the TDCJ employees involved, a risk of disclosing the confidential identities of the drug team, risks to the unprepared and untrained outsider, and a risk of disrupting the closure for the victim's family witnessing the execution. ECF No. 39-13 at 4–5; ECF No. 39-4 at 3. The unknown outsider could pull the intravenous lines out of the condemned, could taunt the victim's family and friends, could create a disruption, or assault the warden. ECF No. 39-4 at 3–4. The outsider could also attempt to gain access to the execution team and jeopardize exposing their identities. *Id.* Any of these actions would require the opening of the execution chamber door, which is an unacceptable security risk. *Id.*

It cannot be known whether an outsider has nefarious intent in requesting to attend an execution. ECF No. 39-12 at 26:4–8. Even if the outsider does not have malicious intentions, it is difficult to know how someone will react when placed in such an intense environment. ECF No. 39-4 at 3. The outsider could faint—as some witnesses in the viewing rooms have done—causing the TDCJ staff to focus their attention on the outsider instead of focusing on their role in carrying out the execution. *Id.* "There is no room for error, and uncertainty about how a person will perform on the day of execution is unacceptable." *Id.*

TDCJ's security concerns and need for strict control over the process are even more critical when applied specifically to Murphy. *Davis v. Davis*, 826 F.3d 258, 265 (5th Cir. 2016) (explaining that the governmental interest must be evaluated based on the individual characteristics of the plaintiff,

and the security risks implicated by accommodating him in particular). Due to his escape from the Connally Unit in 2000, Murphy is assigned every security precaution designator that exists in TDCJ. ECF No. 39-5 at 7:11–19. Security precaution designators are signals to all staff that an offender is dangerous and presents an increased risk. Murphy has taken hostages, assaulted staff, used security restraints inappropriately, and escaped from TDCJ custody. *Id.* The compelling security interests explained above are particularly furthered and tailored when the policies are applied to Murphy.

### C.   TDCJ's execution protocols are the least restrictive means of furthering its compelling security interests.

The final step of the RLUIPA analysis is whether the challenged regulation is the least restrictive means of furthering the compelling government interest. 42 U.S.C. § 2000cc-1(a)(2). "[L]east restrictive means' has its plain meaning." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 332 (5th Cir. 2009).   But, "[s]hould inmate requests for religious accommodations . . . jeopardize the effective functioning of an institution, the facility would be free to resist the imposition." *Cutter*, 544 U.S. at 726.

Murphy suggests that TDCJ could conduct a background check on a non-employee and then allow that outsider into the chamber, thereby maintaining security over the execution process. As explained above, however, TDCJ's fluid consideration process could not be duplicated for a person who is not a TDCJ employee. ECF No. 39-13 at 5. A criminal background check would do nothing to inform TDCJ of the person's character or good judgment, professionalism, discretion, likelihood of verbally or physically disrupting an execution, their ability to handle a tense situation, or to alleviate the unknown factors. Nor would a criminal background check inform TDCJ of non-criminal disciplinary problems the outsider may have had.

A background check, additionally, would not help to prepare someone for the execution process. The extensive preparation and training for TDCJ employees involved in executions are

necessary and effective. ECF No. 39-13 at 4–5. This includes the experience each employee gained by merely coming to work on a prison unit each day. Through training and experience, TDCJ employees learn how to recognize cues that an offender is becoming agitated and how to avoid escalation. Before participating on the team that aids in execution procedures, each chaplain must first observe multiple executions and will shadow another chaplain in the pre-execution holding area. ECF No. 39-12 at 13:1–18; ECF No. 39-14 at 11:4–25. This training and preparation could not be replicated for a non-employee. A mere criminal background check would be wholly insufficient to reduce the risks of allowing an outsider in the chamber. ECF No. 39-13 at 4.

In the pre-execution holding area, TDCJ employs the least restrictive policy while ensuring un-rushed execution preparations and protecting the confidentiality of the drug team. TDCJ does not restrict all access to outside spiritual advisors on the day of execution. The least restrictive means of furthering its compelling government interests is to permit the condemned to spend several hours with his outside spiritual advisor in the morning on the date of execution, an additional hour from 3:00 to 4:00 p.m., and several hours on the phone if desired. ECF No. 39-2 at 10, § V.C.; ECF. 39-6 at 16:17–21. The extended presence of an outsider in the pre-execution holding area would disrupt the execution preparations by the drug team who must remain confidential. ECF No. 39-5 at 5:11–15; Tex. Code of Crim. Pro. Art. 43.14; *Tex. Dep't of Crim. Just. v. Levin*, 572 S.W.3d 671, 680–85 (2019) (concluding that disclosing the identity of people or companies involved in the execution-drug process would cause them a substantial risk of harm). When an outsider arrives and departs from the holding area, he must be escorted through corridors in which he may cross paths with members of the confidential drug team. Accordingly, if an outsider were permitted to remain in the holding area beyond 4:00 p.m., Director Davis would delay further preparations until the outsider is clear of the area, thereby causing them to rush through the remaining preparations. ECF No. 39-13 at 10. Execution preparations and protocols should not be rushed because, as previously mentioned, there

can be no corrections made after the fact. *Id.*

Moreover, when an outsider is present in the pre-execution holding area, TDCJ security staff must focus their attention on the outsider. Security concerns peak in the hours before an execution, and the introduction of contraband that could be used to harm staff or for the offender to harm himself is a great concern. ECF No. 39-19 at 2. As stated, TDCJ cannot strip search a visitor as a preventative measure, so a less-thorough non-strip search is performed. When the spiritual advisor meets with the condemned from 3:00 to 4:00 p.m., the available security staff must focus their attention on the outsider and condemned. Beyond 4:00 p.m., security staff must direct their attention on the other activities occurring within the holding area: food is brought in, the offender showers and changes clothing, he continues to make phone calls, and the chamber and drug room are prepared. Maintaining strict control over movement and activity in the holding area and chamber are paramount concerns and become increasingly tense as the time nears 6:00 p.m.[12]

There is no alternative means of maintaining the confidentiality of the drug team or the security and control of the pre-execution activity than to maintain a cut-off time at which no outsiders may be present in the pre-execution holding area.

## CONCLUSION

Murphy has produced no competent summary judgement evidence that TDCJ's pre-execution and execution policies violate the First Amendment or RLUIPA. Accordingly, Murphy's motion for summary judgment should be denied in its entirety and Defendants' motion for summary judgment should be granted.

---

[12] Statutorily, executions may begin at 6:00 p.m. Tex. Code Crim. Pro. Art. 43.14(a).

Respectfully submitted.

**KEN PAXTON**
Attorney General of Texas

**JEFFREY C. MATEER**
First Assistant Attorney General

**DARREN L. MCCARTY**
Deputy Attorney General for Civil Litigation

**SHANNA E. MOLINARE**
Chief, Law Enforcement Defense Division

*/s/ Leah O'Leary*
**LEAH O'LEARY**
Deputy Chief,
Law Enforcement Defense Division
Attorney in Charge
Texas Bar No. 24079074
Southern District No. 1563191
Leah.Oleary@oag.texas.gov

**AMY L. PRASAD**
Assistant Attorney General
Co-Counsel
Texas Bar No. 24037295
Southern District No. 563045
Amy.Prasad@oag.texas.gov

Law Enforcement Defense Division
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548
Austin, Texas 78711-2548
(512) 463-2080 / Fax (512) 370-9918

**ATTORNEYS FOR DEFENDANTS
COLLIER, DAVIS, AND LEWIS**

## NOTICE OF ELECTRONIC FILING

I, **LEAH O'LEARY**, Assistant Attorney General of Texas, certify that I have electronically submitted for filing a true and correct copy of the foregoing in accordance with the Electronic Case Files system of the Southern District of Texas, on August 9, 2019.

*/s/ Leah O'Leary*
**LEAH O'LEARY**
Assistant Attorney General

## CERTIFICATE OF SERVICE

I, **LEAH O'LEARY**, Assistant Attorney General of Texas, certify that a true and correct copy of the foregoing has been served on all attorneys of record by electronic notification through the ECF system for the Southern District of Texas on August 9, 2019, to:

David R. Dow
ddow@central.uh.edu

Jeffrey R. Newberry
jrnewber@central.uh.edu

Attorneys for Plaintiff Murphy

*/s/ Leah O'Leary*
**LEAH O'LEARY**
Assistant Attorney General