IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| PATRICK HENRY MURPHY, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. H-19-1106 |
| TDCJ EXECUTIVE DIRECTOR, | § | |
| BRYAN COLLIER, et al., | § | |
| | § | |
| *Defendants*. | § | |

### ORDER STAYING EXECUTION

Earlier this year, Texas death row inmate Patrick Henry Murphy filed this lawsuit under 42 U.S.C. § 1983 challenging Texas' execution protocol. After the United States Supreme Court stayed an earlier execution date, Texas set a new execution date of **November 13, 2019**. This Court must now for the second time decide whether Murphy's lawsuit should proceed or whether the State of Texas should carry out its otherwise-lawful judgment against him.

For the reasons discussed below, the Court stays Murphy's execution.

### Background

In 2003, Murphy was tried for capital murder and sentenced to death in the 283rd District Court of Dallas County, Texas. Murphy has challenged his conviction and sentence in state and federal court. The instant lawsuit involves Murphy's religious beliefs. Murphy committed himself to the teachings of Buddha almost a decade ago. Rev. Hui-Yong Shih, also known as Gerald Sharrock, has been the Murphy's TDCJ-approved spiritual advisor for six years. Murphy sues because Texas limits access to his spiritual advisor before his execution.

I.   **Initial Stay of Execution**

In December 2018, the State of Texas set an execution date of Thursday, March 28, 2019. On February 21, 2019, Murphy told his attorneys that he wished to have his spiritual advisor present in the execution chamber. At that time, Texas's execution protocol only permitted TDCJ-employed chaplains to accompany an inmate in the execution chamber. TDCJ does not employ a Buddhist chaplain. The execution protocol did not provide any accommodation for inmates, such as Murphy, who wished for the presence of a spiritual advisor who was not an employee of TDCJ.

On Tuesday, March 26, 2019, Murphy filed a complaint pursuant to 42 U.S.C. § 1983 raising three arguments: TDCJ's execution protocol violates (1) the First Amendment's Establishment Clause because it is not neutral between religions; (2) Murphy's First Amendment right to Free Exercise of religion by interfering with his ability to practice his religion; and (3) the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc, et seq. ("RLUIPA"). (Dkt. 1). Murphy also moved for a stay of his execution. (Dkt. 3).

Without ruling on the substance of Murphy's claims, the district court found that Murphy "should have known about his potential claims and had ample opportunity to bring suit, but still waited until the eve of his execution." (Dkt. 9). The Fifth Circuit affirmed. *See Murphy v. Collier*, 919 F.3d 913, 915 (5th Cir. 2019).

On March 28, 2019, the Supreme Court stayed Murphy's execution in a brief order:

> The application for a stay of execution of sentence of death presented to Justice ALITO and by him referred to the Court is granted. The State may not carry out Murphy's execution pending the timely filing and disposition of a petition for a writ of certiorari unless the State permits Murphy's Buddhist spiritual advisor or another Buddhist reverend of the State's choosing to accompany Murphy in the execution chamber during the execution.

*Murphy v. Collier*, 139 S. Ct. 1475 (Mem) (2019).

Justice Kavanaugh wrote a concurring opinion that foreshadowed Texas' subsequent policy changes. Recognizing the security concerns attendant to an execution, Justice Kavanaugh proposed "at least two possible equal-treatment remedies available to the State going forward: (1) allow all inmates to have a religious adviser of their religion in the execution room; or (2) allow inmates to have a religious adviser, including any state-employed chaplain, only in the viewing room, not the execution room." *Id*. at 1475-76 (Kavanaugh, J., concurring).

## II.     TDCJ's Revised Policy

On April 2, 2019, TDCJ revised its execution procedure under defendant Lorie Davis' signature. The new policy disallows the presence of any chaplain or spiritual advisor in the execution chamber: "Only TDCJ security personnel shall be permitted in the execution chamber. . . . TDCJ Chaplains and Ministers/Spiritual Advisors designated by the offender may observe the execution only from the witness room." (Dkt. 38, Exh. 1 at 8).

## III.    Murphy's Amended Complaint

On April 18, 2019, Murphy filed an amended complaint that incorporated arguments reflecting the changes in TDCJ policy. (Dkt. 22). Murphy's amended complaint continues to allege violations of the Establishment Clause, Free-Exercise Clause, and RUILPA. According to Murphy, "Defendants apparently adopted the amended policy in a naked attempt to render Plaintiff's claim pursuant to the Establishment Clause moot. Insofar as that was their objective, Defendants were (and are) mistaken; Murphy's execution pursuant to the amended protocol would still violate his rights pursuant to the Establishment Clause." (Dkt. 22 at 4). Murphy argues that the new policy "evinces a hostility to religion generally." (Dkt. 22 at 14). Murphy also continues in his argument that the Free-Exercise Clause and RUILPA protect his right to having his spiritual advisor present in the execution chamber, TDCJ policy notwithstanding.

Murphy's amended complaint, however, has moved its primary focus to the interaction an inmate has with his spiritual advisor before entering the execution chamber. In a timeline confirmed through discovery, all inmates have access to their spiritual advisor during business hours in the two-and-a-half days leading up to the execution. An inmate, however, may only meet with non-TDCJ spiritual advisors in the holding area (generally referred to as the "death house") between 3:00 and 4:00 p.m. on the day of execution. For the next two hours, preparations are made for the execution. The inmate may make phone calls, including to his spiritual advisor, until 5:00 p.m. Only TDCJ personnel may interact with the inmate thereafter.

The policy, however, does not place any limitation on visits by TDCJ-employed clergy, "who appear to have access to an inmate until the minute he enters the execution chamber." (Dkt. 22 at 13). Murphy argues that the amended policy still favors some religions over others because TDCJ-employed chaplains, who are all Christian or Muslim, have greater access to the condemned than non-TDCJ employee spiritual advisors.

## IV. Litigation to Date

To reiterate, this lawsuit involves two separate concerns: the absence of Murphy's spiritual advisor in the death chamber and the greater access to a spiritual advisor in the death house by inmates sharing the same faith as TDCJ-employed clergy. The parties to date have engaged in significant discovery. Both parties have served written interrogatories and deposed prison officials, including prison chaplains. A deposition of Murphy has clarified important issues about his desire regarding the interaction with his spiritual advisor in the time leading up to his execution. The proceedings have culminated in both parties moving for summary judgment. (Docket Entry Nos. 38, 39).

The defendants bolster their summary judgment arguments with a May 13, 2019, statement Justice Kavanaugh entered respecting the granting of the stay. Justice Kavanaugh recounted that "Texas changed its unconstitutional policy, and it did so effective immediately. Texas now allows all religious ministers only in the viewing room and not in the execution room." Justice Kavanaugh went further to opine on the legal effect of the new policy:

> The new policy solves the equal-treatment constitutional issue. And because States have a compelling interest in controlling access to the execution room, as detailed in the affidavit of the director of the Texas Correctional Institutions Division and as indicated in the prior concurring opinion in this case, the new Texas policy likely passes muster under the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 114 Stat. 803, 42 U.S.C. § 2000cc et seq., and the Free Exercise Clause.
>
> Put simply, this Court's stay facilitated the prompt resolution of a significant religious equality problem with the State's execution protocol and should alleviate any future litigation delays or disruptions that otherwise might have occurred as a result of the State's prior discriminatory policy.

*Murphy*, 139 S. Ct. at 1476 (statement of Kavanaugh, J.). In arguments expanding on Justice Kavanaugh's statement, the defendants argue that the Court should grant summary judgment on the execution-chamber claim.[1]

---

[1] The defendants unpersuasively raise various procedural arguments. For example, the defendants argue that Murphy has not litigated with diligence, although the Supreme Court's earlier stay in this case suggests otherwise. The defendants also argue that the Prison Litigation Reform Act ("PLRA") bars federal review of Murphy's claims because he did not properly exhaust available administrative remedies before filing suit in federal court. *See* 42 U.S.C. § 1997e(a). The Supreme Court has emphasized that exhaustion of all administrative procedures is mandatory before an inmate can file any suit. *See Jones v. Bock*, 549 U.S. 199, 212 (2007). The Supreme Court has not recognized a futility exception to the exhaustion requirement. *See Booth v. Churner*, 532 U.S. 731, 741 n. 6 (2001). Requiring inmates to exhaust remedies through the prison grievance process serves to "give[] officials a fair opportunity to address the problem that will later form the basis of the lawsuit." *Johnson v. Johnson*, 385 F.3d 503, 517 (5th Cir. 2004). Texas employs a two-step grievance process that first allows a Warden to address problems and then permits an inmate to appeal to TDCJ Central Grievance Office. Before filing this lawsuit, however, Murphy's attorneys communicated about his concerns with general counsel for TDCJ. He sought relief in the state courts through a petition for a writ of prohibition. *Ex parte Murphy*, 2019 WL 1379859, at *1 (Tex. Crim. App. 2019). Lorie Davis explained in her deposition that the policy was changed through consultation between her, TDCJ general counsel, and Bryan Collier. (Dkt. 38, Exh. 7 at 64). Only Ms. Davis, however, apparently has signature authority to change TDCJ policy. (Dkt. 38, Exh. 7 at 68); Dkt. 38, Exh. 2 at 17; Dkt. 38, Exh. 3 at 19). There is no indication in the record that filing a prison grievance for review by a warden and then administrative staff would be productive when they have no ability to change TDCJ execution protocol. It appears that Murphy has effectively satisfied the spirit of the exhaustion rule. Dismissing this action for failing to file prison grievances when the issues

The defendants also argue that Texas' pre-execution protocol does not favor one religion over another. The defendants specifically argue that the presence of TDCJ clergy during the time when other spiritual advisors are excluded from in-person contact poses no constitutional concern. The defendants argue that prison clergy "serve three distinct roles in prison: (1) to personally conduct religious worship services and education in his or her own faith where there is a need; (2) to facilitate and encourage religious exercise for all faiths; and (3) secular administrative tasks such as notifying an offender of a family member's death." (Dkt. 39 at 25). In the condemned inmate's final hours, "[t]he chaplains' role is to act as a consistent and calming presence for the condemned throughout the day, retrieving items requested by the condemned, offering and serving coffee and pastries to the condemned, facilitating phone calls, answering questions about the process, and serving as an active listener should the condemned want to talk." (Dkt. 39 at 26).

TDCJ chaplains will listen to all inmates regardless of religious affiliation, chat with them, and comfort them. Texas protocol prohibits TDCJ clergy from pressuring an inmate to change his religious preference. (Dkt. 39, Exh. F at 2). TDCJ chaplains "are trained to facilitate all religious exercise and are encouraged to learn about the many faiths represented in TDCJ." (Dkt. 39 at 27). The defendants thus argue that the personal religious preference of the Christian and Muslim TDCJ-employed clergy does not discriminate against other faiths. In fact, the defendants say that the TDCJ chaplains "may pray with the condemned in the offender's faith if he so requests." (Dkt. 39 at 30).

---

have already been passed upon by the TDCJ director and the state courts would prioritize hollow formality over the religious rights of a man condemned to die soon. The defendants likewise argue that Murphy has not complied with the applicable statute of limitations. The parties have not yet provided sufficient factual or briefing on that issue, particularly with regard to the pre-execution access to spiritual advisors.

Murphy's summary judgment motion emphasizes that point. All of the TDCJ chaplains currently authorized to attend an inmate's final hours are Christian.[2] "While all three of the Christian chaplains who currently work in the death house on the day of an execution would pray with a Christian inmate, none of the three would recite the declaration of faith with a Muslim inmate if asked to do so because each believes doing so would violate their faith." (Dkt. 38 at 18). "No TDCJ chaplain would be expected to recite the declaration of faith with a Muslim inmate or chant with a Buddhist inmate if that chaplain believed doing so would violate his or her faith." (Dkt. 38 at 13).

Murphy supports his summary judgment motion with the depositions of TDCJ-employed chaplains. Each of the three TDCJ chaplains currently authorized to work in the death house would pray with inmates of their same faith. The TDCJ-employed chaplains varied somewhat in how they would interact with a condemned inmate of a different faith. In a deposition, one of the chaplains explained: "I could only pray according to my faith and my belief. If they have something that's different – for instance, Buddhists, I don't know their chants. I don't know what they say, so I couldn't offer them any prayers. I take that back. I could offer them prayers, but it wouldn't be the way they wanted it." (Dkt. 38, Exh. 4 at 24-25). He said it would not "be fair" to mimic the Buddhist chants with the offender "[b]ecause it wouldn't be something that I believe or something that I would practice. So I don't know that I could do it." (Dkt. 38, Exh. 4 at 24-25). Another chaplain would not "feel comfortable" chanting with a Buddhist inmate.

---

[2] Texas has a "team of three" chaplains in the death house on the day of an execution. (Dkt. 38, Exh. 4 at 27). Currently, Timothy Jones, Thomas Brouwer, and Wayne Moss serve as chaplain for an inmate's final hours. Until Texas changed its policy, they rotated which chaplain would accompany the inmate into the execution chamber. (Dkt. 38, Exh. 4 at 27-28). It appears that a TDCJ-employed Muslim chaplain has been in the death chamber when an inmate so requested, but it is not clear if he was present in the death house as the execution approached. (Dkt. 38, Exh. 8 at 26-27).

(Dkt. 38, Exh. 6 at 32). The third chaplain was "not really sure," but would not chant with a Buddhist inmate if it would violate his faith. (Dkt. 38, Exh. 8 at 30-31).

With that background, Murphy argues that the current Texas policy is not neutral toward religion, and also impedes the free exercise of his own. Murphy argues that "[b]eing able to chant with his spiritual advisor until the moment he enters the execution chamber would greatly assist him in maintaining th[e] focus" he needs to "be reborn in the Pure Land and work towards enlightenment" by "remain[ing] focused on Buddha while dying." (Dkt. 38 at 15). Murphy argues that allowing his spiritual advisor to remain in the death house after 4:00 pm would have no impact on prison resources.

## Motion to Stay Murphy's Execution

During the pendency of this lawsuit, and ongoing proceedings in the Supreme Court, the State of Texas set a new execution date of November 13, 2019. The parties attempted to settle this lawsuit. While the parties mediated in good faith, they could not reach an agreement. Murphy's lawsuit can only proceed if the Court issues a preliminary injunction, temporary restraining order, or stay of execution. With the execution date approaching, the Court ordered a briefing schedule regarding the question of whether to enter a stay or injunction. Murphy's motion to stay is currently pending before the Court. (Dkt. 55). The defendants have filed an opposition. (Dkt. 56).

A prisoner condemned to death, however imminent that death may be, has no automatic entitlement to a stay of execution. *See McFarland v. Scott*, 512 U.S. 849, 858 (1994). "A stay of execution is an equitable remedy that is not available as a matter of right." *Wood v. Collier*, 836 F.3d 534, 538 (5th Cir. 2016). A court considering a motion to stay an execution must consider the four factors outlined in *Nken v. Holder*, 556 U.S. 418, 433-34 (2009): "(1) whether the

movant has made a showing of likelihood of success on the merits, (2) whether the movant has made a showing of irreparable injury if the stay is not granted, (3) whether the granting of the stay would substantially harm the other parties, and (4) whether the granting of the stay would serve the public interest." *In re Campbell*, 750 F.3d 523, 534 (5th Cir. 2014) (quotation omitted).

**Analysis**

This lawsuit involves Murphy's rights in two distinct periods: (1) his pre-execution access to a spiritual advisor of choice, rather than a TDCJ-employed chaplain and (2) the presence of his spiritual advisor in the execution chamber. The Supreme Court stayed Murphy's execution when the State only gave TDCJ-employed chaplains access to the execution chamber. Texas resolved the concerns which led to that stay. In his current motion to stay, however, Murphy argues that "the disparate treatment of different religions continues to exist in the holding area where a condemned inmate is held in the hours before he is executed. The defect Justice Kavanaugh identified last March has simply not been eradicated by this policy adopted by TDCJ on April 2d." (Dkt. 55 at 7).

Murphy grounds his lawsuit in the First Amendment to the United States Constitution which commands that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const., amend. I. "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982). The Supreme Court has repeatedly emphasized "this principle of denominational neutrality . . . ." *Id*. at 246; *see also Abington School District v. Schempp*, 374 U.S. 203, 305 (1963) (Goldberg, J., concurring) ("The fullest realization of true religious liberty requires that government . . . effect no favoritism among sects or between religion and nonreligion"). Yet his lawsuit, like many brought by prisoners

seeking to protect their rights under the First Amendment and RLUIPA, sits across a balance between an inmate's religious beliefs and penological practice.

"[T]here is no question that, if Murphy were not in prison, Texas could not tell him that the only cleric he could have at his side" as he prepared for death "is one who is approved by the State." *Murphy*, 139 S. Ct at 1481 (Alito, J., dissenting). Security, however, is of paramount concern in the implementation of a State's execution protocol. Issues of prison security are "peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence . . . that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Pell v. Procunier*, 417 U.S. 817, 827 (1974).

With those competing interests, the questions raised by this lawsuit are "not simple, and they require a careful consideration of the legitimate interests of both prisoners and prisons." *Murphy*, 139 S. Ct at 1484 (Alito, J., dissenting). The fact development and briefing has revealed that serious issues remain unresolved about the TDCJ-employed clergy's mission and how they will carry it out, specifically in relation to inmates not of their faith.

The defendants' summary motion depends on TDCJ clergy serving a primarily secular role in the execution process. While they clearly operate in a secular capacity by providing comfort and consolation to soon-to-be-executed inmates, the facts developed this far suggest that they may serve as more to inmates of certain faiths. Murphy moves to stay his execution because "contrary to Defendants' claim that the State's chaplains serve a purely secular purpose in the holding area, TDCJ's Christian chaplains in fact serve a religious function as well. Those chaplains have indicated they would pray with Christian inmates during this time but would not engage in any activity with a prisoner who adheres to a different faith if that activity did not

accord with the chaplain's personal religious faith." (Dkt. 55 at 7). Serious questions remain as to whether Texas' current policy unconstitutionally allows a Christian inmate in-person access to a state-employed religious adviser in the hours immediately before execution, while inmates of other religious denominations may only communicate with their religious advisors by telephone (and not communicate at all after a certain hour).

Murphy's deposition demonstrates valid concerns about the current TDCJ policy. During the hours before his last execution date was stayed, TDCJ chaplains interacted with Murphy. Murphy said in a deposition that "it could have been helpful" to have his religious advisor present before entering the execution chamber. (Dkt. 38, Exh. 13 at 37). The spiritual advisor could have helped Murphy chant and "continue [his] focus on Buddhism." *Id*. at 38. Murphy explained: "I would have rather had conversation with my reverend than with the chaplains I had there" during the hours before his first execution date was stayed. *Id*. at 37. As it was, as Murphy conversed with TDCJ-employed clergy the conversation "almost always, at one point, would turn towards religion." *Id*. at 33. Conversation continued about Murphy's conversion to Buddhism, and while TDCJ clergy never made explicit statements, Murphy felt "an underlying current of a little bit of pressure . . . to make a last-minute conversion to Christianity, maybe, you know, confess my sins and accept Christ. *Id*. at 34-35.[3]

Murphy's sense that TDCJ clergy wanted to convert him to their personal faith my have been subjective. Still, during those final hours in which TDCJ denied Murphy in-person access to his chosen spiritual advisor, he interacted with clergy who would "only pray according to [their] faith and [their] belief." (Dkt. 38, Exh. 4 at 24). If Murphy had a shared faith with the

---

[3] It may be true, as one chaplain stated in response to interrogatories: "Very seldom did we ever directly discuss matters of faith, and only if the offender wanted to discuss it." (Dkt. 38, Exh. I at 7). Still, the personal faith of that chaplain allowed him to assist in an inmate's conversion to Christianity in his final moments. (Dkt. 38, Exh. I at 7) ("[O]ne offender, who had become Muslim during his incarceration, asked the other chaplain and me if he could ask for forgiveness and return to Christianity. We told him that he could.").

TDCJ-employed chaplains, however, they could have prayed together.[4] While TDCJ policy may authorize chaplains to calm and comfort inmates, in practice they may provide spiritual support only to inmates of certain faith groups. Any denominational discrimination could be diffused by (1) ending all contact with all clergy at the same hour for all inmates or (2) allowing all inmates equal access to their chosen spiritual advisors before they enter the death chamber.

As this case proceeds, the Court will have to explore the relationship between the State's secular purpose and its use of prison-employed chaplains.[5] Litigation has not fleshed out why it is imperative for the State to accomplish its secular purpose – to calm and comfort inmates – using chaplains rather than other trained professionals. Presumably, the secular purpose which the TDCJ clergy perform could likewise be provided by a trained individual whose position does not carry with it the imprimatur of a specific religion.

Attendant to that concern, this case may turn on whether the State's procedures are the least restrictive means or whether ready alternatives exist to the policy.[6] The record is not clear yet as to whether other accommodations may fulfill the inmate's religious expectations while maintaining the heightened security necessary for a successful execution. Courts generally defer to the judgment of prison officials. *See O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987) ("[W]e have often said that evaluation of penological objectives is committed to the considered

---

[4] Chaplain Jones explained in his deposition that he would not pray with a Muslim or Buddhist offender, but would pray with a Christian inmate. (Dkt. 38, Exh. 4 at 24, 37-38). Chaplain Brouwer would pray with an inmate but would not feel comfortable chanting with a Buddhist inmate. (Dkt. 38, Exh. 6 at 31-33). If it did not "compromise [his] faith," Chaplain Moss "probably would" be supportive and chant with a Buddhist inmate. (Dkt. 38, Exh. 8 at 23-24).

[5] Under the reasonableness test set forth in *Turner v. Safley*, 482 U.S. 78, 89-90 (1987), a court asks whether a "valid, rational connection exists between the prison regulation and the legitimate governmental interest put forward to justify it."

[6] RLUIPA prevents the government from "impos[ing] a substantial burden on the religious exercise of a person residing in or confined to an institution . . . unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling government interest." 42 U.S.C. § 2000cc-1(a). Under *Turner*'s reasonableness test, a court asks whether there is an "absence of ready alternatives" to the regulation in question. *Turner*, 482 U.S. at 90.

judgment of prison administrators . . . ."). The defendants emphasize security and logistical concerns relating to the presence of non-TDCJ employees as the time for execution nears. The defendants rely on "TDCJ's legitimate interests in protecting the confidentiality of the drug team, ensuring sufficient time for preparations, and ensuring security and control in the hours of escalating tension before an execution." (Dkt. 40 at 15).[7] For instance, the defendants argue that, "[w]hen an outsider arrives and departs from the holding area, he must be escorted through corridors in which he may cross paths with members of the confidential drug team." (Dkt. 40 at 22). The State's interests at that stage are compelling. But the facts are thin as to whether alternative means may exist to shield the identity of participants in the execution and allow the proceedings to go forward while an inmate spends time with the spiritual advisor of his choosing. The record to date does not provide any information about whether the condemned inmate could be held in a location where his spiritual advisor would be unable to view the execution preparations. Litigation to date has not developed whether some alternative arrangement may be possible to preclude interaction between outside clergy and the process of preparing for an execution.

In sum, the Supreme Court once stayed this case on an equal-treatment theory, that the State's policy discriminated against some inmates. The concerns raised by the amended complaint's focus on the pre-execution procedure are as compelling as those in the original complaint. If Murphy were Christian, he would have the benefit of faith-specific spiritual support until he entered the execution chamber; as a Buddhist he is denied that benefit. The

---

[7] Davis explained that having a non-TDCJ employee in the death house could present a security concern and risk divulging the identity of those participating in the execution team: "It would not be possible to allow an outside spiritual advisor to be present in the holding area from 4:00 to 6:00 p.m. without compromising the confidentiality of the execution team, who are moving about the area in preparation, and without compromising security as personnel secure the area in and around the execution chamber and holding area." (Dkt. 39, Lorie Davis' Answers to Interrogatories, Exh. L, at 6).

defendants have provided justifications for why things are done as they are, but the facts have not yet clarified whether it is the only, or even best, way. Murphy's "claims are dependent on the resolution of fact-intensive questions that simply cannot be decided without adequate proceedings and findings at the trial level." *Murphy*, ___ U.S. ___, 139 S. Ct at 1481 (Alito, J., dissenting). Answering those questions can only be done by staying the impending execution date. A stay will allow the Court time to explore and resolve serious factual concerns about the balance between Murphy's religious rights and the prison's valid concerns for security.

## Conclusion

As it now stands, the record is insufficient to grant summary judgment and adjudicate the instant amended complaint. The Court, therefore, **DENIES** both pending summary judgment motions. (Dkt. 38, 39). The Court also **DENIES** the pending motion to compel discovery **WITHOUT PREJDUICE** to reurging. (Dkt. 35). The Court **GRANTS** the plaintiff's motion for a stay of execution. (Dkt. 55).

SIGNED this day 7th day of November, 2019.

_____
George C. Hanks Jr.
United States District Judge