Case 4:19-cv-01106   Document 91   Filed on 06/24/20 in TXSD   Page 1 of 15

United States District Court
Southern District of Texas
**ENTERED**
June 24, 2020
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

PATRICK HENRY MURPHY, §
§
*Plaintiff*, §
§
v. §
§ CIVIL ACTION NO. H-19-1106
TDCJ EXECUTIVE DIRECTOR, §
BRYAN COLLIER, et al., §
§
*Defendants*. §

## ORDER ON MOTION FOR RECONSIDERATION

Patrick Henry Murphy, an inmate on Texas' death row, filed suit under 42 U.S.C. § 1983 because the defendants will limit access to his chosen spiritual advisor before and during his execution. This Court has denied summary judgment. (Dkt. 57). This case was scheduled for trial. The defendants have moved for reconsideration and seek summary judgment on Murphy's claims involving his religious rights in the execution chamber. (Dkt. 78). For the reasons discussed below, the Court **denies** the defendants' motion for reconsideration.

## Background

Murphy's original complaint challenged Texas Department of Criminal Justice ("TDCJ") protocol that would allow a prison-employed chaplain, but not his chosen Buddhist spiritual advisor, to accompany him during the execution of his death sentence. (Dkt. 1). Murphy's execution-chamber claims relied on (1) the First Amendment's Establishment Clause; (2) the First Amendment's Free Exercise Clause; and (3) the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc, et seq. ("RLUIPA"). (Dkt. 1).

Murphy filed this lawsuit in 2019 while facing an execution date.

Murphy filed this lawsuit in 2019 while facing an execution date. When the Supreme Court stayed Murphy's execution on March 28, 2019, Justice Kavanaugh entered a concurring statement which counseled Texas on how it could change its execution protocol. Justice Kavanaugh proposed that "there would be at least two possible equal-treatment remedies available to the State going forward: (1) allow all inmates to have a religious adviser of their religion in the execution room; or (2) allow inmates to have a religious adviser, including any state-employed chaplain, only in the viewing room, not the execution room." *Murphy v. Collier*, 139 S. Ct. 1475 (2019) (Kavanaugh, J., concurring).

TDCJ revised its execution policy on April 2, 2019. The relevant portion of the TDCJ procedure now states that the Correctional Institutions Director (or her designee) and the Huntsville Unit Warden (or his designee) are the only two employees who may be inside the execution chamber during an execution. (Dkt. 22, Ex. A at 8). Members the drug team enter and exit the execution chamber during the time immediately prior to administration of the execution drugs. Texas state law shields the identity of the drug team members. *See* Tex. Code Crim. Pro. art. 43.14; *Tex. Dep't of Crim. Just. v. Levin*, 572 S.W.3d 671, 680–85 (2019) (concluding that disclosing the identity of people or companies involved in the execution-drug process would cause them a substantial risk of harm). No spiritual advisors, not even the TDCJ employees who formerly could provide spiritual comfort to the condemned, are now allowed at the inmate's side during an execution.

After TDCJ changed its policy, members of the Supreme Court issued two statements. First, Justice Alito (joined by Justices Thomas and Gorsuch) entered a May 13, 2019, statement dissenting from the Supreme Court's earlier order. Justice Alito's dissent argued that the Supreme Court should not have stayed Murphy's execution because he had not filed his section 1983 lawsuit

in a timely manner. Justice Alito, however, went on to opine that the First Amendment issues in the case were not easily decided. Justice Alito highlighted that the "flimsy record" precluded any decision about whether Texas could safely accommodate Murphy's request to have his spiritual advisor in the execution chamber. Justice Alito stated "that the prison setting justifies important adjustments in the rules that apply outside prison walls. Determining just how far those adjustments may go is a sensitive question requiring an understanding of many factual questions that cannot be adequately decided on the thin record before us." Additionally, "unresolved factual issues" remained about whether the current policy furthers TDCJ's "compelling interest in security," "is narrowly tailored to serve that interest," and "can be sustained on that basis . . . ." *Murphy*, 139 S. Ct. at 1484 (Alito, J., dissenting from grant of application for stay).

In response to Justice Alito's dissent, Judge Kavanaugh authored a statement which Chief Judge Roberts joined. Justice Kavanaugh recounted that "Texas changed its unconstitutional policy, and it did so effective immediately. Texas now allows all religious ministers only in the viewing room and not in the execution room." Justice Kavanaugh went on to opine:

> The new policy solves the equal-treatment constitutional issue. And because States have a compelling interest in controlling access to the execution room, as detailed in the affidavit of the director of the Texas Correctional Institutions Division and as indicated in the prior concurring opinion in this case, the new Texas policy likely passes muster under the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 114 Stat. 803, 42 U.S.C. § 2000cc et seq., and the Free Exercise Clause.
>
> Put simply, this Court's stay facilitated the prompt resolution of a significant religious equality problem with the State's execution protocol and should alleviate any future litigation delays or disruptions that otherwise might have occurred as a result of the State's prior discriminatory policy.

*Murphy*, 139 S. Ct. at 1476 (statement of Kavanaugh, J.).

The changes to TDCJ policy did not end legal challenges to its execution protocol. After TDCJ revised its policy to bar all spiritual advisors from the death chamber, Murphy amended his

3

complaint and added additional arguments about limitations on access to his spiritual advisor in the hours before an execution. The parties moved for summary judgment. (Dkts. 38, 39). The State of Texas obtained a death warrant setting a new execution date. This Court entered an order denying summary judgment and staying Murphy's execution. (Dkt. 57). This Court's order focused on factual issues needing development regarding pre-execution access to Murphy's spiritual advisor. The Fifth Circuit affirmed the stay of execution. *See Murphy v. Collier*, 942 F.3d 704, 706 (5th Cir. 2019).

The defendants have now filed a Motion for Reconsideration of the Court's Order. (Dkt. 78). The defendants argue that this Court should grant summary judgment on Murphy's execution-chamber claims.

The concerns raised by this lawsuit have impacted the rights of other death-row inmates. In a separate lawsuit, Texas death-row inmate Ruben Gutierrez sued because he wanted a TDCJ-employed chaplain to accompany him in the execution chamber. *Gutierrez v. Saenz*, 1:19-cv-00185 (S.D. Tex.). Gutierrez alleged that TDCJ violated his rights under the First Amendment and RLUIPA by taking away from him what it had long allowed other inmates: the right to spiritual comfort in his final moments. In that on-going litigation, the District Court recently denied TDCJ's motion to dismiss and stayed Gutierrez's execution. After the Fifth Circuit reversed, *see Gutierrez v. Saenz*, 2020 WL 3250040, at *1 (5th Cir. 2020), the Supreme Court stayed Gutierrez's execution and issued a short order on June 16, 2020. The Supreme Court ordered that "[t]he District Court should promptly determine, based on whatever evidence the parties provide, whether serious security problems would result if a prisoner facing execution is permitted to choose the spiritual adviser the prisoner wishes to have in his immediate presence during the execution." *Gutierrez v. Saenz*, 2020 WL 3248349, at *1 (2020).

## Summary Judgment Standard

The defendants have renewed their motion for summary judgment on both Murphy's RLUIPA and First Amendment claims. Summary judgment should be granted when the moving party conclusively establishes that there is no genuine issue of material fact. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Fed. R. Civ. P. 56(c) precludes summary judgment when there is a genuine dispute involving facts that might affect the outcome of the lawsuit. *Anderson*, 477 U.S. at 248.

## Analysis

The parties' briefing on the motion for reconsideration relies heavily on the earlier summary judgment briefing. (Dkts. 38-41).[1] In addition to reurging arguments from the summary judgment motion, the defendants argue that Murphy has waived any execution-chamber claim. (Dkt. 89 at 2-3). The Court will first address the defendants' waiver agreement before turning to the other issues raised in the motion for reconsideration.

### I. Waiver

For the first time in their reply, the defendants argue that Murphy has waived his execution-chamber claims. (Dkt. 89 at 2-3). Murphy's briefing relating to summary judgment extensively discussed his execution-chamber claims. This Court did not grant summary judgment on the

---

[1] Rule 54(b) of the Federal Rules of Civil Procedure states that "any order or other decision, however designated, that adjudicates fewer than all claims or the rights and liabilities of fewer than all the parties . . . may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b). The defendants repeatedly state that summary judgment is appropriate because Murphy previously did not respond to their summary judgment motion. The parties moved for summary judgment on the same date. (Dkts. 38, 39). Murphy intended his own summary judgment motion to constitute a response to the Defendants' motion. (Dkt. 41 at 1) ("Because Plaintiff believes his Motion for Summary Judgment, ECF No. 38, fully responds to Defendants' Motion, Plaintiff has not filed and does not intend to file a Response to Defendants' Motion for Summary Judgment.).

execution-chamber claims and Murphy has not affirmatively abandoned those claims.[2] The defendants' argument rests on how Murphy briefed a motion to stay. Murphy's motion for a stay briefly mentioned, but did not extensively address, his execution-chamber arguments. (Dkt. 55 at 5-6). The defendants state that "Murphy was granted a stay of execution only as to his claims related to the pre-execution holding area. [ECF No. 57]. Murphy then failed to assert, on appeal, that he was entitled to a stay of execution as to his challenge to the execution chamber policy." (Dkt. 55 at 3). The defendants argue that Murphy waived his execution-chamber claims because "[i]n his briefing [from this Court's order staying his execution], Murphy did not argue that he was likely to succeed on his RLUIPA claims or his execution chamber claims." (Dkt. 89 at 2).

As an initial matter, the defendants have not provided any legal justification for their argument that by failing to litigate claims in a stay (or preliminary injunction) motion a party waives claims from the active complaint. The defendants have not provided any controlling law showing that by seeking a stay on one claim a party waives all others.

More importantly, the record does not support the defendants' argument that Murphy waived his claims. The path this Court took in denying summary judgment and staying the execution channeled the issues that the parties briefed on appeal. In his briefing before the Fifth Circuit, Murphy discussed his strategy relating to the execution-chamber claims:

> In this section, Counsel briefly summarize the arguments raised in the district court related to the merits of Murphy's Establishment Clause claim and, specifically, the portion of that claim pertaining to disparate treatment during the time before an inmate enters the execution chamber *because that claim is the one the district court found to be compelling (and because Counsel are working to keep the number of words in this response comparable to the number in Defendants' Motion)*. Accordingly, that claim is the one that is most relevant to this pleading responding

---

[2] The defendants seek clarification on whether Murphy's execution-chamber challenges are active claims. This Court's earlier order only addressed the question of a stay; it did not grant the defendants' motion for summary judgment on Murphy's execution-chamber claims. Those claims are still actively available for adjudication. This Court has ordered that a trial be held on Murphy's claims relating to his pre-execution access to his chosen spiritual advisor. The Court must decide whether the parties should address Murphy's execution-chamber claims at trial.

6

> in opposition to Defendants' Motion to Vacate. *Counsel believes Murphy will likely ultimately prevail on all of his claims once he is given the opportunity to further develop his claims in district court. For a more complete argument on the merits of all of Murphy's claims, see ECF No. 38 at 15-27.*

Plaintiff-Appellee's Response in Opposition to Motion to Vacate Stay of Execution, *Murphy v. Collier*, No. 19-20019, filed Nov. 10, 2019, at 26 n.8 (emphasis added). Contrary to the defendants' argument, Murphy's appellate briefing did not signal any abandonment of claims. The defendants' waiver argument does not accurately reflect the record and is without any support.

## II. RLUIPA

Murphy argues that the TDCJ policy barring his chosen spiritual advisor from the execution chamber violates his rights under the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA or Act), 114 Stat. 804, 42 U.S.C. § 2000cc-1(a)(1)-(2). RLUIPA provides in part: "No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution," unless the burden furthers "a compelling governmental interest," and does so by "the least restrictive means." RLUIPA "alleviates exceptional government-created burdens on private religious exercise." *Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005).

The defendants raise two primary arguments for reconsideration of the RLUIPA claim. First, the defendants rely on statements by Justice Kavanaugh to argue that Murphy's RLUIPA challenge to the revised execution chamber policy is without merit. (Dkt. 78 at 2). Second, the defendants contend that Murphy has not met his preliminary duty under RLUIPA to show that the challenged policy places a substantial burden on his religious exercise. (Dkt. 78 at 4). The defendants argue that Murphy's summary judgment evidence only relates to the pre-execution access to a spiritual advisor, not access in the execution chamber, (Dkt. 78 at 5), and that Murphy testified in a deposition that the current execution protocol will not burden his religious beliefs (Dkt. 6). The Court finds that summary judgment is not proper on Murphy's RLUIPA claim.

7

A. Justice Kavanaugh's Statements

Throughout the motion for reconsideration the defendants rely on statements Justice Kavanaugh has made to argue that Murphy's claims lack any merit. However, it is axiomatic that the statements of a single Supreme Court justice do not create binding precedent.[3] The defendants err in relying on Justice Kavanaugh's statements as binding legal authority.

Further, Justice Kavanaugh's statements do not predict how the Supreme Court may consider issues after fuller development. The Supreme Court considered Murphy's claims under a different legal framework than now before the Court. This case previously came before the Supreme Court through Murphy's request for a stay his execution, which a court considers under the same standard a preliminary injunction. *See Sells v. Livingston*, 561 F. App'x 342, 343 (5th Cir. 2014) (reciting the same factors for a preliminary injunction or a stay of execution). "[T]he standards governing a motion for a preliminary injunction and a motion for summary judgment are entirely different." *Bruni v. City of Pittsburgh*, 824 F.3d 353, 361 n. 11 (3rd Cir. 2016); *see H & W Industries, Inc. v. Formosa Plastics Corp., USA*, 860 F.2d 172, 177 (5th Cir. 1988) ("[I]ssues which are considered in the preliminary injunction hearing are entirely different from the focus of a summary judgment adjudication.").[4] The comments of a Supreme Court justice in a statement

---

[3] In the order staying the case, the Court state that "[t]he Supreme Court stayed Murphy's execution when the State only gave TDCJ-employed chaplains access to the execution chamber. Texas resolved the concerns which led to that stay." (Docket No. 57 at 9). In doing so, the Court did not endorse Justice Kavanaugh's statement or make any conclusive determination about constitutional issues. The Court merely observed that the State no longer treated inmates differently in the execution chamber according to their religious beliefs.

[4] One court has identified concerns about transposing findings and conclusions from the preliminary-injunction context onto a summary judgment adjudication:

> A court must be cautious in adopting findings and conclusions from the preliminary injunction stage in ruling on a motion for summary judgment for two reasons. First, a court's findings of fact and conclusions of law at the preliminary injunction stage are often based on incomplete evidence and a relatively hurried consideration of the issues. 11 C. Wright & A. Miller, Federal Practice and Procedure: Civil § 2950 (1973). Second, the questions focused on differ in deciding a motion for preliminary injunction and in deciding a motion for summary judgment. In the former a court considers whether there is a reasonable

concerning a preliminary injunction do not decide issues as a matter of law on summary judgment review.[5]

This case comes before the Court with insight from appellate opinions addressing earlier stay requests. While those opinions may provide important perspective, the slim facts that the parties had developed by that point in the litigation limit their precedential effect. Since those appellate opinions issued, the parties have developed a rich factual record and have sharpened their legal arguments. Earlier comments framed under preliminary injunction standards do not conclusively decide constitutional and statutory issues remaining in this case.

### B. Burden on Religious Exercise

The remainder of the defendants' arguments focus on whether it will be a substantial burden on Murphy's religious exercise for his chosen spiritual advisor to chant in the viewing area rather than be in the execution chamber. The defendants argue that "Murphy's 'preference' for having his spiritual advisor in the chamber falls far short of a substantial burden" on his religious rights. (Dkt. 89 at 7). The defendants have not identified any law sanctioning the dismissal of a

---

likelihood that the moving party will prevail on the merits; in the latter a court considers whether there is any issue of material fact remaining after construing the facts in a light most favorable to the non-moving party. 11 C. Wright & A. Miller, Federal Practice And Procedure: Civil § 2950 (1973); *see also Technical Publishing Co. v. Lebhar-Friedman, Inc.*, 729 F.2d 1136, 1139 (7th Cir. 1984) (there is no inconsistency in denying plaintiff's motion for preliminary injunction and denying defendant's motion for summary judgment).

*Communications Maintenance, Inc. v. Motorola, Inc.*, 761 F.2d 1202, 1205 (7th Cir. 1985); *see also H & W Industries, Inc. v. Formosa Plastics Corp.*, 860 F.2d 172, 177 (5th Cir. 1988) (stating that "it is a risky approach to assume that the often incomplete evidence adduced at a preliminary injunction hearing is sufficient to determine whether a claimant is entitled to judgment as a matter of law").

[5]      Additionally, the Supreme Court recently stayed an execution raising similar issues. In doing so, the Supreme Court gave the District Court the mandate to "promptly determine, based on whatever evidence the parties provide, whether serious security problems would result if a prisoner facing execution is permitted to choose the spiritual adviser the prisoner wishes to have in his immediate presence during the execution." *Gutierrez v. Saenz*, ___ S. Ct. ___, 2020 WL 3248349, at *1 (2020). The language in the stay order suggests that at least some justices see the main issues in these cases as being whether TDCJ has valid security concerns and whether they have developed the least restrictive means of addressing those concerns.

RLUIPA claim based on religious devotion preferred by an inmate rather than compelled by his religion.[6] Instead, the defendants argue that Murphy testified in his deposition "that the thing that is important—in fact, the only thing that is important—is knowing that his spiritual advisor is there." (Dkt. 89 at 7). The defendants construe Murphy's testimony as meaning that hearing his spiritual advisor in the viewing area will sufficiently meet his religious needs.

The parties debate the meaning of Murphy's deposition testimony. On one hand, the defendants argue that: "it is not important that Murphy hear his spiritual advisor chanting during his execution; rather, 'knowing he is there is what's important'." (Dkt. 78 at 6). On the other hand, Murphy contends that "Murphy's testimony, contrary to Defendants' assertion, was precisely that it is important to him that he hear his spiritual advisor." The parties based their arguments on one portion of Murphy's deposition:

> Q. So in the execution chamber, if the reverend was in there, do you say these chants with your eyes closed or would you look at each other and say the chants?
>
> A. No, ma'am. I wouldn't even say that I might—I would chant with my eyes closed. Probably with my eyes open. And we wouldn't necessarily be looking at one another, you know, but I would hear him, you know.
>
> Q. Okay. So is hearing him what is important to his presence?
>
> A. I think knowing he is there is what's important. It's more—more relaxing to—you know, knowing that he is there to represent our faith and help me in this transition.

(Dkt. 38, Exhibit 13 at 42). Murphy did not disclaim that he wished for his advisor to be present, and never stated that his presence in the viewing area would satisfy his religious desires. Murphy elsewhere said that his "lawsuit has to deal with having a minister in the actual execution" because

---

[6] The Supreme Court has "not addressed whether . . . there is a difference between a State's interference with a religious practice that is compelled and a religious practice that is merely preferred." *Murphy*, 139 S. Ct. at 1484 (Alito, J., dissenting from grant of application for stay).

"I believe his presence will help me with the focus for my transition." (Dkt. 39, Ex. E at 41). The parties' debate on the meaning of Murphy's statements highlights that summary judgment would not be appropriate on this issue.

Further, important facts remain unclear about the execution chamber. The parties agree that "[p]eople in the viewing rooms can clearly hear the offender. The offender can hear only muffled sounds through the glass from the people in the viewing rooms." (Dkt. 83 at 7).[7] Murphy indicated that he would want to hear his spiritual advisor to know he was present. At this point, the evidence has not established whether the plexiglass will transmit the sound of chanting. The facts do not yet clarify whether an inmate can hear chanting from the viewing area or can only hear unintelligible muffled sounds.

The defendants' RLUIPA arguments strongly emphasize the important security issues involved in carrying out a death sentence. The defendants urge that "Murphy's requests must be considered in the context of the tense and careful process of carrying out an execution." (Dkt. 39 at 13). According to the defendants, "there is no circumstance in which it would be safe or controlled for a non-TDCJ employee to be present in the execution chamber during an execution. The risks of permitting an unknown person in the execution chamber are significant." (Dkt. 39 at 16). Important questions remain about how TDCJ's new policy is in furtherance of a compelling governmental interest and whether it is the least restrictive means of furthering that compelling governmental interest. The Court will need to decide whether serious security problems would

---

[7] The defendants rely on this stipulation to state that "Murphy will be able to hear his spiritual advisor from the viewing room on the other side of the plexi glass; he will hear his voice although what he is saying may be muffled. ECF No. 83 at 7 (stipulated fact number 11)." (Dkt. 89 at 8). The defendants take the stipulation too far. The parties agree that some sounds carry through the plexiglass. Nothing in the record indicates whether those sounds are intelligible, much less sufficient to aid Murphy in his religious chanting during the execution. The defendants, in fact, have previously stated that "[p]eople in the viewing rooms can clearly hear the offender. The offender can hear only muffled sounds through the glass from the people in the viewing rooms." (Dkt. No. 26 at 12 n.8).

11

result from a prisoner facing execution having his chosen spiritual adviser present during the execution.

### III. First Amendment Claims

Murphy contends that excluding his chosen spiritual advisor from the execution chamber violates both the Establishment and Free Exercise Clauses of the First Amendment. The parties debate which standard should govern Murphy's First Amendment claims. For the purposes of this Order, the Court assumes that the reasonableness test from *Turner v. Safley*, 482 U.S. 78 (1987), governs those claims.[8] Under *Turner*, a court considers:

> (1) whether a "valid, rational connection [exists] between the prison regulation and the legitimate governmental interest put forward to justify it," (2) whether there exist "alternative means of exercising the fundamental right that remain open to prison inmates," (3) what "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally," and (4) whether there is an "absence of ready alternatives" to the regulation in question.

*Adkins v. Kaspar*, 393 F.3d 559, 564 (5th Cir. 2004) (quoting *Turner*, 482 U.S. at 89-90). "Courts, are not, however, required '"to weigh evenly, or even consider, each of these factors."'" *Fluker v. King*, 679 F. App'x 325, 330 (5th Cir. 2017) (quoting *Scott v. Miss. Dep't of Corrs.*, 961 F.2d 77, 80 (5th Cir. 1992)). "Factor one is controlling; the other factors merely help a court determine if the connection is logical." *Fluker*, 679 F. App'x at 330 (quotation omitted).

While citing the *Turner* test, the defendants do not provide briefing on each element of that analysis. Instead, the defendants' recent briefing primarily relies on Justice Kavanaugh's statement to argue that no genuine factual disputes preclude summary judgment on Murphy's First

---

[8] Murphy asks the Court to apply the more-stringent test from *Lemon v. Kurtzman*, 403 U.S. 602 (1971), when determining whether a government practice violates the Establishment Clause. Supreme Court law does not appear settled on which standard should govern Murphy's First Amendment claims. The Fifth Circuit, however, has applied the *Turner* to Free Exercise and Establishment Clause claims.

12

Amendment claims. (Dkt. 78 at 8-9). Justice Kavanaugh's statement is insufficient on its own to grant summary judgment.

The defendants' base much of their summary judgment arguments on the contention that "TDCJ's decision to exclude non-TDCJ employees from the execution chamber is clearly motivated by security concerns rather than discrimination against religion." (Dkt. 78 at 9). Security is a valid concern in an execution and substantial deference is given to prison officials in the exercise of their professional judgment. However, to be entitled to summary judgment, the record must be "sufficient to demonstrate that the policy is a reasonable one." *Prison Legal News v. Livingston*, 683 F.3d 201, 215 (5th Cir. 2012) (citations and quotations omitted). Murphy argues that he has "presented ample summary judgment that, at a minimum, raises an issue of material fact as to whether Defendants' policy is narrow-tailored to their security interest. The summary judgment evidence suggests an accommodation of Murphy's right would have little to no impact on guards and prison resources." (Dkt. 85 at 4). Murphy emphasizes that his chosen spiritual advisor has ministered to him in prison for many years without incident. Murphy argues that the same preparation necessary to train TDCJ-employed chaplains for execution could be made available to the spiritual advisor of an inmate's choice. (Dkt. 38 at 20). Murphy has shown that TDCJ provides minimal execution-specific training to its chaplains and has allowed their attendance at an execution after only a few months of employment. (Dkt. 38 at 16-18).

The defendants make the conclusory argument that "there are no ready alternatives that would allay the security risks of allowing an outsider in the execution chamber during an execution." (Dkt. 39 at 23-24). The core of the defendants' concern is that a spiritual advisor's ability to view the drug team whose identity is protected by state law. Murphy, however, responds that "Defendants are undoubtedly able to move members of the drug team as needed without

13

risking their identities being discovered by the inmate, and Defendants have offered no explanation regarding why these same procedures would be insufficient to ensure a spiritual advisor visiting the inmate would also be unable to discover the identities of the member of the drug team." (Dkt. 38 at 14). A serious fact question exists as to whether there are ready alternatives to the regulation in question.

### IV. Conclusion of Discussion Regarding the Defendants' Motion for Reconsideration

When the Supreme Court stayed Murphy's execution, three dissenting Supreme Court Justices commented that the issues "are not simple, and they require a careful consideration of the legitimate interests of both prisoners and prisons." *Murphy*, 139 S. Ct. at 1485 (Alito, J., dissenting from grant of application for stay). Important factual questions remain unresolved concerning the balance between TDCJ's interest and Murphy's religious rights. Accordingly, the Court **DENIES** the defendants' motion for reconsideration. (Dkt. 78).

### V. Additional Issues for Briefing

While not determinative of the issues in the motion for reconsideration, additional briefing would aid in judicial consideration as this case progresses. First, the parties debate what law will govern Murphy's First Amendment claims. For the purposes of this Order, the Court has assumed that the *Turner* reasonableness test governs those issues. If they choose, the parties may provide additional law from this and other circuits describing what constitutional test governs First Amendment claims in the prison context.

Second, history and tradition can inform a court's consideration of First Amendment concerns. *See Van Orden v. Perry*, 545 U.S. 677, 687 (2005) (looking to history and tradition in considering an Establishment Clause claim). The Court invites the parties to provide additional

information about what role the presence of clergy has played in executions throughout history, and in Texas specifically.

Third, the parties may provide information about what policies exist in other jurisdictions (other States, the federal government, and the military) regarding access to chaplains before an execution and in the execution chamber. If other jurisdictions limit access to clergy before or during an execution, the parties may provide information about what reasons they have given for doing so. If other jurisdictions allow greater access to spiritual advisors in the execution process, the parties may submit information about how they have accommodated any security concerns.

Fourth, the parties debate the level of training necessary for spiritual advisors to attend an execution. The defendants highlight the extensive training and experience TDCJ-employed clergy previously experienced before being allowed in the execution chamber. Murphy argues that clergy previously received no execution-specific training. The parties may each provide a concise summary of what training or experience a spiritual advisor should have before being allowed in the execution chamber, if so required by law.

The parties may submit the suggested briefing within thirty (30) days from the Entry of this Order.

**SIGNED** at Houston, Texas, on ___June 24_____, 2020.

_George C. Hanks Jr._
GEORGE C. HANKS, JR.
UNITED STATES DISTRICT JUDGE